Dockets.Justia.com

# COURT REPORTERS
## OF AKRON CANTON AND CLEVELAND

Transcript of the Testimony of
# Robert W. Vitale

**Taken On:** February 20, 2008
**Case Number:** 2:06-CV-2141-DGC

**Case:** Soilworks, LLC, vs. Midwest Industrial Supply, Inc.,

Court Reporters of Akron Canton and Cleveland
Phone: 800-804-7787
Fax: 330-666-9833
Email: reporters@compuserve.com
Internet: www.courtreportersinc.com

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

- - -

SOILWORKS, LLC, an Arizona          )

corporation,                        ) CASE NO.

  Plaintiff/Counterdefendant/) 2:06-CV-2141-DGC

  Counterclaimant,                  )

     vs.                          )

MIDWEST INDUSTRIAL SUPPLY,          )

INC., an Ohio corporation           )

authorized to do business in        )

Arizona,                            )

  Defendant/Counterclaimant/   )

  Counterdefendant.            )

- - -


    30(b)(6) Deposition of ROBERT W. VITALE, a

Witness herein, called by the

Plaintiff/Counterclaimant/Counterdefendant for

Examination pursuant to the Federal Rules of

Civil Procedure, taken before me, the

undersigned, Christina A. Arbogast, a Registered

Professional Reporter and Notary Public in and

for the State of Ohio, pursuant to Notice and

agreement of counsel at the law offices of

1    Vorys, Sater, Seymour and Pease, LLP, First

2    National Tower, 106 South Main Street, Suite

3    1100, Akron, Ohio, on Wednesday, the 20th day of

4    February, 2008, commencing at 10:03 o'clock a.m.

5                        - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **APPEARANCES:**

2

3    On Behalf of the

4    Plaintiff/Counterdefendant/Counterclaimant:

5         KUTAK ROCK LLP

6    BY:   John P. Passarelli, Attorney at Law

7         E. Scott Dosek, Attorney at Law

8         Suite 300

9         8601 North Scottsdale Road

10        Scottsdale, Arizona 85253-2742

11        480/429-5000

12

13   On Behalf of the

14   Defendant/Counterclaimant/Counterdefendant:

15        BROUSE McDOWELL

16   BY:   John M. Skeriotis, Attorney at Law

17        388 South Main Street, Suite 500

18        Akron, Ohio 44311-4407

19        330/535-9999

20

21                - - -

22

23

24

25

4

1                      I N D E X

2

3      EXAMINATION                          5

4

5

6      Plaintiff's Exhibits 8 and 9         44

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    ROBERT W. VITALE

2    of lawful age, a Witness herein, having been

3    first duly sworn, as hereinafter certified,

4    deposed and said as follows:

5                         EXAMINATION

6    BY MR. PASSARELLI:

7    Q.    Good morning.

8    A.    Good morning.

9    Q.    Could you please state your name for the

10   record?

11   A.    Robert Vitale.

12   Q.    You've had your deposition taken before, I

13   understand.

14   A.    Yes.

15   Q.    Approximately how many times?

16   A.    Oh, six or eight.

17   Q.    Have any of those been in connection with

18   the patents that are involved in this suit?

19   A.    No.

20   Q.    Have you ever -- strike that.  Has Midwest

21   Industrial Supply, Inc., ever sued anybody with

22   respect to the patents involved in this case?

23   A.    No.

24   Q.    Has Midwest Industrial Supply, Inc., ever

25   sued anybody with respect to the trademarks that
```

1    are involved in this lawsuit?

2    A.    No.

3    Q.    I'm going to hand you what has been marked

4    as -- or what has been served on your counsel,

5    it's an amended notice of 30(b)(6) deposition,

6    and ask if you've seen that.

7              MR. SKERIOTIS:    You want to mark it

8    as an exhibit?

9              MR. PASSARELLI:    If you want, I

10   could.

11             THE WITNESS:    I don't know that

12   I've seen -- I have seen the -- that, Exhibit A.

13   BY MR. PASSARELLI:

14   Q.    Exhibit A to the -- those are the

15   categories for which you're here to testify

16   today?

17   A.    Correct.  Right.

18   Q.    What did you do to prepare for your

19   deposition today?

20   A.    Talked with John.  That was about it.

21   Q.    When did you talk -- I don't want the

22   substance of your communication with

23   Mr. Skeriotis, but when did you talk to him?

24   A.    There were -- it was at the office two days

25   last week when your representative was in the

1   office and we were -- talked over the course of

2   those two days.

3   Q.   Mr. Peterson?

4   A.   Yes.

5   Q.   So these were personal meetings with

6   Mr. Skeriotis, or were they telephone or both?

7   A.   Personal.

8   Q.   And these took place at Midwest's offices?

9   A.   Correct.

10   Q.   And can you describe for me how long those

11   meetings with Mr. Skeriotis were in preparation

12   for this deposition in terms of minutes or

13   hours?

14   A.   I would say an hour, hour and a half.

15   Q.   Was there anybody present besides

16   Mr. Skeriotis when you had those conversations?

17   A.   No.

18   Q.   Did you review any documents in

19   connection -- at those meetings?

20   A.   We reviewed things like this.  It was

21   during that time that he showed me --

22   (Indicating.)

23   Q.   The 30(b)(6)?

24   A.   30(b)(6).

25   Q.   And the categories for which you were to

1  testify today?

2  **A.**  Yeah.  Correct.

3  **Q.**  But you didn't review any Midwest records

4  during that one and a half hours of meeting?

5  **A.**  No.  We went through, I think, the answers

6  to interrogatories.  Just filings as part of the

7  action.

8  **Q.**  The pleadings that were filed with the

9  court?

10 **A.**  Yeah.  And the answers to questions that we

11 had provided.

12 **Q.**  Do you recall reviewing any other

13 information or documentary materials in

14 connection with those discussions with

15 Mr. Skeriotis?

16 **A.**  I don't really recall and I -- I mean the

17 thing that I really recall is sitting down

18 with -- the two of us with all this stuff and

19 just, "Go to page so and so," and --

20 **Q.**  The two books, can you describe what those

21 are for me?

22 **A.**  The -- the filings, the interrogatories.

23        **MR. SKERIOTIS:**  I just want to

24 caution you not to discuss what we talked about.

25        **THE WITNESS:**  Yeah.  Oh, yeah.

1      **MR. SKERIOTIS:**    Objection.

2      **THE WITNESS:**    MeadWestvaco.

3   BY MR. PASSARELLI:

4   Q.    That's for packaging, right?

5   A.    They're in chemicals.

6   Q.    Okay.

7   A.    And they also are user chemicals for

8   packaging.  They sell packaging materials.

9   Q.    What chemicals -- I'm sorry.  What

10  chemicals do you buy from MeadWestvaco?

11  A.    One of the ingredients that we use in the

12  manufacture of several products of ours that --

13  it's a specially formulated tall oil pitch.

14  Q.    Specially formulated for Midwest?

15  A.    Correct.

16  Q.    Okay.  And, I'm sorry, you mentioned -- you

17  were going to --

18  A.    Petro-Canada is certainly a large supplier.

19  Dow Chemical.

20  Q.    Dow?

21  A.    Dow, D-o-w.  There are Rohm and Haas.

22  There are -- there are a number of, you know,

23  large vendors like that.

24  Q.    You mentioned the phrase "oil sheen"?

25  A.    Yes.  That's s-h-e-e-n.  Oil-sheen free.

1    Q.    And what do you mean by that?

2    A.    That is a requirement of the NPDES, the

3 National Pollution Distribution Elimination

4 System, regulation for storm water runoff that

5 oil sheens are violations and/or a condition

6 that is monitored for and which -- for which any

7 business has to get permitting in order for that

8 to be allowed.

9    Q.    So oil sheen is defined by a governmental

10 body?

11    A.    Yes.   US EPA.

12    Q.    And you believe that Soilworks is using the

13 phrase oil-sheen free with regard to products

14 that it should not?

15    A.    That's correct.

16    Q.    So you believe that Soilworks represents

17 certain of its products as oil-sheen free when,

18 in fact, they are not?

19    A.    Yeah.   The product Durasoil, yes.

20    Q.    Any other product besides Durasoil that you

21 believe should not be represented to be

22 oil-sheen free?

23    A.    That's the only one that they so represent.

24    Q.    And on what do you base the conclusion that

25 Durasoil is not oil-sheen free?

1    A.    Partially on the public information where

2    they claim that it is -- that they have a

3    hydro-treated -- that their product is a mixture

4    of severely hydro-treated blah-blah-blah.

5         As I would understand what they are

6    claiming on a Material Safety Data Sheet, it

7    would be our experience that that material would

8    not pass the test method that is a standard test

9    method to determine whether something is

10   oil-sheen free.

11   Q.    So you -- you've described the term

12   manufacturer, the term Synthetic Organic Dust

13   Control, the term oil-sheen free and the term

14   ultra-pure as words or phrases that our client

15   uses when it should, in fact, not use, correct?

16   A.    If they are false, yes, they should not use

17   them.

18   Q.    Well, when you say "if they are false,"

19   it's your testimony that they are using them and

20   that it constitutes false advertising?

21   A.    Yes.

22              MR. SKERIOTIS:    Objection.

23   BY MR. PASSARELLI:

24   Q.    And have you provided to me today all

25   substantiation you have for those conclusions?

1          **MR. SKERIOTIS:**    Objection.

2          **THE WITNESS:**      Yeah.  I'm not sure

3    that I have remembered everything, but for the

4    most part I would say yes.

5    **BY MR. PASSARELLI:**

6    Q.    Am I to understand then that Midwest has

7    conducted an analysis with regard to those terms

8    and concluded that they're misused?

9          **MR. SKERIOTIS:**    Objection.

10    Remember, the question is:  Did Midwest do this.

11    So anything that your lawyers may have done will

12    be privileged information that you are not -- I

13    instruct you not to answer on.

14          But anything that Midwest did, you're

15    more than welcome to answer that question.

16          **THE WITNESS:**      Yeah.  Our

17    experience would be that what they claim their

18    product is in their Material Safety Data Sheet

19    would not pass the oil-sheen free test.  We have

20    not tested their product to see if it is

21    oil-sheen free.  We have tested those types of

22    materials for our own studies.  Ultra-pure, we

23    have -- I mean that is a matter of looking at

24    the specific ingredients and seeing if they meet

25    the definitions determining what ultra-pure

```
 1              C  E  R  T  I  F  I  C  A  T  E
 2
    STATE OF OHIO,     )
 3                     )  SS:
    SUMMIT COUNTY,     )
 4
         I, Christina A. Arbogast, a Registered
 5  Professional Reporter and Notary Public within
    and for the State of Ohio, duly commissioned and
 6  qualified, do hereby certify that the within
    named witness, ROBERT W. VITALE, was by me first
 7  duly sworn to testify the truth, the whole truth
    and nothing but the truth in the cause
 8  aforesaid; that the testimony then given by him
    was by me reduced to Stenotypy in the presence
 9  of said witness, afterwards prepared and
    produced by means of Computer-Aided
10  Transcription and that the foregoing is a true
    and correct transcript of the testimony so given
11  by him as aforesaid.
         I do further certify that this deposition
12  was taken at the time and place in the
    foregoing caption specified, and was completed
13  without adjournment.
         I do further certify that I am not a
14  relative, employee of or attorney for any party
    or counsel, or otherwise financially interested
15  in this action.
         I do further certify that I am not, nor is
16  the court reporting firm with which I am
    affiliated, under a contract as defined in Civil
17  Rule 28(D).
         IN WITNESS WHEREOF, I have hereunto set my
18  hand and affixed my seal of office at Akron,
    Ohio on this 26th day of February, 2008.
19
20
21
22
23          Christina A. Arbogast, RPR
24
         My commission expires December 7, 2010.
25                    - - -
```