IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

SOILWORKS, LLC, an Arizona          )
corporation,                        )
                                    )
    Plaintiff/Counterdefendant,     )
                                    )
            vs.                     ) NO. 2:06-CV-02141-DGC
                                    )
MIDWEST INDUSTRIAL SUPPLY,          )
INC., an Ohio corporation           )
authorized to do business           )
in Arizona,                         )
                                    )
    Defendant/Counterclaimant.      )
_____     )


Phoenix, Arizona
April 9, 2008
9:00 a.m.


C O N F I D E N T I A L
DEPOSITION OF CHAD FALKENBERG
SOILWORKS, LLC 30(b)(6)
(VOLUME I, Pages 1 - 229)


LEA, SHERMAN & HABESKI
Registered Professional Reporters
834 North First Avenue
Phoenix, Arizona  85003
Phone: 602.257.8514 - Fax: 602.257.8582
Reported by:  Linda Blackmon, RPR/RMR
Certified Reporter
Certificate No. 50320

Dockets.Justia.com

```
 1                    I N D E X
 2
 3
 4    EXAMINATION                                   PAGE
 5
 6    BY MR. SKERIOTIS ...............................   6
 7
 8
 9
10    EXHIBITS              DESCRIPTION             PAGE
11
12    14  Notice of Deposition of Soilworks 30(b)(6)    5
13    15  ConocoPhillips Web Page of Group 2 Base Oils  54
14    16  ConocoPhillips Pure Performance Base Oils
          Specifications Sheet .......................  56
15
16    17  Letter dated 7-27-06 to Donald Dunavant from
          Robert Vitale .............................  129
17    18  Letter dated 7-27-06 to David Shooner from
          Robert Vitale .............................  129
18
19    19  Letter dated June 8, 2006 to Douglas Allsworth
          from John Skeriotis .......................  140
20    20  Letter dated July 18, 2006 to John Skeriotis
          from John Passarelli ......................  142
21
22    21  Letter dated July 27, 2006 to John Skeriotis
          from John Passarelli ......................  144
23    22  Letter dated August 8, 2006 to John Passarelli
          from John Skeriotis .......................  147
24
      23  Series of E-mails Re Patent dated 11-22-06   152
25
```

1          I N D E X (CONTINUED)
2

3

4   EXHIBITS                DESCRIPTION                    PAGE
5

6   24  E-mail dated 12-12-06 to Steve Gordner from
        Dorian Falkenberg Re Indemnification Letter      157
7

    25  Indemnification Letter dated 12-12-06 to
8       Steve Gordner from Dorian Falkenberg ........     157
9   26  Invitation to Bid issued May 31, 2007 .......     188
10  27  Invitation to Bid issued July 10, 2006 ......     188
11  28  Notice of Intent to Award a Contract
        dated 6-27-07 ..............................      196
12

    29  Notice of Intent to Award a Contract
13      dated August 1, 2006 .......................      198
14  30  Document titled Dust Palliative Re Material
        Requirements ...............................      199
15

    31  Fax to Chad Falkenberg from Steve Hickman
16      Re Kokhanok Surface Requirements ...........      202
17  32  State of Alaska Laboratory Report Re Soil
        Cement Specimens ...........................      204
18

    33  Fax dated 5-4-6 to Chad Falkenberg from Steve
19      Hickman Re Chevak Airport Specification .....     206
20  34  E-mail dated 11-14-07 to Steve Gordner from
        Jaquel Shepperson Re Chevak Airport  ........     211
21

    35  Picasa Web Albums for Soilworks  ...........      213
22

    36  Bid Schedule for Circle Hot Springs Airport      221
23

    37  E-mail dated August 2, 2006 to Bob Vitale
24      from Jim Simko Re Prices ...................      225
25

```
 1              DEPOSITION OF CHAD FALKENBERG,
 2    taken at 9:09 a.m., on April 9, 2008, at the law
 3    offices of Jones, Skelton & Hochuli, 2901 North Central
 4    Avenue, Suite 800, Phoenix, Arizona, before LINDA
 5    BLACKMON, RPR/RMR, a Certified Reporter in the State of
 6    Arizona.
 7
 8    APPEARANCES:
 9            For the Plaintiff/Counterdefendant:
                  Kutak Rock, LLP
10                BY E. SCOTT DOSEK, ESQ.
                  8601 North Scottsdale Road
11                Scottsdale, Arizona  85253-2742
12            For the Defendant/Counterclaimant:
                  Brouse McDowell
13                BY JOHN M. SKERIOTIS, ESQ.
                  388 South Main Street, Suite 500
14                Akron, Ohio  44311-4407
                  330-535-5711
15
16            Also Present:
                  Robert Vitale
17
18
19
20
21
22
23
24
25
```

1          (Deposition Exhibit No. 14 was marked.)

2          MR. SKERIOTIS:  Some introductory

3    remarks.  This deposition is being taken pursuant to

4    notice and agreement of the parties, it's also being

5    taken pursuant to the Federal Rules of Civil Procedure

6    for purposes of discovery and other purposes allowed

7    under the Federal rules.  This deposition is also

8    taking place pursuant to the notice of deposition to

9    you, Mr. Falkenberg, as well as the 30(b)(6) notice of

10   deposition.

11         Counsel have agreed that since much of

12   your knowledge is within the 30(b)(6) parameters of

13   this schedule I am about to show you that this

14   deposition and your personal deposition are being

15   combined as a 30(b)(6).

16         THE WITNESS:  Okay.

17         MR. SKERIOTIS:  What that all means to

18   you is you are here testifying today for the company

19   Soilworks.

20         THE WITNESS:  So is this the 30(b)(6) or

21   are they combined?

22         MR. DOSEK:  We are combining them.

23         THE WITNESS:  Okay.

24         MR. DOSEK:  And I think that, and you

25   tell me what you think, it seems to me that we could

1    agree that all of the answers that he gives to

2    questions that are posed to the extent that they are

3    within the scope of the categories defined in the

4    30(b)(6) are corporate answers, if you will, and that

5    if he gives an answer that is uniquely personal, a

6    personal opinion, not binding on the company and not

7    within the scope of the categories defined in the

8    30(b)(6) notice that he will tell us that.  Does that

9    make sense?

10            **MR. SKERIOTIS:**  Yeah, that's fine, that's

11   perfectly fine.  I agree with that, that will be real

12   easy.  Thanks, Scott.

13

14                    CHAD FALKENBERG,

15   called as a witness herein, having been first duly

16   sworn, was examined and testified as follows:

17

18                    EXAMINATION

19   BY MR. SKERIOTIS:

20     **Q.**    Mr. Falkenberg, can you please state and spell

21   your name for the record.

22     **A.**    Chad, C-h-a-d, Falkenberg,

23   F-a-l-k-e-n-b-e-r-g.

24            **MR. SKERIOTIS:**  Just for the record the

25   individuals who are here present today are

1    Mr. Falkenberg, his lawyer Mr. Dosek, myself and

2    Mr. Bob Vitale who is the corporate representative of

3    the Defendant Midwest Industrial.

4        Q.    BY MR. SKERIOTIS:   I would like to hand you

5    what has been marked as Exhibit 14.   And the reason

6    it's Exhibit 14 is we picked up from yesterday's

7    deposition of Mrs. Falkenberg and continued, so we had

8    13 exhibits yesterday, this is the first one today and

9    we started with 14 to keep everything simple.

10              So I have handed you what has been marked

11   as Exhibit 14, have you seen that document before?

12       A.    I believe so.

13       Q.    Could you take a minute to go through it

14   briefly, just to make sure that you have, I guess,

15   three pages and then a Schedule A which should be --

16       A.    Yes.

17       Q.    -- six pages long.   Do you have all of those

18   pages?

19       A.    I do.

20       Q.    Okay.   I would like to go over Schedule A with

21   you to ensure that you are the corporate representative

22   who is here today to testify with respect to the

23   information that we requested.   Specifically I would

24   like you to turn to Page 2 of Schedule A.   Underneath

25   the heading Categories/Topics for Deposition.   Do you

1    see that?

2        A.    Yes.

3        Q.    There are a lot of categories here, roughly

4    46; however, I will note that on Page 4 there are two

5    number 15s and on Page 6 request No. 35 is incomplete.

6    It says "all information and facts regarding."  If you

7    can fulfill that request, that would be wonderful.  I

8    am kidding.

9              Could you take a look at those categories

10   and let's take a look at Page 2 and do you see 1

11   through 5, could you please take a moment to take a

12   look at Categories 1 through 5 and make sure that you

13   are the person who has knowledge with respect to each

14   of those categories from Soilworks.

15       A.    Okay.

16       Q.    So would that be a true statement that you

17   have knowledge on behalf of Soilworks for each of those

18   categories 1 through 5?

19       A.    Yes.

20       Q.    And the second page, 6 through 12, the same

21   question, are you the person who has knowledge with

22   respect to those categories from Soilworks?

23       A.    I am the most appropriate.

24       Q.    And then Category 13 begins at the bottom of 3

25   and continues on Page 4, same question with respect to

1    those categories?

2       A.    Again I would be the most appropriate person.

3       Q.    And then the same thing with Page 5, if you

4    want to speed it up?

5       A.    Same answer.

6       Q.    Same answer for Page 5 and 6?

7       A.    Same answer.

8       Q.    Okay, good.  We kind of got a little bit of

9    ahead of ourselves.  Have you ever had your deposition

10   taken before?

11      A.    I think for a car accident probably ten years

12   ago.

13      Q.    Is that the only time you have had your

14   deposition taken before then?

15      A.    To the best of my knowledge.

16      Q.    Did you bring anything with you here today,

17   any documents?

18      A.    No.

19      Q.    Now I am sure that Mr. Dosek has explained to

20   you the process we are going to go through, but I still

21   want to make sure that we are on the same page

22   together.  First of all, if you don't understand the

23   question will you tell me?

24      A.    I will do my best.

25      Q.    And if you don't hear any part of the question

1    Q.    How about EK-35?

2    A.    No.

3    Q.    That does have a binder?

4    A.    To the best of my knowledge.

5    Q.    We were talking I think and we kind of got

6    into this by talking about infringement and the

7    conversation you had with Mrs. Falkenberg about you

8    were pretty strong on noninfringement because you don't

9    have a binder, correct?

10   A.    Absolutely.  We would have never -- we would

11   not be sitting here if I didn't start off with that.

12   Q.    Did you guys talk about strengths of the case

13   with respect to invalidity, in other words the Midwest

14   patents are invalid?

15   A.    Yes, we touched on that.

16   Q.    Do you feel you have a strong case on that?

17   A.    Absolutely.

18   Q.    Why do you believe the Midwest patents are

19   invalid?

20   A.    Prior art.

21   Q.    And what prior art is that?

22   A.    I am still swimming through the massive

23   documents.

24   Q.    Of what?

25   A.    Of information that you would be looking for.

1    Q.    Why would I be looking for information?

2    A.    To answer your question.

3    Q.    I see.  You do understand, though, that

4  discovery is closed from the standpoint of document

5  production and giving me prior art, do you not?

6    A.    Am I not still entitled to do my own research?

7    Q.    You can do as much research as you want, but I

8  will represent to you that I have asked for prior art

9  disclosures, and we'll go over that today, and I have

10  received no prior art whatsoever outside of obviously

11  what the Patent Office found, so that in our opinion is

12  closed.  So anything you would give to us obviously we

13  would be objecting to, but we can take that up between

14  Mr. Dosek and I.  But we have received no prior art

15  from Soilworks whatsoever.

16           As you sit here today, by the way, you

17  don't know of any prior art that you can name to me,

18  correct, because you are still going through it?

19    A.    I don't have the information with me.

20    Q.    Is there anything else that you and

21  Mrs. Falkenberg talked about as to strength of your

22  case with respect to the noninfringement or invalidity

23  of Midwest's patents?

24    A.    It's likely.

25    Q.    Anything you can recall today?

1  A.    I can't be for sure.

2  Q.    So as you sit here you don't recall anything?

3  A.    That's fair to say.

4  Q.    It sounds like and I am getting the impression

5  that some of that was done with respect to

6  Environmental Products and Applications, is that

7  correct, the lies, deceit and false claims?

8  A.    Exactly.

9  Q.    I won't get into that but I just can sense

10 that's where you are headed and I don't want to make

11 you uncomfortable and we won't go down that road to

12 some degree.

13        So you start Soilworks, and I'm trying to

14 go chronologically to some degree, you start Soilworks

15 in 2003, correct?

16 A.    That sounds about right.

17 Q.    And Soilworks is a limited liability company,

18 correct?

19 A.    That is correct.

20 Q.    My understanding is, and just correct me if I

21 am wrong, I am trying to move through this as fast as

22 we can, the members of the L.L.C. are yourself as

23 president, Mrs. Falkenberg as vice-president, and

24 Masterson Properties, L.L.C.; is that correct?

25 A.    Yes.

1    **A.**    We recently promoted Shane Williams to Sales

2  Manager.

3    **Q.**    And is it fair to say that he would be in

4  charge of the sales of all the products?  In other

5  words, he doesn't have a specific product line that he

6  deals with and that's it?

7    **A.**    He covers all product lines, he sells all

8  product lines.

9    **Q.**    And in addition to the salespeople you have

10  it's my understanding you also have distributors,

11  correct?

12    **A.**    Yes.

13    **Q.**    Do you know who those distributors are?

14    **A.**    I can think of some, yes.

15    **Q.**    How many distributors do you have?

16    **A.**    I would have to write them down.  We could

17  easily get that though.

18    **Q.**    Why don't we go over some that you know.  Let

19  me start with one, Spendard Builder Supply?

20    **A.**    I believe they -- I go by Polar Supply.

21    **Q.**    I think they recently got bought.  The E-mail

22  I got from the Internet said Spendard Builder Supply

23  got bought.

24    **A.**    I refer to them as Polar Supply.

25    **Q.**    Okay, Spendard Builder Supply, we will go with

1    slash Polar Supply.  Okay, who else?

2              MR. DOSEK:  Let me interject, is this an

3    area of inquiry that should be treated as attorneys'

4    eyes only, the identification of all of the

5    distributors that you work with?

6              THE WITNESS:  Yes.

7              MR. DOSEK:  Okay.

8              MR. SKERIOTIS:  You can leave the room,

9    go ahead, Bob, but I will object to that when you are

10   out of the room.

11              (Mr. Vitale left the deposition.)

12

13

              (BEGINNING OF ATTORNEYS' EYES ONLY SECTION)

14

15   Q.   BY MR. SKERIOTIS:  These distributors that we

16   are about to talk about actively promote your product

17   in the marketplace, correct?

18   A.   To the best of my knowledge, yes.

19   Q.   And that's public information, correct, that

20   they sell your products?

21   A.   I would hope so.

22   Q.   So there is no confidentiality there

23   whatsoever, no attorneys' eyes only, because Polar

24   Supply is out there actually selling your product to

25   the Alaska Department of Transportation and saying we

1    sell Durasoil, correct?

2        A.    Polar Supply is.

3        Q.    Sure.  I mean that's the way the

4    distributorship works, I mean they are out there saying

5    we are a distributor of Soilworks, correct?

6        A.    Polar Supply is.

7        Q.    Yeah, I mean don't they all do that?

8        A.    I would have to think about that.

9        Q.    Okay.

10       A.    No.

11       Q.    Okay, which ones don't?

12       A.    One of them that comes to mind who we no

13   longer deal with, they didn't sell the product enough

14   and they didn't because -- I would assume it's because

15   they didn't market the product.

16       Q.    Okay, who are they, let's start with that?

17       A.    Well, let me clarify.  Our intention for

18   distributors is not to have our product sit on a shelf

19   and just take advantage of our marketing and the sale

20   just passes through and that happens.  Does that make

21   sense?

22       Q.    Sure.  It sounds to me like, if I got you

23   right, you want them actively promoting your products

24   and not just relying upon the information that you have

25   in your possession?

1    A.    I think that's fair to say.

2    Q.    You want them actively working for you to try

3    to sell your products, correct?

4    A.    I would like them increasing brand name

5    awareness.

6    Q.    Exactly.  I fully understand that.  But let's

7    talk about this one entity so we close that loop.  Who

8    was that one entity?

9    A.    Desert Mountain.

10    Q.    Desert Mountain.  But they are no longer a

11    distributor, correct?

12    A.    That's correct.

13    Q.    And they are no longer a distributor I believe

14    you said because they weren't actively promoting your

15    product?

16    A.    Their volumes weren't meeting our minimums.

17    Q.    So to get back to the initial thing, what

18    distributors of Soilworks are there, let's just start

19    there, tell me your distributors.  We have identified

20    Polar Supply as the only one so far because Desert

21    Mountain is no longer a distributor.

22    A.    There is Environmental Solutions.

23    Q.    Where are they located?

24    A.    I believe Virginia.  It would probably be

25    best -- I am probably not the best person to remember

1          (Mr. Vitale returned to the deposition.)

2     Q.    BY MR. SKERIOTIS:  I would like to go over

3     Soilworks' business.  My understanding is Soilworks is

4     in the soil stabilization and dust control area; is

5     that correct?

6     A.    I would also add erosion control.

7     Q.    My understanding is, by the way, there are

8     five products that you sell; is that correct?  I have

9     got Durasoil, Soiltac, Powdered Soiltac, Gorilla-Snot,

10    Surtac and I think that's it.

11    A.    I think that's it.

12    Q.    I have a good memory because I didn't write

13    those down.  And my understanding is Surtac is licensed

14    from some other entity, correct?

15    A.    Correct.

16    Q.    Is Surtac your trademark, Soilworks' trademark?

17    A.    Yes.

18    Q.    And the license agreement for Surtac is with

19    who?

20    A.    The Naval Research Lab of the Department of

21    Defense.

22    Q.    Is that an exclusive license agreement?

23    A.    Yes.

24    Q.    And my understanding of that product is that

25    it's got some kind of sucrose type of ingredient; is

1    Soilworks?

2        A.    You bet.

3        Q.    How so?

4        A.    I have a very deep understanding of physics

5    and engineering.

6        Q.    And how does that help you with Soilworks'

7    product line?

8        A.    I would say it has more to do with the

9    ultimate results that we are looking for for our

10   clients is where that comes in handy.

11       Q.    When you say "results" I take you to mean the

12   end results you are looking for, for example, to

13   control dust?

14       A.    Right.  To solve our customers' problems.

15       Q.    I would like to establish what your areas of

16   knowledge are with respect to Soilworks and I mean with

17   different categories such as marketing.  Are you in

18   charge of marketing for Soilworks?

19       A.    I have traditionally played the primary role

20   for marketing.

21       Q.    And that would be consistent, by the way, with

22   what Mrs. Falkenberg said yesterday, she said you were

23   in charge of marketing and you would have the most

24   knowledge about advertising and sales as well; would

25   that be accurate?

1    A.    I think so.

2    Q.    And then she also indicated as far as product

3    application you would be the individual to look to.  As

4    far as the ingredients of the products she identified

5    you as being the person to look to.

6    A.    I think I would be the primary source for all

7    of those.

8    Q.    And she also indicated manufacturing,

9    shipping, technical product knowledge, product testing,

10   all fall within your scope as well?

11   A.    I think all of those except shipping, shipping

12   I haven't been so closely tied to recently.

13   Q.    Who at Soilworks has?

14   A.    We have a logistics manager that covers all of

15   that, the shipping and receiving.

16   Q.    And who would that be?

17   A.    Tara Hensley.

18   Q.    How long has Tara Hensley worked for

19   Soilworks?

20   A.    I don't think it's even been a year.

21   Q.    Has it been longer than six months?

22   A.    I am not sure.

23   Q.    Has it been longer than a month?

24   A.    Oh, yeah.

25   Q.    Who does the hiring and firing at Soilworks?

1    **Q.**    There is nothing else; is that correct?

2    **A.**    I don't think so.

3    **Q.**    Okay.  Now let's turn to Page 10, No. 12, and

4 this is what you alluded to a little earlier.  We

5 requested "all documents, things and

6 electronically-stored information which Soilworks

7 believes basically makes the Midwest patents invalid."

8             Do you see that?

9    **A.**    Uh-huh.  Yes.

10    **Q.**    And you indicated you were reviewing prior

11 art, correct?

12    **A.**    Yes.

13    **Q.**    This is where we asked for those documents and

14 to date as I stated earlier we have received no

15 documents of prior art.

16    **A.**    If that's the case, I don't know why.

17    **Q.**    Well, you didn't provide it to us; is that

18 correct?

19    **A.**    If that's what you are saying.

20    **Q.**    No, what I am saying is do you have prior art

21 in your possession right now that you believe

22 invalidates the Midwest patents?

23    **A.**    I think there is, I think there is data that

24 exists.

25    **Q.**    In your possession; is that correct?

1    A.    I think so.

2    Q.    And you have not provided that to us, have

3  you?

4    A.    If you are saying so.

5    Q.    Well, did you provide it to Mr. Hughlette to

6  copy?

7    A.    I can't be sure.

8    Q.    But as far as you know you didn't formally

9  hand it to him, correct?

10    A.    I definitely did not formally hand it to him.

11    Q.    When I say "him" by the way, it's him or his

12  copying company.

13    A.    I understand.  No.

14    Q.    And you didn't direct as far as you know

15  Miss Johnston that he should be copying that material;

16  is that correct?

17    A.    I don't think so, no.

18    Q.    With respect to No. 14 it asks for

19  "information that you will rely upon to contend or show

20  that you don't infringe the Midwest patents."

21            Do you see that?

22    A.    I see it.

23    Q.    Do you know, have you provided us with all of

24  that information as to why you don't infringe the

25  Midwest patents?

1    A.    I don't know.

2    Q.    I mean you agree, though, that the word

3    "manufacture" is not in that paragraph, correct?

4    A.    I don't see the word there.

5    Q.    And it is your contention, is it not, that

6    Soilworks is a manufacturer?

7    A.    I believe we are definitely a manufacturer.

8    Q.    But this paragraph only talks about Soilworks

9    distributing, sourcing and marketing, correct?

10   A.    That's what the paragraph says.

11   Q.    The next paragraph, Paragraph 8, says "Midwest

12   competes with Soilworks and has recently embarked on a

13   scheme to injure the reputation that Soilworks has

14   established with its distributors, customers and end

15   users." Do you see that?

16   A.    I see it.

17   Q.    What is that scheme referred to in

18   Paragraph 8?

19   A.    Well, I think a pivotal piece of that scheme

20   is the letter that Bob sent to Polar Supply. I would

21   think that that would be the face of a very big issue.

22   Q.    Anything else?

23   A.    It's likely.

24   Q.    What else?

25   A.    I can't think of it this minute.

1    Q.    Well, two things:  One is I want to make sure

2  you understand that you are representing the

3  corporation here and in order for Midwest to be able to

4  defend itself it has to know exactly what it is that

5  Soilworks is accusing it of.  So that's what I am

6  trying to get to, is what facts are you alleging

7  Midwest has done that's hurt Soilworks with respect to

8  this Complaint.

9              So I need to ask you and you need to

10  provide to me all of the information that you know of

11  from a corporation side so that we can help defend

12  ourselves and if you can't do that, then we can't

13  defend ourselves.

14    A.    It would be common sense I would think for Bob

15  to send the letter regarding this patent and his stance

16  with Soilworks to Polar Supply who is our distributor,

17  I would say that it is common sense that that

18  distributor would be concerned about moving forward in

19  their business with us, Soilworks, and potentially even

20  jump ship and work directly with Midwest.

21              I don't see any reason why that letter

22  would have been sent to Polar Supply if it weren't to

23  take business from Soilworks and potentially gain it

24  for Midwest.  I don't see any other reason that that

25  letter would have been issued.

1    Q.    Is there any other facts that you are aware of

2  showing that Midwest has embarked on a scheme to injure

3  Soilworks other than this letter to Polar Supply?

4    A.    It's hard to quantify how deep that rabbit

5  hole goes.  You know, when you are walking in the

6  kitchen in the middle of the night and you see a roach

7  on the floor, you know there is a hundred more and

8  that's the way I came at this.

9    Q.    But you have asked us, you Soilworks, have

10  asked Midwest for documents, correct?

11    A.    I believe so.

12    Q.    And you would have asked us for information

13  with respect to things that we have sent out, correct?

14    A.    Uh-huh.

15         MR. DOSEK:  Object to the form.

16    Q.    BY MR. SKERIOTIS:  Have you seen anything that

17  would add any facts to the claim that we, Midwest, has

18  embarked on a scheme to injure Soilworks?

19    A.    I would need to review the documents again.

20    Q.    But as you sit here today there is nothing

21  else you know of, correct?

22    A.    I didn't say that.

23    Q.    So you know of something else or not?  It's a

24  simple question, you either know something today right

25  now or you don't.  I am not saying there might not be

1    something else out there, but as you sit here today

2    there is nothing else you know of, correct?

3        A.    Well, I would want to think about that.

4        Q.    Okay.

5        A.    I have reason to believe that Midwest may be

6    involved in problems that we have had with the Federal

7    Highway Administration, I am concerned that roads lead

8    back to them.  Specifications have been changed for

9    projects that originally fit our product and have now

10   been broadened and it is my belief that those roads

11   lead back to Midwest.  I think they may have a bearing

12   on this.

13       Q.    Are we talking about Hawaii?

14       A.    Yes.

15       Q.    That's what Mrs. Falkenberg had identified

16   yesterday.

17       A.    Okay.

18       Q.    That's why I mention that.

19             Mrs. Falkenberg yesterday indicated no

20   documents whatsoever with respect to this Hawaii issue

21   have been provided to us; is that a fair statement?

22       A.    I don't know if they have or if they have not.

23       Q.    So you wouldn't have any further knowledge

24   than what she would have, is that a fair statement,

25   about documents being provided to us with respect to

1    Q.    Correct.

2    A.    In that case I don't think so.

3    Q.    Is Polar Supply a current distributor?

4    A.    Yes, they are.

5    Q.    Under Spendard Builder Supply though, correct?

6    A.    I believe so.

7    Q.    Have they ever ceased being a distributor of

8    Soilworks?

9    A.    I would like to say that they would not

10   purchase from us until -- until we gave them

11   indemnification and protected them they ceased to do

12   business with us.

13   Q.    What indemnification have you given to them?

14   A.    I would have to refer to Scott on what all was

15   provided, I don't know all the details of what you are

16   looking for.

17   Q.    Have you given them something other than a

18   letter indicating that you would indemnify them should

19   they get sued for selling your product?

20   A.    It was something to that effect I believe.

21   Q.    Have you given them any money, have you paid

22   them anything?

23   A.    I don't understand.

24   Q.    Have you paid Polar Supply any money as an

25   indemnification yet?

1    A.    I wouldn't know.  I am not aware of anything

2    but that doesn't mean that it hasn't happened.

3    Q.    Who would know?

4    A.    I would think our books would show it.

5    Q.    Back to the initial question.  Has Polar

6    Supply ever ceased being a distributor with Soilworks?

7    A.    Not to my knowledge.

8    Q.    Have they ever indicated to you they are not

9    selling your product?

10   A.    During the period from the time Bob sent the

11   letter to the time we provided them indemnification I

12   don't believe there was any transactions that took

13   place and I believe it was because of the letter.

14   Q.    Did they miss a bid or a sale in that time

15   period that you know of?

16   A.    Actually, yes, I think so.

17   Q.    Which one?

18   A.    I believe it was another ADOT-related project

19   or an airport-related project.  There were several.

20   Q.    Do you know specifically which airport?

21   A.    No.

22   Q.    Do you have a date by which they would have

23   missed something?

24   A.    No.

25   Q.    Do you have any information whatsoever to

1    identify the instance you are saying they missed

2    because of this letter?

3        A.    Not the firm details you are looking for, no.

4        Q.    I am looking for any detail.  By the way, all

5    you have told me is that there may be an airport but

6    you don't know of any, correct?

7        A.    I think you would be best off when you depose

8    Polar that they would have the closest information

9    relating to those projects.

10       Q.    Do you know what irreparable harm has been

11   caused by Midwest against Soilworks?

12            **MR. DOSEK:**  Object to the form.

13       A.    I don't know.

14       Q.    BY MR. SKERIOTIS:  Do you know what

15   "irreparable harm" is?

16       A.    I have an idea.

17       Q.    I will represent to you that when I use that

18   term I mean harm that can't be repaired monetarily.  So

19   with that definition what irreparable harm is Midwest

20   causing to Soilworks?

21            **MR. DOSEK:**  Same objection.

22       A.    I don't know.

23       Q.    BY MR. SKERIOTIS:  With respect to

24   Paragraph 12, Paragraph 12 states "Midwest

25   intentionally has misrepresented the scope of said

1    Q.   BY MR. SKERIOTIS:  Do you know the damage, can

2  you estimate the damage that you feel that Midwest has

3  caused Soilworks?

4    A.   I wish it was that easy.  It's very difficult.

5    Q.   Do you know of any damages you have suffered

6  that you can quantify?

7    A.   That's the problem, it's very difficult to

8  quantify and it's a challenge to quantify that number.

9    Q.   But do you know of anything that you can

10  quantify?

11    A.   I don't know for sure.

12    Q.   So I guess again the question is as you sit

13  here today do you know of any damage that you can

14  quantify as you sit here today?

15           **MR. DOSEK:**  Object to the form.

16    A.   It's difficult to quantify.

17    Q.   BY MR. SKERIOTIS:  I understand it's difficult

18  to quantify.  The question is, though, do you know of

19  any damage as you sit here today that you can quantify?

20    A.   I am not sure.

21    Q.   But I don't think that's an "I'm not sure"

22  question, I think it's either "yes" or "no", either you

23  can quantify something here today or you can't.  I

24  understand it's difficult.  Just so you know, I am not

25  asking you for what's difficult to quantify, I am

1   asking you for what you can quantify.

2      A.    I have not come here with numbers in my head,

3   no.

4      Q.    So as you sit here today you cannot quantify

5   any amount of damage, correct?

6      A.    As I sit here today I do not know how much

7   damage has been caused.

8      Q.    Well, Mr. Falkenberg, how do you expect

9   Midwest to proceed with its litigation when at some

10  point in time you quantify some amount?  I mean when do

11  you plan on quantifying that amount, can I ask you

12  that?

13            I mean here we are getting ready to be

14  done with discovery, this is our only deposition that's

15  going to happen today and tomorrow, when do you expect

16  to quantify this?  Do you expect to just spring it on

17  Midwest at some point in the future later and we go

18  where did that come from?

19            MR. DOSEK:  Object to the form.  If you

20  have a question, ask the question.

21      Q.    BY MR. SKERIOTIS:  When do you expect to

22  quantify these numbers?  This litigation has been

23  pending that you filed on September 7, 2006.  We are

24  almost at the two-year mark and you haven't been able

25  to quantify what amount of damage; is that correct?

1    **A.**    That's because it's difficult to quantify.

2    **Q.**    When do you plan on quantifying it?  That's

3  what my question is, when do you plan on quantifying

4  the damage?

5    **A.**    I wish I could give you a date.

6    **Q.**    So it could be that you can never quantify

7  this damage, correct?

8    **A.**    I don't know when I am going to give you a

9  date, I don't know what that date is going to be.

10              **MR. DOSEK:**  Let's break for lunch.

11              **MR. SKERIOTIS:**  Hang on.

12              **MR. DOSEK:**  It's 12:30 now, we have had

13  one little break and I think now is a good time.

14              **MR. SKERIOTIS:**  Well, with all due

15  respect, Scott, I mean I always have given you leniency

16  and I understand, but this is my deposition.

17              **MR. DOSEK:**  I understand that too and I

18  understand that --

19              **MR. SKERIOTIS:**  I have got one more

20  count I want to get to and then we will take a break.

21  I want to finish this Complaint up to the degree that I

22  can.

23              **MR. DOSEK:**  If it wasn't for the fact

24  that you are spending such an inordinate amount of time

25  going through this Complaint, I would agree with you

1  that when we get finished with this would be an

2  appropriate time, but given the amount of time we have

3  spent on it so far it seems logical to me that you have

4  got another hour or so to deal with this particular

5  exhibit.

6          MR. SKERIOTIS:  I may have but right now

7  I would like to go through it.

8          THE WITNESS:  It is 12:30 and it would be

9  nice to get lunch.

10          MR. SKERIOTIS:  I don't have a problem

11  with that.

12          THE WITNESS:  I had to get up at 5:00

13  just to be here on time because of traffic.

14          MR. SKERIOTIS:  I understand that and

15  that's fine, but we will take a break after Count IV.

16  I won't get to Count V or VI, how about that?

17          MR. DOSEK:  All right.

18  Q.    BY MR. SKERIOTIS:  With respect to Count IV on

19  Page 5 it's called Tortious Interference With Business

20  Relationship and Expectancy.  Paragraph 29 talks about

21  Midwest knows of Soilworks' business relationships and

22  expectancies and without justification intentionally

23  interfered with existing business relationships and has

24  sought to frustrate Soilworks' expected customer

25  relationships.  Do you see that?

1    **A.**    Yes.

2    **Q.**    Is the relationship that's referred to there

3  between Soilworks and Polar Supply?

4    **A.**    Can you ask me that again, please?

5    **Q.**    Yes.  Is the business relationship that's

6  referred to in Paragraph 29 the relationship between

7  Soilworks and Polar Supply?

8    **A.**    I think that would certainly fall here.

9    **Q.**    And what led to that alleged interference is

10  the letter to Polar Supply that you later on then

11  indemnify Polar Supply for, correct?

12             **MR. DOSEK:**  Object to the form.

13    **A.**    Can you ask it again, please?

14    **Q.**    BY MR. SKERIOTIS:  Sure.  I didn't ask it very

15  well, that's a fair question.  The interference that's

16  mentioned here is the letter that Midwest drafted and

17  sent to Polar Supply, correct?

18    **A.**    I would assume that that letter constitutes

19  interference.

20    **Q.**    And that's interference that's referenced in

21  Paragraph 29, correct, of your Complaint?

22    **A.**    I believe so.

23    **Q.**    And I take it, then, that it's your position

24  that Midwest tried to interfere with that relationship

25  to gain Polar Supply as a customer, correct?  Is that

1   your allegation?

2       A.    I think that could be part of it.

3       Q.    And in fact Midwest was not successful,

4   though, in getting Polar Supply to be its customer,

5   correct?

6               MR. DOSEK:  Object to form, foundation.

7       A.    I hope Midwest doesn't do business with Polar

8   Supply.

9       Q.    BY MR. SKERIOTIS:  And as far as you know they

10  don't do business with Polar Supply, correct?

11      A.    I don't have any knowledge of that.

12      Q.    In other words you don't have any knowledge

13  that Midwest does business with Polar Supply, correct?

14      A.    No, I don't.

15      Q.    Can you tell me how you have been damaged by

16  this interference between you and Polar Supply?

17      A.    One of the things would be the fact that we

18  didn't make any sales during the time between the

19  letter being received by Polar and the letter provided

20  from us from our attorneys committing to

21  indemnification of them.  But who knows how far that

22  goes in terms of their -- there is many different

23  pieces of this.

24      Q.    But it's true you haven't to your knowledge

25  lost any sales pursuant to the letter sent by Midwest

1    to Polar Supply, correct?

2        A.    The letter was very timely and because of a

3    project that was taking place, and to the best of my

4    recollection that project was lost to Midwest, actually

5    to Nana Supply or Nana Pacific who markets Midwest's

6    materials.  So I believe that we directly lost an ADOT

7    project, one more reference, one more plot, one more

8    sale, because of that.

9        Q.    Are you saying, then, that Polar Supply did

10   not bid on that project because of Midwest's letter to

11   Polar Supply?

12       A.    I don't want to speak on their behalf, it's

13   best that you talk to them directly about that.

14       Q.    Do you know if they bid on a project during

15   this time period that we are speaking of between the

16   letter and the indemnification?

17       A.    I am fairly certain.

18       Q.    That they did or did not?

19       A.    I am fairly certain that during this time

20   there was a bid that they were involved in.  I don't

21   know if it was bid or not bid, I don't know.

22       Q.    Other than that, though, there is no other

23   damage that you know of caused by the letter to Polar

24   Supply from Midwest?

25       A.    I certainly could not say that for sure.

1          MR. SKERIOTIS:  We will take a break now.

2          (Recessed at 12:33 until 1:35.)

3     Q.   BY MR. SKERIOTIS:  We left off with Count IV

4  on the Complaint, Page 6.  I would like to now turn to

5  the prayer for relief, and actually Page 7, excuse me,

6  and on Page 7, Paragraph No. 9, it says some of the

7  relief that you are requesting is your attorney's

8  fees.  Do you see that?

9     A.   I see it.

10    Q.   Do you know what those are to date?

11    A.   A lot more than I want to pay.  I don't know

12 what they are for sure, but I know they are a lot.  I

13 think the last check was about 50 grand so it's a lot.

14    Q.   So it's at least that much?

15    A.   For sure.

16         MR. SKERIOTIS:  I don't think I have

17 anything else with respect to this Complaint right

18 now.  I will hand you what we will mark as the next

19 exhibits.

20         (Exhibits Nos. 17 and 18 were marked.)

21    Q.   BY MR. SKERIOTIS:  Mr. Falkenberg, you have

22 just been handed what has been marked as Exhibits 17

23 and 18, have you seen those before?

24    A.   I believe so.

25    Q.   And what are they?

1    A.    These appear to be letters from the President

2    of Midwest going to a Soilworks distributor, Polar

3    Supply Company, letting them know that there are -- you

4    have appraised (sic) Soilworks would be one of the

5    issues of your patents and that you haven't received

6    any responses to your appraisal.  (sic)

7    Q.    Actually I think that should be "apprised."

8    A.    I am sorry.

9    Q.    I just want to ask you to identify them.  Have

10   you seen these before?

11   A.    I believe so, yeah.

12   Q.    And Exhibit 17 is the letter to Don Dunavant,

13   correct?

14   A.    I don't know that I am aware that there was

15   two letters.

16   Q.    Okay.

17   A.    I think I am most familiar with the Shooner,

18   Exhibit 18.

19   Q.    Okay.

20   A.    I honestly can't recall though.

21   Q.    Can you take a look at the two letters and let

22   me know if there are any differences between them other

23   than the names?

24   A.    They look pretty similar to me.

25   Q.    So there is no differences?

1    A.    From quickly looking at the two there appears

2    to be no differences.

3    Q.    Is this the letter --

4    A.    Let me clarify, other than who it's addressed

5    to would be the most obvious.

6    Q.    Is this the letter that you referred to

7    earlier in your deposition regarding the letter to

8    Polar Supply?

9    A.    I believe this or these are it.

10    Q.    So this would be one of the bases for the

11    tortious business interference count, correct?

12    A.    I think so.

13    Q.    The first sentence reads "this letter is meant

14    to apprise you of a recent development at Midwest

15    Industrial Supply, Inc.  Midwest invented the category

16    of synthetic organic dust control agents more commonly

17    known as EK-35 and EnviroKleen."  Do you see that?

18    A.    I see that.

19    Q.    Is that a true statement to your knowledge?

20         **MR. DOSEK:**  Object to the form.

21    A.    I don't know if that's a true statement.

22    Q.    BY MR. SKERIOTIS:  It says "recently the

23    United States Patent and Trademark Office awarded

24    Midwest United States Patent No. 7,074,266."  Do you

25    see that?

1    A.    I see that.

2    Q.    And this letter is dated July 27th, 2006,

3    correct?

4    A.    It is.

5    Q.    Is that sentence correct?

6            MR. DOSEK:  Form and foundation.

7    A.    I don't know.  I can't verify it.

8    Q.    BY MR. SKERIOTIS:  Do you have any reason to

9    believe that sentence is not true?

10    A.    It's very likely.

11    Q.    Very likely that it's true?

12    A.    Correct.

13    Q.    The next paragraph reads "there are a number

14    of imitators that claim to be synthetic organic dust

15    control agents, however, none of those competitors can

16    have the formulation or method as that of EK-35 or

17    EnviroKleen."  Do you see that?

18    A.    I see that.

19    Q.    Is that a true statement to your knowledge?

20            MR. DOSEK:  Form, foundation.

21    A.    I don't know.

22    Q.    BY MR. SKERIOTIS:  "The granting of the U.S.

23    Patent now allows Midwest to pursue those who make,

24    use, sell, offer for sale, and/or import knock-off or

25    imitators of EK-35 or EnviroKleen."  Do you see that?

1    A.    I see it.

2    Q.    Is that a true statement?

3              **MR. DOSEK:**  Form, foundation.

4    A.    I don't know.

5    Q.  BY MR. SKERIOTIS:  Do you have any knowledge

6    of what the U.S. patent law allows a patent owner to

7    do?

8              **MR. DOSEK:**  Form, foundation.

9    A.    I don't have a complete knowledge of patent

10   law.

11   Q.  BY MR. SKERIOTIS:  Do you understand that

12   patent law allows the holder, the owner of a patent, to

13   exclude others from making, using, selling, offering

14   for sale and/or importing a patented product?  Do you

15   understand that?

16             **MR. DOSEK:**  Form and foundation.

17   A.    I understand what you are saying.

18   Q.  BY MR. SKERIOTIS:  Do you have any knowledge

19   of that with respect to patent law?

20   A.    That's not my specialty.

21   Q.    So the answer would be "no"?

22   A.    The answer would be I don't know.

23   Q.    If it were true that the granting of the U.S.

24   patent to the owner allows the owner to stop anyone

25   else from selling or offering for sale an infringing

1   product, if that were true, do you understand that so

2   far?

3       A.    I understand that.

4       Q.    Then that would allow Midwest to stop Polar

5   Supply from selling an infringing product; would that

6   be true?

7                    **MR. DOSEK:**  Form, foundation.

8       A.    Again I don't know the law is the problem.

9       Q.    BY MR. SKERIOTIS:  Yeah.  And I am

10  representing to you what the law is so that's okay, I

11  am not asking my question very well and that's my

12  fault.

13                   Polar Supply was selling or offering to

14  sell on or around July 27, 2006 Durasoil, correct?

15      A.    I believe so.

16      Q.    And it's your understanding that Midwest

17  believed that there was a possibility of Durasoil

18  infringing one of the Midwest patents, correct?

19      A.    Repeat the question one more time, please.

20                   (Record read.)

21      A.    I believe that Midwest thinks that we

22  infringed their patent or patents.

23      Q.    BY MR. SKERIOTIS:  And that was your thought

24  back in July of '06 as well?

25      A.    When I read this letter to me it seemed

1    obvious that Midwest felt that we infringed.

2        Q.    And again, Polar Supply was a company who sold

3    or was offering for sale Durasoil, correct?

4        A.    I believe so.

5        Q.    So if a sale or offer for sale was or would be

6    an infringement of a patent, would that now give you

7    the understanding of why this letter was sent to Polar

8    Supply?

9                MR. DOSEK:  Object to the form,

10   foundation.

11       Q.    BY MR. SKERIOTIS:  Here is what I'm trying to

12   get at, this isn't a trick question.  You indicated

13   earlier you didn't know why Midwest would send a letter

14   to Polar Supply but for the fact that they were trying

15   to get Polar Supply as a distributor; did you not say

16   that?

17       A.    It seemed to make the most sense to me.

18       Q.    Right.  And that's all I'm trying to get.  So

19   what I am trying to do is say here is another basis for

20   why Midwest sent this letter to Polar Supply, it's

21   because Polar Supply would be an infringer since they

22   were selling and offering for sale the Durasoil

23   product?

24       A.    So you are saying that potentially Midwest was

25   apprising them of infringing on their patent or

1    for that because I don't necessarily know for sure.

2        Q.    Does Durasoil compete with EK-35?

3        A.    Again, it depends.  When we go into a

4    situation I don't look and see --

5        Q.    Let me give you an example.  For example for

6    an airport trying to control dust, an EK-35 is being

7    sought, would Durasoil be in competition for that

8    project?

9        A.    We would ask what is it that that airport is

10   trying to do and if our products meet the criteria of

11   their objectives to solve the problem, and if our

12   product fits the bill, and if Bob is saying his does,

13   then that would be a scenario where we compete against

14   each other.

15       Q.    Let me ask you this:  Is there any area by

16   which Durasoil competes with EK-35?

17       A.    It's very possible.

18       Q.    How about EnviroKleen?

19       A.    It's very possible.

20       Q.    How about Arena RX?

21       A.    Very possible.

22       Q.    How about Diamond Dr.?

23       A.    Very possible.

24                MR. SKERIOTIS:  I am done with these

25   two.  Let's mark this one.

1　harmless clause prior to November 22, 2006?

2　　A.　I don't know.

3　　Q.　Do you know, did you provide them a hold

4　harmless by December 15, 2006?

5　　A.　I don't know.

6　　Q.　You are aware, though, I guess, from your

7　earlier testimony that you gave them an indemnification

8　letter, correct?

9　　A.　I believe so.

10　　Q.　But you just don't know as you sit here today

11　what date that was?

12　　A.　I don't know what the date was.  I know that

13　we provided them some sort of legal way to help protect

14　them from Midwest.

15　　Q.　So from July 27 to November 22 did Polar

16　Supply stop being a distributor for Soilworks?

17　　A.　There is no such document that would support

18　that.

19　　Q.　Did they ever tell you verbally, "you" being

20　Soilworks, that they are not going to be a supplier for

21　you any longer between July 27, 2006 and November 22,

22　2006?

23　　A.　I can't remember what they said.

24　　Q.　So is it fair to say they continue to be a

25　supplier to your knowledge?

1    A.    Today?

2    Q.    Throughout this time.

3    A.    Today they are a supplier, we supply them

4    today.

5    Q.    Is it fair to say they have been a distributor

6    for you from July 27 to November 22, 2006?

7    A.    We haven't signed up anybody else in place of

8    them and there is no documents stating that anything

9    was ever terminated.  But I do want to reiterate that

10   there was a time frame that we did not do business and

11   I think it is directly correlated to what is

12   transpiring between Midwest, Polar Supply and us.

13   Q.    I'm trying to figure out when is that time

14   period?

15   A.    I would have to go back and review the dates.

16   Q.    Okay.

17   A.    I think you would agree that that's

18   accessible.

19   Q.    Well, we are reviewing some of the dates and I

20   think these dates that we are going to review should

21   refresh your recollection but we will see.

22            We have already established the letter

23   was sent July 27th.  November 22 you still don't have

24   an indemnification letter given to Polar Supply and

25   they have requested now one by December 15; is that

1   correct?

2      A.    That's what this says.

3              (Deposition Exhibit No. 24 was marked.)

4      Q.    BY MR. SKERIOTIS:  Mr. Falkenberg, you have

5   just been handed what has been marked as Exhibit 24; do

6   you recognize that document?

7      A.    I do.

8      Q.    What is it?

9      A.    It's an E-mail.

10     Q.    From who?

11     A.    Dorian.

12     Q.    To who?

13     A.    Steve Gordner.

14     Q.    And it's dated December 12th, 2006, correct?

15     A.    That's what it says.

16     Q.    And it says that she is attaching an

17  indemnification letter; do you see that?

18     A.    It says that.

19     Q.    Does that refresh your recollection of when an

20  indemnification letter was sent to Polar Supply?

21     A.    It would seem fairly obvious that it probably

22  went out on December 12th of 2006.

23              (Deposition Exhibit No. 25 was marked.)

24     Q.    BY MR. SKERIOTIS:  Mr. Falkenberg, you have

25  just been handed what has been marked as Exhibit 25, do

1   you recognize that document?

2       A.      I think so.

3       Q.      What is it?

4       A.      It's a letter.

5       Q.      In fact it's a letter from Mrs. Falkenberg to

6   Steve Gordner at Polar Supply, correct?

7       A.      Yes.

8       Q.      I will note for the record this document is

9   labeled SBS000001 and is this the indemnification

10  letter that was referenced in Exhibit 24, SBS000389?

11              **MR. DOSEK:**  Form and foundation.

12      A.      I am not sure, I didn't send it.

13      Q.      BY MR. SKERIOTIS:  But you did receive

14  Exhibit 24, did you not, since you are cc'd on the

15  E-mail?

16      A.      I would assume so.

17      Q.      And this Exhibit 24 indicates "I have attached

18  an indemnification letter for you," correct?

19      A.      If that's what it says.  I don't understand

20  what is so confusing.

21      Q.      I just want to understand that this is the

22  letter attached to the E-mail because this is all I

23  have been given.  Again, we were not given this by

24  Soilworks.  We got this from Spendard Builder Supply,

25  this is the way I got it, and I want to make sure that

1  this is the indemnification letter that is with this

2  E-mail?

3      A.    That is a much clearer question, thank you.

4      Q.    Sorry.

5      A.    I would assume that this is the letter that

6  would go with that E-mail.

7      Q.    Do you have any reason to believe it's not the

8  letter that would go with this E-mail?

9      A.    Not at this time.

10     Q.    So does this refresh your recollection with

11  respect to the time period we are talking about between

12  July 27, 2006 and December 12, 2006, the time period

13  with respect to the issues with Polar Supply?

14     A.    Everything helps.

15     Q.    So going back now to the earlier statements

16  you made I believe which is that there was a time

17  period that you thought that Polar Supply was not a

18  distributor for Soilworks; is that a fair statement?

19            MR. DOSEK:  Object to the form.

20     A.    That's not what I said.

21     Q.    BY MR. SKERIOTIS:  That's fine.  What did you

22  say about that, them being a distributor for you?

23     A.    I said there was a time period that I believe

24  Midwest (sic) did not move material.

25            MR. DOSEK:  You mean "Polar Supply."

1    **A.**    I am sorry, yes, thank you.  Polar Supply.

2  Basically our relationship with Polar Supply was put

3  for lack of a better term on hold.

4    **Q.**    BY MR. SKERIOTIS:  And you indicated you

5  didn't know what the time period was.  Do these

6  documents help to reflect what time period we are

7  looking at?

8    **A.**    That would certainly narrow it down.

9    **Q.**    Okay, what is it then?

10    **A.**    Well, this document is December 12th and the

11  other one was -- you have the exhibit in front of you I

12  believe.

13    **Q.**    July 27th.

14    **A.**    If that's what that one says, that seems

15  reasonable.

16    **Q.**    Okay.

17    **A.**    Assuming that they are accepting of this, they

18  are accepting of the indemnification.

19    **Q.**    Okay.

20    **A.**    Just because it's written doesn't mean it's

21  accepted.

22    **Q.**    Let me ask you this:  If one of your

23  distributors were to get sued for patent infringement

24  would you not step in their shoes and defend them?

25            **MR. DOSEK:**  Object to the form,

1    Q.    So are you saying you don't know what business

2    Polar does in Alaska, what bids they win and what bids

3    they don't win because you just supply them with

4    product?  Once they order it and what they do with it

5    you don't know?

6    A.    I in fact do not know where all the product

7    goes.

8    Q.    Do you know in fact when they win a bid or

9    lose a bid?

10   A.    Not always.

11            MR. SKERIOTIS:  We are going to have to

12   work with one copy and we'll have to do something in a

13   little bit.

14            (Deposition Exhibit No. 35 was marked.)

15   Q.    BY MR. SKERIOTIS:  Mr. Falkenberg, I am going

16   to hand you what has been marked as Exhibit 35, can you

17   tell me what that is?

18   A.    Pictures.

19   Q.    From where?

20   A.    From Picasa Web Albums.

21   Q.    And what is that if you know?

22   A.    It's a place where photos can be displayed

23   publicly.

24   Q.    Are those images that you have placed on that?

25   A.    They appear to be.

1    a long list.

2       **Q.**    How about glycerines?

3       **A.**    Same answer.

4       **Q.**    And have you been in competition with any

5    supplier of either tall oils or glycerines for bids?

6       **A.**    I am sure we have.

7       **Q.**    And as you sit here you don't know if any of

8    those are marketed as a synthetic organic dust control

9    product?

10      **A.**    No, I do not.

11                (Deposition Exhibit No. 42 was marked.)

12      **Q.**    BY MR. SKERIOTIS:  Mr. Falkenberg, you have

13   just been handed what has been marked as Exhibit 42.

14   Have you seen that document?

15      **A.**    I believe so.

16      **Q.**    What is it?

17      **A.**    This would appear to be our Durasoil product

18   presentation.

19      **Q.**    Can you take a look at it and ensure that you

20   have all the pages, 22?

21      **A.**    It seems that way.

22      **Q.**    Is all the information in here true and

23   accurate to the best of your knowledge.

24      **A.**    I would think so.

25      **Q.**    If we turn to the second page, Page 2 of 22,

1    testing methods on that data that we receive, so I

2    would say that it is highly likely that they have been

3    tested and there is data, quantitative data, for those.

4        **Q.**   To show it's nonflammable and nonvolatile?

5        **A.**   Correct.

6        **Q.**   The next one says "non-slippery and safe to

7    drive on."  Same questions, has there been any testing

8    done to show that Durasoil is non-slippery and safe to

9    drive on to your knowledge?

10       **A.**   No quantifiable data that I am aware of.

11       **Q.**   The next one says "oil sheen free, no rainbow

12   effect."  Has there been any testing on Durasoil as far

13   as being oil sheen free?

14       **A.**   That would be similar to the colorless and the

15   nonflammable.

16       **Q.**   So you believe there is a test to show

17   something is oil sheen free?

18       **A.**   I believe there is.

19       **Q.**   Do you know if there is or not?

20       **A.**   I am not positive.

21       **Q.**   So do you believe if there is a test, that

22   your manufacturer would have done that test?

23       **A.**   It's very likely.

24       **Q.**   But you yourself have not done any testing to

25   show that the Durasoil product is oil sheen free?

1    **A.**    I don't think we have.

2    **Q.**    The next one is "no curing for immediate

3    results," and I guess that just means that Durasoil

4    doesn't cure, correct?

5    **A.**    That's correct.

6    **Q.**    The next one, and some of the remaining ones,

7    talk about non-regulated for transportation,

8    non-tracking and nontransferable.  The other one says,

9    though, below that "ecologically and environmentally

10   safe"; is that a true statement?

11   **A.**    I believe so.

12   **Q.**    Has there been testing done on Durasoil to

13   assure that it's ecologically safe?

14   **A.**    We have performed environmental testing that I

15   am led to believe makes that statement true.

16   **Q.**    What environmental testing have you performed

17   to make that statement true?

18   **A.**    I believe there is things like fish toxicity

19   testing, leachables, volatile organics.

20   **Q.**    I am sorry?

21   **A.**    Leachables and volatile organics, metals

22   content, I think those are the types of things that

23   have been tested for.

24   **Q.**    And you think those tests support your

25   ecologically/environmentally safe?

1     **A.**    I believe so.

2     **Q.**    By the way, all of that Durasoil advantages on

3    this page, that would be for all the blends that you

4    have done?  In other words all versions of the Durasoil

5    product?

6     **A.**    I think it's fair to say that those would

7    cover everything.

8     **Q.**    The next page is saying "why is Durasoil

9    superior?"  Can you tell me what did you mean when you

10   said "superior"?  Superior to what?

11    **A.**    To traditional dust control products that are

12   on the market is what first comes to mind.

13    **Q.**    Would that be superior, then, also to the

14   competitors' products?

15    **A.**    Well, competitors make, you know, competitive

16   dust control products so I would think that would be

17   logical.

18    **Q.**    So let's just turn to EnviroKleen and EK-35,

19   and you have "why is Durasoil superior?"  Would all of

20   the things that you list on this page make in your mind

21   Durasoil superior to EK-35 and EnviroKleen?

22    **A.**    I can't say that for sure because I don't know

23   that I would have the data to support that claim.

24    **Q.**    "Low viscosity," you believe that's something

25   that's important for Durasoil and that makes it

20          (END OF ATTORNEYS' EYES ONLY SECTION)

21

22          (Mr. Vitale returns to the deposition.)

23          (Deposition Exhibit No. 44 was marked.)

24     Q.   BY MR. SKERIOTIS:  Mr. Falkenberg, you have

25  just been handed what has been marked as Exhibit 44; do

1   you recognize that document?

2   **A.**   This would appear to be our GSA price schedule

3   list.

4   **Q.**   Is it Soilworks' price list?

5   **A.**   For GSA.

6   **Q.**   Yes.

7   **A.**   I believe so.

8   **Q.**   Who put this Exhibit 44 together?

9   **A.**   I had a heavy hand in putting this together.

10  **Q.**   Any one else help you with it?

11  **A.**   Yes.

12  **Q.**   Who else helped?

13  **A.**   Kristen Rensmeyer with Plymouth Consulting.

14  **Q.**   And who is that?

15  **A.**   They help manage our GSA documents, making

16  sure we are in compliance.

17  **Q.**   On Page 3, numbered Page 3 at the bottom of 13

18  it lists Soilworks, L.L.C. key words.  Can you tell me

19  what that is?

20  **A.**   It's a list of key words.

21  **Q.**   For what purpose are these key words listed

22  here?  I mean why are they here?

23  **A.**   If somebody is looking for a product that has

24  to do with these key words, we likely have a product

25  that will fit their needs.

1    **Q.**    So if I am looking for for example a dust

2    palliative, you would have this key word and then -- I

3    guess I'm trying to figure this out myself.  I don't

4    understand, where do these key words go or what are

5    they doing here?

6    **A.**    I just think it's good reference.

7    **Q.**    Does somebody search these key words?

8    **A.**    If it's an electronic format, it should be

9    searchable.

10    **Q.**    Is that why they are there, so somebody can

11    search them?

12    **A.**    I would think that would be a reason.

13    **Q.**    So if I am looking for a dust palliative,

14    since a key word here is listed it would come up and

15    then Soilworks has a product that is a dust palliative

16    product, correct?

17    **A.**    Again, this list, if someone is looking for

18    something that is on this list of key words, we likely

19    have a product that will fit their needs and solve

20    their problems.

21    **Q.**    And would this list include key words for all

22    of Soilworks' products, all five?

23    **A.**    Are you asking if it includes all the key

24    words?

25    **Q.**    No, I am asking you if -- Gorilla-Snot is what

1   for example.

2   **A.**    You mean which key words?

3   **Q.**    Yes.  Are there key words in here that would

4   be applicable to Gorilla-Snot?

5   **A.**    I am sure.

6   **Q.**    And that's what I am asking, are there key

7   words here that would be applicable to Soiltac?

8   **A.**    I am sure.

9   **Q.**    Are there key words here that would be

10  applicable to the rest of your products?

11  **A.**    I am sure.

12  **Q.**    That's all I was getting at.  Can you tell me

13  what this next page is, Page 4?

14  **A.**    Certain agencies require us to have our

15  product listed under certain categories and these would

16  be the categories that we felt our product lines would

17  fit into best, which makes sense, so that when someone

18  is looking for a product like ours and they would turn

19  to one of these sections or one of these categories to

20  find our product, hopefully it would be there.  It

21  needs to make common sense for the buyer.

22  **Q.**    And these listings, for example the North

23  American industry classification system, this comes

24  directly from their classification system, correct, you

25  didn't create these classes?

1    **Q.**   The next one is "standard industrial

2  classification," Durasoil would fit into at least one

3  of those classes listed under that, correct?

4    **A.**   I would certainly hope so.

5    **Q.**   "Product service codes," Durasoil is a

6  chemical, correct?

7    **A.**   I would call it a chemical.

8    **Q.**   And the last one is "Federal supply

9  classification," Durasoil would fit under at least one

10  of those, correct?

11    **A.**   I would think so.

12    **Q.**   Page 8 is the Durasoil page, is it not?

13    **A.**   Yes.

14    **Q.**   And who came up with this page?

15    **A.**   Primarily me.

16    **Q.**   The first line underneath the trademark says

17  "Durasoil, crystal clear, ultra-pure synthetic organic

18  dust control fluid," correct?

19    **A.**   It says that.

20    **Q.**   Why did you choose to use "crystal clear" if

21  you know in describing Durasoil here?

22    **A.**   I think it's important for the end user.

23    **Q.**   I mean you have it listed, do you not, as a

24  tag line next to Durasoil the trademark registered

25  symbol?

1    soil stabilization, dust control erosion control?

2    **A.**    Yes, I see it.

3    **Q.**    What erosion control are you referring to

4    there?

5    **A.**    Wind and water.

6    **Q.**    And I think we established that Durasoil also

7    provides erosion control for wind but not water,

8    correct?

9    **A.**    I think that's a fair statement.

10   **Q.**    Towards the back of the second to the last

11   page do you know what that document is?

12   **A.**    This would appear to be a document from the

13   web archive.

14   **Q.**    And are you familiar with the web archive?

15   **A.**    Not completely.

16   **Q.**    Just to make things proper why don't we detach

17   those two pages and we will mark them as a separate

18   exhibit because they really don't go with this GSA

19   sheet, do they?

20   **A.**    I wouldn't think so.

21   **Q.**    We will mark them as a separate exhibit.

22              (Deposition Exhibit No. 45 was marked.)

23   **Q.**    BY MR. SKERIOTIS:  Mr. Falkenberg, you have

24   just been handed what has been marked as Exhibit 45 and

25   I think you have already identified that this is an

1    **A.**    I have no information substantiating that.

2    **Q.**    The last page says "last modified 2-19-05."

3    Do you see that?

4    **A.**    I see that.

5    **Q.**    And that helps substantiate --

6    **A.**    That states when it was modified.

7    **Q.**    Wouldn't it be, though, how it appeared as

8    well on February 19, 2005?

9              **MR. DOSEK:**  Form and foundation.

10   **A.**    I can't say for sure.

11   **Q.**    BY MR. SKERIOTIS:  And this appears to be a

12   web page of Durasoil dot com?

13   **A.**    It would appear that way.

14   **Q.**    Do you have any reason to believe that it's

15   not a web page of Durasoil dot com?

16   **A.**    Not really.

17   **Q.**    Underneath Durasoil at the top of the first

18   page of Exhibit 48 it says Durasoil "ultra-pure

19   synthetic organic fluid."  Do you see that?

20   **A.**    I see that.

21   **Q.**    Underneath that it says "ultra-pure dust

22   control agent."  Do you see that?

23   **A.**    I see that.

24   **Q.**    Let me ask you:  Did you choose those tag

25   lines?

1    **A.**    I would say I had a heavy hand in choosing

2    those tag lines.

3    **Q.**    Did anyone else help you in choosing those tag

4    lines?

5    **A.**    If they did I don't remember who.

6              (Deposition Exhibit No. 49 was marked.)

7    **Q.**    BY MR. SKERIOTIS:  Mr. Falkenberg, you have

8    just been handed what has been marked as Exhibit 49; do

9    you recognize that document?

10    **A.**    It looks like some sort of copy of our

11    Durasoil web site.

12    **Q.**    And then the third page says "last modified

13    4-2-05."  Do you see that?

14    **A.**    I see that.

15    **Q.**    I am also going to hand you back what was

16    marked as Exhibit 48 that we just reviewed.  In

17    comparing the two web sites, the two exhibits, one

18    being from April 2nd of '05 and the other one being

19    from February 19 of '05, Exhibit 49 and 48

20    respectively, there are some changes in that two-month

21    period, roughly two-month period.

22              One of the changes is the tag line in

23    Exhibit 49.  It now says "ultra-pure synthetic organic

24    dust control agent."  Do you see that?

25    **A.**    On 49?

1    Q.    Yes.

2    A.    I see that.

3    Q.    Were you responsible for changing that tag

4    line from Exhibit 48 to Exhibit 49?

5    A.    Most likely.

6    Q.    Why did you change that tag line?

7    A.    It would appear that the logo in document 48

8    has the wording "ultra-pure synthetic organic fluid" in

9    the logo which is an image which is not searchable by

10   search engines in terms of meta data and that it would

11   likely be the reason why it was changed to what is seen

12   on Exhibit 49 as the Durasoil without the tag line

13   "ultra-pure synthetic organic fluid" listed underneath

14   Durasoil as an image so that it is searchable.

15   Q.    So are you familiar with how things get

16   searched on the Internet via Yahoo and Google?

17   A.    I would say I have a fair understanding.

18   Q.    So in Exhibit 49 you changed it to my

19   understanding from what you just said so that people

20   who are looking for ultra-pure synthetic organic would

21   be able to find Durasoil; is that a fair statement?

22   A.    I am assuming that that's the reason why I did

23   it.

24   Q.    But at least you do know that in Exhibit 48 it

25   was part of the image of the Durasoil brand, the logo,

1   I am sorry, and therefore you are saying in 48 you know

2   for sure it was not searchable there?

3       **A.**    I am making a judgment call based on these

4   black and white copies it appears to be that that is an

5   image, not text, on document 48.

6       **Q.**    And if it is in fact an image, those words on

7   Exhibit 48 "ultra-pure synthetic organic fluid" would

8   not be searchable?

9       **A.**    Not as they are seen.

10      **Q.**    Yes, on that image?

11      **A.**    Yeah.  To the visual eye, no.

12      **Q.**    And then in Exhibit 49, if in fact it is taken

13  apart from the logo of Durasoil; i.e., not an image,

14  then it is searchable?

15      **A.**    It is my understanding that text is

16  searchable.

17      **Q.**    I will now hand you what has been marked as

18  Exhibit 13; have you seen Exhibit 13 before today?

19      **A.**    Not this form, no.

20      **Q.**    Do you know what it is?

21      **A.**    It says it's a trademark for synthetic organic

22  dust control.

23      **Q.**    When did you first find out that Midwest had a

24  registered trademark for synthetic organic dust

25  control?

1    **A.**    It's possible.

2    **Q.**    Anything that you know of?

3    **A.**    Not offhand.

4    **Q.**    How did you come up with the words "synthetic
5    organic dust control"?

6    **A.**    I don't remember.

7    **Q.**    Were you the one who came up with the words
8    "synthetic organic dust control" for Durasoil?

9    **A.**    I think I had a heavy hand in putting that
10    together.

11    **Q.**    Do you recall how you first saw the use of
12    "synthetic organic dust control" by Midwest?

13    **A.**    I don't recall that.

14    **Q.**    Do you know of any other entity whatsoever
15    using the words "synthetic organic dust control" in
16    association with a dust suppressant?

17    **A.**    I am not sure.

18    **Q.**    Do you know of any, though, as you sit here
19    today?

20    **A.**    Nothing comes to mind.

21    **Q.**    Other than of course your Durasoil product,
22    correct?

23    **A.**    If we have used that, then yes.

24    **Q.**    Have you used "synthetic organic dust
25    control"?

1    **A.**    I believe so.

2    **Q.**    But you don't know?

3    **A.**    I think we have.

4    **Q.**    Again, we went over that, you don't know when

5    you first started using it, correct?

6    **A.**    That's correct.

7    **Q.**    In fact you have used "synthetic organic dust

8    control" exactly as it appears in Exhibit 13, correct?

9    In other words you have used those four words to

10   describe Durasoil, correct?

11   **A.**    I am sure we have.

12   **Q.**    And we have already established, I think, that

13   Durasoil is a competitor, competing product with

14   respect to EnviroKleen, correct?

15   **A.**    In what sense?

16   **Q.**    With respect to some invitations to bid

17   Durasoil and Soilworks -- strike that -- Durasoil and

18   EnviroKleen can be used for the same applications, can

19   be?

20   **A.**    I don't believe that I have data documenting

21   that they are interchangeable.

22   **Q.**    I didn't say they were interchangeable, they

23   could be used for the same soil stabilization or dust

24   control, correct?

25   **A.**    I think you should go back to yesterday when

1    Q.   And if we take a look at Exhibit 13 is a "dust

2  suppressant in the nature of aliphatic and cyclic

3  organic dust suppressing compositions," correct?

4    A.   That's what it describes here.

5    Q.   I am asking you if Durasoil meets that?

6    A.   I don't know.

7    Q.   Okay.

8    A.   What are those?

9    Q.   Is Durasoil a dust suppressant?

10    A.   We already established that this morning, I

11  believe so.

12    Q.   And Durasoil can be used in controlling dust

13  on roadways, correct?

14    A.   It has.

15    Q.   And it can be used for controlling dust on

16  shoulders, trails, helipads, stockpiles, heavy traffic

17  roads, baseball diamonds and horse tracks, correct?

18    A.   I think it could.

19    Q.   Are you aware of the channels of marketing

20  that Durasoil is used within, is promoted within?

21    A.   I don't understand the question.

22    Q.   How do you market Durasoil; are you aware of

23  that?

24    A.   I think I have a good idea.

25    Q.   How do you market it?

1    **A.**    Trade shows, literature, online.

2    **Q.**    When you say "online" you mean the Internet?

3    **A.**    Yes.

4    **Q.**    Any other ways?

5    **A.**    E-mail, mailings.  I think that's a good list.

6    **Q.**    Have you ever seen Midwest at any of the trade

7    shows?

8    **A.**    Yes, I have.

9    **Q.**    Have you seen at the trade shows them

10   marketing EnviroKleen?

11   **A.**    I think so.

12   **Q.**    How about EK-35?

13   **A.**    I think so.

14   **Q.**    Have you seen literature, marketing

15   literature, for EnviroKleen and EK-35?

16   **A.**    I believe so.

17   **Q.**    And are you aware that Midwest advertises

18   EnviroKleen and EK-35 online?

19   **A.**    I believe so.

20   **Q.**    At these trade shows have you seen Midwest's

21   products using the words "synthetic organic dust

22   control"?

23   **A.**    It's very likely.

24   **Q.**    Have you seen them using "synthetic organic

25   dust control" in literature?

1    **A.**    I believe so.

2    **Q.**    Have you seen them using "synthetic organic

3    dust control" online, on the Internet?

4    **A.**    I believe so.

5    **Q.**    Have you seen any marketing E-mails of

6    Midwest?

7    **A.**    I am not sure.

8    **Q.**    Have you seen any mailings of marketing from

9    Midwest?

10    **A.**    I am not sure.

11    **Q.**    Have you seen any marketing mailings of

12    synthetic organic dust control by Midwest?

13    **A.**    I am not sure.

14    **Q.**    With respect to the end purchasers of Durasoil

15    would you classify them as individuals who typically

16    take a great degree of care in selecting what product

17    they are going to use or could it be a mixture of both,

18    some people really care about the products they use and

19    some people only care about price?  How would you

20    classify them if you can?

21              **MR. DOSEK:**  Object to the form,

22    foundation.

23    **A.**    Can you state that in another fashion.

24    **Q.**    BY MR. SKERIOTIS:  What I'm trying to figure

25    out is how likely is it that the end purchaser is

1    **Q.**   BY MR. SKERIOTIS:  Mr. Falkenberg, you have

2  just been handed what has been marked as Exhibit 52; do

3  you recognize that document?

4    **A.**   It appears to be a printout of Google search

5  results.

6    **Q.**   Google search results for the mark soil

7  sement?

8    **A.**   Soil sement is listed in the search, and

9  that's soil sement with an S.

10    **Q.**   Correct.  And do you see on the right-hand

11  side under Sponsored Links it says Soiltac soil

12  stabilizer?  Do you see that?

13    **A.**   I see that.

14    **Q.**   Do you know how it came to be that the search

15  for soil sement on Google's web site produced as a

16  sponsored link Soiltac soil stabilizer?

17    **A.**   There must be a term that is a trigger for

18  that sponsored link to appear.

19    **Q.**   What term would that be?

20    **A.**   Well, if I am guessing it would either be the

21  entire phrase or it would be either of those words.

22    **Q.**   Who is in charge at Soilworks of adopting key

23  words for Google's web site?

24    **A.**   I am the person that primarily has dealt with

25  our Google campaigns.

1    **Q.**    Was there ever a time that you indicated to

2    Google that you would like your web site Soiltac dot

3    com to pop up when someone is searching for soil

4    sement?

5    **A.**    What do you mean by indicated to them?

6    **Q.**    Well, have you ever taken out the key word

7    soil sement so that Soiltac dot com would pop up as a

8    sponsored link?

9    **A.**    I believe so.

10    **Q.**    And you did that because you wanted someone

11    searching for soil sement to see Soiltac under the

12    sponsored link, correct?

13    **A.**    That trigger, we wanted the result of our ad

14    to show up with that trigger.

15    **Q.**    Correct.  And the trigger being soil sement?

16    **A.**    If that's the key word that was being used.

17    **Q.**    Do you know if that's the key word that was

18    being used?

19    **A.**    I believe that that key word is used or has

20    been used.

21    **Q.**    It's my understanding, then, that you chose

22    the trademark soil sement as a key word on Google's web

23    site so that when someone searches for soil sement they

24    find Soiltac, correct?

25    **A.**    As a trigger term?

1    **Q.**   Right.  Correct.

2    **A.**   I think that sounds correct.

3    **Q.**   And you did that because you wanted someone

4  who is searching for Midwest's Soil-Sement to know

5  and/or find Soiltac?

6    **A.**   We compete in similar industries.

7    **Q.**   Right.  But that's what you intended to have

8  happen, right, somebody searching for Midwest's

9  Soil-Sement would find Soiltac?

10    **A.**   Soil-Sement can also be misspelled and that is

11  a very common misspelling, there is soil sement with an

12  S and soil cement with a C.

13    **Q.**   But you wanted someone searching for

14  Soil-Sement to find Soiltac, correct?

15    **A.**   I think that's reasonable to state.

16    **Q.**   Could you turn to Page 2.  Do you see

17  International Soil Technologies, LLC?

18    **A.**   I do.

19    **Q.**   Do you know who that is?

20    **A.**   Yes.

21    **Q.**   Who is that?

22    **A.**   It's another one of the companies that I am

23  related to.

24    **Q.**   How are you related to International Soil

25  Technologies, LLC?

1          **MR. SKERIOTIS:**  It doesn't go soil then

2     sement, you are correct.

3          **MR. DOSEK:**  Okay, thanks.

4     **Q.**    BY MR. SKERIOTIS:  Do you know of anyone else

5     who would have chosen those key words other than that?

6     **A.**    We have worked with other companies on

7     optimizing our web presence.

8     **Q.**    But which key words to choose would still come

9     from someone at Soilworks, correct?

10    **A.**    More than likely.

11    **Q.**    If we turn to the Results page of Google,

12    Results 101 - 110, in fact what now pops up for soil

13    sement is the actual Soiltac dot com web site, correct?

14    **A.**    That's what this document appears to show.

15         **MR. SKERIOTIS:**  I think we are done with

16    that one.

17         (Deposition Exhibit No. 53 was marked.)

18    **Q.**    BY MR. SKERIOTIS:  Mr. Falkenberg, you have

19    just been handed what has been marked as Exhibit 53; do

20    you know what that is?

21    **A.**    This appears to be another Google search

22    result.

23    **Q.**    And except this one is I think dated

24    January 31, 2005; do you see that in the lower right

25    corner?

1    **A.**    I see that.

2    **Q.**    The same type of questions, I am not going to

3    go through it all, it's just that "soil sement" is

4    being searched on Google and Soiltac comes up in the

5    sponsored link section; do you see that?

6    **A.**    I see that.

7    **Q.**    Do you have any reason to believe that there

8    was any different reasons that you gave earlier as to

9    why soil sement -- or strike that -- why "Soiltac"

10   comes up under a "soil sement" search?

11   **A.**    Did you say did I have any other reasons?

12   **Q.**    In other words would the reasons be the same

13   as to what you gave earlier with respect to Exhibit 52

14   as to why that comes up?

15   **A.**    I think that was appropriate.

16   **Q.**    The same reason you mean?

17   **A.**    Yes.

18   **Q.**    Okay.

19   **A.**    I wanted to clarify, I have only looked at the

20   cover of that page, I haven't looked through that

21   entire document, so are we referencing anything that's

22   behind Page 1?

23   **Q.**    I think you should take a look at it.  It's

24   basically the same types of results, International Soil

25   Technologies, LLC, same types of things with respect to

1  soil sement.

2          If you would like to add anything that

3  you believe is different from Exhibit 52, you are more

4  than welcome to do that.  I just don't want to repeat

5  the same questions and get the same answers, I am

6  trying to save time.  And in no way am I saying that's

7  identical to Exhibit 52, I understand it's different,

8  it's a different time period, but it's basically got

9  the same results.

10     **A.**    Okay, I just didn't want to be making

11  generalizations about the entire document when I hadn't

12  even looked at it.

13     **Q.**    Sure.  And I really don't want you to do that

14  either.  I understand that.  And that's a fair

15  statement.

16          (Deposition Exhibit No. 54 was marked.)

17     **Q.**    BY MR. SKERIOTIS:  You have just been handed

18  what has been marked as Exhibit 54; do you know what

19  that is?  And take a moment to look through it.

20     **A.**    It appears to be an HTML code.

21     **Q.**    For Soiltac dot com?

22     **A.**    I think so.

23     **Q.**    Underneath the Soiltac Home Page do you see

24  where it says "sement soil"?

25     **A.**    Which line?

1    **Q.**    Underneath if you look at the --

2    **A.**    What does the line start with?

3    **Q.**    Under meta - name equals key words, underneath

4    that key words three lines under that "sement soil"

5    next to abatement products the line begins with

6    "abatement products."

7    **A.**    Yes.

8    **Q.**    Do you see "sement soil"?

9    **A.**    Yes.

10   **Q.**    Do you know what those words in there after

11   "meta name equals" and then "key words," do you know

12   what those are called?

13   **A.**    I believe they are called key words.

14   **Q.**    I will represent to you they are also called

15   meta tags.  Are you familiar with meta tags?

16   **A.**    I think I have a pretty good idea what meta

17   tags are.

18   **Q.**    And do you see again soil sement is listed as

19   a meta tag, correct?

20   **A.**    Soil sement?

21   **Q.**    Or "sement soil".

22   **A.**    Because I have "soil cement" here with a C.

23   **Q.**    No, sement soil, s-e-m-e-n-t soil.  Do you see

24   that?

25   **A.**    Sement soil with an S?

1    **Q.**    Correct.

2    **A.**    Yes.

3    **Q.**    And that is in fact Midwest's trademark but in

4    reverse order, correct?

5    **A.**    You could look at it that way.

6    **Q.**    And that would be for Soiltac, correct?

7          **MR. DOSEK:**  Object to the form.

8    **A.**    What do you mean?

9    **Q.**  BY MR. SKERIOTIS:  This is Soiltac's home

10   page, correct?

11    **A.**    It appears to be that way.

12    **Q.**    And if you come down underneath the next

13   heading Product Information Page, again next to the

14   word "abatement" is the word sement, s-e-m-e-n-t; do

15   you see that?

16    **A.**    I see that.

17    **Q.**    And then right above that line it says

18   "polymer chemical soil stabilizers," correct?

19    **A.**    I see that.

20    **Q.**    And again that would be the meta tag

21   identifiers, correct?

22          **MR. DOSEK:**  Form.

23    **A.**    What do you mean?

24    **Q.**  BY MR. SKERIOTIS:  These words that are in

25   there after the word "meta names equal key words,"

1      those are all called meta tags, correct, on this line

2      as well?

3          A.    That would be my understanding.

4          Q.    And then if you take a look at the rest of the

5      document it's basically the same thing, the word soil

6      and the word sement, s-e-m-e-n-t, appears in the meta

7      tags for each page?

8          A.    You mean "sement soil"?

9          Q.    Well, I am saying the word "soil" and the word

10     "sement" appear separately in the meta tags for each

11     web page?

12         A.    I agree that the word "sement" and the word

13     "soil" appear in there.

14         Q.    But you haven't flipped the page, I want to

15     make sure you have flipped the page, it's in every web

16     page that's listed on this Exhibit 54.

17         A.    It would help if they are highlighted because

18     there is an awful lot of stuff here.

19         Q.    I understand.  I didn't want to give you a

20     marked up copy, but take your time.  I can help you if

21     you like.

22         A.    I will take your word for it.

23         Q.    No, I don't want you to do that.  Let's go to

24     the first page.

25         A.    Why don't I trade you copies.

1    **Q.**    Because that one is the one that has to be

2    here.  And why don't you follow along with me, "sement"

3    there underneath Application Rates on the second page?

4    **A.**    Okay.

5    **Q.**    And then the word "soil" as well.

6    **A.**    Okay.

7    **Q.**    "Sement" underneath Application Equipment

8    page.

9    **A.**    Okay.

10    **Q.**    And the word "soil" as well.

11    **A.**    Okay.

12    **Q.**    And then underneath Application Methods page,

13    I actually don't have highlighted, let's see if it's in

14    there.  "Sement" here.

15    **A.**    Okay.

16    **Q.**    And then "soil" here.

17    **A.**    Okay.

18    **Q.**    And then Shipping Containers page "sement"

19    there, "soil" at least there.

20    **A.**    I see them on the different lines.

21    **Q.**    MSDS page "sement" there and then "soil" in

22    there as well right there.

23    **A.**    Uh-huh.

24    **Q.**    And the next page begins with -- on the bottom

25    is the FAQ page, Frequently Asked Questions, "sement"

1    there and then "soil" there.

2        **A.**    Way over there.

3        **Q.**    Yes.  And then Photo Gallery page "sement"

4    here and the word "soil" there as well.

5        **A.**    All the way down there.

6        **Q.**    And then Price Schedule "sement" and then

7    "soil" there.

8        **A.**    Way over there.

9        **Q.**    Correct.  And then the next page Test and

10   Evaluations page the word "sement" there.

11       **A.**    Yes.

12       **Q.**    And then the word "soil" again in the same

13   place.

14       **A.**    On the other line.

15       **Q.**    Yes.  And then underneath Environmental Data

16   page "sement" there and the word "soil" there.

17       **A.**    Yes.  On the other line.

18       **Q.**    And then the Downloads page "sement" there and

19   the word "soil" there.

20       **A.**    Okay.

21       **Q.**    If we keep going and we turn the page to

22   Industry Regulations page, "sement" there and the word

23   "soil" there.

24       **A.**    Uh-huh.  Over there.

25       **Q.**    Industry News page, again I don't have that

1    highlighted here but let's take a look.  I don't see it

2    on the Industry News page; do you?

3        A.    No.

4        Q.    I don't see it there.  Industry Links page it

5    does not appear to be there either, correct?

6        A.    I don't see it.

7        Q.    Underneath the Free Soiltac Sample page it is

8    there, correct, "sement" with "soil"?

9        A.    Yes.

10       Q.    And then on the Contact Us page it is there,

11   "sement" and then the word "soil".

12       A.    And again --

13       Q.    Far apart.

14       A.    Yes.

15       Q.    Or a few words apart?

16       A.    Yes.

17               MR. SKERIOTIS:  And I wanted to tell you

18   "sement" is with an S in all of those instances.

19               THE WITNESS:  But I also want to clarify

20   that the word "cement" with a C is in that document

21   many times as well.

22               MR. SKERIOTIS:  Sure.  I mean the

23   document sort of speaks for itself but you are right.

24               (Deposition Exhibit No. 55 was marked.)

25       Q.    BY MR. SKERIOTIS:  You have just been handed

1 what has been marked Exhibit 55; do you know what that

2 is?

3    A.    It looks like more HTML code.

4    Q.    From Soiltac dot com?

5    A.    It says Soiltac at the top, I would presume

6 that's where it's from.

7    Q.    Once again in the meta tag description do you

8 see the words "sement" with an S and "soil"?

9    A.    I see that.  I also see "soil cement" with a

10 C.

11    Q.    Correct.  Do you know who is responsible for

12 choosing the word "sement" with an S in the meta tag

13 for Soiltac dot com?

14    A.    I would primarily be the person responsible

15 for choosing our key words.

16              (Deposition Exhibit No. 56 was marked.)

17    Q.    BY MR. SKERIOTIS:  Mr. Falkenberg, you have

18 just been handed what has been marked Exhibit 56; do

19 you know what that is?

20    A.    Another HTML code document, it looks like it's

21 referring to Soilworks dot com.

22    Q.    And do you see a date on there as well?

23    A.    Can you point me in the right direction?

24    Q.    Maybe at the very top.  March 23rd, 2006,

25 06-23-03.

1    **A.**    Okay.

2    **Q.**    As a matter of fact let's turn to Page 6.  I

3  will represent to you this came off of the Internet

4  Archive dot org web site and it says at the very bottom

5  file archived on 2003/06/23.  Actually I messed that

6  up, that's June 23rd, 2003.  Do you see that?

7    **A.**    I see that.

8    **Q.**    Do you have any reason to believe that this

9  was not your source page for Soilworks dot com on

10  June 23, 2003?

11    **A.**    Not right now.

12    **Q.**    Going back to Page 1 of Exhibit 56 do you see

13  where it says "meta name key words" and then in there

14  it has "soil" and then another line it has "sement"

15  with an S?  Do you see that?

16    **A.**    Yes.

17    **Q.**    And again, you were in charge of key words on

18  June 23, 2003 for this web site?

19    **A.**    I would think I would be the primary person.

20            (Deposition Exhibit No. 57 was marked.)

21    **Q.**  BY MR. SKERIOTIS:  Mr. Falkenberg, you have

22  just been handed what has been marked as Exhibit 57; do

23  you recognize that document?

24    **A.**    This looks similar to the last one with a

25  different date I presume.

1    **Q.**    So this would be the source data for Soilworks

2  dot com?

3    **A.**    I can't say for sure but that would be my best

4  guess.  I am not sure where this came from.

5    **Q.**    On Page 10 right in the middle it says

6  "Soilworks, LLC" over to the left, "2003, all rights

7  reserved," and it goes on to say "last modified

8  8-5-03."  Do you see that?

9    **A.**    I see that.

10    **Q.**    Do you have any reason to believe that this is

11  not the source information of the Soilworks dot com web

12  site on August 5, 2003?

13    **A.**    I haven't researched this.  I can't say for

14  sure, but it would appear that way.

15    **Q.**    And in fact if we turn back to Page 1, same

16  questions here, we have within the meta tag

17  identifiers, we have the words "soil" and the word

18  "sement" with an S, correct?

19    **A.**    I see the word "sement" and I see the word

20  "soil" in many places.

21    **Q.**    In fact one of it says "sement soil binder

22  products," correct?

23    **A.**    Yes.

24    **Q.**    Then again at this time or during this time

25  period, again you would be the person who would be in

1   charge of the meta tags, correct?

2   **A.**   That's right.  And also again "sement" spelled

3   with both an S and a C are in here.

4   **Q.**   And just to clarify, you understand how at

5   least rudimentarily that placing key words in the meta

6   tags allow search engines like Google and Yahoo to find

7   on those key words, correct?

8   **MR. DOSEK:**  Form, foundation.

9   **A.**   It's my understanding -- would you like to

10   repeat?

11   (Record read.)

12   **THE WITNESS:**  Could you simplify that?

13   **Q.**   BY MR. SKERIOTIS:  Why would you put the key

14   words in those meta tags?

15   **A.**   It's my understanding that that's important

16   for search engine optimization.

17   **Q.**   So when somebody puts in a key word in a

18   search of Google it will find your web site?

19   **A.**   I don't know that that's important for Google.

20   **Q.**   Or search engines?

21   **A.**   I think traditionally it has been important

22   for search engines.

23   **Q.**   Is there any other reason to put in key words

24   or meta tags that you know of other than to allow them

25   to be searched and then they pop up in a search result?

1    **A.**    I would think that would be a very important

2    reason, I can't think of anything else at this time.

3           **MR. SKERIOTIS:**  Let's take a quick break

4    and then if I don't have anything else we will just say

5    we will conclude.

6           (Recess.)

7    **Q.**    BY MR. SKERIOTIS:  A couple of follow-up

8    questions, I guess, on some topics we want to make sure

9    I have covered.  I think I asked Dorian this, I didn't

10   ask you this, that's why I want to make sure I do.

11          Are you aware of any lawsuits or

12   accusations against Soilworks for trademark

13   infringement other than this current suit?

14   **A.**    I am not real sure.

15   **Q.**    So you are not sure if you have ever received

16   a letter being accused of trademark infringement?

17   **A.**    I can't be for certain.

18   **Q.**    What makes you uncertain?

19   **A.**    I certainly don't think anything in the near

20   future, otherwise it would come to mind -- I mean in

21   the recent past, otherwise it would come to mind.

22   **Q.**    How about patent infringement?

23   **A.**    Not to my knowledge.

24   **Q.**    How about any lawsuits or accusations against

25   Soilworks for copyright infringement?

```
1  STATE OF ARIZONA        )
                           )    ss.
2  COUNTY OF MARICOPA      )

3

4         BE IT KNOWN that the foregoing deposition was

5  taken before me, LINDA BLACKMON, a Certified Reporter

6  in the State of Arizona; that the witness before

7  testifying was duly sworn by me to testify to the whole

8  truth; that the questions propounded to the witness and

9  the answers of the witness thereto were taken down by

10 me in shorthand and thereafter reduced by

11 computer-aided transcription to print under my

12 direction; that the deposition was submitted to the

13 witness to read and sign; that the foregoing 228 pages

14 are a true and correct transcript of all proceedings

15 had upon taking of said deposition, all done to the

16 best of my skill and ability.

17         I FURTHER CERTIFY that I am in no way related

18 to any of the parties thereto nor am I in any way

19 interested in the outcome hereof.

20         DATED at Phoenix, Arizona, this 15th day of

21 April, 2008.

22

23                          _____
                            Linda Blackmon, RPR/RMR
24                          Certified Reporter
                            Certificate No. 50320
25
```

```
1   STATE OF ARIZONA        )
                            )   ss.
2   COUNTY OF MARICOPA      )

3

4           BE IT KNOWN that the foregoing deposition was

5   taken before me, LINDA BLACKMON, a Certified Reporter

6   in the State of Arizona; that the witness before

7   testifying was duly sworn by me to testify to the whole

8   truth; that the questions propounded to the witness and

9   the answers of the witness thereto were taken down by

10  me in shorthand and thereafter reduced by

11  computer-aided transcription to print under my

12  direction; that the deposition was submitted to the

13  witness to read and sign; that the foregoing 125 pages

14  are a true and correct transcript of all proceedings

15  had upon taking of said deposition, all done to the

16  best of my skill and ability.

17          I FURTHER CERTIFY that I am in no way related

18  to any of the parties thereto nor am I in any way

19  interested in the outcome hereof.

20          DATED at Phoenix, Arizona, this 15th day of

21  April, 2008.

22

23                          Linda Blackmon, RPR/RMR
                            Certified Reporter
24                          Certificate No. 50320

25
```