IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

SOILWORKS, LLC, an Arizona )
corporation, )
)
    Plaintiff/Counterdefendant, )
)
           vs. )No.2:06-CV-02141-DGC
)
MIDWEST INDUSTRIAL SUPPLY, INC., )
an Ohio corporation authorized to )
do business in Arizona, )
)
    Defendant/Counterclaimant. )
                    )


Phoenix, Arizona
April 8, 2008
9:00 a.m.


CONFIDENTIAL DEPOSITION OF DORIAN FALKENBERG


LEA, SHERMAN & HABESKI
Registered Professional Reporters
834 North First Avenue
Phoenix, Arizona  85003
Phone: 602.257.8514 - Fax: 602.257.8582
Reported by:  Jennifer Hanssen, RPR
Certified Reporter
Certificate No. 50165

Dockets.Justia.com

```
                          I N D E X
```

EXAMINATION                                                PAGE

By Mr. Skeriotis ..................................    4


EXHIBITS            DESCRIPTION                             PAGE

1    Notice of Deposition dated 3-24-08 ..........    5

2    Complaint for Damages and Equitable Relief and
     Demand for Jury Trial dated 9-7-06 ..........   55

3    Letter to John M. Skeriotis from John P.
     Passarelli dated 10-3-07 ....................   82

4    Midwest Industrial Supply, Inc.'s Answers and
     Counterclaims dated 3-26-07 .................   90

5    Reply to Midwest Industrial Supply, Inc.'s
     Counterclaims dated 4-16-07 .................   97

6    Soilworks, LLC's Rule 26 Disclosures
     dated 5-21-07 ................................   98

7    Soilworks, LLC's Answers To Midwest Industrial
     Supply, Inc.'s First Set of Interrogatories
     dated 7-23-07 ................................  102

8    Soilworks, LLC's Responses to Midwest Industrial
     Supply, Inc.'s First Request for Production of
     Documents dated 7-23-07 ......................  122

9    Facsimile Transmission to John M. Skeriotis from
     E. Scott Dosek dated 4-1-08 ..................  128

10   Soilworks, LLC's Response to Midwest Industrial
     Supply, Inc.'s First Set of Request for
     Admissions to Soilworks, LLC dated 12-31-07 ... 136

11   Soilworks Settlement Conference Memorandum dated
     2-20-08 ......................................  137

12   Durasoil Material Safety Data Sheet ..........  164

13   Trademark Principal Register .................  169

1       CONFIDENTIAL DEPOSITION OF DORIAN FALKENBERG,

2

3   taken at 9:23 a.m., on April 8, 2008, at the law offices

4   of Jones, Skelton & Hochuli, P.L.C., 2901 North Central

5   Avenue, Suite 800, Phoenix, Arizona, before JENNIFER

6   HANSSEN, RPR, a Certified Reporter in the State of

7   Arizona.

8

9   APPEARANCES:

10          For the Plaintiff/Counterdefendant:
                Kutak Rock, L.L.P.
11              by E. SCOTT DOSEK, ESQ.
                8601 North Scottsdale Road
12              Scottsdale, Arizona  85253

13          For the Defendant/Counterclaimant:
                Brouse McDowell
14              by JOHN M. SKERIOTIS, ESQ.
                388 East Main Street, Suite 500
15              Akron, Ohio  44311-4407

16          Also present:

17              Robert Vitale

18

19

20

21

22

23

24

25

DORIAN FALKENBERG,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SKERIOTIS:

Q.    Ms. Falkenberg, this deposition is being taken pursuant to notice and agreement of the parties. It's being taken also pursuant to the Federal Rules of Civil Procedure for purposes of discovery and other purposes allowed pursuant to the Federal Rules of Evidence and to the Notice of Deposition that we issued in this case.

Can you state your name, please?

A.    Dorian Falkenberg.

Q.    Can you spell your last name, please?

MR. DOSEK:  I'm sorry to interrupt. Before we go any further I do want on the record to invoke pursuant to the Protective Order my right to review the transcript of this entire deposition within 20 days to designate information that is provided today as either confidential information or confidential attorneys' eyes only information.

MR. SKERIOTIS:  Anything else that you know of right now?

1          MR. DOSEK:  No.

2     Q.    BY MR. SKERIOTIS:  Spell your last name,

3   please.

4     A.    F-a-l-k-e-n-b-e-r-g.

5          MR. SKERIOTIS:  And just for purposes of

6   the record, the people who are in this room are Scott

7   Dosek representing Ms. Falkenberg and Robert Vitale, CEO

8   of Midwest, along with myself.

9     Q.    BY MR. SKERIOTIS:  Ms. Falkenberg, did you

10  bring any documents with you here today?

11    A.    Yes.

12    Q.    Can I have those documents that you brought

13  with you today, take a look at them.

14          What you've handed me then is the Notice of

15  Deposition that I sent to you; correct?

16    A.    Yes.

17    Q.    Okay.  I'll hand that back to you.  Have you

18  had your deposition taken before?

19    A.    Yes.

20    Q.    How many times?

21    A.    Once.

22    Q.    And when was that?

23    A.    Several years ago.

24    Q.    What type of case was that?

25    A.    An auto accident.

1    Q.    And were you the plaintiff or defendant?

2    A.    Plaintiff.

3    Q.    Who was the defendant?

4    A.    I believe the insurance company.

5    Q.    Now I'm sure that Mr. Dosek has informed you of

6    how this deposition process goes and you may even recall

7    it from your prior deposition in your auto accident;

8    however, I'd like to go over just some ground rules so

9    you and I are on the same page of how it's going to go

10   today.  If you don't understand a question, will you let

11   me know?

12   A.    M'hum.  Yes.

13   Q.    If you don't hear any part of the question,

14   will you tell me?

15   A.    Yes.

16   Q.    If you don't tell me, I'm going to assume that

17   you heard the question and you understand the question.

18   Is that okay?

19   A.    Yes.

20   Q.    Now if you realize that during this deposition

21   that you have given an answer that was either inaccurate

22   or incomplete, please let me know and I'll give you a

23   chance to correct it on the record.  Is that okay?

24   A.    Yes.

25   Q.    And you understand that your responses, your

1    answers, are being recorded by the court reporter?

2       A.    Yes.

3       Q.    And you already understand I can tell that you

4    must give audible, verbal answers; correct?

5       A.    Yes.

6       Q.    And you understand that you may request a

7    chance to review the transcript that's going to be

8    generated by the court reporter from your testimony

9    today?

10      A.    Yes.

11      Q.    And you also understand that after you review,

12   you may correct any errors in the transcript; correct?

13      A.    Yes.

14      Q.    And you understand that any changes that you

15   make to the transcript, I will have an opportunity to

16   comment upon those changes at trial?

17      A.    Yes.

18      Q.    Is there any reason why you feel that you

19   cannot testify fully and accurately here today?

20      A.    No.

21      Q.    Do you have any questions about how it's going

22   to go today?

23      A.    No.

24      Q.    Now I plan on taking breaks during the

25   deposition so do you have any special needs I need to be

1  aware of?

2     A.    Yes.

3     Q.    What are those?

4     A.    I need to excuse myself to go pump because I'm

5  breastfeeding an infant.

6     Q.    Okay.  I've been there, my wife has done that,

7  I fully appreciate that.  Okay, thanks for letting me

8  know.  The only thing I ask is that when a question is

9  pending we don't take a break.

10    A.    Yes.

11    Q.    We can take a break right after that to go

12 ahead and do what you need to do, that's fine.

13 Obviously if you need to use the rest room, just let me

14 know as well, not a problem.

15          Did you meet with anybody before this

16 deposition for the purposes of preparing?

17    A.    Yes.

18    Q.    Who did you meet with?

19    A.    My attorney.

20    Q.    And would that be Mr. Dosek?

21    A.    Yes.

22    Q.    And how many times did you meet with Mr. Dosek

23 to prepare for this deposition?

24    A.    Once.

25    Q.    And when was that?

1   address?

2     A.   Yes.

3     Q.   When was Soilworks formed?

4     A.   2003.

5     Q.   Who are the principals of Soilworks?

6     A.   Chad Falkenberg, myself and Masterson

7   Properties, L.L.C.

8     Q.   Is Chad the president?

9     A.   Yes.

10     Q.   And you are the vice president?

11     A.   Yes.

12     Q.   And what is Masterson Properties, L.L.C.?

13     A.   The financial member.

14     Q.   Can you explain what a financial member is?

15     A.   They've invested in the company.

16     Q.   Who are the principals of Masterson Properties,

17   L.L.C.?

18     A.   I don't know.

19     Q.   Who are the owners of Masterson Properties,

20   L.L.C.?

21     A.   I don't know.

22     Q.   Do you know anybody who works for Masterson

23   Properties, L.L.C.?

24     A.   Yes.

25     Q.   Who do you know that's associated with

1     Q.    But you do have an operating agreement?

2     A.    We do.

3     Q.    And the officers in that operating agreement

4 are Chad Falkenberg, Dorian Falkenberg and Masterson

5 Properties, L.L.C.; correct?

6     A.    Yes.

7     Q.    There are no other officers; correct?

8     A.    Correct.

9     Q.    Does Masterson Properties, L.L.C. provide any

10 other assistance to Soilworks other than the $950,000?

11    A.    I don't believe so.

12    Q.    You said you don't believe so.  Would anyone

13 else have any other information about that other than

14 you?

15    A.    I don't know.

16    Q.    You indicated that Soilworks sells chemicals

17 for soil stabilization and dust control; correct?

18    A.    Yes.

19    Q.    What products does Soilworks sell?

20    A.    Soiltac, Powdered Soiltac, Gorilla-Snot,

21 Durasoil and Surtac.

22    Q.    So if I did it right, I counted five products?

23    A.    Yes.

24    Q.    And what is Soiltac?

25    A.    It's a polymer-based soil stabilizer.

1    Q.    And then in 2003 he forms Soilworks; correct?

2    A.    Yes.  We did.

3    Q.    You both did, correct.  Okay.

4          MR. DOSEK:  Are you doing okay?

5    A.    I'm fine, thank you.

6    Q.    BY MR. SKERIOTIS:  I'd like to establish some

7    areas of knowledge that you have with respect to

8    Soilworks.  Do you have knowledge of marketing with

9    respect to Soilworks?

10   A.    Some.

11   Q.    How about advertising?

12   A.    Not really.

13   Q.    Who would have information about advertising at

14   Soilworks?

15   A.    Chad.

16   Q.    How about sales, do you have knowledge of sales

17   at Soilworks?

18   A.    What do you mean by "sales," sales reps or?

19   Q.    To whom sales are made.

20   A.    Yes.

21   Q.    The amount of your sales?

22   A.    Yes.

23   Q.    By the way, would that be by product?  Would

24   you have information about the sales of Soilworks by

25   product?

1     A.    Yes.

2     Q.    Do you have knowledge about Soilworks about

3 product application, how to apply the products?

4     A.    Some.

5     Q.    How about the product ingredients, would you

6 have knowledge of that?

7     A.    Some.

8     Q.    Who would have the most knowledge of the

9 product applications?

10    A.    Chad.

11    Q.    How about the ingredients of the products?

12    A.    Chad.

13    Q.    How about sales, if I didn't ask you that

14 already, who would have the most knowledge about sales?

15    A.    I would say myself or Chad.

16    Q.    How about the manufacturing of the product, do

17 you have knowledge about that?

18    A.    Some.

19    Q.    Who would have the most knowledge of that?

20    A.    I believe Chad.

21    Q.    How about the shipping of the products?

22    A.    Can you clarify "shipping of the products"?

23    Q.    Yeah.  Who would be in charge of shipping the

24 products?  Who would have the most knowledge about the

25 actual shipping and getting it delivered there,

1  et cetera, et cetera?

2      A.    Probably Chad.

3      Q.    Do you have technical product knowledge?

4      A.    Some.

5      Q.    Who would have the most?

6      A.    I believe Chad.

7      Q.    I assume your products have had some testing

8  associated with them; would that be a fair statement?

9      A.    Yes.

10     Q.    Who would have knowledge of that product

11 testing?

12     A.    Chad.

13     Q.    Would you have some of that knowledge at all or

14 not at all?

15     A.    Not really.

16     Q.    I wouldn't assume from your background, but I

17 still have to ask the question.

18          Who would have the most knowledge about

19 profitability of Soilworks?

20     A.    I believe I would.

21     Q.    How about the cost/expense side, who would have

22 knowledge about that?

23     A.    Probably myself and Chad.

24     Q.    Associated with labor and employment, who does

25 the hiring and the firing?

1    A.    Chad and myself.

2    Q.    Do you have an HR person specifically

3    designated for human resources?

4    A.    No.

5    Q.    Does Soilworks the corporation have books and

6    records?

7    A.    Yes.

8    Q.    Who keeps those books and records?

9    A.    Myself or the bookkeeper.

10    Q.    Do you have a corporate lawyer?

11    A.    What do you mean by that?

12    Q.    Do you have a lawyer that set up the L.L.C.?

13    A.    No, I don't believe so.

14    Q.    Do you have a lawyer you turn to just for

15    general questions about your business?

16    A.    Yes.

17    Q.    Who would that be?

18    A.    Mr. Dosek.

19    Q.    You're also familiar with Mr. Passarelli;

20    correct?

21    A.    Yes.

22    Q.    Do you know what his role is with respect to

23    Soilworks?

24    A.    He's counsel for us.

25    Q.    Do you know what he handles for Soilworks other

1    Q.    Do you have a trademark lawyer to work with for

2    those trademarks?

3    A.    No.

4    Q.    You do them yourself?

5    A.    Yes.

6    Q.    You don't often find that.  Has Soilworks

7    applied for any copyrights on any of the material?

8    A.    I don't believe so.

9    Q.    With respect to sales, does Soilworks have

10   independent sales representatives that works for them?

11   A.    I don't think so.

12   Q.    You say you don't think so, would somebody else

13   know more than you?

14   A.    Can you clarify what you mean by "independent

15   sales"?

16   Q.    Does anyone sell products for Soilworks that

17   you have not identified thus far with Soilworks?

18   A.    No.

19   Q.    So all the sales, just to be perfectly clear,

20   all the sales are conducted by the sales representatives

21   you previously identified?

22   A.    No.

23   Q.    Okay.

24   A.    We have distributors.

25   Q.    Okay.  Who are your distributors?

1    A.    I don't know all of them.

2    Q.    How many distributors do you have?

3    A.    I don't know.

4    Q.    More than 10?

5    A.    I would say approximately maybe a dozen or so.

6    Q.    In fact, one of them was Polar Supply; correct?

7    A.    Yes.

8    Q.    And is it now Spenard Builder Supply?

9    A.    Yes.

10    Q.    And that would be S-p-e-n-a-r-d; correct?

11    A.    Yes.

12    Q.    Who would have the knowledge on who the

13 distributors are?

14    A.    I would.

15    Q.    You just don't recall as you sit here today who

16 they all are?

17    A.    Yes.

18    Q.    You have documents, though, that would show who

19 those distributors are; correct?

20    A.    Yes.

21    MR. SKERIOTIS:  Why don't we take a quick

22 break, I can bring Bob back in.

23    (Recessed from 10:29 a.m. until

24 10:49 a.m.)

25    (Mr. Vitale returns to the deposition.)

1       Q.    Turning now to paragraph 8, you see where it

2 says "Midwest competes with Soilworks and has recently

3 embarked on a scheme to injure the reputation that

4 Soilworks has established with its distributors,

5 customers and end-users."  Did I read that correctly?

6       A.    Yes.

7       Q.    Is that a true statement?

8       A.    I believe so.

9       Q.    Can you tell me what that scheme is that's

10 referred to in paragraph 8?

11       A.    I don't know.

12       Q.    What led you to believe that the statement was

13 true and accurate?

14       A.    That would be in proprietary conversations with

15 my husband or privileged conversations why I would

16 believe that's true.

17       Q.    Those conversations that you allege are

18 privileged, why do you believe they're privileged?

19       A.    Because they're just between my spouse and

20 myself.

21       Q.    Your lawyer can object as well, but I will

22 indicate to you that they are not privileged so I'd ask

23 you to answer the question.  I think what you're

24 referring to is a spousal immunity and I'm not trying to

25 tell you the law on that, but typically that arises when

1    it's one spouse against another or if you're

2    incriminating one's spouse in another setting.  This is

3    not one of those types of disputes so you don't have a

4    spousal immunity in this case.  I just represent that to

5    you and obviously you can turn to your lawyer for his

6    advice.

7         MR. DOSEK:  What's the question?

8         MR. SKERIOTIS:  The question is -- I can

9    repeat the question.  What scheme did Midwest embark

10   upon and she said she knows the answer but it's

11   between -- she had conversations between her and her

12   husband with respect to this scheme.

13        MR. DOSEK:  Dorian, I think that you can

14   go ahead and answer that unless the information that you

15   received was information that Chad had learned only in

16   communication and consultation with his lawyers.

17   A.    Okay.  To the best of my knowledge it would be

18   the letter that was sent to Polar Supply.

19   Q.    BY MR. SKERIOTIS:  And is that the only -- I

20   just want to make sure that we cover everything.  Is

21   that the only scheme that you're aware of that Midwest

22   has embarked upon to injure the reputation of

23   Soilworks?

24   A.    That I can recall.

25   Q.    So that would be a "yes"?

1    A.    No, that's what I can recall.

2    Q.    Is that all you know or is that all you recall?

3    A.    That's all I can recall.

4    Q.    So as you sit here today you don't recall

5    anything else; correct?

6    A.    Not that I remember.

7    Q.    Is there any documents that would help you in

8    your recollection with respect to a scheme that's

9    mentioned in paragraph 8 of the Complaint?

10   A.    There could be.

11   Q.    What documents could there be?

12   A.    I know there's a letter sent to Polar Supply.

13   Q.    That's what you've already mentioned though as

14   far as a scheme.  Is there anything else?

15   A.    I don't know.

16   Q.    How did that letter to Polar Supply injure

17   Soilworks?

18   A.    I don't really know.

19   Q.    Has Soilworks lost any money to its knowledge

20   with respect to the letter that allegedly injured the

21   reputation of Soilworks?

22   A.    I don't know.

23   Q.    Does Soilworks continue to do business with

24   Polar Supply?

25   A.    Yes.

1    Q.    But now it's with Spenard Builder Supply;

2    correct?

3    A.    Yes.

4    Q.    Because Spenard purchased Polar; correct?

5    A.    I believe so.

6    Q.    Has there ever been a time when Polar Supply

7    and Soilworks did not do business?

8    A.    I don't recall.

9    Q.    Has there ever been a disruption of business

10   between Soilworks and Polar Supply?

11   A.    I don't recall.

12   Q.    Who would have that knowledge if there has been?

13   A.    Probably myself.

14   Q.    I think we already established that Soilworks

15   continues to do business with Polar Supply now known as

16   Spenard; correct?

17   A.    Yes.

18   Q.    Paragraph 8 goes on to say "pursuant to this

19   scheme, Midwest has disparaged Soilworks and its

20   products, falsely represented that Soilworks is

21   infringing alleged patent rights of Midwest and falsely

22   represented that Soilworks' products fall within the

23   scope of alleged patent claims owned by Midwest."  Did I

24   read that correctly?

25   A.    Yes.

1    represents characteristics and attributes of its company

2    and products."  Do you see that?

3        A.    Yes.

4        Q.    Do you know how Midwest falsely represents

5    characteristics and attributes of its company and

6    products?

7        A.    I don't know.

8        Q.    Who would know?

9        A.    I don't know.

10        Q.    It goes on to say "pursuant to this scheme,"

11    and the one scheme you've identified is the letter to

12    Polar Supply, "Midwest has attempted to divert sales

13    from Soilworks and injure Soilworks' reputation by,

14    among other things, representing that Soilworks'

15    products infringe Midwest's alleged patent rights."  Is

16    that a true statement?

17                MR. DOSEK:  Object to the form,

18    foundation.

19        A.    I believe so.

20        Q.    BY MR. SKERIOTIS:  Has Midwest attempted to

21    divert sales from Soilworks?

22        A.    I don't know.

23        Q.    Has Midwest tried to injure Soilworks'

24    reputation?

25                MR. DOSEK:  Object to the form,

1    foundation.

2         A.    I would just be speculating.

3         Q.    BY MR. SKERIOTIS:  The next paragraph is

4    paragraph 9, it says "Midwest has disseminated

5    information and documentation to Soilworks'

6    distributors, customers and end-users which is

7    inaccurate, misleading and which is causing irreparable

8    harm and damage to Soilworks, Soilworks' reputation and

9    the reputation of Soilworks' products."  Do you see

10   that?

11        A.    Yes.

12        Q.    Did I read that correctly?

13        A.    Yes.

14        Q.    Do you know what information Midwest has

15   disseminated to Soilworks' distributors that has caused

16   irreparable harm and damage to Soilworks?

17        A.    I believe it would be stating that we're

18   infringing or potentially infringing their patent.

19        Q.    Would that be that information that's contained

20   in that letter to Polar Supply you referred to earlier?

21        A.    I believe so.

22        Q.    Okay.  Do you know what is the irreparable harm

23   caused to Soilworks pursuant to that letter?

24        A.    I don't know.

25        Q.    Do you know what damage has been done, if any,

1  to Soilworks pursuant to that letter?

2      A.    I don't know.

3      Q.    Is there any damage that you're aware of to

4  Soilworks pursuant to that letter?

5      A.    I don't know.

6      Q.    Has Soilworks' reputation been damaged?

7      A.    I don't know.

8      Q.    Do you know who would know that?

9      A.    No.

10     Q.    Do you know who would know if Soilworks has

11 been damaged?

12     A.    I don't know.

13     Q.    Has Soilworks to your knowledge lost any

14 business pursuant to that letter to Polar Supply?

15     A.    I don't know.

16     Q.    Who would know if Soilworks has lost business

17 with respect to that letter to Polar Supply?

18     A.    I would believe it would be me.

19     Q.    And as you sit here you say you don't know?

20     A.    I don't know.

21     Q.    Next paragraph is paragraph 10 and it says

22 "Midwest's conduct is intended to cause mistake,

23 deception and consumer confusion and was done with the

24 intention of damaging Soilworks' reputation Soilworks

25 has earned in the industry."  Did I read that

1    correctly?

2      A.    Yes.

3      Q.    Is that conduct that's referred there to your

4    knowledge the letter to Polar Supply?

5      A.    I don't know.

6      Q.    Do you know of any of Midwest's conduct that

7    caused mistake, deception and consumer confusion to

8    Soilworks?

9      A.    I don't know.

10      Q.    The next sentence states "the conduct of

11    Midwest wrongfully diverts the potential market and

12    customer loyalty to which Soilworks is entitled."  Do

13    you see that?

14      A.    Yes.

15      Q.    Do you know of any diversion of customer

16    loyalty from Soilworks to Midwest?

17      A.    I don't know.

18      Q.    Have you lost any customers from Soilworks to

19    Midwest because of the letter to Polar Supply?

20            MR. DOSEK:  Object to the form.

21      A.    I don't know.

22      Q.    BY MR. SKERIOTIS:  Who would know if you've

23    lost any customers from Soilworks to Midwest pursuant to

24    the letter to Polar Supply?

25            MR. DOSEK:  Form.

       A.    Don't know.  Probably myself.

       Q.    BY MR. SKERIOTIS:  And as you sit here you

don't know if you've lost any customers or not;

correct?

       A.    I don't know.

       Q.    The next paragraph is paragraph 11, it says

"defendant has engaged in the foregoing wrongful conduct

intentionally and in order to profit from such

conduct."  Is that a true statement?

       A.    I don't know.

       Q.    The next sentence states "Midwest's conduct is

causing and will continue to cause irreparable harm to

Soilworks and to tarnish and diminish the substantial

goodwill Soilworks has cultivated with respect to its

company, products and the proprietary rights associated

therewith."  Did I read that correctly?

       A.    Yes.

       Q.    Is that a true statement?

       A.    I don't know.

       Q.    Again, do you know of any irreparable harm to

Soilworks that Midwest is causing or has caused?

                MR. DOSEK:  Object to the form,

foundation.

       A.    I don't know.

       Q.    BY MR. SKERIOTIS:  Has Midwest tarnished and

1      MR. DOSEK:  Same objection, form and

2  foundation.

3      A.    I would be speculating if I gave a definition.

4      Q.    BY MR. SKERIOTIS:  But you said you did think

5  you had an understanding of what it was, what was that?

6      A.    My definition I believe would be irreparable

7  damages.

8      Q.    Typically those that money damages cannot

9  suffice, not to make you whole?  A quick example is if

10  somebody owned a piece of property that they had for

11  sale on the coast of California and you lost the

12  opportunity to buy that property, money couldn't make

13  you whole because that was a specific valuable piece of

14  property and therefore even if they paid you the money

15  for it, you still lost that piece of property.  Does

16  that make sense?

17      A.    Yes.

18      Q.    So what I'm trying to get at is what other than

19  money damages has Soilworks suffered, if any?

20      A.    I don't know.

21      Q.    Next one is Count 4, Tortious Interference with

22  Business Relationship and Expectancy.  Go ahead and read

23  paragraphs 28, 29 and 30, please.

24      A.    I'm finished.

25      Q.    Turn back, please, to page 5, paragraph 29.

1    You see where it says, I'm paraphrasing, Midwest

2    intentionally interfered with existing business

3    relationships?

4        A.    Yes.

5        Q.    What business relationships did Midwest

6    intentionally interfere with?

7               MR. DOSEK:  Object to the form and

8    foundation.

9        A.    I don't know.

10       Q.    BY MR. SKERIOTIS:  Do you know of any

11   relationships that Midwest has interfered with?

12              MR. DOSEK:  Same objection.

13       A.    I don't know.

14       Q.    BY MR. SKERIOTIS:  Has Midwest gotten in the

15   way of any business relationships?

16              MR. DOSEK:  Same objection.

17       A.    I don't know.

18       Q.    BY MR. SKERIOTIS:  You've referred to a letter

19   to Polar Supply earlier, would that be possibly what

20   this is referring to?

21       A.    It may be.

22       Q.    Do you believe that Midwest interfered with the

23   relationship between Soilworks and Polar Supply?

24       A.    Can you repeat that?

25       Q.    Yes.  Do you believe that Midwest interfered

1    with the relationship between Soilworks and Polar

2    Supply?

3         A.    I don't know.

4         Q.    Do you have any reason to believe that Midwest

5    would want to interfere with that relationship?

6              MR. DOSEK:  Object to form.

7         A.    I would be speculating.

8         Q.    BY MR. SKERIOTIS:  To your knowledge has

9    Midwest ever approached Polar Supply to be a distributor

10   of Midwest?

11        A.    I don't know.

12        Q.    Who would know, if anyone, at Soilworks what

13   business relationships Midwest has interfered with at

14   Soilworks?

15        A.    I don't know.

16        Q.    So it could be that nobody at Soilworks knows

17   the answer to that question?

18             MR. DOSEK:  Object to the form.

19        A.    I don't know.

20        Q.    BY MR. SKERIOTIS:  Paragraph 30 says "as a

21   direct result of Midwest's actions as set forth above,

22   Soilworks has been damaged."  Do you see that?

23        A.    Yes.

24        Q.    If the actions at set forth above is the letter

25   to Polar Supply, how has Soilworks been damaged?

1    A.    I don't know.

2    Q.    Count 6 is entitled Arizona Common Law and

3    Unfair Competition.  Do you see that?

4    A.    Yes.

5    Q.    Take a look at paragraphs 31, 32 and 33,

6    please.

7    A.    I'm finished.

8    Q.    Probably the same answers, but I have to ask

9    anyway.  Do you know what Midwest's conduct constitutes

10   unfair competition?

11                MR. DOSEK:  Form and foundation.

12   A.    I don't know.

13   Q.    BY MR. SKERIOTIS:  Do you know Midwest's

14   conduct that is referred to in those paragraphs?

15                MR. DOSEK:  Form and foundation.

16   A.    I don't know.

17   Q.    BY MR. SKERIOTIS:  Paragraph 33 states "as a

18   result of Midwest's actions, Soilworks has been

19   damaged."  Do you see that?

20   A.    Yes.

21   Q.    Do you know how under the Arizona Common Law

22   and Unfair Competition Soilworks has been damaged?

23                MR. DOSEK:  Same objection.

24   A.    I don't know.

25   Q.    BY MR. SKERIOTIS:  The next section is Prayer

1    for Relief and specifically what I want to turn your

2    attention to is paragraph 6 on page 7.  It states that

3    you're asking the Court to award Soilworks actual

4    damages in an amount to be proven at trial.  Do you see

5    that?

6        A.    Yes.

7        Q.    Do you know what Soilworks' actual damages are?

8        A.    I don't know.

9        Q.    Are there any actual damages to Soilworks?

10       A.    I don't know.

11       Q.    The next section that I want to turn to is that

12   "the Court award Soilworks its attorneys' fees and costs

13   incurred herein."  Do you see that?

14       A.    Yes.

15       Q.    You understand you're asking the Court to award

16   Soilworks their attorneys' fees; correct?

17       A.    Yes.

18       Q.    Do you know what your attorneys' fees are to

19   date?

20       A.    I don't know.

21       Q.    Do you know if they're less than $100,000?

22       A.    I don't know.

23       Q.    Who would know?

24       A.    I would.

25       Q.    Are they less than $200,000?

1    That's it for that one.

2                    (Exhibit No. 6 was marked.)

3         Q.    BY MR. SKERIOTIS:   Ms. Falkenberg, I'm handing

4    you what's been marked as Exhibit 6.   Have you seen this

5    document?

6         A.    I believe so.

7         Q.    Page 2 continues from page 1 underneath

8    "individuals likely to have discoverable information."

9    Do you see all of the individuals and/or entities listed

10   there?

11        A.    Do I read them, yes.

12        Q.    Do you have any knowledge of any other

13   individuals that are not listed in paragraphs 1 through

14   5 that may have information with respect to this case?

15        A.    I don't know.

16        Q.    Paragraph 1 states that "Ms. Falkenberg has

17   knowledge concerning the overall operation of Soilworks,

18   the composition of Soilworks' products, the manner in

19   which Soilworks' products are manufactured, marketed,

20   sold and distributed, the competitive environment

21   amongst Soilworks, Midwest and their competitors and the

22   facts alleged in the Complaint and Reply and

23   Counterclaim."   Is that a true statement as we sit here

24   today?

25        A.    I believe so.

1  without researching it?

2     A.    Yes.

3     Q.    Could it be that that information was not

4  provided to us to your knowledge?

5     A.    I don't know.

6     Q.    With respect to page 15, number 13 asks for the

7  identification of what makes plaintiff's Durasoil

8  product ultra-pure and a synthetic organic fluid.  Do

9  you see that?

10    A.    Yes.

11    Q.    Are you familiar with the term "ultra-pure"?

12    A.    Yes.

13    Q.    Are you familiar with the term "synthetic

14  organic fluid"?

15    A.    Yes.

16    Q.    Do documents to your knowledge exist that would

17  support Durasoil's product being ultra-pure?

18    A.    No.

19             MR. DOSEK:  Object to the form.

20    Q.    BY MR. SKERIOTIS:  Why not?

21    A.    I believe it's just a term to describe a

22  product.

23    Q.    Do you believe that there are documents that

24  exist in Soilworks' possession to support that it's a

25  synthetic organic fluid?

1          MR. DOSEK:  Object to the form.

2     A.     I don't know.

3     Q.     BY MR. SKERIOTIS:  You don't know if any

4  documents exist or you don't know if there are any

5  documents to support that?

6     A.     Either way I don't know.

7     Q.     And do you see that the answer to the

8  interrogatory on the next page, page 16, indicates that

9  Soilworks will make documents available from which

10 Midwest may derive or ascertain the answer; do you see

11 that?

12    A.     Yes.

13    Q.     Do you know if any of those documents were

14 given to us?

15    A.     I don't know.

16    Q.     I will represent to you that we have no

17 documents that represent that so to my knowledge then

18 those documents don't exist.

19          Number 14 indicates or requests the

20 identification of all ingredients including the

21 proprietary ingredients as listed on plaintiff's MSDS

22 sheet.  Do you see that?

23    A.     Yes.

24    Q.     Are you familiar with the Material Safety Data

25 Sheet with respect to Durasoil?

1     A.    Yes.

2     Q.    Do you understand there's a section listed

3 where it says that something is proprietary?

4     A.    Yes.

5     Q.    Do you know if there are documents that would

6 show what information is proprietary in possession of

7 Soilworks?

8     A.    What do you mean?

9     Q.    That's what I'm trying to ask you.  Do you have

10 documents that would support that certain ingredients

11 within Durasoil are proprietary?

12     A.    I don't know.

13     Q.    Are there any proprietary ingredients in

14 Durasoil?

15           MR. DOSEK:  Objection, confidential.

16     A.    I don't know.

17           MR. DOSEK:  Don't answer.

18     A.    Okay.

19           MR. SKERIOTIS:  Don't answer?  You're

20 instructing your witness not to answer because of what?

21           MR. DOSEK:  Because Mr. Vitale is here.

22           MR. SKERIOTIS:  I thought you were going

23 to say "confidential, attorneys' eyes only," that's what

24 you've done in the past, because there's two levels.

25           MR. DOSEK:  I understand.  And what I

1    Q.    But the actual mineral oil would not be
2    organic, just where it originated from would be organic?
3    A.    These are our own definitions.
4    Q.    Oh, okay.  But I'm still trying to figure out
5    where do you believe based on your own definitions that
6    the mineral oil --
7    A.    We believe something like mineral oil can be
8    called synthetic organic because it started out as an
9    organic, raw, natural occurring product as crude oil,
10   it's been refined or synthesized or gone through a
11   process which we call synthetic and that's the component
12   that makes it a synthetic organic dust control product.
13   That's my own definition of it.
14   Q.    Is there any industry standard that you're
15   aware of with respect to calling something synthetic?
16   A.    No.
17   Q.    Is there any industry standard that you know of
18   with respect to calling something organic?
19   A.    I don't believe so.
20   Q.    Where did you come up with the terms synthetic
21   organic, do you recall?
22   A.    I don't.
23   Q.    Did you come up with that wording?
24   A.    No.
25   Q.    Do you know who at Soilworks did?

1    A.    No.

2    Q.    Did someone at Soilworks come up with that?

3    A.    I don't know.

4    Q.    Do you recall where you first saw the words

5    synthetic organic?

6    A.    I don't.

7    Q.    Do you know of any competitors that use the

8    words synthetic organic?

9    A.    Yes.

10   Q.    Who are they?

11   A.    Midwest.

12   Q.    Do you know of anyone else who uses the words,

13   the term "synthetic organic" to describe their products?

14   A.    I don't know the details of it.  I know there's

15   a Synthetic Organic Chemical Association so I know it's

16   a widely-used term.

17   Q.    You're saying there's a Synthetic Organic --

18   A.    Chemical Association.

19   Q.    -- Chemical Association?  How did you come

20   across them?

21   A.    Through research on the Internet.

22   Q.    When did you do this research?

23   A.    I personally didn't do it, Chad did it, but I

24   was made aware of it maybe a couple of months ago.

25   Q.    Do you know if he did that research pursuant to

1          MR. VITALE:  We figured that out.

2          MR. SKERIOTIS:  Scott knows that's

3    happened before many times to us.

4      Q.    BY MR. SKERIOTIS:  With respect to Midwest's

5    products, can you identify which product of Midwest's

6    compete with Durasoil?

7      A.    I would say EK3,5 Envirokleen, Arena Rx and

8    Dust Dr.

9      Q.    Did you mean Diamond Dr.?

10     A.    Oh, yes.  Sorry.

11     Q.    Soiltac is your product; correct?

12     A.    Yes.

13     Q.    And that competes with what product of Midwest?

14     A.    Soil-Sement.

15     Q.    When did you first become aware of Soil-Sement?

16     A.    Oh, I don't recall.  Since the beginning of our

17   business.

18     Q.    Since 2003?

19     A.    Yes.

20     Q.    When did you first become aware of Envirokleen?

21     A.    I don't remember exactly when.

22     Q.    Somewhere between 2003 and 2005?

23     A.    I would say that's fair, yes.

24     Q.    When did you first introduce Durasoil?

25     A.    I think 2004.

1       (End of attorneys' eyes only section.)

2       Q.    BY MR. SKERIOTIS:   "This

3    technologically-advance fluid does not cure allowing for

4    immediate use upon its application;" correct?

5       A.    Yes.

6       Q.    It says "Durasoil has the unique ability to be

7    reworked and still maintain its dust controlling

8    properties;" correct?

9       A.    Yes.

10      Q.    Later on it says "key advantages" and it says,

11   among the things we've already stated, that it's

12   "nonslippery and oil-sheen free."   Do you see that?

13      A.    Yes.

14      Q.    Do you know what is meant by "oil-sheen free"?

15      A.    No, I don't.

16      Q.    Do you know if there's been any tests to

17   support that it's oil-sheen free?

18      A.    I don't know.

19      Q.    But that would be another thing that's

20   descriptive of what Durasoil is; correct?

21      A.    Yes.

22      Q.    It's also self-penetrating and wetting;

23   correct?

24      A.    Yes.

25      Q.    Basically the key advantages, many of those

1    A.    Okay.

2    Q.    I'll represent that to you.  So has anyone

3    reviewed that history of this trademark for Soilworks?

4    A.    I have not.

5    Q.    You have not.  Do you know if anybody else at

6    Soilworks has reviewed the trademark prosecution history

7    for this mark?

8    A.    I don't believe so.

9    Q.    Are you aware that it received no rejection for

10   being generic?

11   A.    No.

12   Q.    This is the first time you've heard of this?

13   A.    Yes.

14   Q.    Are you aware that it did not receive a

15   rejection for even being descriptive?

16   A.    No.

17   Q.    Soilworks' use of the word "synthetic organic

18   dust control" is identical to this registered trademark

19   of Midwest's; correct?

20   A.    I believe so.  I don't have our literature

21   right in front of me.

22   Q.    Going back again to Exhibit 3, here is one

23   piece of promotional literature.  Do you see that?

24   A.    Yes.

25                MR. DOSEK:  What's the date of Exhibit 3?

1          MR. SKERIOTIS:  It just says "printed

2     September of '05."

3          MR. DOSEK:  Okay.

4     Q.     BY MR. SKERIOTIS:  You continue to use

5     synthetic organic dust control; correct?

6     A.     Yes.

7     Q.     Even as we sit here today it's on your website;

8     correct?

9     A.     Yes.

10    Q.     And as far as the goods that are listed in this

11    trademark registration of Exhibit 13, you see there "for

12    dust suppressant in the nature of aliphatic and cyclic

13    organic dust suppressing compositions for use in

14    controlling dust on roadways, shoulders, trails,

15    helipads, stockpiles, heavy traffic roads, baseball

16    diamonds and horse tracks."  Do you see that?

17    A.     Yes.

18    Q.     The Durasoil product, is it for use with that

19    same nomenclature that's listed in Exhibit 13 that I

20    just read?

21    A.     I don't know what "aliphatic and cyclic

22    organic" means.

23    Q.     Okay.  But other than that, it would be --

24    A.     Are you asking is it used for the same kinds of

25    applications?

1      Q.     BY MR. SKERIOTIS:  How do you market Durasoil,

2  what are the marketing channels that you use?

3      A.     What do you mean?

4      Q.     For example, do you use the Internet?

5      A.     Yes.

6      Q.     What other ways do you market your Durasoil

7  product?

8      A.     I don't know all of them.

9      Q.     Give me the ones that you know of.

10     A.     The Internet mainly, brochures.

11     Q.     Anything else?

12     A.     Not that I can think of.

13     Q.     Does Midwest use the Internet to advertise its

14  products that are synthetic organic dust control?

15     A.     I don't know.

16     Q.     Have you been to the Midwest website?

17     A.     Not recently.

18     Q.     Have you ever seen the term "synthetic organic

19  dust control" on Midwest's website?

20     A.     Yes.

21     Q.     Okay.  So is it fair to say that they use the

22  words "synthetic organic dust control" on their own

23  website and so do you?

24     A.     Yes.

25     Q.     And Midwest does have brochures that you're

```
 1  STATE OF ARIZONA      )
                          )  ss.
 2  COUNTY OF MARICOPA    )

 3

 4          BE IT KNOWN that the foregoing confidential

 5  deposition was taken before me, JENNIFER HANSSEN, a

 6  Certified Reporter in the State of Arizona; that the

 7  witness before testifying was duly sworn by me to

 8  testify to the whole truth; that the questions

 9  propounded to the witness and the answers of the witness

10  thereto were taken down by me in shorthand and

11  thereafter reduced to print by computer-aided

12  transcription under my direction; that the confidential

13  deposition was submitted to the witness to read and

14  sign; that the foregoing 180 pages are a true and

15  correct transcript of all proceedings had upon the

16  taking of said confidential deposition, all done to the

17  best of my skill and ability.

18          I FURTHER CERTIFY that I am in no way related

19  to any of the parties hereto nor am I in any way

20  interested in the outcome hereof.

21          DATED at Phoenix, Arizona, this 9th day of

22  April, 2008.

23          _____
                         Certified Reporter
24                       Certificate No. 50165

25
```

LEA, SHERMAN & HABESKI (602) 257-8514