EXHIBIT 5



IN THE PIMA COUNTY JUSTICE COURT

| | |
|---|---|
| STATE OF ARIZONA,<br>Plaintiff,<br>vs.<br>FRANK SANCHEZ,<br>Defendant. | No. DR03-312038 |

Tucson, Arizona

April 5, 2005

TRANSCRIPT OF PROCEEDINGS

A/V-TRONICS, INC.
E-Reporting and E-Transcription
Phoenix, AZ (602) 263-0885
Tucson, AZ (520) 661-3553

ii

TABLE OF CONTENTS

Page

April 4, 2005

Bench Trial

Petitioner's Witness - Karl James Woolridge

Direct Examination . . . . . . . . . . . . . . 8

Cross-Examination . . . . . . . . . . . . . . 21

Redirect Examination . . . . . . . . . . . . . 49

Rebuttal Direct Examination . . . . . . . . . . 138

Rebuttal Cross-Examination. . . . . . . . . . . 145

Rebuttal Redirect Examination . . . . . . . . . 150

Petitioner's Witness - John P. Schranz

Direct Examination . . . . . . . . . . . . . . 50

Cross-Examination . . . . . . . . . . . . . . 55

Redirect Examination . . . . . . . . . . . . . 70

Defendant's Witness - Lucy Martinez

Direct Examination . . . . . . . . . . . . . . 78

Cross-Examination . . . . . . . . . . . . . . 96

Redirect Examination . . . . . . . . . . . . . 105

Recross-Examination . . . . . . . . . . . . . . 105

Defendant's Witness - Patricia Gallegos Duran

Direct Examination . . . . . . . . . . . . . . 108

Cross-Examination . . . . . . . . . . . . . . 122

Redirect Examination . . . . . . . . . . . . . 127

A/V-TRONICS, INC.
E-Reporting and E-Transcription
Phoenix, AZ (602) 263-0885
Tucson, AZ (520) 661-3553

iii

TABLE OF CONTENTS

Page

Defendant's Witness - Frank Sanchez

Direct Examination . . . . . . . . . . . . . . 129

Cross-Examination . . . . . . . . . . . . . . 134

Redirect Examination . . . . . . . . . . . . . 137

Taken Under Advisement . . . . . . . . . . . . . . 169

A/V-TRONICS, INC.
E-Reporting and E-Transcription
Phoenix, AZ (602) 263-0885
Tucson, AZ (520) 661-3553

iv

APPEARANCES

April 4, 2005

Judge:

For the Petitioner:

Carlos J. Betancourt

Witnesses:

Karl James Woolridge

John P. Schranz

For the Respondent:

Sallie A. Blake

Mr. St. Louis

Witnesses:

Lucy Martinez

Patricia Gallegos Duran

Frank Sanchez

A/V-TRONICS, INC.
E-Reporting and E-Transcription
Phoenix, AZ (602) 263-0885
Tucson, AZ (520) 661-3553

*Sanchez v. Dupnik et al*
*05-CV-583-TUC-RCC*
*PCJC 0001*

REDIRECT EXAMINATION

BY MS. BLAKE:

Q Mr. Betancourt mentioned that you only saw Poncho have the one beer?

A Uh-huh.

Q Okay. Now, was he able to drink that beer?

A Yeah, until we got to the crowd.

Q Okay. And it got spilled?

A Yes.

Q Okay.

A Uh-huh.

Q Now, you know Poncho well?

A Uh-huh.

Q Okay. And have you ever seen him intoxicated?

A Yes.

Q Okay. Was he intoxicated or under the influence of alcohol when you saw him on that night?

A No, I didn't see him that way.

MS. BLAKE: No further questions.

MR. BETANCOURT: Just a short recross, Your Honor?

THE COURT: Go ahead.

RECROSS-EXAMINATION

BY MR. BETANCOURT:

Q They asked you about Mr. Sanchez and his drinking, and you testified that you do -- that you have seen Mr. Sanchez

intoxicated. For example, where have you seen him intoxicated?

A At my home.

MS. BLAKE: Objection. Irrelevant.

THE COURT: Yeah, where are we going?

MR. BETANCOURT: Your Honor, I just want to see why it's that she would be able to know that he was intoxicated on that occasion? I believe Ms. Blake opened the door as to that --

THE COURT: All right. Go ahead.

BY MR. BETANCOURT:

Q I'm sorry. Go ahead and answer the question.

A What was it again?

Q Where have you seen him intoxicated?

A At my home parties that we used to have before, at his home where he used to have parties at his home --

Q And how many beers --

A -- where family members get along.

Q And in your experience, how many beers before you would consider that Mr. Sanchez is intoxicated?

A I wouldn't know that. I can't answer that question.

Q And when you mention that he wasn't intoxicated that night but you have seen him intoxicated, what would be the difference; what are you basing that on?

A I know the way he acts when he's really, really intoxicated, compared to when he takes one or two beers.

Q And how does he act when he's really, really intoxicated?

A Like we -- like we all do. I will say that for myself.

Q And what do you mean by that?

A We get loud, and we get feeling good, and have a good time.

Q Doesn't do things that he normally wouldn't do when he's not intoxicated?

A No. I don't understand your question. I'm sorry.

Q I mean, you mention that the way we all get, and I guess I didn't understand it. I asked you to explain it further. Go ahead; try it again.

A We just have good times, and we just -- I don't know what you want me to tell you.

Q Well, the point I'm getting at is that you mentioned that Mr. Duran was under -- was under the pain of being tased, and I guess you were -- testimony was that Mr. Sanchez was saying -- was yelling at the deputies to stop doing that?

A Uh-huh.

Q That he was kind of saving Mr. Duran? Would you say that's true or not?

A Yes, I would say that.

Q And in your experience is that something he would more likely do when he's intoxicated or when he's sober?

A When he's sober.

MR. BETANCOURT: Nothing further, Your Honor.

MS. BLAKE: Nothing further.

THE COURT: You may step down, Ms. Martinez. Thank you.

MS. BLAKE: May she be excused?

THE COURT: Yes, you may be excused, ma'am.

MS. BLAKE: The Defense calls Patricia Gallegos Duran.

MS. BLAKE: You can sit at the witness stand.

THE COURT: Remember I -- we gave you the oath a while ago?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. Have a seat there, ma'am.

PATRICIA GALLEGOS, RESPONDENT'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MS. BLAKE:

Q Will you state your name for the record?

A Patricia Gallegos Duran.

Q And were you present on the night in May of 2003 at Old Tucson when an incident occurred involving some officers and some tasing?

A Yes, I was present.

Q Okay. Could you tell me a little bit about yourself? How are you currently employed?

A I'm a real estate agent and a loan officer.

Q All right. Prior to being a real estate agent and a loan

officer, do you have any law enforcement related experience?
A Yes, I do.
Q Could you tell me what that is?
A I worked with the sheriff's department in corrections for five years. I was weapons qualified, female. I worked judicial security. I worked transportation, any weapons post that was available.
Q And as a part of that, what kind of training did you get?
A Training in levels of force, training on, you know, weapons qualifications, just training on the department rules and regulations in general.
Q Okay. And what do you mean about trainings on levels of force?
A I mean that, you know, you have to assess every situation and determine what level of force you need to use, and what your threat is, and it would be different for me being a female. My level of threat could be a lot more serious than a, you know, a 250-pound man, what he's going to perceive to be his level of threat --
Q Okay.
A -- and how we respond to that.
Q Now, on the night of this particular incident, how was it that you were at Old Tucson?
A I was there with my husband and my sister, and we were at a concert, was the reason why we were there.

Q Okay. At some point did some kind of disagreement break out?
A Yes.
Q How did that come about?
A I was pregnant at that time, and my husband and I were towards the front of the concert, and there was an argument between -- somebody was offended, and we're not even sure why they got offended, but I was -- my husband had pushed me towards the front so that I could see, and I guess we blocked somebody's view and, you know, the man said we disrespected his wife, and a little confrontation, verbal, occurred.
Q Okay. At some point did security or deputies become involved?
A Yes.
Q Okay. And how -- how did -- when did they become involved?
A After the verbal argument, I guess they were notified, and security was notified. They were people that weren't in uniform, weren't -- it wasn't recognizable that they were security, or they, you know, they were just in plainclothes, and they confronted my husband, and they were trying to detain him.
Q Okay. At some time -- at some point did the deputies become involved?
A Yes.

Q Okay. And what did they do?
A The deputies were talking to the other personnel that were in plainclothes trying to get the story of what was going on, and my husband wasn't readily detained at that point. He walked around, and -- because the other gentleman had come up to confront him, so he was moving up towards my husband, and my husband turned around to confront him as well. And then the deputies got involved and they thought, I guess, that my husband was -- was going to initiate something, but they didn't realize that the other man had moved forward.
Q Now where were you in relation to your husband when this was going on?
A I was about the distance that you and I are, maybe less, and --
Q Okay.
A -- and facing him, and when the plainclothes security were discussing it with the deputies; what was going on.
Q Okay. And did you have a clear view of that?
A Yes, I did.
Q So were there any people standing between you at that time and where your husband and the deputies were?
A No.
Q Okay. Now, what -- after they discussed together, the security and the deputies, what happened?
A They were in the process of discussing that when the other

gentleman confronted my husband, and then my husband went around to confront him as well, and then they just, you know, went after my husband and took him down.
Q Okay. Now, at any time did you see your husband strike anyone?
A No.
Q Okay. And if he would have struck someone, would you be in a position to have seen that?
A Yes.
MR. BETANCOURT: Objection, Your Honor. Speculation.
THE COURT: Overruled.
MS. BLAKE: All right.
BY MS. BLAKE:
Q So, he walks around, and the other guy's coming forward.
A Well, I got to say something that, like I said, some of these men were in plainclothes, and this other gentleman who had started a confrontation, he initiated it, you know, the first verbal argument, you know. My husband didn't know who was coming at him, you know, because he also had friends that were involved there, so --
Q The other guy had friends?
A The other guy had friends with him sitting there in the front row, and they had made some comments, so when the officers came, there were plainclothes people as well as the deputies. My husband didn't know who these plainclothes people

were. For all he knew they could have been the friends of this other gentleman who had started the fight.

Q Okay. But at some point there starts to be another confrontation, and your husband moves around --

A Correct.

Q -- the officers?

A Correct.

Q But as you testified, he never struck anyone?

A No, he did not.

Q Okay. So at that point what did the officers do?

A They tasered him. They took him down and they were tasering him.

Q Do you know which officer tasered him?

A The officer sitting here at the desk.

Q Okay. Now, is the -- your husband, Mr. Duran, is the one that was taken down first --

A Correct.

Q -- by the deputy?

A Correct.

Q Now is he in the courtroom?

A Is who in the courtroom?

Q Mr. Duran?

A Yes, he is.

Q And where is he sitting?

A He's sitting in the front row in the blue shirt there.

Q All right. Now, when he was on the ground, where were you?

A I was watching. I was --

Q Okay. Let's say this is a picture of your husband. What's his first name?

A Ernesto.

Q Ernesto. Let's say this is Ernesto on the ground. Where was this deputy?

A He was over him. He was over him. My husband was face down and his hands were behind him, and they had -- some of the officers -- one of the officers had managed to cuff him. What I recall was this officer was hitting him with the taser consistently, continuously, you know. Minutes seemed to have passed and he was still tasering him.

Q Okay. And where were you standing? Would this be a correct location as to where this officer would have been?

A Yes.

Q And was there another officer on the other side?

A Yes.

Q Okay. Now, if let's say your -- Ernesto was laying down here --

A Uh-huh.

Q -- this way, now what would Deputy Woolridge be doing?

A He was bent over him. He was bent over in this fashion with, you know, with his taser, was hitting him in the back.

Q All right. And where were you standing at that time?

A Can I approach that?

Q Yes, would you put -- we'll have you put a P for your name.

A Okay. I was standing right here.

Q Okay. And about how many feet were you from your husband and Deputy Woolridge?

A About three to four feet maybe, three feet, I would say.

Q All right.

A About the same distance that --

Q About like we are right now?

A Yes.

Q Three, four, five feet, maybe?

A Okay.

Q All right. Go ahead and have a seat. Now, what was the crowd doing during this time?

A What I could hear, a lot of the people were upset because he was tasering my husband. There was a lot of shouts. There was some people that were passive; not everybody was getting involved, but the people that were really, you know, in our area that were watching this were saying, yelling, "Stop, stop." You know? Somebody said, "Stop; you're going to kill him. That's enough. He's already" --

MR. BETANCOURT: I'm going to object to hearsay, Your Honor.

THE COURT: Overruled. Just that the words were spoken.

BY MS. BLAKE:

Q All right. And how close was the crowd in; were they closer than you, or behind you?

A Behind me.

Q Okay. So, the crowd was behind you?

A Yes.

Q At any point did you ever see anyone in the crowd move up directly behind the officer?

A No.

Q Now, while this was going on, where was your attention focused?

A On my husband, and on the officer, and that he was consistently using the taser.

Q So that --

A And I was yelling as well.

Q And you were yelling, and what were you yelling?

A Yelling, "Stop, stop. He's already in cuffs. He's already restrained. That's enough."

Q All right. Now, so is it fair to say you kept your eye and that pretty much had your attention?

A Yes, and that --

Q The entire time?

A That had my attention, yes, the entire time. The only

*Sanchez v. Dupnik et al*
*05-CV-583-TUC-RCC*
*PCJC 0030*

time that I did turn to look was when the officer had turned to look at Mr. Sanchez, and my -- my -- I -- this was before. This was when the crowd was yelling. Okay. He just turned to look at that direction, and I turned to follow his gaze to see what he was looking at, and then our attention both -- his attention and my attention went back on my husband.

Q Okay.

A So, he was looking at the crowd. He looked up to look at the crowd, and I followed his gaze.

Q Now did you know Mr. Sanchez prior to this occasion?

A No.

Q Okay. Now you said that the first time you noticed Mr. Sanchez was when the deputy turned around?

A Correct.

Q Okay. Now, he turned around, and what -- what made you notice Mr. Sanchez, since there was a whole crowd?

A Well, I didn't just notice him. I noticed other people, but he caught my attention also because he was yelling. He was the one yelling, "Stop, you're going to kill him." And that's why my attention was directed at him, because I was in concurrence with what he was saying.

Q All right.

A "Stop; you're going to kill him."

Q And at that time how far away was Mr. Sanchez from the deputy?

A I want to say a minimum of ten feet.

Q Okay. And at any time did you see Mr. Sanchez approach the deputy while he had the person on the ground --

A Never. He never approached him.

Q -- like your husband.

A He never approached him.

Q Okay. And you would have been able to see from your vantage point?

A Right.

Q Did you ever see anyone walk up and hit the deputy in the back of the head?

A No.

Q At any point did you see someone throw beer?

A If -- as I was facing my husband, you know, I saw the beer hit the officer, but I didn't see who threw it.

Q Okay. Because it was behind you?

A Correct; it was coming from -- all I saw was the beer, when it caught my view, the beer hit -- hit him.

Q And when --

A It was --

Q -- the beer hit Deputy Woolridge, which direction was he faced?

A He was - his attention was on my husband, and his head was down. He was doing something with his hands at that point, because at that point he'd stopped tasering, I think. When the

beer hit him, I noticed the beer hit him right here. It was a cup. It was like a plastic or paper cup full of beer.

Q Okay. And his, his face, was it towards the person who threw it?

A Near -- no, no, his face was -- he was focused on my husband and what he was doing here with his --

Q Okay.

A He did not -- his head was bent over. He did not -- there was no way he could have seen -- the only reason he knew is because he felt -- felt the beer hit him. Otherwise he --

Q And what did he do after you saw the cup and the beer hit him?

A He turned towards his right, and he immediately went towards Mr. Sanchez and tasered him and took him down, and he was very, very angry.

Q Okay.

A He was --

Q Did you ever -- did you ever hear Deputy Woolridge say anything to Mr. Sanchez?

A He never said anything to him, and he, in my opinion, could not have known who threw that beer.

MR. BETANCOURT: Objection to speculation, Your Honor.

THE COURT: Overruled.

BY MS. BLAKE:

Q All right. And so, Deputy Woolridge just turns around and tases Mr. Sanchez?

A Yes.

Q What happens at that point?

A He tasered him and he -- they took him down, and there was another officer came, and they were struggling with Mr. Sanchez.

Q All right.

A And they were cuffing him.

Q Okay. And was Mr. Sanchez resisting, or --

A I didn't see him resisting, no. He didn't have a chance to resist.

Q Okay.

A He was tasered and down on the ground before he knew what was hitting him, what was happening to him.

Q Okay. Now, once he was on the ground, did you become aware that something had happened to Mr. Sanchez, other than being tased laying on the ground?

A Did I become aware in that moment that something had happened?

Q Yes.

A I didn't know at that specific moment that his leg had been broke.

Q Okay. That's what I was asking.

A I did not know.

121

Q You did not know at that time. Now, at some point did they take him away?
A They did. They turned him over because I remember him being on his back, and then I remember them flipping him over, and they kind of cuffed him like in a hogtie situation.
Q And what do you mean, hogtie? Where did they cuff him?
A They had his legs be -- his hands behind his back, cuffed, and his legs bent over, cuffed.
Q Okay. And when they carried him away, how did they carry him away?
A They picked him up by the cuffs.
Q All right. Okay. Let's go back to the time that your husband, Ernesto, was on the ground. During that time, did anyone strike Deputy Woolridge?
A No.
Q And how are you certain?
A Because I was watching my husband being tasered extensively, and that -- my whole attention was focused there.
Q Since this -- okay. Now, you said you were pregnant?
A Yes.
Q Okay. So, on that night had you consumed any alcohol?
A No.
Q Okay.
A Absolutely not.
Q All right. So, how would you say your memory is of that

A/Vr TRONICS, INC.
E-Reporting and E-Transcription
Phoenix, AZ (602) 263-0885
Tucson, AZ (520) 661-3553

122

event?
A My memory's very clear. As a matter of fact it was -- it's almost traumatized me.
Q Okay. Since this incident do you have any relationship with Mr. Sanchez?
A I never speak to him. I don't -- to this point I don't consider myself that I know him.
Q All right.
A I just know of him, and the situation.
Q Okay.
MS. BLAKE: I have no further questions.
THE COURT: Mr. Betancourt.
MR. BETANCOURT: Thank Your Honor.

CROSS-EXAMINATION

BY MR. BETANCOURT:
Q You mentioned you were a corrections officer; is that correct?
A That's correct.
Q And how many times did you have to use force on your job when you were a corrections officer?
A I've had to use force several times in the aspect of the jail, bringing someone in.
Q You mentioned several times; is that more than 25 times?
A No, I wouldn't say more than 25.
Q How many years were you a corrections officer, by the way?

A/Vr TRONICS, INC.
E-Reporting and E-Transcription
Phoenix, AZ (602) 263-0885
Tucson, AZ (520) 661-3553

123

A Five years.
Q And from when to when were you a corrections officer?
A From 1996 is when I started, through 2000, so I guess four years.
Q You weren't -- after 2000 you weren't a corrections officer anymore?
A I don't remember the exact date, but no, I wasn't a corrections officer.
Q Around 2000, approximately?
A Yeah.
Q And why is it that you weren't a corrections officer anymore?
A Because I resigned.
Q What were -- actually, let me go back to some of the questions on force. Were you trained on using taser?
A Yes, I was.
Q And were you -- did you have any opportunities to deploy your taser when you were using taser?
A No.
Q You never used it?
A No, I never used it.
Q Did you ever use other -- other methods of putting people under control?
A Physical methods, sure.
Q Did you ever use, for example, pepper spray?

A/Vr TRONICS, INC.
E-Reporting and E-Transcription
Phoenix, AZ (602) 263-0885
Tucson, AZ (520) 661-3553

124

A No, I did not.
Q What kind of methods would you use to put somebody under control that was being argumentative or that you had to put into control?
A Well, because I was in the jail, the tasers weren't in the actual cells or in the pods, and neither -- pepper spray was not allowed. We did carry pepper spray when I would go on post as far as a weapons post, but I never had to use it, so, you know, verbal would be the first thing to put someone under control, would be verbal direction.
Q So it is your --
A And then physical presence.
Q I'm sorry; go ahead.
A No, just physical presence, calling for assistance, and the mere presence of more than one officer a lot of times would make someone back down.
Q So it is your testimony that in a combative situation you would not use pepper spray or a taser?
A I said I have not used it, and more because I worked in the pod, and those things weren't allowed in the pod.
Q What do you mean, the pod?
A The corrections, where the men were housed.
Q And there has been testimony that you were pregnant during this incident?
A Yes.

A/Vr TRONICS, INC.
E-Reporting and E-Transcription
Phoenix, AZ (602) 263-0885
Tucson, AZ (520) 661-3553

*Sanchez v. Dupnik et al*
*05-CV-583-TUC-RCC*
*PCJC 0032*

Q How many months pregnant were you?

A I don't remember exactly, but I gave birth in July, so eight months, say eight months pregnant, my -- I gave birth but, you know --

Q And is it your testimony that you didn't have any type of physical contact with the deputies that night?

A That I didn't have any?

Q Yes, any pushing at all, that you -- any pushing at all with the deputies, or anything like that?

A No.

Q And you mentioned that your focus was on your husband, Mr. Duran?

A That's correct. My focus --

Q So, you weren't focusing on Mr. Sanchez the whole time?

A No, I was not. I was focused on this officer here in front of me and my husband.

Q And how long have you known -- and did you know Officer or Deputy Woolridge?

A Never met him before. No, I don't know him.

Q Any acquaintances in common or anybody that you know from work in common?

A I know Deputy Grisholm or Detective Grisholm. In fact, I worked with him prior to him becoming a detective.

Q And you mention that you -- do you know Detective Daubertson (phonetic throughout)?

A Daubertson?

Q Yes.

A No, that doesn't -- I don't recall that name.

MS. BLAKE: Your Honor, is this relevant to anything?

THE COURT: We'll see the next one.

MR. BETANCOURT: It is, Your Honor.

BY MR. BETANCOURT:

Q You mentioned that you resigned. Isn't it true that you were actually terminated?

A No, that's not true.

Q And do you know an officer -- or detective, and I think you mentioned that you don't, and I'll ask, or I'll stable (phonetic) that he is part of Internal Affairs.

A Okay.

Q Do you know him, Detective Daubertson?

A I don't recall the name, but if you're asking me if I was questioned by Internal Affairs, yes, I was questioned on more than one occasion.

Q And did that questioning -- what were you questioned about?

MS. BLAKE: Objection. Relevance.

THE COURT: Yeah, what's this? Where are we going with this?

MR. BETANCOURT: Your Honor, it goes to the -- to the fact that she testified already that she resigned, and it's my

contention that she did not. I'm just trying to get to that.

THE COURT: Well, I mean, so what? I mean, she resigned or she was fired three years before this. Are you trying to say that she has some animus?

MR. BETANCOURT: Yes, specifically to the deputy, Your Honor.

MS. BLAKE: Your Honor, I have a question. If he has evidence to prove up anything, other than that, what she's saying, is that she resigned.

THE COURT: Yeah.

MR. BETANCOURT: I'll just call a rebuttal witness, Your Honor, and I'll just leave it at that.

MS. BLAKE: Okay.

THE COURT: Okay. Ask your next question.

MR. BETANCOURT: No further questions, Your Honor.

THE COURT: Ms. Blake?

MS. BLAKE: Yes, just a short follow up.

REDIRECT EXAMINATION

BY MS. BLAKE:

Q You said you were trained as part of your training in the use of tasers?

A Yes.

Q And is the manner in which Carl Woolridge was using the taser on your husband consistent with any training you've had?

A No, I felt it was excessive force.

Q And was the way in which he used the taser on Mr. Sanchez consistent with any of your training?

A I don't -- I'm going to have to say yes, it was consistent in the fact that, you know, he tasered him, and then took him down immediately. He wasn't consistently tasering him, so --

Q But in the scale of force, did he use the levels of force as you were taught?

A No, I don't believe he used appropriate escalation of force. I think that he immediately tasered without -- he didn't even -- I don't even know who threw that beer, and I'm certain he doesn't know because he couldn't see it unless he's got eyes in the back of his head.

MR. BETANCOURT: Objection, Your Honor. Speculation.

THE COURT: Sustained.

MS. BLAKE: I have no further questions.

THE COURT: Okay.

Anything further, Mr. Betancourt?

MR. ST. LOUIS: Not from the State, Your Honor.

THE COURT: You can step down. Thank you, Ma'am.

MS. BLAKE: Thank you.

THE COURT: You can call your next?

MS. BLAKE: The Defense calls Frank Sanchez.

THE WITNESS: Can I stay here?

THE COURT: You need to step outside, ma'am. I'm sorry.

*Sanchez v. Dupnik et al*
*05-CV-583-TUC-RCC*
*PCJC 0033*

