# COURT REPORTERS
## OF AKRON CANTON AND CLEVELAND

Transcript of the Testimony of
# Robert W. Vitale

**Taken On:** February 20, 2008
**Case Number:** 2:06-CV-2141-DGC

**Case:** Soilworks, LLC, vs. Midwest Industrial Supply, Inc.,

Court Reporters of Akron Canton and Cleveland
Phone: 800-804-7787
Fax: 330-666-9833
Email: reporters@compuserve.com
Internet: www.courtreportersinc.com



EXHIBIT

A

Dockets.Justia.com

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

- - -

SOILWORKS, LLC, an Arizona    )
corporation,                  ) CASE NO.
  Plaintiff/Counterdefendant/) 2:06-CV-2141-DGC
  Counterclaimant,           )
    vs.                     )
MIDWEST INDUSTRIAL SUPPLY,    )
INC., an Ohio corporation     )
authorized to do business in  )
Arizona,                      )
  Defendant/Counterclaimant/  )
  Counterdefendant.           )

- - -


    30(b)(6) Deposition of ROBERT W. VITALE, a
Witness herein, called by the
Plaintiff/Counterclaimant/Counterdefendant for
Examination pursuant to the Federal Rules of
Civil Procedure, taken before me, the
undersigned, Christina A. Arbogast, a Registered
Professional Reporter and Notary Public in and
for the State of Ohio, pursuant to Notice and
agreement of counsel at the law offices of

1    Vorys, Sater, Seymour and Pease, LLP, First

2    National Tower, 106 South Main Street, Suite

3    1100, Akron, Ohio, on Wednesday, the 20th day of

4    February, 2008, commencing at 10:03 o'clock a.m.

5                        - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**APPEARANCES:**


On Behalf of the

Plaintiff/Counterdefendant/Counterclaimant:

      KUTAK ROCK LLP

BY:    John P. Passarelli, Attorney at Law

       E. Scott Dosek, Attorney at Law

       Suite 300

       8601 North Scottsdale Road

       Scottsdale, Arizona 85253-2742

       480/429-5000


On Behalf of the

Defendant/Counterclaimant/Counterdefendant:

      BROUSE McDOWELL

BY:    John M. Skeriotis, Attorney at Law

       388 South Main Street, Suite 500

       Akron, Ohio 44311-4407

       330/535-9999


         - - -

4

1                    I N D E X

2

3    EXAMINATION                                    5

4

5

6    Plaintiff's Exhibits 8 and 9             44

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          ROBERT W. VITALE

2     of lawful age, a Witness herein, having been

3     first duly sworn, as hereinafter certified,

4     deposed and said as follows:

5                    EXAMINATION

6     **BY MR. PASSARELLI:**

7     **Q.**   Good morning.

8     **A.**   Good morning.

9     **Q.**   Could you please state your name for the

10    record?

11    **A.**   Robert Vitale.

12    **Q.**   You've had your deposition taken before, I

13    understand.

14    **A.**   Yes.

15    **Q.**   Approximately how many times?

16    **A.**   Oh, six or eight.

17    **Q.**   Have any of those been in connection with

18    the patents that are involved in this suit?

19    **A.**   No.

20    **Q.**   Have you ever -- strike that.  Has Midwest

21    Industrial Supply, Inc., ever sued anybody with

22    respect to the patents involved in this case?

23    **A.**   No.

24    **Q.**   Has Midwest Industrial Supply, Inc., ever

25    sued anybody with respect to the trademarks that

1    are involved in this lawsuit?

2    **A.**    No.

3    **Q.**    I'm going to hand you what has been marked

4    as -- or what has been served on your counsel,

5    it's an amended notice of 30(b)(6) deposition,

6    and ask if you've seen that.

7              **MR. SKERIOTIS:**    You want to mark it

8    as an exhibit?

9              **MR. PASSARELLI:**    If you want, I

10   could.

11             **THE WITNESS:**    I don't know that

12   I've seen -- I have seen the -- that, Exhibit A.

13   **BY MR. PASSARELLI:**

14   **Q.**    Exhibit A to the -- those are the

15   categories for which you're here to testify

16   today?

17   **A.**    Correct.  Right.

18   **Q.**    What did you do to prepare for your

19   deposition today?

20   **A.**    Talked with John.  That was about it.

21   **Q.**    When did you talk -- I don't want the

22   substance of your communication with

23   Mr. Skeriotis, but when did you talk to him?

24   **A.**    There were -- it was at the office two days

25   last week when your representative was in the

1   office and we were -- talked over the course of

2   those two days.

3   **Q.**   Mr. Peterson?

4   **A.**   Yes.

5   **Q.**   So these were personal meetings with

6   Mr. Skeriotis, or were they telephone or both?

7   **A.**   Personal.

8   **Q.**   And these took place at Midwest's offices?

9   **A.**   Correct.

10  **Q.**   And can you describe for me how long those

11  meetings with Mr. Skeriotis were in preparation

12  for this deposition in terms of minutes or

13  hours?

14  **A.**   I would say an hour, hour and a half.

15  **Q.**   Was there anybody present besides

16  Mr. Skeriotis when you had those conversations?

17  **A.**   No.

18  **Q.**   Did you review any documents in

19  connection -- at those meetings?

20  **A.**   We reviewed things like this.  It was

21  during that time that he showed me --

22  (Indicating.)

23  **Q.**   The 30(b)(6)?

24  **A.**   30(b)(6).

25  **Q.**   And the categories for which you were to

1   testify today?

2   **A.**   Yeah.  Correct.

3   **Q.**   But you didn't review any Midwest records

4   during that one and a half hours of meeting?

5   **A.**   No.  We went through, I think, the answers

6   to interrogatories.  Just filings as part of the

7   action.

8   **Q.**   The pleadings that were filed with the

9   court?

10  **A.**   Yeah.  And the answers to questions that we

11  had provided.

12  **Q.**   Do you recall reviewing any other

13  information or documentary materials in

14  connection with those discussions with

15  Mr. Skeriotis?

16  **A.**   I don't really recall and I -- I mean the

17  thing that I really recall is sitting down

18  with -- the two of us with all this stuff and

19  just, "Go to page so and so," and --

20  **Q.**   The two books, can you describe what those

21  are for me?

22  **A.**   The -- the filings, the interrogatories.

23          **MR. SKERIOTIS:**   I just want to

24  caution you not to discuss what we talked about.

25          **THE WITNESS:**   Yeah.  Oh, yeah.

1  Yeah.

2          MR. SKERIOTIS:   Just discuss -- you

3  know, answer his question about, like he said,

4  what books.  You can answer his question, but

5  don't talk about the substance of our

6  conversations about those books.

7          THE WITNESS:     Yeah.

8  BY MR. PASSARELLI:

9  Q.   Your understanding is those books contained

10 court filings that were prepared either by your

11 counsel or Soilworks' counsel and filed in the

12 litigation?

13 A.   Yes.

14 Q.   Other than what you've described here for

15 me today, did you review any other materials in

16 those discussions you had with Mr. Skeriotis

17 about today's deposition?

18          MR. SKERIOTIS:   Objection.

19          THE WITNESS:     No, not that I can

20 recall.

21 BY MR. PASSARELLI:

22 Q.   Okay.  One of the topics of the 30(b)(6)

23 deposition is:  "Midwest Industrial Supply,

24 Inc.'s claim that it has received US Patent

25 Number 7,074,266 and US Patent Number 7,081,270

1  **A.**   N-a-l-c-o.  I have to -- I could -- I would

2  have to compile a list of, I mean, 50 that are

3  sort of on any given day competitors that we

4  compete with, but including Soilworks.

5  **Q.**   Have you done an analysis of Soilworks'

6  products to determine whether they infringed the

7  '266 or '270 patents?

8         **MR. SKERIOTIS:**    Objection.

9  Attorney work product as well as some

10  attorney-client privilege.

11         If -- you can answer the question,

12  unless any information was derived during the

13  course of this litigation by us or otherwise was

14  not subject to attorney-client privileged

15  communications.

16         If, in fact, there's any test that

17  Midwest did outside of an attorney representing

18  you or being with you or in anticipation of

19  litigation, you can answer that question.

20  Otherwise I instruct you not to answer.  Do you

21  understand?

22         **THE WITNESS:**    I don't know.

23         **MR. SKERIOTIS:**    If Midwest did a

24  test outside of preparing for litigation or in

25  anticipation of litigation or outside of me --

1           **THE WITNESS:**      Yeah.  We did some

2    testing in our lab.

3           **MR. SKERIOTIS:**    -- the lawyer --

4    then the answer is -- then you can't answer

5    that.  But if you're testing it in the lab

6    without anybody around --

7           **THE WITNESS:**      We did some testing

8    in our lab.

9    **BY MR. PASSARELLI:**

10   **Q.**   When did you do that?

11          **MR. SKERIOTIS:**    And I just want to

12   make sure he answers correctly.  The question

13   was -- and you can repeat it and I don't want to

14   take over, but the question was:  Did you do any

15   testing in preparation -- to determine

16   infringement.

17          **THE WITNESS:**      Oh.

18          **MR. SKERIOTIS:**    Just make sure you

19   understand the question.

20          **THE WITNESS:**      Oh.

21          **MR. SKERIOTIS:**    So if these lab

22   results you did for infringement, that's okay,

23   but make sure you understand the question.

24          **THE WITNESS:**      We did not do that

25   for infringement.  But that was -- again, we did

1   no -- I guess when Durasoil first came out we

2   didn't know what it was other than to read what

3   they said in their published materials.

4   **BY MR. PASSARELLI:**

5   Q.   So when -- you described the product as

6   Durasoil?

7   **A.**   Yes.

8   Q.   When you encountered Durasoil in the

9   marketplace you did an evaluation of the

10  product?

11              **MR. SKERIOTIS:**   Objection.

12              **THE WITNESS:**   Yes.

13  **BY MR. PASSARELLI:**

14  Q.   Can you describe for me what you did?

15  **A.**   Probably testing of different types of

16  soils to see its action or reaction, testing

17  viscosity.  Testing some physical properties

18  like viscosity, pH.

19  Q.   Did you arrive at any conclusions as a

20  result of that testing?

21  **A.**   No.

22  Q.   What was the purpose of the testing?

23  **A.**   Just to see what it was.

24  Q.   Did you learn anything?

25  **A.**   Not really, no.

1   **Q.**   Did you use that evaluation in any respect

2   in your business?

3   **A.**   In our business?

4           **MR. SKERIOTIS:**   Objection.

5           **THE WITNESS:**   We may have created

6   some type of comparison document between

7   Durasoil and our product.

8   **BY MR. PASSARELLI:**

9   **Q.**   And our product would be what?

10  **A.**   EnviroKleen.

11  **Q.**   Do you remember if you did that?

12          **MR. SKERIOTIS:**   Objection.

13          **THE WITNESS:**   We did do that.

14  I'm not sure what we did with it.  It might have

15  been internal.

16  **BY MR. PASSARELLI:**

17  **Q.**   Do you know if you provided any of those

18  evaluations to any customers or prospective

19  customers?

20  **A.**   I don't recall.

21  **Q.**   Have you performed any evaluations to

22  determine whether Soilworks products infringe

23  the '270 or '266 patents?

24          **MR. SKERIOTIS:**   Objection.  Same

25  objection.  When you say "evaluations," you're

1   looking at tests, John?

2                **MR. PASSARELLI:**   Tests.

3                **MR. SKERIOTIS:**   All right.  It's

4   asked and answered and I maintain the objection.

5   And he's already identified the one test -- the

6   testing he did.

7   **BY MR. PASSARELLI:**

8   **Q.**   So let me confirm for the record that

9   the -- you understand Midwest has asserted

10   claims of patent infringement in this case,

11   correct?

12   **A.**   Yes.

13   **Q.**   As far as your testimony is concerned,

14   Midwest has never performed any analysis about

15   that infringement?

16                **MR. SKERIOTIS:**   Objection.  Again,

17   that's attorney work product, preparation for

18   litigation, in anticipation thereof, and during

19   the course of litigation as to whether or not

20   what they did pursuant to this litigation.  He's

21   already identified the only test that they did.

22   He's already answered that, so I'm not going to

23   let him answer that question.  So I instruct you

24   not to answer.

25                **MR. PASSARELLI:**   Why don't we take a

1    little break.  I would like to visit with my --

2              **MR. SKERIOTIS:**    Yeah.

3              (Thereupon, a recess was taken.)

4    **BY MR. PASSARELLI:**

5    **Q.**    What I would like to get from you,

6    Mr. Vitale, is any substantiation you have that

7    your lawyer isn't contending is privileged that

8    substantiates that my client infringed your two

9    patents.

10        What substantiation do you have, are you

11   aware of?

12   **A.**    The claims in the marketing materials.  The

13   bidding, their product in terms of meeting the

14   specification of a user which would indicate

15   violation or infringement of patents.

16        Claims that appear in various military

17   publications and handbooks about what their

18   product is that would, in my opinion, be an

19   infringement.

20             **MR. SKERIOTIS:**    John, I think -- I

21   just want to make sure the record's clear.

22   We're talking about Durasoil?  You just said

23   client's products.

24             **MR. PASSARELLI:**    Any products.

25             **THE WITNESS:**    Durasoil.

1   **A.**   I don't know if there would be anything

2   else.

3   **Q.**   Okay. As I understand it, you are claiming

4   that Soilworks infringes Midwest trademarks; is

5   that correct?

6   **A.**   Yes.

7   **Q.**   And what trademarks are they infringing?

8   **A.**   The trademark Synthetic Organic Dust

9   Control.

10   **Q.**   Is that the only one you contend they're

11   infringing?

12           **MR. SKERIOTIS:**   Objection.

13           **THE WITNESS:**   Yes, I believe so.

14   **BY MR. PASSARELLI:**

15   **Q.**   And is that because they actually used that

16   phrase?

17   **A.**   Correct.

18   **Q.**   And you believe that you are the only

19   manufacturer -- strike that.

20       You believe that you are the only entity

21   that can use that phrase?

22   **A.**   Yes.

23           **MR. SKERIOTIS:**   Objection.

24   **BY MR. PASSARELLI:**

25   **Q.**   In the soil -- in the dust control arena,

1   correct?

2   **A.**   Yes.

3   **Q.**   Have you attempted to quantify the alleged

4   damages that you have sustained as a result of

5   our client's use of the term Synthetic Organic

6   Dust Control?

7   **A.**   Not yet.

8   **Q.**   What have you done to quantify damages

9   resulting from our client's infringement of your

10  alleged trademarks?

11  **A.**   Nothing specific as yet other than general.

12  **Q.**   Have you described for me what you mean by

13  "general"?

14  **A.**   Just -- just the sense of customers lost

15  and/or customers buying Durasoil in lieu of.

16  **Q.**   And is it your testimony that customers are

17  buying product -- Durasoil product because our

18  client uses the phrase Synthetic -- Synthetic

19  Organic Dust Control?

20          **MR. SKERIOTIS:**   Objection.

21          **THE WITNESS:**   I would say the --

22  that and the -- the representation of what that

23  is.  Meaning that that's what they are selling,

24  so they have to buy it.

25  **BY MR. PASSARELLI:**

1    Q.    So it's your testimony that our client is

2    representing its product -- its Durasoil product

3    as Synthetic Organic Dust Control?

4    A.    Correct.

5    Q.    And that that is causing Soilworks'

6    customers to buy that particular product?

7                    MR. SKERIOTIS:    Objection.

8                    THE WITNESS:    Yes.

9    BY MR. PASSARELLI:

10   Q.    In those cases, it's clear the customer's

11   not deceived into believing they're buying

12   product from Midwest?

13                   MR. SKERIOTIS:    Objection.

14                   THE WITNESS:    No.

15   BY MR. PASSARELLI:

16   Q.    In other words, it's not your -- strike

17   that.

18         You're not saying that customers are buying

19   product from Soilworks thinking they're buying

20   products from Midwest?

21                   MR. SKERIOTIS:    Objection.

22                   THE WITNESS:    I'm not saying

23   that.

24   BY MR. PASSARELLI:

25   Q.    So your objection is to any use our client

1  makes of Synthetic Organic Dust Control?

2  **A.**    Yes.

3  **Q.**    And at this point in time you have not

4  quantified the volume of revenues our client

5  allegedly derived from its use of the term

6  Synthetic Organic Dust Control?

7  **A.**    That is right.  We have not quantified

8  that.

9  **Q.**    Category number 4, "Midwest's claim that

10 Soilworks has made false or misleading

11 statements of fact in its commercial

12 advertisements and promotions that misrepresent

13 the nature, characteristics, qualities or origin

14 of its own services, products or commercial

15 activities."  What information do you have with

16 regard to that subject?

17 **A.**    Well, we would base that on a claim of

18 being a manufacturer of Durasoil and their claim

19 associated with environmental claims of

20 Durasoil.

21 **Q.**    And so it's your testimony that any time

22 Soilworks describes itself as a manufacturer, it

23 is engaging in false advertising?

24         **MR. SKERIOTIS:**    Objection.

25         **THE WITNESS:**    I would -- with

1   removal of the word "any," because I don't know

2   what all they do, I would say that they're using

3   when they use -- in terms of Durasoil the word

4   manufacturer.

5   **BY MR. PASSARELLI:**

6   **Q.**   Okay.   So -- so it's your position that

7   Soilworks is representing to its customers and

8   prospective customers that it is a manufacturer

9   of Durasoil when, in fact, it is not?

10  **A.**   Yes.   That and Soiltac and Gorilla-Snot.   I

11  don't --

12              (Thereupon, a discussion was held off

13              the record.)

14  **BY MR. PASSARELLI:**

15  **Q.**   What substantiation do you have that

16  Soilworks' customers are misled by their use of

17  the term manufacturer as you described?

18              **MR. SKERIOTIS:**   Objection.

19              **THE WITNESS:**   I don't have an

20  answer to that.   If it's -- if it's false, it's

21  false.   If it's false, I would think that it is

22  misleading.

23  **BY MR. PASSARELLI:**

24  **Q.**   And how do you believe it to be false?

25  **A.**   I don't believe they are manufacturers

1   of --

2   **Q.**   Those particular products?

3   **A.**   Right.

4   **Q.**   You believe -- well, if Soilworks requires

5   its suppliers of those products to meet

6   Soilworks' proprietary product specifications,

7   would that change your opinion as to whether

8   they can describe themselves as a manufacturer

9   or not?

10          **MR. SKERIOTIS:**   Objection.

11          **THE WITNESS:**   If -- if they are

12   actually having them toll blended, I would think

13   that -- you know, that that would be

14   considered -- and toll blended to a specific

15   formula as opposed to it being an off-the-shelf,

16   standard item that is simply being sourced,

17   labeled and shipped to something other than what

18   it ships to other people as.

19   **BY MR. PASSARELLI:**

20   **Q.**   That would -- so under your definition of

21   manufacturer, that would include a company who

22   provides a product specification to a supplier

23   and a supplier meets that product spec?

24          **MR. SKERIOTIS:**   Objection.

25          **THE WITNESS:**   Yeah.  Again, it

1   would go to is their product specification an

2   off-the-shelf product or a product that the

3   supplier has that is sold for other purposes

4   that is now just being relabeled.  If it's being

5   sourced as opposed to made.

6   **BY MR. PASSARELLI:**

7   Q.   On what do you base your definition of

8   manufacturer?

9   A.   Just a general understanding of making

10  things.

11  Q.   Okay.  So you haven't based it on any

12  market research?

13  A.   No.

14  Q.   Or any specific dictionary definition?

15  A.   No.  I mean I -- in one of the responses

16  you gave us you identified Soilworks as sourcing

17  and marketing, which is what I understand them

18  to do, as opposed to manufacturing.

19  Q.   Is there any authoritative source that you

20  rely on as to who meets the qualifications of

21  describing themselves as a manufacturer?

22          **MR. SKERIOTIS:**   Objection.

23          **THE WITNESS:**     No, I'm not

24  referring to any authoritative source.

25  **BY MR. PASSARELLI:**

1       AFTERNOON SESSION

2                    1:13 p.m.

3              **THE WITNESS:**    I would like to add

4    one thing in with all the marketing stuff to the

5    one question.

6    **BY MR. PASSARELLI:**

7    **Q.**   Okay.

8    **A.**   There is also the, like, misuse or use of

9    our registered trademark in their meta tagging

10   of their website, which is also part of our

11   complaint.

12   **Q.**   What -- what do you know about that?

13   **A.**   That they were just doing copies of it.

14   **Q.**   What trademark specifically?

15   **A.**   I -- I don't remember what all -- I know

16   the one that -- I mean that I know is

17   S-o-i-l-S-e-m-e-n-t, Soil-Sement, which is a

18   product competitive with their Soiltac.

19   **Q.**   And it's your allegation that through the

20   use of META Tags they're infringing your

21   trademark?

22   **A.**   Yes.

23   **Q.**   And --

24   **A.**   And I think violating other things.  You're

25   not supposed to be doing that.  I think that's

1    an illegal practice.

2    Q.   On what do you base that conclusion?

3              MR. SKERIOTIS:    Objection.

4              THE WITNESS:    Just, you know,

5    internet law or whatever is the practice or the

6    law.

7    BY MR. PASSARELLI:

8    Q.   Do you have any information or

9    documentation that substantiates that?

10   A.   The law?

11   Q.   No, the infringement.

12             MR. SKERIOTIS:    Objection.

13             THE WITNESS:    I got copies of it.

14   BY MR. PASSARELLI:

15   Q.   You have copies.  And what is it that you

16   have copies of?

17   A.   Of their meta tagging on their website that

18   includes our mark or marks.

19   Q.   Have you attempted to quantify any alleged

20   damage from that conduct?

21   A.   Not yet.

22   Q.   Are there any other trademarks involved

23   other than Soil-Sement and Soiltac?

24   A.   Well, Soiltac is their name.  I don't

25   recall.  I mentioned these yesterday and I

1    didn't check anything.  It's just I forgot.

2    **Q.**    Okay.  Earlier you described -- or you

3    mentioned that you had invoiced customers.

4    These invoiced customers, are they all users or

5    are any of them resellers?

6              **MR. SKERIOTIS:**    Objection.

7              **THE WITNESS:**        Users.  We do have

8    resellers, but users.  The ones I'm --

9    **BY MR. PASSARELLI:**

10   **Q.**    Do you have any resellers of dust control

11   products?

12   **A.**    Yes.

13   **Q.**    Approximately how many reseller -- would

14   you invoice sales to them?

15   **A.**    Yes.

16   **Q.**    Approximately how many invoiced customers

17   in the calendar year 2007 were resellers?

18   **A.**    Ten approximately.

19   **Q.**    Would you describe these as dealers?

20   **A.**    Dealers or distributors.

21   **Q.**    Can you identify the top three?

22   **A.**    EarthCare Consultants, Belterra, Nor --

23   N-o-r-d-u-s-t, Nordust.

24   **Q.**    So these would be customers that Midwest

25   sells product to and they, in turn, resell to

1    Q.   On page 11, line 3, you are seeking an

2    injunction against my client from using

3    Midwest's marks.

4         Can you specifically identify which marks

5    you're referring to?

6    A.   It would be Synthetic Organic Dust Control.

7    Q.   Anything else?

8    A.   This may include the meta tagging issue, if

9    they are still doing that.

10   Q.   And you've told me everything you know

11   about the meta tagging conduct that --

12   A.   Yeah, that I'm aware of.

13   Q.   -- that you're finding objectionable?

14            MR. SKERIOTIS:    Objection.

15            THE WITNESS:    Yeah.

16   BY MR. PASSARELLI:

17   Q.   Anything else?

18   A.   I don't think so.

19   Q.   Paragraph 2, "Falsely designating the

20   origin of the Soilworks products and services,"

21   have you told me everything you know about my

22   client falsely designating the origin of

23   Soilworks products and services?

24            MR. SKERIOTIS:    Objection.

25            THE WITNESS:    I believe I have,

C E R T I F I C A T E

STATE OF OHIO,      )
                    )  SS:
SUMMIT COUNTY,      )

    I, Christina A. Arbogast, a Registered Professional Reporter and Notary Public within and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within named witness, ROBERT W. VITALE, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by him was by me reduced to Stenotypy in the presence of said witness, afterwards prepared and produced by means of Computer-Aided Transcription and that the foregoing is a true and correct transcript of the testimony so given by him as aforesaid.

    I do further certify that this deposition was taken at the time and place in the foregoing caption specified, and was completed without adjournment.

    I do further certify that I am not a relative, employee of or attorney for any party or counsel, or otherwise financially interested in this action.

    I do further certify that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D).

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Akron, Ohio on this 26th day of February, 2008.

_____
Christina A. Arbogast, RPR

My commission expires December 7, 2010.

- - -