IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SOILWORKS, LLC, an Arizona corporation, | ) ) ) |
| Plaintiff/Counterdefendant, | ) ) |
| vs. | ) No.2:06-CV-02141-DGC ) |
| MIDWEST INDUSTRIAL SUPPLY, INC., an Ohio corporation authorized to do business in Arizona, | ) ) ) ) |
| Defendant/Counterclaimant. | ) ) |

Phoenix, Arizona
April 11, 2008
10:00 a.m.

CONFIDENTIAL DEPOSITION OF KEVIN RAY HURST

LEA, SHERMAN & HABESKI
Registered Professional Reporters
834 North First Avenue
Phoenix, Arizona 85003
Phone: 602.257.8514 - Fax: 602.257.8582
Reported by: Jennifer Hanssen, RPR
Certified Reporter
Certificate No. 50165

EXHIBIT C

1                    I N D E X

2  EXAMINATION                                                    PAGE

3  By Mr. Skeriotis .................................    4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        CONFIDENTIAL DEPOSITION OF KEVIN RAY HURST,
 2
 3   taken at 9:58 a.m., on April 11, 2008, at the law
 4   offices of Jones, Skelton & Hochuli, P.L.C., 2901 North
 5   Central Avenue, Suite 800, Phoenix, Arizona, before
 6   JENNIFER HANSSEN, RPR, a Certified Reporter in the State
 7   of Arizona.
 8
 9   APPEARANCES:
10         For the Plaintiff/Counterdefendant:
               Kutak Rock, L.L.P.
11             by E. SCOTT DOSEK, ESQ.
               8601 North Scottsdale Road
12             Scottsdale, Arizona  85253
13         For the Defendant/Counterclaimant:
               Brouse McDowell
14             by JOHN M. SKERIOTIS, ESQ.
               388 East Main Street, Suite 500
15             Akron, Ohio  44311-4407
16         Also present:
17             Robert Vitale
18
19
20
21
22
23
24
25
```

```
 1                    KEVIN RAY HURST,
 2
 3   called as a witness herein, having been first duly
 4   sworn, was examined and testified as follows:
 5
 6                       EXAMINATION
 7   BY MR. SKERIOTIS:
 8       Q.    Mr. Hurst, can you state your name for the
 9   record and spell it as well, please?
10       A.    Kevin Ray Hurst, K-e-v-i-n, R-a-y, H-u-r-s-t.
11       Q.    Mr. Hurst, my name is John Skeriotis and I
12   represent the defendant Midwest Industrial Supply in
13   this action between Soilworks and Midwest.  I understand
14   that you are an employee of Soilworks and that Mr. Dosek
15   is representing you here today.  Is that correct?
16       A.    Yes.
17       Q.    Did you bring anything with you here today, any
18   documents?
19       A.    No.
20       Q.    Have you ever had your deposition taken before?
21       A.    No.
22       Q.    Okay.  I'm sure Mr. Dosek has explained to you
23   the process we're going to go through, but just so that
24   we're on the record I'd like to ensure that you
25   understand how we are going to proceed today.  Basically
```

1   I'm going to ask you questions and you're going to give
2   answers, but if you don't hear my question, please let
3   me know; okay?
4     A.    Okay.
5     Q.    And if you don't understand a certain part of
6   the question, please let me know.
7     A.    Okay.
8     Q.    If you don't tell me that you don't understand
9   or hear any part of the question, I will presume that
10  you have heard it and understood it; is that fair?
11    A.    Yes.
12    Q.    If you realize during the deposition that an
13  answer that you gave earlier was inaccurate or
14  incomplete, please let me know and I'll give you a
15  chance to explain it in more detail.
16    A.    Okay.
17    Q.    You understand that your responses are being
18  taken down by the court reporter?
19    A.    Yes.
20    Q.    And you realize that you have to give verbal,
21  audible answers, you can't do the "m'hums" or "huh-uhs"
22  or nod or shake your head? You understand that?
23    A.    Yes.
24    Q.    And at the end of the time you'll have a chance
25  to correct your transcript and review it. Do you

```
 1   understand that?
 2       A.   Yes.
 3       Q.   And if you make any changes to it, I will have
 4   the opportunity at trial to comment upon those changes.
 5   Do you understand that?
 6       A.   Yes.
 7       Q.   Is there any reason why you can't testify fully
 8   and accurately here today?
 9       A.   Not that I can think of.
10       Q.   Do you have any special needs I need to be
11   aware of that you need to take breaks for?
12       A.   No.
13       Q.   If you want to take a break or something, let
14   me know, but presumably we're probably not going to take
15   a break because this shouldn't take that long.  The only
16   thing I ask is if you do want to take a break, you do it
17   after a question so there's not a question pending.
18       A.   Okay.
19       Q.   Can you give me your educational background?
20       A.   High school graduate, I have numerous college
21   credits, but I've never graduated.
22       Q.   What courses did you take -- by the way, what
23   college did you attend?
24       A.   I've attended Mesa Community College, Mohave
25   County Community College and then just satellite courses
```

```
                                                                    7
1    from University of Wisconsin.
2        Q.      Mesa Community, where is that located?
3        A.      Here in Maricopa County.
4        Q.      In Arizona?
5        A.      M'hum.
6        Q.      How about Mohave?
7        A.      Arizona.
8        Q.      And you mentioned University of Wisconsin?
9        A.      Yeah.  I've taken several classes through the
10   university, they're continuing education classes.
11       Q.      What types of classes did you take at Mesa?
12       A.      Business.
13       Q.      How about Mohave County?
14       A.      I took some business classes and some
15   manufacturing engineering classes.
16       Q.      And how about the University of Wisconsin?
17       A.      They were soil stabilization related classes.
18       Q.      These soil stabilization classes, was that
19   while you were an employee of Soilworks?
20       A.      Yes.
21       Q.      And do you recall what those classes in soil
22   stabilization were, what were their titles?
23       A.      Just one class so far, I have another one
24   coming up next month.  It's a really long -- Soils
25   Engineering for Nonsoils Engineers.
```

1    Q.    Can you give me your employment history?

2    A.    I've been in the Army for six years, I've

3    worked in oil fields repairing oil wells, I've been a

4    motorcycle test rider for Harley-Davidson/Buell

5    motorcycles, I've been a machinist. Extensive

6    supervisory positions in all those.

7    Q.    Is that right? I'd love to ask you about the

8    Harley-Davidson stuff but I'll get an objection from

9    Mr. Dosek and he'd be right.

10          MR. DOSEK: No, you wouldn't because he

11   and I talked about that as well.

12          MR. SKERIOTIS: Man, test driver. They

13   don't go very fast -- well, I guess they can.

14   A.    The Buells will run about 140, but we got to

15   test competitor products.

16          MR. SKERIOTIS: I haven't seen you walk.

17   Do you walk with a limp, an injury from one of those

18   things yet?

19   A.    Slight one. It gets worse when it gets cold.

20   Q.    BY MR. SKERIOTIS: Take me through some

21   employment history that's related, if any, to your work

22   at Soilworks.

23   A.    Just my job at Soilworks.

24   Q.    When did you start working at Soilworks?

25   A.    I started there in March of 2006.

1    Q.    And when you started there what were your job
2    duties?
3    A.    When I first started there it was just as a
4    forklift driver for three weeks and then I became the
5    general foreman.
6    Q.    Wow, they knew somebody good when they saw him
7    right off the bat. And are you the current general
8    foreman?
9    A.    Yes, I'm the general foreman and field
10   technician.
11   Q.    When was the field technician added?
12   A.    That title was added about six months ago.
13   Q.    When you first got hired did you have a written
14   employment agreement with Soilworks?
15   A.    No.
16   Q.    Do you currently have an employment agreement?
17   A.    Yes.
18   Q.    Do you know approximately when that employment
19   agreement was -- was it signed?
20   A.    Yeah.
21   Q.    When was it signed?
22   A.    The last one was signed in August of 2007.
23   Q.    Was there more than one?
24   A.    Yeah. Probably about I think it was either
25   April or May of 2007 was when they started writing

1  employment agreements.

2  Q. Do you know is there a confidentiality
3  agreement clause within that agreement?

4  A. Yes.

5  Q. Do you know what it pertains to, what must you
6  keep confidential?

7  A. Pretty much anything that I learn in the
8  company if I were to leave that company. There's a
9  confidentiality agreement, there's a competition clause.

10 Q. Who did you report to when you first started as
11 a forklift driver?

12 A. Chad Falkenberg.

13 Q. And who do you report to now?

14 A. Chad Falkenberg.

15 Q. I understand it's a small company, but would
16 you consider Mrs. Falkenberg your boss as well?

17 A. Yes.

18 Q. But you don't directly report to her?

19 A. Right, I report directly to Chad.

20 Q. Why do you report directly to Chad and not to
21 her? Is he in charge of the things you do?

22 A. Yeah. Chad runs more the production end of
23 things and Dorian oversees the sales staff more than
24 Chad does.

25 Q. Do you know what else Mr. Falkenberg oversees

1  other than the production end?

2     A.   The entire company.

3     Q.   Is there something specific to Mrs. Falkenberg
4  that she oversees other than sales?

5     A.   No.  I think the two of them work very well
6  together and they do a good job of...

7     Q.   Are they typically in the office together?

8     A.   Yes.

9     Q.   Does she also handle like the accounting end of
10 it, do you know, purchase invoices, sales invoices?

11    A.   Yeah.

12    Q.   Can you tell me your job duties as a general
13 foreman and field technician?

14    A.   I oversee all the activities out in the yard as
15 far as blending materials together, making sure they're
16 ready for shipping and receiving.  I also oversee larger
17 jobs for our customers, go out and teach customers how
18 to apply our products, train our distributors to be able
19 to go out and teach customers how to apply our products.

20    Q.   So do you travel much?

21    A.   Yes.

22    Q.   About what percentage do you think you travel?

23    A.   Lately about 60 percent probably.

24    Q.   Wow.  Do you like traveling?

25    A.   Yeah.

1  Q.   Good for you.  I loved Arizona though, I will
2  tell you that.
3  A.   It's not a problem.
4       MR. DOSEK:  But you're not staying for the
5  weekend?
6       MR. SKERIOTIS:  No.
7  A.   We're going to have our best day tomorrow.
8       MR. DOSEK:  We have NASCAR, we have the
9  Scottsdale Picnic, baseball.
10      MR. SKERIOTIS:  I have two little ones, 5
11 and 7, calling my name and I'm happy about that.  But
12 you're right.
13 Q.   BY MR. SKERIOTIS:  My understanding is that
14 Durasoil became a product of Soilworks in 2003 so since
15 you've been there it's always been a product; correct?
16 A.   Yeah, it's always been there.
17 Q.   In blending, do you blend the Durasoil product
18 as well?
19 A.   No, I haven't.
20 Q.   How come?
21 A.   As far as I know there hasn't been any need for
22 it since I've been here.
23 Q.   But would you be the person who does the
24 blending?
25 A.   I would probably be the person to go out there

1  and tell them to do it. I would get my information on
2  what to do from Chad.
3    Q.    How many people are under you?
4    A.    There's six.
5    Q.    And I guess you would be in charge of the
6  blending; correct? You would tell them, hey, you know,
7  I got word from Chad that we have to blend a product and
8  you would tell them here's how we're going to do it and
9  they would go out and do it; is that a fair way to
10 characterize it?
11   A.    Yes.
12   Q.    Are you involved in any research regarding
13 products, things you guys go back in the yard maybe to
14 try and see if things would work?
15   A.    The research I do involves customers sending us
16 soil samples and I'll figure out what's going to be the
17 best application rate for the soil that they have for
18 what they're wanting to do with it. Other than that I
19 don't really do any research.
20   Q.    Okay. Do you actually yourself go out and
21 apply the product?
22   A.    Yes.
23   Q.    So if a customer calls and says we'd like you
24 guys to come out and apply this product, you would
25 typically go out?

1   A.   I would go out and oversee it.  Our customers
2   provide the crew, our customers provide all the
3   equipment to do it, I just go out and oversee the job
4   itself.
5   Q.   You make sure it gets applied correctly?
6   A.   Yes.
7   Q.   Okay.  And you've done that; correct?
8   A.   Yes.
9   Q.   Have you ever done that with the Durasoil
10  product?
11  A.   No.  It's such an easy application that I can
12  usually give instructions over the phone.
13  Q.   Which ones have you typically gone out to do?
14  A.   Mostly Soiltac and occasionally Gorilla-Snot.
15  Q.   Have your job duties changed over time, other
16  than obviously when you drove a forklift, as general
17  foreman and field technician?  When they added the field
18  technician did it increase your job responsibilities?
19  A.   My job duties have constantly increased the
20  entire time I've been there.
21  Q.   Okay.  Do you know the various Soilworks'
22  products ingredients?
23  A.   No.  I mean I have a general idea.
24  Q.   Do you know the ingredients for Durasoil?
25  A.   No.

Lea, Sherman & Habeski                           602-257-8514

1    the possibility exists.
2    Q.    We've already gone over that you don't have
3    knowledge of the ingredients of Durasoil; correct?
4    A.    Yes.
5    Q.    You've never blended anything for Durasoil;
6    correct?
7    A.    Yes.
8    Q.    Do you have any recipe cards?  Do you know what
9    those are?
10   A.    For Surtac, that's it.
11   Q.    How about batch records?
12   A.    No.
13   Q.    Do you know how Soilworks keeps track of what
14   they send to a distributor or a customer?
15   A.    The batch numbers are put on the invoices.
16   Q.    And then those batch numbers would coordinate
17   to what?
18   A.    I'm sure either Chad or Dorian keeps some type
19   of record of what batch came in.
20   Q.    Have you ever seen that?
21   A.    No.
22   Q.    So they keep that and you don't have anything
23   to do with that?
24   A.    Right.
25   Q.    Do you have production paperwork that you

1    **MR. DOSEK:** He'll read and sign.

2    (10:27 a.m.)

_____

KEVIN RAY HURST

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SOILWORKS, LLC, an Arizona corporation, | ) |
| | ) |
| Plaintiff/Counterdefendant, | ) |
| | ) |
| vs. | ) NO. 2:06-CV-02141-DGC |
| | ) |
| MIDWEST INDUSTRIAL SUPPLY, INC., an Ohio corporation authorized to do business in Arizona, | ) |
| | ) |
| Defendant/Counterclaimant. | ) |

STATE OF ARIZONA    )
                    )ss.
COUNTY OF MARICOPA  )

BE IT KNOWN that the deposition of KEVIN RAY HURST was taken before me, JENNIFER HANSSEN, RPR, Certified Reporter in and for the County of Maricopa, State of Arizona, on April 11, 2008; that the witness elected to sign the transcript before its filing; that the signature page from the original transcript was forwarded to Mr E. Scott Dosek on April 15, 2008 for the witness's signature.

In view of the fact said signature page has not been returned within the 30 days and our office has not been contacted for an extension of time, pursuant to Rule 30(e) of the Rules of Civil Procedure, being an officer of the court, I am filing said deposition.

DATED at Phoenix, Arizona this 2nd day of June, 2008.

_____
JENNIFER HANSSEN, RPR
Certified Reporter Certificate No. 50165

Subscribed and sworn to before me this 2nd day of June, 2008.

_____
NOTARY PUBLIC

OFFICIAL SEAL
BETH A. THOMPSON
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires June 5, 2009

```
1    STATE OF ARIZONA      )
                           ) ss.
2    COUNTY OF MARICOPA    )
3
4            BE IT KNOWN that the foregoing deposition was
5    taken before me, JENNIFER HANSSEN, a Certified Reporter
6    in the State of Arizona; that the witness before
7    testifying was duly sworn by me to testify to the whole
8    truth; that the questions propounded to the witness and
9    the answers of the witness thereto were taken down by me
10   in shorthand and thereafter reduced to print by
11   computer-aided transcription under my direction; that
12   the deposition was submitted to the witness to read and
13   sign; that the foregoing 25 pages are a true and correct
14   transcript of all proceedings had upon the taking of
15   said deposition, all done to the best of my skill and
16   ability.
17           I FURTHER CERTIFY that I am in no way related
18   to any of the parties hereto nor am I in any way
19   interested in the outcome hereof.
20           DATED at Phoenix, Arizona, this 11th day of
21   April, 2008.
22
23                         _____
                                  Certified Reporter
24                                Certificate No. 50165
25
```