1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA


SOILWORKS, LLC,

      Plaintiff,

-vs-

MIDWEST INDUSTRIAL SUPPLY, INC.

      Defendant.

_____/

Case No. 2:06-cv-02141


_____

VIDEOTAPED DEPOSITION OF STEVEN HICKMAN

_____


April 23, 2008
9:04 a.m.

Taken at:
DeLisio Moran Geraghty & Zobel, P.C.
943 West 6th, Avenue
Anchorage, Alaska


Reported by:
Britney Dudley, Shorthand Reporter



EXHIBIT

G

Dockets.Justia.com

```
 1                    A-P-P-E-A-R-A-N-C-E-S
 2    For the Plaintiff:  KUTAK ROCK, LLP
                          Douglas H. Allsworth, Esquire
 3                        8601 N. Scottsdale Road, Suite 300
                          Scottsdale, AZ   85253
 4
 5
 6    For the Defendant:  BROUSE MCDOWELL
                          Craig A. Marvinney, Esquire
 7                        1001 Lakeside Avenue, Suite 1600
                          Cleveland, Ohio   44114
 8
 9    Also Present:       HOLMES WEDDLE & BARCOTT
                          Grant Watts, Esquire,
10                        701 West Eighth Avenue, Suite 700
                          Anchorage, AK   99501
11
12                        Bob Vitale,
                          Midwest Industrial Supply, Inc.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

1

I-N-D-E-X

2

STEVEN HICKMAN                          APRIL 23, 2008

3

4

5

EXAMINATION BY:                                      PAGE

6

Mr. Marvinney                                         5

7

8

9

10

11                          EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 58 | May 4, 2006 Fax, Bates No. 0035504 | 156 |
| 59 | May 4, 2006 Fax, Bates No. 0035468 | 171 |

15

16

17

18

19

20

21

22

23

24

25

1           THE VIDEOGRAPHER:   One moment please.

2           We are on the record.   Today is April 23rd,

3       2008.   The time is approximately 9:04 a.m.   This is

4       tape 1 of the videotaped deposition of Steve Hickman

5       being taken on behalf of the Defendant in the matter

6       of Soilworks, LLC, versus Midwest Industrial Supply,

7       Inc., filed in the United States District Court for

8       the district of Alaska.

9           MR. MARVINNEY:   District of Arizona.

10          THE VIDEOGRAPHER:   District of Arizona?   Pardon

11      me.   I apologize.

12          MR. MARVINNEY:   The subpoena was issued out of

13      the District of Alaska, United States Supreme Court.

14          THE VIDEOGRAPHER:   Thank you, sir.

15          Case number 2:06-cv-02141.   We're in the

16      conference room of the offices of DeLisio Moran

17      Geraghty & Zobel, PC, located at 943 West 6th

18      Avenue, Suite 200 in Anchorage, Alaska.   My name is

19      Steve Miedzwiadok, and I'm the videographer.   My

20      business address is 545 East 12th Avenue in

21      Anchorage, Alaska.   The court reporter is Britney

22      Dudley with Northern Lights Realtime & Reporting.

23          Would counsel identify themselves for the

24      record, please.

25          MR. MARVINNEY:   My name is Craig Marvinney,

1      appearing from Brouse McDowell in Cleveland, Ohio,

2      on behalf of Midwest Industrial Supply, Inc.

3           **MR. ALLSWORTH:**  Douglas Allsworth of Kutak Rock

4      on behalf of Plaintiff Soilworks, LLC.

5           **MR. WATTS:**  Grant Watts, with the law firm of

6      Holmes Weddle Barcott, here on behalf of Spenard

7      Builders Supply/Polar.

8           **THE VIDEOGRAPHER:**  Pardon me, also present is

9      Bob Vitale.

10          We ask now that the court reporter please swear

11     the witness.

12 THEREUPON:

13                      STEVEN HICKMAN

14 was called as a witness herein, after having been duly

15 sworn upon oath by Britney Dudley, Notary Public, was

16 examined and testified as follows:

17                      EXAMINATION

18 BY MR. MARVINNEY:

19     **Q.**  Good morning, sir.  How are you?

20     **A.**  I'm fine.  How are you?

21     **Q.**  Fine, thank you.

22          Would you please state your full name for the

23 record?

24     **A.**  My name is Steven Todd Hickman.

25     **Q.**  And Mr. Hickman, is that okay if I call you

1    that?

2         A.   That's fine.

3         Q.   My name is Craig Marvinney and in the

4    introductory portion of the deposition that

5    Mr. Miedzwiadok did so well, we noted I represent Midwest

6    Industrial Supply, Inc., which is a company out of

7    Canton, Ohio and it's been named as a defendant in a case

8    filed by Soilworks, LLC, a company out of Gilbert,

9    Arizona.

10         And I'll be asking you some questions today.  If

11   at any time you don't understand my question, would you

12   please straighten it out with me before you give your

13   answer in full on the record?

14        A.   Yes.

15        Q.   And if you've had a chance to speak with your

16   attorney before the deposition, you may already know

17   this, but if you answer each question out loud, verbally,

18   so that it has true meaning and understandability to the

19   transcript and to the video today, that would be great;

20   do you understand that?

21        A.   I understand.

22        Q.   That will ascribe meaning to things other than

23   huh-uh and uh-huh, which when we see your -- in person,

24   many times that makes sense, but on a transcript or

25   sometimes on video, it doesn't; if that's all right?

1      A.   That's fine.

2      Q.   The other thing is, if you find that my -- my

3   questions are confusing, ambiguous or otherwise in need

4   of clarification at any time, please also straighten --

5   straighten that out with me on the record before you

6   respond; is that all right?

7      A.   I'll give it my best try.

8      Q.   Are you feeling okay today?

9      A.   I'm feeling fine.

10     Q.   Under any medication or anything?

11     A.   Not a thing.

12     Q.   Feel all clearheaded, ready to go?

13     A.   As clear as I can be.

14     Q.   That's great.

15        MR. MARVINNEY:  For the record - and I know this

16        has been said before - this is the deposition of

17        Steven Hickman in the United States District Court

18        for the District of Arizona, case number

19        2:06-cv-02141.

20        MR. MARVINNEY:  The deposition today is being

21        taken pursuant to a subpoena issued to you

22        personally, correct?

23        THE WITNESS:  Yes.

24        MR. MARVINNEY:  All right.  And you're here

25        pursuant to that subpoena, correct?

1       THE WITNESS:  Yes.

2       MR. MARVINNEY:  And that subpoena was issued by

3   the United States District Court for the District of

4   Alaska.

5       The court reporter today is registered and

6   certified here in the state of Alaska.  Do you have

7   any objections, Mr. Allsworth, to the qualifications

8   or the abilities of the court reporter and the

9   videographer today?

10       MR. ALLSWORTH:  No.

11       MR. MARVINNEY:  The deposition is being taken

12   pursuant to subpoena.  I have seen no objections

13   registered to the subpoena or the service of the

14   subpoena.  And the notice that was supplied to your

15   office as well.  There are no objections to that?

16       MR. ALLSWORTH:  I'm aware of none.

17       MR. MARVINNEY:  All right.

18       On that basis, then, pursuant to the subpoena

19   we'll proceed.  Thank you very much.

20       Mr. Watts, as far as you're concerned, you're

21   representing Polar Supply and/or Steve -- Spenard --

22   is it Spenard?

23       MR. WATTS:  It's Spenard.

24       MR. MARVINNEY:  Spenard Builders Supply?

25       MR. WATTS:  Yes, sir.

1              MR. MARVINNEY:  All right.  And you've got no

2        objections to the subpoena, as well, as we proceed?

3              MR. WATTS:  At least for, you know, the

4        attendance of the witness today, I didn't raise any

5        objections to the subpoena.  And I agreed we accept

6        service on behalf of the two people that you've

7        noticed up, Mr. Hickman and Mr. Gordner.

8              MR. MARVINNEY:  Thank you very much.

9        With that then we can proceed further.

10   BY MR. MARVINNEY:

11        Q.  Sir, if you would, please state your home

12   address for the record.

13        A.  My home address is 2001, two zero zero one,

14   Salem Court, Anchorage, Alaska, 99508.

15        Q.  And your date of birth?

16        A.  1/4/59.

17        Q.  Would you briefly recite for us your educational

18   background?

19        A.  My educational background.

20             I graduated from college in 1981 from Augustana

21   College in Rock Island, Illinois, with a bachelor of arts

22   in business administration.

23        Q.  Did you grow up here in Alaska?

24        A.  I've lived here the last 25 years.

25        Q.  And so then where did you grow up?

1    that, that's fine.

2         Do you understand that?

3    A.   Yes.

4    Q.   All right.

5         Now, back to where I asked, is, to your

6    knowledge, Polar Supply an approved distributor of

7    Soilworks for Soilworks products?

8    A.   An approved distributor?

9         MR. ALLSWORTH:  Same objection.

10        THE WITNESS:  You know, I don't know.  I mean,

11   I'm a sales guy.

12   BY MR. MARVINNEY:

13   Q.   Do you have any --

14   A.   Approved distributor, we sell -- we buy and sell

15   the product.  So if that means that we're a distributor,

16   if that makes you happy, then I guess we are.  But I

17   don't know, to be truthful.

18   Q.   Well, then that's fair.  And if I ask you a

19   question that you don't know the answer to that's --

20   that's the -- that's the accurate answer then, you don't

21   know.

22        Your role with Polar Supply is, and now Spenard

23   as a Polar Supply division, is outside sales, which does

24   not necessarily include developing a relationship with

25   the suppliers of Polar Supply, does it?

1       A.   That's really a loosely --

2            MR. WATTS:  You understand the question?

3            THE WITNESS:  -- ended question.  You know, I --

4       of course I help develop relationships.  I talk to

5       your suppliers personally, but as far as contractual

6       agreements, I'm not involved in that at all.

7  BY MR. MARVINNEY:

8       Q.   And that's a -- that's a fair way of clarifying

9  my question.  If I ask an inartful question, I apologize.

10           So you do have relationships with your

11 various -- your company's various vendors or suppliers?

12      A.   Correct.

13      Q.   But you don't get involved in the nitty-gritty

14 of the legalese, the detailed contracts or the

15 distribution arrangements, per se?

16      A.   Correct.

17      Q.   And agreements, correct?

18      A.   Correct.

19      Q.   All right.

20           But you do, for instance, with Soilworks, you

21 have made contacts with people at Soilworks yourself?

22      A.   Yes.

23      Q.   And who would those people at Soilworks be that

24 you have contact with?

25      A.   Dorian and Chad Falkenberg, their freight

1    division, I think it's Tara Hensley (phonetic). There's

2    two Tara's there. I've talked to both of them, I'm sure.

3    And I think they have an outside sales guy, Chuck.

4        Q. Can you think of Chuck's last name?

5        A. No.

6        Q. Is there any individual or number of those

7    individuals with whom you have primary contact at

8    Soilworks?

9        A. It would be Chad.

10       Q. If you had a question regarding a Soilworks

11   product that your company was selling and you had to call

12   someone at Soilworks to find out about that product, who

13   at Soilworks would you call?

14       A. Chad.

15       Q. Have you done that?

16       A. Yes.

17       Q. And has Chad responded favorably, or at least in

18   a way that you felt satisfied?

19       A. Chad's very responsive.

20       Q. And so the question -- the answer would be

21   "yes"?

22       A. Yes.

23       Q. Aside from Durasoil and Soiltac, does your

24   company sell, to your knowledge, any other Soilworks

25   products?

```
 1      A.   I'm not sure.

 2      Q.   -- "I'm not sure"?

 3      A.   That is correct.

 4      Q.   With respect to the compounds phrase -- or I

 5   should say the phrase a "synthetic organic liquid

 6   compound," what does the word "synthetic" mean to you in

 7   that parlance?

 8      A.   In that parlance, I'm not sure.

 9      Q.   So your answer to my question is you're not sure

10   what synthetic means?

11      A.   And that's what I say to my customers, as well,

12   yes.

13      Q.   And so if a customer or a prospective customer

14   of Polar Supply asks what does synthetic mean, when you

15   say "synthetic organic liquid compound," your answer to

16   them is "I'm not sure"?

17      A.   Correct.  Do you believe it?

18      Q.   I have to understand you're telling the truth

19   today.  Are you?

20      A.   Yes.

21      Q.   Now, with respect to Soiltac, what do you

22   understand Soiltac to be?

23      A.   Polymer emulsion.

24      Q.   Let me go back to Durasoil just for a moment.

25   The phrase severely treated alkaloid ring compound, to
```

1    your knowledge, comes from what source?

2        A.   Their literature.

3        Q.   "Their" being?

4        A.   Soilworks, excuse me.

5        Q.   The phrase "synthetic organic liquid compound"

6    comes from where?

7        A.   Soilworks literature.

8        Q.   The meaning behind severely treated alkaloid

9    ring compound comes from Soilworks, to your knowledge?

10       A.   The meaning?

11       Q.   Right.  What is meant by that?

12       A.   I don't know.

13            No one's defined that for me, and I haven't

14   asked.

15       Q.   So you've been supplied that phrase from

16   Soilworks with respect to its Durasoil product, but

17   you've never had a discussion with anyone there as to

18   what it means, correct?

19       A.   Correct.

20       Q.   With respect to the phrasing "synthetic organic

21   liquid compound," that phrase, again, comes from

22   Soilworks, correct?

23       A.   Correct.

24       Q.   Have you ever had a discussion or asked them

25   what it means there at Soilworks?

1      A.   But that's not really part of my sales pitch.

2      Q.   But you have said that to customers and you got

3   that information from Soilworks --

4      A.   If they ask, yes.

5      Q.   -- and passed it on to the customer without

6   changing it?

7      A.   Yes.

8      Q.   When it comes to that type of product

9   information, technical information as it relates to

10  Durasoil, its composition or background, the information

11  that you provide the customer is from Soilworks without

12  embellishment or change from you, correct?

13     A.   Technical information that's provided from

14  Soilworks?

15     Q.   That's provided to the customer of Polar Supply

16  by you, is that from Soilworks or is it from Soilworks to

17  you with some embellishment or change or alteration?

18          MR. WATTS:   Counselor, just for clarification on

19       the record, are you talking about verbal information

20       or written information?  Perhaps that would help him

21       formulate his response.

22          MR. MARVINNEY:   First off, I appreciate that

23       difference.

24  BY MR. MARVINNEY:

25     Q.   With respect to technical product background and

1    information, as it relates to Durasoil, do you provide

2    written materials to customers and prospective customers?

3        A.   Yes.

4        Q.   Does that written material come from Soilworks

5    and you pass it on to the customer, or does it come from

6    Polar Supply, which is adapted from Soilworks literature?

7        A.   It comes directly from Soilworks.

8        Q.   And you pass it on unchanged to the customer,

9    correct?

10       A.   Yes.

11       Q.   That's in writing with respect to Durasoil.  Is

12   that also true in writing with respect to Soiltac?

13       A.   Yes.

14       Q.   Now, let's talk about oral representations as to

15   the technical background of the product.  Technical

16   information regarding Durasoil, its characteristics, its

17   performance data and its technical description, do you

18   take that information from Soilworks and pass it on

19   without substantial alteration to the customer, or do you

20   take information of your own and embellish and pick and

21   choose from Soilworks as to what you tell the customer

22   orally with respect to Durasoil?

23       A.   I -- I think that -- any information that I get

24   from Soilworks off -- comes from their website.  And I

25   use their material.  Do I give every single page of

1   everything, you know, I don't -- you know --

2       Q.  But orally --

3       A.  I don't really know what you're getting at.

4       Q.  In an oral discussion with a client.

5       A.  In an oral discussion?

6       Q.  Right.  That's what I'm talking about, is the

7   oral representations that you make in your -- in your

8   meetings with prospective customers or customers.

9           Do you, as relates to the technical information

10  available from Soilworks, do you relate that information

11  as close to verbatim as you can get it?

12      A.  As close to verbatim as I can get it, yes.

13      Q.  Or do you change it substantially and alter it

14  in any way?

15      A.  No, I'm not making stuff up here.

16      Q.  So it comes -- in other words, when you tell a

17  customer --

18      A.  The information I say comes from Soilworks.

19      Q.  That's my question.

20          As it relates to Durasoil, correct?

21      A.  Yes.

22      Q.  And as it relates to Soiltac, correct?

23      A.  Yes.

24      Q.  Can you think of any instances where you haven't

25  directly related information from Soilworks, but have

1    instead substantially changed the information before you

2    told it to a customer?

3         A.   No.

4         Q.   As it relates to Soilworks?

5         A.   No.

6         Q.   As it relates to, specifically, their product

7    Durasoil?

8         A.   No.

9         Q.   As it relates specifically to their product,

10   Soiltac?

11        A.   No.

12        Q.   Are you familiar with the phrase --

13             **THE WITNESS:**   Are you okay there?

14   BY MR. MARVINNEY:

15        Q.   Are you familiar with the phrase, as it relates

16   to the application of Durasoil or Soiltac, meaning,

17   quote, applied neat, close quote?  Have you ever heard

18   that?

19        A.   Yes.

20        Q.   What does that mean to you?

21        A.   It's not mixed with water.

22        Q.   Is there any other meaning to it?

23        A.   As far as I know, no.

24        Q.   So it's applied --

25        A.   For the use of these products.

1      Q.  Do you understand what the phrase oil sheen-free

2  means?

3      A.  Yes.

4      Q.  What does it mean to you?

5      A.  Oil sheen-free, I would think that it means that

6  if a product, oil, for instance, were on water, there

7  would be a sheen.  So oil free-sheen would be the lack of

8  a sheen if it was on water, in water.

9      Q.  So an oil sheen, would be that rainbow-like

10  look --

11      A.  Rainbow.

12      Q.  -- that we see on puddles or things in parking

13  lots, for example?

14      A.  Prince William Sound, for instance.

15      Q.  From the Exxon Valdez?

16      A.  Yeah.

17      Q.  And for those from outside the area, that would

18  mean the 11 million gallon crude oil spill from the Exxon

19  Valdez back in the 1980s?

20      A.  Correct.

21      Q.  And the rainbow-like sheen that's left when oil

22  drops into the water, correct?

23      A.  Yes.

24      Q.  And so oil sheen-free would be something which

25  doesn't leave that rainbow-like effect in water, correct?

1       A.   Yes.

2       Q.   On the surface?

3       A.   Yes.

4       Q.   Are you aware of the phrase oil sheen-free as

5    applies to dust control chemicals or compounds, soil

6    stabilization chemicals or compounds?

7       A.   I believe, yes.   Soilworks claims that.

8       Q.   And you just mentioned Soilworks claims that.

9    Does it claim it with respect to Durasoil?

10      A.   Durasoil.

11      Q.   Does it claim it with respect to Soiltac?

12      A.   I don't know.

13      Q.   Do you pass that information from Soilworks,

14   that Durasoil is oil sheen-free, on to customers and

15   prospective customers?

16      A.   Yes.

17      Q.   Do you understand why customers would put an oil

18   sheen-free requirement in its specification?

19      A.   No.

20      Q.   Have you, to your knowledge, as you sit here

21   today, can you recall any project where you've responded

22   to a customer bid or a prospective customer involving an

23   oil sheen-free requirement in its specifications?

24      A.   I can't remember.

25      Q.   Do you know what a branched alkane is?

87

1    prospective customer of yours or your company's, as

2    relates to Durasoil that it is petroleum resin-free?

3        A.   No.

4        Q.   Or that it is, in Soiltac's context, petroleum

5    rosin free?

6        A.   No.

7        Q.   At some point this morning we talked a little

8    bit about uses of Durasoil and uses of Soiltac.  As you

9    sit here today, can you recall any projects where you've

10   sold Durasoil as the primary dust control chemical or

11   compound that was applied?

12       A.   Yes.

13       Q.   Can you relate to us any of those projects?

14       A.   Runways and roads.

15       Q.   Can you relate to them -- to us any specifics,

16   any specific runway or road that you can recall where

17   Durasoil was the primary purchased and used dust control

18   chemical or compound --

19       A.   Yes.

20       Q.   -- on a project where you've sold?

21       A.   Yes.

22       Q.   Such as what?

23       A.   Tanana city streets.

24       Q.   Any others?

25       A.   Kokhanok Airport.

1    Q.  Okay.  Any others?

2    A.  Togiak -- Togiak, Port Heiden.

3    Q.  Togiak Airport or road?

4    A.  They're all airports, the ones that I'm naming

5    now.

6    Q.  Okay.

7    A.  Which ones do you have?

8    Q.  I've got Kokhanok --

9    A.  Say the last couple.

10        Port Heiden.

11   Q.  Port Heiden, Togiak?

12   A.  Okay.  Port Heiden, Togiak, Emmonak, Stebbins

13   Village, Savoonga, Ambler.  That's all I can remember.

14   Q.  Okhanok (sic) Airport is west of here --

15   A.  Kokhanok?

16   Q.  Kokhanok.  Thank you for pronunciate -- the

17   pronunciation on that.

18        Kokhanok is out in the southwestern portion of

19   the Alaska mainland, isn't it?

20   A.  Yes.

21   Q.  With respect to Kokhanok, that was used, to your

22   knowledge, and sold for the purpose of application to the

23   runway of that airstrip?

24   A.  Yes.

25   Q.  Same question as to Togiak?

1      A.   Yes.

2      Q.   Togiak is where?

3      A.   Western Alaska.

4      Q.   Port Heiden is where?

5      A.   They're all Western Alaska, from there down.

6      Q.   How far up, how far north is Togiak, further

7   north than Nome?

8      A.   You know, I'm not sure, to be honest with you.

9      Q.   Have you been to these places?

10      A.   No.

11      Q.   You do these -- are -- are these bid responses?

12      A.   Yes.

13      Q.   So you're bidding to someone's specification?

14      A.   Yes.

15      Q.   Is the specification provided by the Alaska

16   Department of Transportation in these instances?

17      A.   Yes.

18      Q.   Are there other entities that provide

19   specifications relative to any of these projects that

20   you've just listed?

21      A.   No.

22      Q.   So these are all ADOT, Alaska Department of

23   Transportation, bids?

24      A.   Yes.

25      Q.   Port Heiden is in Western Alaska, you mentioned.

1    And the Durasoil was used on the tarmac on the airstrip?

2        A.    From Kokhanok down hasn't been used yet.   It's

3    en route.

4        Q.    Has it been used at Kokhanok?

5        A.    Yes.

6        Q.    But at Togiak, Port Heiden, Stevens Village,

7    Savoonga, Amber (sic) -- Ambler and Emmonak?

8        A.    Emmonak.

9        Q.    Emmonak, it's en route, but it hasn't been used

10   yet?

11       A.    Correct.

12       Q.    In other words, it's been sold for the current

13   season treatment after the breakup?

14       A.    Yes.

15       Q.    And up in Alaska we'd know the breakup would

16   mean the breakup of ice that occurs in early April,

17   generally?

18       A.    In Anchorage.

19       Q.    Fair comment.

20            Have you been aware of any ecosystem testing of

21   Durasoil?

22       A.    Eco -- no.

23       Q.    Are you aware of any ecosystem testing of

24   Soiltac?

25       A.    No.

96

```
 1    got it from Soilworks, correct?

 2         A.   Correct.

 3         Q.   And you passed it on from Soilworks then, on to

 4    your customers, or prospective customers?

 5         A.   Yes.

 6         Q.   Are you aware of the phrase synthetic organic

 7    dust control?

 8         A.   Yes.

 9         Q.   Have you used that phrase, synthetic organic

10    dust control, in the context of sales of Durasoil?

11         A.   Yes.

12         Q.   Of syn -- of Soiltac?

13         A.   No, I don't think so.

14         Q.   What does synthetic organic dust control mean to

15    you?

16         A.   Not much.

17         Q.   Do you understand what it means?

18         A.   No.

19         Q.   Where did you get the phrase synthetic organic

20    dust control for use in sales presentations as relates to

21    Durasoil?

22         A.   From Soilworks literature.

23         Q.   You didn't come up with that on your own, did

24    you?

25         A.   Huh-uh.
```

1    Q.   Is that a no?

2    A.   Yes, that's a no.

3    Q.   And you got that from Soilworks?

4    A.   Yes.

5    Q.   Did you ever have any discussions with either

6    the Falkenbergs or anyone else at Soilworks about the

7    meaning of synthetic organic dust control?

8    A.   No.

9    Q.   Do you know where they got the phrase synthetic

10   organic dust control?

11   A.   No.

12   Q.   Are you aware of synthetic organic dust control

13   being a trademarked phrase?

14   A.   No.

15   Q.   Are you aware of the phrase or the word cohesion

16   in the context of Durasoil in sales techniques or sales

17   presentations regarding Durasoil?

18   A.   No.

19   Q.   Are you aware of the phrase adhesion as it

20   relates to Durasoil?

21   A.   No.

22   Q.   Have you ever heard of a foreign object damage

23   measurement, or FOD, as relates to airfields and

24   performance of dust control inhibitors?

25   A.   Yes.

1      owner rejects it because of a spec issue, then I

2      don't object.  But if you're just making it a

3      broad-brush answer, then I'd object to the form.

4   BY MR. MARVINNEY:

5      Q.   Let me see if I can clarify that a little bit

6   further with you.

7           If you, on behalf of Polar Supply, are putting

8   together a bid response, and your bid proposal doesn't

9   meet the bid requirement specifications, can that be one

10  of the reasons, obviously, why that bid is rejected by

11  ADOT or the other organization asking for the bid?

12     A.   Yes.

13     Q.   Has that happened to you in one of your bids or

14  any of your bids, to your knowledge?

15     A.   Have we had any bids rejected?

16     Q.   For that reason.

17     A.   And the reason, again?

18     Q.   That the bid proposal did not meet the bid

19  specifications.

20     A.   Yes.  Sure.

21     Q.   Can you think of any examples as you sit here

22  today?

23     A.   No.  There's -- no.

24     Q.   Can you think of any examples as it relates to

25  erosion or dust control chemicals or compounds?

1      A.   Yeah.   Yeah, we were rejected somewhere where
2    EK35 was specified.   And we bid on it and we weren't EK35
3    so we were rejected.
4      Q.   Who was it that held the position as the bidding
5    entity that rejected the bid?
6      A.   Alaska DOT.
7      Q.   Do you remember the project; was it an airport
8    or a road?
9      A.   I'm not sure, it was an airport, but I'm not
10   sure which one.   It was last year.
11     Q.   Chevak,   C-H-E-V-A-K?
12     A.   That's -- I don't know.   I -- I don't know.
13     Q.   You don't know or you don't recall?
14     A.   I don't recall if it was Chevak or not.   I'd
15   been at Polar Supply for about a month at that point.
16   And I wasn't involved in a lot of things right then.
17     Q.   Were you involved in that particular bid, to
18   your knowledge?
19     A.   To Chevak?
20     Q.   Yeah.
21     A.   No.
22     Q.   With respect to selecting a product for dust
23   control in responding to a bid, do you make it a point to
24   review the specifications of the bid requirements before,
25   or in the process of selecting the responsive product in

1      A.   Okay.

2      Q.   And that Exhibit 30 is the first page of the

3   ADOT spec, which is the document which you're providing

4   as part of the Kokhanok job -- you're referencing this

5   particular spec from ADOT shown in Exhibit 30 on the

6   Kokhanok Airport job, correct?

7      A.   Okay.

8      Q.   Now, who prepared, within Polar Supply, the bid

9   response by Polar Supply on the Kokhanok Airport job?

10  Who put the bid together?

11          MR. WATTS:   I'm just going to object to the

12      form.   There's no testimony that they bid it.

13          MR. ALLSWORTH:   Join.

14          THE WITNESS:   I believe it was Steve Gordner.

15  BY MR. MARVINNEY:

16      Q.   Because, indeed, Polar Supply did respond to the

17  bid request, correct?

18      A.   Yes.

19      Q.   All right.

20          And if you look at the last page of Exhibit 31

21  marked SBS 000776, that page is a July 18th, 2006 letter

22  from Steve Gordner, Polar Supply, to Jerry Fletcher at

23  Tamsher Construction, correct?

24          MR. WATTS:   I'm just going to enter an objection

25      in that I believe it mischaracterizes.   I think

1  handwritten drawings in case 1 and case 2 for the airport

2  job, correct?

3      A.  Yes.

4      Q.  And the last page of this document, which is the

5  next page, is the letter from Steve Gordner to Jerry

6  Fletcher at Tamsher Construction that we just identified,

7  correct?

8      A.  Yes.

9      Q.  Tamsher Construction, to your knowledge, was

10  actually preparing the bid response to the Alaskan

11  Department of Transportation bid request for the Kokhanok

12  Airport job, correct?

13          MR. WATTS:  Object to the form.

14  BY MR. MARVINNEY:

15      Q.  If you know.

16      A.  Tamsher bid on the Kokhanok job.

17      Q.  And it was Polar Supply that was working with

18  Tamsher to provide Tamsher's aspect of the dust

19  palliative aspect of the bid response, correct?

20          MR. WATTS:  Again object to form.

21  BY MR. MARVINNEY:

22      Q.  For Kokhanok?

23          MR. WATTS:  Object to the form.

24          Did you understand his question?

25          THE WITNESS:  Just say it one more time.  Try it

1      again.  Sorry.

2   BY MR. MARVINNEY:

3      Q.  It was Polar Supply that was putting together

4   the aspect of Tamsher Construction's response to the bid

5   associated with the dust palliative conditions, correct,

6   the product involved?

7      A.  Yes.

8      Q.  And that product was Durasoil?

9      A.  Yes.

10     Q.  Now, did you have any input to Steve Gordner's

11   letter which is seen at the last page of this Exhibit

12   31 --

13          MR. WATTS:  What page are you referring to,

14      Counsel?  Is that the -- 76?

15          THE WITNESS:  000776.

16          MR. MARVINNEY:  Yes, sir.

17   BY MR. MARVINNEY:

18     Q.  Did you have any input to that letter?

19     A.  I don't remember.

20     Q.  Whose handwriting on that letter is it, is it

21   yours?

22     A.  That's mine, yeah.

23     Q.  What was the purpose of this fax to Chad

24   Falkenberg dated November 14, 2006?

25     A.  To give him the surface treatment requirement

1    for Kokhanok.

2        Q.  Was that to determine whether or not Polar

3    Supply could supply Durasoil from Soilworks in response

4    to the spec?

5        A.  Say that again?

6        Q.  Was that to determine whether or not Polar

7    Supply could provide Durasoil from Soilworks in response

8    to the spec?

9        A.  Yes.

10       Q.  Did you get a response from Mr. Falkenberg to

11   your inquiry?

12       A.  I'm sure we did.

13       Q.  And what was your response?

14       A.  I don't remember.

15       Q.  Did Tamsher Construction get the Kokhanok

16   Airport job?

17       A.  Yes.

18       Q.  Was Durasoil the dust palliative that was used

19   on the Kokhanok Airport job by Tamsher Construction as

20   part of its bid award?

21       A.  Yes.

22       Q.  Did Polar Supply provide that Durasoil on that

23   job?

24       A.  Yes.

25       Q.  And it was Polar Supply that provided the

1  Durasoil as part of this bid response, then executed upon

2  by doing the job at the airport, correct?

3      A.  Yes.

4      Q.  When you faxed Chad Falkenberg at Soilworks on

5  November 14, 2006, did you know whether or not Durasoil

6  fit the spec or not, or were you making inquiry to

7  Chad at -- Chad Falkenberg at Soilworks in order to

8  determine whether or not the Soilworks Durasoil would

9  meet that spec?

10     A.  I'm not sure.  I don't remember.

11     Q.  I'm going to hand you a document that's been --

12         MR. MARVINNEY:  I'm going to ask you mark this

13     Exhibit 58.

14             (Exhibit 58 was marked.)

15         MR. WATTS:  Why don't you go ahead and read

16     through it.

17             (Reading.)

18         MR. WATTS:  Let me take a look at that when

19     you're done.

20         THE WITNESS:  Sure.

21         MR. MARVINNEY:  Why don't you take a look at

22     this, that's an extra copy for him.

23         MR. WATTS:  Thank you.

24 BY MR. MARVINNEY:

25     Q.  The cover sheet on this is May 4, 2006, fax from

1      A.   I have no idea.

2      Q.   Have you ever made inquiry to anyone at ADOT as

3  to why they have certain specifications for dust control

4  chemicals, compounds or products as opposed to others on

5  these airport jobs?

6      A.   Yes.

7      Q.   And what -- what responses do you get?

8      A.   Because we've used it before and it works.

9      Q.   Anything else?

10     A.   Pretty much it.

11     Q.   Who was that at ADOT who made that -- made that

12  response to you?

13     A.   Clark Milne.

14     Q.   What job was it?

15     A.   Oh, I can't remember specific job.

16     Q.   All right.  Clark Milne?

17     A.   Milne.

18     Q.   M-E-L-N?

19     A.   M-I-L-N-E.

20     Q.   And how do you know Mr. Milne?

21     A.   He's a construction manager for northern

22  regions, Alaska DOT.

23     Q.   And forgive my ignorance here, but does the ADOT

24  have various regions?  You mention there is another

25  northern region?

1

2                REPORTER'S CERTIFICATE

3

4          I, Britney E. Dudley, Notary Public for the State

5     of Alaska, and Shorthand Reporter, do hereby certify that

6     the forgoing proceedings were taken before me at the time

7     and place herein set forth; that the witness was sworn to

8     tell the truth; that the proceedings were reported

9     stenographically by me and later transcribed by computer

10    transcription; taht the waived signature; that the

11    foregoing is a true record of the proceedings taken at

12    that time; and that I am not a party to, nor do I have

13    any interest in the outcome of the action herein

14    contained.

15          IN WITNESS WHEREOF, I have hereunto set my hand

16    and affixed my official seal this 2nd day of May, 2008.

17

18

19

20

21                     BRITNEY E. DUDLEY, REPORTER

22                     Notary Public - State of Alaska

23
                       STATE OF ALASKA
24                     NOTARY PUBLIC
                       Britney E. Dudley
25                     My Commission Expires April 25, 2011