1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA


SOILWORKS, LLC,

       Plaintiff,

-vs-

MIDWEST INDUSTRIAL SUPPLY, INC.

       Defendant.
_____/
Case No. 2:06-cv-02141

---

VIDEOTAPED DEPOSITION OF STEVEN GORDNER

---

April 23, 2008
2:03 p.m.

Taken at:
DeLisio Moran Geraghty & Zobel, P.C.
943 West 6th, Avenue
Anchorage, Alaska

Reported by:
Britney Dudley, Shorthand Reporter

EXHIBIT
H

```
1                    A-P-P-E-A-R-A-N-C-E-S
2    For the Plaintiff:   KUTAK ROCK, LLP
                          Douglas H. Allsworth, Esquire
3                         8601 N. Scottsdale Road, Suite 300
                          Scottsdale, AZ   85253
4
5
6    For the Defendant:   BROUSE MCDOWELL
                          Craig A. Marvinney, Esquire
7                         1001 Lakeside Avenue, Suite 1600
                          Cleveland, Ohio   44114
8
9    Also Present:        HOLMES WEDDLE & BARCOTT
                          Grant Watts, Esquire,
10                        701 West Eighth Avenue, Suite 700
                          Anchorage, AK   99501
11
12                        Bob Vitale,
                          Midwest Industrial Supply, Inc.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1                        I-N-D-E-X
 2
    STEVEN GORDNER                        APRIL 23, 2008
 3
 4
 5
    EXAMINATION BY:                                 PAGE
 6
    Mr. Marvinney                                      5
 7
 8
 9
10
11                        EXHIBITS
12  NUMBER              DESCRIPTION                 PAGE
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    THE VIDEOGRAPHER: One moment, please.
2    We're on the record, today's April 23rd, 2008.
3    And the time is approximately 2:03 p.m. This is
4    tape 1 of the videotaped deposition of Steven Mark
5    Gordner, being taken on behalf of the defendant in
6    the matter of Soilworks, LLC, versus Midwest
7    Industrial Supply, Inc. Filed in the United States
8    District Court for the District of Arizona. Case
9    number 2:06-cv-02141. We're in the conference room
10   of the Offices of DeLisio Moran Geraghty & Zobel,
11   PC, located at 943 West Sixth Avenue in Anchorage,
12   Alaska.
13   My name is Steve Miedzwiadok, and I'm the
14   Videographer. My business address is 545 East 12th
15   Avenue, in Anchorage, Alaska. The court reporter is
16   Britney Dudley with Northern Lights Realtime &
17   Reporting.
18   Would Counsel identify themselves for the
19   record, please.
20   MR. MARVINNEY: Craig Marvinney of the law firm
21   Brouse McDowell from Cleveland, Ohio, on behalf of
22   Midwest Industrial Supply.
23   MR. ALLSWORTH: Douglas Allsworth of Kutak Rock
24   on behalf of the Plaintiff Soilworks, LLC.
25   MR. WATTS: Grant Watts, Holmes Weddle & Barcott

1   here on behalf of Polar Supply.

2   THE VIDEOGRAPHER: Would the court reporter

3   please swear the witness.

4 THEREUPON:

5   STEVEN GORDNER

6 was called as a witness herein, after having been duly

7 sworn upon oath by Britney Dudley, Notary Public, was

8 examined and testified as follows:

9   EXAMINATION

10 BY MR. MARVINNEY:

11   Q. Good afternoon, sir, how are you feeling?

12   A. Pretty good.

13   Q. My name's Craig Marvinney. And as I said at the

14 outset, I represent a company known as Midwest Industrial

15 Supply out of Canton, Ohio. I'll be asking you a few

16 questions today, sir. And if you would, please answer

17 each question out loud, verbally, so that we can have as

18 clear an understanding as we can.

19   A. Uh-huh.

20   Q. Is that all right?

21   A. Yep.

22   Q. And as well, if I ask you a question that you

23 find to be confusing or ambiguous or in any way in need

24 of clarification, please straighten that out with me on

25 the record before you put your answer down. Is that

1   okay?

2   A.  Okay.

3   Q.  As well, if at any time you feel like you need
4   to take a break, please let us know, and we'll be happy
5   to accommodate you as best we possibly can.

6   A.  Okay.

7   Q.  If you want me to restate a question or in any
8   way don't understand a question, please, as well, clarify
9   that.  You're in charge and you can answer -- you can ask
10  me questions to make me elucidate or clarify what I'm
11  asking.

12  A.  Okay.

13  Q.  You understand that?

14          MR. MARVINNEY:  If you will, this is the
15      deposition, then, of Steve Gordner in the case that
16      we've all -- are here on.  We're here pursuant to
17      subpoena.  And there are no objections as to the
18      subpoena or the service of the subpoena involved,
19      correct?

20          MR. ALLSWORTH:  As I said in the earlier
21      deposition, I'm aware of none.

22          MR. MARVINNEY:  Mr. Watts?

23          MR. WATTS:  I'm presently unaware of any.

24          MR. MARVINNEY:  All right.

25          And as to the court reporter, the court reporter

1  there are no objections to the court reporter or the
2  videographer and their certification qualifications
3  to take a deposition and transcribe it and record it
4  here in the state of Alaska, are there?
5      **MR. ALLSWORTH:** No.
6      **MR. WATTS:** No.
7      **MR. MARVINNEY:** And there's no objection to the
8  use of this deposition in the Arizona action that
9  brings us here today, correct?
10     **MR. ALLSWORTH:** That would not be my call.
11     **MR. MARVINNEY:** But as far as the technical
12 aspects of the deposition, the service, the notice
13 of service or anything else, there's no defects, to
14 your knowledge.
15     **MR. ALLSWORTH:** Not to my knowledge.
16 BY MR. MARVINNEY:
17     Q. Mr. Gordner, thank you very much. And I
18 apologize for that little bit of housecleaning.
19         Are you employed today?
20     A. Yes.
21     Q. And who -- by whom are you employed?
22     A. Spenard Builders Supply.
23     Q. Are you working in the Polar Supply division of
24 Spenard Builders Supply?
25     A. Yes.

1    Q.  And how long have you worked with Polar Supply?
2    A.  Since 2000.
3    Q.  Has your job remained pretty much the same since
4    you worked with Polar Supply?
5    A.  Pretty much the same, yes.
6    Q.  And what was -- and what is the job?  What's
7    your position?
8    A.  Currently I'm the civil division manager and the
9    assistant branch manager.
10   Q.  Is that with the Anchorage branch?
11   A.  Yes.
12   Q.  Polar Supply has offices in Kenai and up in
13   Fairbanks as well?
14   A.  Correct.
15   Q.  Are those different branches, then?
16   A.  Yes.
17   Q.  And the Anchorage office, is that assigned to
18   a -- a given region of Alaska within the company?
19   A.  For Polar Supply?
20   Q.  Yes.
21   A.  No.  The other two offices are actually subbed
22   to the Anchorage office.  The Anchorage office is the
23   main office.
24   Q.  You'll have to pardon me, you wrote -- you --
25   you mentioned you were civil division manager?

1     A.   Correct.

2     Q.   For Polar Supply?

3     A.   Correct.

4     Q.   And you mentioned another position as well?

5     A.   Assistant branch manager.

6     Q.   In your position as civil division manager at

7  Polar Supply, have you held that position since 2000?

8     A.   No.

9     Q.   Have your job duties that you have as civil

10 division manager now been largely the same since 2000?

11    A.   Probably not as much as they were when I

12 originally started.

13    Q.   What are your job duties, if you will, as

14 relates to interfacing with customers of Polar Supply?

15    A.   Currently today, or as they're -- as they're

16 defined, I guess, as -- for my job?

17    Q.   Why don't we talk --

18    A.   Because there is a difference.

19    Q.   Let's talk about your job, as defined.

20    A.   It -- it -- as it relates to customers?

21    Q.   Yes, sir.

22    A.   Pretty much, I generally talk to engineers,

23 specifiers, buyers of the contractors, the estimators of

24 the contractors.  I do the majority of our --

25 large-dollar bids, say over $50,000.

1    Q.   When you say you do the majority of the
2    large-dollar bids, defining the large-dollar bids as
3    being something greater than $50,000, what do you mean
4    when you say you do the majority?  What does that mean
5    you do?  You respond to --
6    A.   I work up the bid.
7    Q.   So as far as Polar Supply's response to bids,
8    you're the one who works up those bids on the large
9    dollar --
10   A.   Not all -- not all of them, but the majority of
11   them.
12   Q.   Who else is involved in working up responses to
13   bids?
14   A.   Currently, Bob Hoffman.
15   Q.   Anyone else?
16   A.   Jaquel Shepperson.
17   Q.   Anyone else?
18   A.   As far as written?
19   Q.   Yes, sir.
20   A.   For the civil division, no.
21   Q.   Responses to requests for bid that Polar Supply
22   received over the last five years from the Alaska
23   Department of Transportation, first off, in your position
24   at Polar Supply, are you aware that there have been bid
25   requests received from ADOT, the Alaska Department of

1  Transportation, for various opportunities that Polar
2  Supply might be able to bid to?
3      A.  And what's the question with relation to ADOT?
4      Q.  Are you aware of ADOT submitting bid requests or
5  Polar Supply becoming aware of bid opportunities with
6  ADOT?
7      A.  Yes.
8      Q.  What sort of bid opportunities would those be?
9      A.  Highway jobs, airports.  Mostly for ADOT it's
10 roads, highways, airports.
11     Q.  And that is largely in the area of dust control?
12     A.  No.  No, it's --
13     Q.  Okay.
14     A.  The majority of it is in the area of
15 geotechnical products, fabrics -- boy, fabrics,
16 reinforcing grids.  What else for the civil division?
17 ADOT doesn't use too many geomembranes.  They do use a
18 few, though, geomembranes.
19     Q.  By the way, if I may, your date of birth is?
20     A.  4/3/62.
21     Q.  And your home address?
22     A.  3349 West 100th, Anchorage 99515.
23     Q.  And if you could just very briefly relate your
24 educational background?
25     A.  High school with two years of college.

1      Q.   Did you grow up here in Alaska?
2      A.   No.
3      Q.   Where did you grow up?
4      A.   I grew up in Kent, Washington.
5      Q.   Finish high school down there?
6      A.   Yes.
7      Q.   And attended two years of college down there?
8      A.   Yes.
9      Q.   And where was that?
10     A.   Green River Community College.
11     Q.   Did you go to college right after high school?
12     A.   Not immediately, no.  I went in the Army first.
13     Q.   About what year was it when you finished up your
14  stint in the Army and went to college?
15     A.   '85, I believe.
16     Q.   And can you give a brief rendition of your
17  employment background?
18     A.   Oh, been with Polar Supply since 2000.  Was with
19  a company called Northwest Linings & Geotextile Products
20  from approximately '90 to 2000.  With -- I don't even
21  recall who I was with before that.  It's been the
22  construction industry my whole life, but I -- I couldn't
23  tell you who it was before that.
24     Q.   Your time at -- at Polar Supply since 2000 has
25  been largely assigned to putting together responses to

1  bids, though; is that correct?
2      A.  Well, the first two years I ran two other
3  companies in Seattle.  So I did do bids down there, but
4  that was -- that was more -- that was more actually
5  managing the personnel in those offices.  Although I did
6  do quite a bit of -- quite a few bids down there also.
7  And then I sold those two companies in 2000 -- fall of
8  2002, I believe.
9      Q.  Is that when you moved up here to Alaska?
10     A.  Yes.
11     Q.  And since fall of 2002, has it been -- is it
12 fair to say that you spent a substantial part of your
13 work obligations with Polar Supply responding to bids?
14     A.  Yes.
15     Q.  In the civil division?
16     A.  Yes.
17     Q.  And, as we said before, some of the responses
18 involve the Alaska Department of Transportation, as you
19 characterized it, correct?
20     A.  Correct.
21     Q.  Now, do some of those bids involve dust control
22 needs?
23     A.  Depends on your definition of dust control.
24     Q.  What do you understand dust control to mean?
25     A.  Almost all ADOT bids -- not all of them, but

```
 1           THE WITNESS:  Yep, I'd just like to get it over
 2      with.
 3           MR. MARVINNEY:  That's fine.
 4   BY MR. MARVINNEY:
 5      Q.   In your knowledge, as you best recall from your
 6   work at Polar Supply, when you had a question regarding
 7   performance of Durasoil to a given specification from a
 8   customer or a prospective customer, it was your knowledge
 9   and your practice to seek clarification of that from Chad
10   Falkenberg at Soilworks, correct?
11      A.   Correct.
12      Q.   When the clarification came through, would you
13   change or amend the clarification or information given to
14   Polar Supply from Chad Falkenberg before it went out to
15   the customer or would you pass that information on to the
16   customer?
17      A.   Not normally.  We would not pass that
18   information on to the customer, because there would be no
19   need for it.  There's either a spec and we meet it or we
20   don't meet it.
21      Q.   And the determination of whether the spec was
22   met or not would be made by Polar Supply or by Chad
23   Falkenberg, Soilworks?
24      A.   By the manufacturer.
25      Q.   And to your knowledge that was who?
```

1    A.  Well, if we're talking about specifically
2    Durasoil or Soiltac, would be Soilworks.
3    Q.  Did you understand that Soilworks was the
4    manufacturer of Durasoil?
5    A.  Yes.
6    Q.  And how did you gain that understanding?
7    A.  I think we just assumed that they were.
8    Q.  Based on information given to Polar Supply from
9    Soilworks?
10        MR. ALLSWORTH:  Form.
11        THE WITNESS:  It's been long enough now that I
12   couldn't say.
13   BY MR. MARVINNEY:
14   Q.  Fundamentally, as between Polar Supply and
15   Soilworks in 2006, if a material spec called for a
16   certain dust control inhibiting compound or chemical,
17   would Polar Supply make the determination as to whether
18   Durasoil was able to meet that specification or would
19   Soilworks?
20   A.  If the documentation could match up, Polar
21   Supply would.  If the documentation from the manufacturer
22   and the specification don't match, the manufacturer does.
23   Q.  And manufacturer would be, in this case, with
24   Durasoil, to your knowledge?
25   A.  Would be Soilworks.

```
 1            MR. MARVINNEY:  I didn't finish the question
 2       yet.
 3            MR. WATTS:  But you're making it as a statement
 4       that can't be turned into a question.
 5  BY MR. MARVINNEY:
 6       Q.   Mr. Gordner, as to the Kokhanok Airport job
 7  would Polar Supply, and would you at Polar Supply,
 8  respond to a bid request or a portion of a bid request as
 9  it relates to dust palliative that Durasoil -- Durasoil
10  was appropriate without checking with Soilworks first?
11            MR. WATTS:  Object to the form.
12            THE WITNESS:  Would Polar Supply recommend it?
13  BY MR. MARVINNEY:
14       Q.   Would it put it in as part of the bid response
15  without checking with Soilworks first?
16       A.   If the documentation from the manufacturer and
17  the bid matched up exactly, then we wouldn't recommend
18  it, we would just bid that product.
19       Q.   Did --
20       A.   If it -- if the documentations don't match up,
21  Polar does not just bid a product.
22       Q.   So if in the Kokhanok Airport job the materials
23  specification for dust palliative doesn't match up with
24  the Durasoil product literature that you had on hand, you
25  would have checked with Chad Falkenberg at Soilworks?
```

 1      A.   We would have checked with Soilworks, yes.
 2      Q.   And if, in fact, Durasoil became part of the bid
 3 package by response, by Polar Supply in that instance, it
 4 was because Soilworks recommended it to you and confirmed
 5 to you that Durasoil would fit that spec?
 6      A.   Yes.
 7      Q.   When you look back on your work with Polar
 8 Supply, to your knowledge, were there any other jobs
 9 besides Kokhanok where there was a need to check with
10 Soilworks to see if Durasoil met a bid specification for
11 dust control?
12      A.   That -- I can't recall a specific job.  I -- I
13 can tell that, you know, if you look at -- at faxes and
14 e-mails early on, like I stated earlier, you know, new
15 manufacturer and we don't know the information, we're to
16 the manufacturer all the time.
17      Q.   And in this case --
18      A.   Mostly for our -- our knowledge.
19      Q.   In this case the relationship, as you understood
20 it to be, with Soilworks by 2006, was that still somewhat
21 of a new relationship?
22      A.   Yes.
23      Q.   And you would typically, then, check back with
24 Soilworks?
25      A.   Typically, yes.

1
2                REPORTER'S CERTIFICATE
3
4       I, Britney E. Dudley, Notary Public for the State
5  of Alaska, and Shorthand Reporter, do hereby certify that
6  the forgoing proceedings were taken before me at the time
7  and place herein set forth; that the witness was sworn to
8  tell the truth; that the proceedings were reported
9  stenographically by me and later transcribed by computer
10 transcription; taht the waived signature; that the
11 foregoing is a true record of the proceedings taken at
12 that time; and that I am not a party to, nor do I have
13 any interest in the outcome of the action herein
14 contained.
15      IN WITNESS WHEREOF, I have hereunto set my hand
16 and affixed my official seal this 2nd day of May, 2008.
17
18
19
20                    *[signature: Britney E. Dudley]*
21                    BRITNEY E. DUDLEY, REPORTER
22                    Notary Public - State of Alaska
23
24
25

STATE OF ALASKA
NOTARY PUBLIC
Britney E. Dudley
My Commission Expires April 25, 2011