Strojnik v. Costar Realty Information, Inc. et al
Doc. 89 Att. 2

# Exhibit 3

Dockets.Justia.com

SOILWORKS VS. MIDWEST INDUSTRIAL

CHAD FALKENBERG, VOL. I

4/09/08

LEA, SHERMAN & HABESKI PHOENIX, AZ (602)257-8514

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

SOILWORKS, LLC, an Arizona corporation,

Plaintiff/Counterdefendant,

vs.

MIDWEST INDUSTRIAL SUPPLY, INC., an Ohio corporation authorized to do business in Arizona,

Defendant/Counterclaimant.

NO. 2:06-CV-02141-DGC

Phoenix, Arizona
April 9, 2008
9:00 a.m.

C O N F I D E N T I A L

DEPOSITION OF CHAD FALKENBERG

SOILWORKS, LLC 30(b)(6)

(VOLUME I, Pages 1 - 229)

LEA, SHERMAN & HABESKI
Registered Professional Reporters
834 North First Avenue
Phoenix, Arizona 85003
Phone: 602.257.8514 - Fax: 602.257.8582
Reported by: Linda Blackmon, RPR/RMR
Certified Reporter
Certificate No. 50320



I N D E X


| EXAMINATION | | PAGE |
|---|---|---|
| BY MR. SKERIOTIS | | 6 |

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| 14 | Notice of Deposition of Soilworks 30(b)(6) | 5 |
| 15 | ConocoPhillips Web Page of Group 2 Base Oils | 54 |
| 16 | ConocoPhillips Pure Performance Base Oils Specifications Sheet | 56 |
| 17 | Letter dated 7-27-06 to Donald Dunavant from Robert Vitale | 129 |
| 18 | Letter dated 7-27-06 to David Shooner from Robert Vitale | 129 |
| 19 | Letter dated June 8, 2006 to Douglas Allsworth from John Skeriotis | 140 |
| 20 | Letter dated July 18, 2006 to John Skeriotis from John Passarelli | 142 |
| 21 | Letter dated July 27, 2006 to John Skeriotis from John Passarelli | 144 |
| 22 | Letter dated August 8, 2006 to John Passarelli from John Skeriotis | 147 |
| 23 | Series of E-mails Re Patent dated 11-22-06 | 152 |






I N D E X (CONTINUED)


| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| 24 | E-mail dated 12-12-06 to Steve Gordner from Dorian Falkenberg Re Indemnification Letter | 157 |
| 25 | Indemnification Letter dated 12-12-06 to Steve Gordner from Dorian Falkenberg | 157 |
| 26 | Invitation to Bid issued May 31, 2007 | 188 |
| 27 | Invitation to Bid issued July 10, 2006 | 188 |
| 28 | Notice of Intent to Award a Contract dated 6-27-07 | 196 |
| 29 | Notice of Intent to Award a Contract dated August 1, 2006 | 198 |
| 30 | Document titled Dust Palliative Re Material Requirements | 199 |
| 31 | Fax to Chad Falkenberg from Steve Hickman Re Kokhanok Surface Requirements | 202 |
| 32 | State of Alaska Laboratory Report Re Soil Cement Specimens | 204 |
| 33 | Fax dated 5-4-6 to Chad Falkenberg from Steve Hickman Re Chevak Airport Specification | 206 |
| 34 | E-mail dated 11-14-07 to Steve Gordner from Jaquel Shepperson Re Chevak Airport | 211 |
| 35 | Picasa Web Albums for Soilworks | 213 |
| 36 | Bid Schedule for Circle Hot Springs Airport | 221 |
| 37 | E-mail dated August 2, 2006 to Bob Vitale from Jim Simko Re Prices | 225 |




DEPOSITION OF CHAD FALKENBERG, taken at 9:09 a.m., on April 9, 2008, at the law offices of Jones, Skelton & Hochuli, 2901 North Central Avenue, Suite 800, Phoenix, Arizona, before LINDA BLACKMON, RPR/RMR, a Certified Reporter in the State of Arizona.

APPEARANCES:

For the Plaintiff/Counterdefendant:
Kutak Rock, LLP
BY E. SCOTT DOSEK, ESQ.
8601 North Scottsdale Road
Scottsdale, Arizona 85253-2742

For the Defendant/Counterclaimant:
Brouse McDowell
BY JOHN M. SKERIOTIS, ESQ.
388 South Main Street, Suite 500
Akron, Ohio 44311-4407
330-535-5711

Also Present:
Robert Vitale

A. **I cannot think of anything right now.**
Q. The next paragraph, Paragraph 10, talks about Midwest's conduct is intended to cause mistake, deception, and consumer confusion. What conduct has caused mistake, deception and consumer confusion?
A. **Let's go back to both the letter that Bob wrote to Polar Supply and their marketing materials about Soilworks being an imitator, both of those would fit the bill for No. 10.**
Q. The letter to Polar Supply you believe causes what, mistakes, deception and confusion or just one of the three?
A. **Well, it could be multiple, but I would say the one that jumps out would certainly be confusion.**
Q. Confusion as to how, as to what?
A. **Polar Supply didn't know if it was true or not and if they were going to be liable or sued if they used our products or sold our products. They were scared.**
Q. But that didn't cause confusion between any product of Soilworks and any product of Midwest, did it?
A. **I think I understand what you're saying is the letter itself didn't cause confusion between the two product lines?**



Q. Correct.
A. **In that case I don't think so.**
Q. Is Polar Supply a current distributor?
A. **Yes, they are.**
Q. Under Spendard Builder Supply though, correct?
A. **I believe so.**
Q. Have they ever ceased being a distributor of Soilworks?
A. **I would like to say that they would not purchase from us until -- until we gave them indemnification and protected them they ceased to do business with us.**
Q. What indemnification have you given to them?
A. **I would have to refer to Scott on what all was provided, I don't know all the details of what you are looking for.**
Q. Have you given them something other than a letter indicating that you would indemnify them should they get sued for selling your product?
A. **It was something to that effect I believe.**
Q. Have you given them any money, have you paid them anything?
A. **I don't understand.**
Q. Have you paid Polar Supply any money as an indemnification yet?



A. **I wouldn't know. I am not aware of anything but that doesn't mean that it hasn't happened.**
Q. Who would know?
A. **I would think our books would show it.**
Q. Back to the initial question. Has Polar Supply ever ceased being a distributor with Soilworks?
A. **Not to my knowledge.**
Q. Have they ever indicated to you they are not selling your product?
A. **During the period from the time Bob sent the letter to the time we provided them indemnification I don't believe there was any transactions that took place and I believe it was because of the letter.**
Q. Did they miss a bid or a sale in that time period that you know of?
A. **Actually, yes, I think so.**
Q. Which one?
A. **I believe it was another ADOT-related project or an airport-related project. There were several.**
Q. Do you know specifically which airport?
A. **No.**
Q. Do you have a date by which they would have missed something?
A. **No.**
Q. Do you have any information whatsoever to



identify the instance you are saying they missed because of this letter?
A. **Not the firm details you are looking for, no.**
Q. I am looking for any detail. By the way, all you have told me is that there may be an airport but you don't know of any, correct?
A. **I think you would be best off when you depose Polar that they would have the closest information relating to those projects.**
Q. Do you know what irreparable harm has been caused by Midwest against Soilworks?
MR. DOSEK: Object to the form.
A. **I don't know.**
Q. BY MR. SKERIOTIS: Do you know what "irreparable harm" is?
A. **I have an idea.**
Q. I will represent to you that when I use that term I mean harm that can't be repaired monetarily. So with that definition what irreparable harm is Midwest causing to Soilworks?
MR. DOSEK: Same objection.
A. **I don't know.**
Q. BY MR. SKERIOTIS: With respect to Paragraph 12, Paragraph 12 states "Midwest intentionally has misrepresented the scope of said






that when we get finished with this would be an appropriate time, but given the amount of time we have spent on it so far it seems logical to me that you have got another hour or so to deal with this particular exhibit.
MR. SKERIOTIS: I may have but right now I would like to go through it.
THE WITNESS: It is 12:30 and it would be nice to get lunch.
MR. SKERIOTIS: I don't have a problem with that.
THE WITNESS: I had to get up at 5:00 just to be here on time because of traffic.
MR. SKERIOTIS: I understand that and that's fine, but we will take a break after Count IV. I won't get to Count V or VI, how about that?
MR. DOSEK: All right.
Q. BY MR. SKERIOTIS: With respect to Count IV on Page 5 it's called Tortious Interference With Business Relationship and Expectancy. Paragraph 29 talks about Midwest knows of Soilworks' business relationships and expectancies and without justification intentionally interfered with existing business relationships and has sought to frustrate Soilworks' expected customer relationships. Do you see that?



A. **Yes.**
Q. Is the relationship that's referred to there between Soilworks and Polar Supply?
A. **Can you ask me that again, please?**
Q. Yes. Is the business relationship that's referred to in Paragraph 29 the relationship between Soilworks and Polar Supply?
A. **I think that would certainly fall here.**
Q. And what led to that alleged interference is the letter to Polar Supply that you later on then indemnify Polar Supply for, correct?
MR. DOSEK: Object to the form.
A. **Can you ask it again, please?**
Q. BY MR. SKERIOTIS: Sure. I didn't ask it very well, that's a fair question. The interference that's mentioned here is the letter that Midwest drafted and sent to Polar Supply, correct?
A. **I would assume that that letter constitutes interference.**
Q. And that's interference that's referenced in Paragraph 29, correct, of your Complaint?
A. **I believe so.**
Q. And I take it, then, that it's your position that Midwest tried to interfere with that relationship to gain Polar Supply as a customer, correct? Is that



your allegation?
A. **I think that could be part of it.**
Q. And in fact Midwest was not successful, though, in getting Polar Supply to be its customer, correct?
MR. DOSEK: Object to form, foundation.
A. **I hope Midwest doesn't do business with Polar Supply.**
Q. BY MR. SKERIOTIS: And as far as you know they don't do business with Polar Supply, correct?
A. **I don't have any knowledge of that.**
Q. In other words you don't have any knowledge that Midwest does business with Polar Supply, correct?
A. **No, I don't.**
Q. Can you tell me how you have been damaged by this interference between you and Polar Supply?
A. **One of the things would be the fact that we didn't make any sales during the time between the letter being received by Polar and the letter provided from us from our attorneys committing to indemnification of them. But who knows how far that goes in terms of their -- there is many different pieces of this.**
Q. But it's true you haven't to your knowledge lost any sales pursuant to the letter sent by Midwest





to Polar Supply, correct?
A. **The letter was very timely and because of a project that was taking place, and to the best of my recollection that project was lost to Midwest, actually to Nana Supply or Nana Pacific who markets Midwest's materials. So I believe that we directly lost an ADOT project, one more reference, one more plot, one more sale, because of that.**
Q. Are you saying, then, that Polar Supply did not bid on that project because of Midwest's letter to Polar Supply?
A. **I don't want to speak on their behalf, it's best that you talk to them directly about that.**
Q. Do you know if they bid on a project during this time period that we are speaking of between the letter and the indemnification?
A. **I am fairly certain.**
Q. That they did or did not?
A. **I am fairly certain that during this time there was a bid that they were involved in. I don't know if it was bid or not bid, I don't know.**
Q. Other than that, though, there is no other damage that you know of caused by the letter to Polar Supply from Midwest?
A. **I certainly could not say that for sure.**

mean that's an overexaggeration, but the point is is that synthetic isoalkane covers a lot of different things and it can be defined in many different ways. Again, it's too broad.
Q. Do you think it could be defined in a way such that Durasoil would be interpreted to have a synthetic isoalkane?
A. Here is what I would love to see, I would love to see that mineral oil is or is not with CAS number such and such, does or does not meet the terms of being what Midwest is defining as a synthetic isoalkane. That's the kind of stuff I would love to be able to look at, but in fact we have to infer what they are meaning by these broad terms and that's not easy.
Q. So back to my question though, do you think that there is a definition of synthetic isoalkane wherein Durasoil would meet having a synthetic isoalkane?
A. I think it's possible. For example, if mineral oil is a synthetic isoalkane or base oil that we describe in our ingredient list are considered as a synthetic isoalkane, then it is what it is.
Q. Well, let me ask you is mineral oil an isoalkane?
A. I don't know.



Q. Do you know is mineral oil synthetic?
A. I know mineral oil is refined.
Q. But do you know if it is synthetic?
A. It depends on how you are defining "synthetic," and if you are defining synthetic as something that is not natural, then I would certainly classify it as synthetic.
Q. Because you believe mineral oil is not natural?
A. I believe so.
Q. So in other words is your definition of "synthetic" just anything that's not natural?
A. Mineral oil to the best of my knowledge cannot be obtained in the form that we use it today without going through some sort of process.
Q. But my question was a little bit broader than that. Is your definition of "synthetic" anything that's not natural?
A. I think that could be a good definition.
Q. Why don't you just tell me what is your definition of "synthetic." I kind of put words in your mouth, I didn't mean to do that.
A. I think it could be described as something that's not natural or naturally occurring.
Q. Not naturally occurring?



A. Sure.
Q. Because you said naturally occurring, I just want to make sure you are talking about not naturally occurring.
Have you tested Durasoil to find out if it has an isoalkane?
A. Again, I don't know what an isoalkane is. I don't know what you guys are trying to classify as an isoalkane.
Q. But let me ask you this, we have determined that you are not a chemist, correct?
A. Again, yes.
Q. Have you turned to a chemist to find out if they can determine whether or not Durasoil has an isoalkane?
A. I have been advised by people, yes.
Q. Who have you been advised by?
A. Randy McFarlane.
Q. Who is Randy?
A. He is with ConocoPhillips.
Q. What has Randy told you?
A. Randy helped clarify his take on what these binders and acids and esters and thermoplastics, he helped paint his knowledge and his picture of what he believes that might be.



Q. Did Randy help you in drafting these two pages?
A. I asked him questions relating to what you have in your patent so that I could answer this.
Q. So he helped you draft or he helped you with your drafting of these two pages, correct? Based on the conversations you had with him you drafted these two pages?
A. Based on our conversation he helped me fill in, you know, fill in the blanks that I needed to go and make this document.
Q. Okay, fair enough.
A. But he did not sit down and help me put this together.
Q. And who is Randy McFarlane?
A. He is with ConocoPhillips and he is -- I believe he's one of the salesmen. He is one of my main points of contact.
Q. So did you ask Randy if Durasoil has an isoalkane in it?
A. I did.
Q. And what did he say?
A. He said that if a synthetic isoalkane -- and I am paraphrasing.
Q. Sure.