# Exhibit 3

# COURT REPORTERS
## OF AKRON CANTON AND CLEVELAND

Transcript of the Testimony of
# Robert W. Vitale

**Taken On:** February 20, 2008
**Case Number:** 2:06-CV-2141-DGC

**Case:** Soilworks, LLC, vs. Midwest Industrial Supply, Inc.,

Court Reporters of Akron Canton and Cleveland
Phone: 800-804-7787
Fax: 330-666-9833
Email: reporters@compuserve.com
Internet: www.courtreportersinc.com

**Page 1**

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF ARIZONA
- - -
SOILWORKS, LLC, an Arizona )
corporation, ) CASE NO.
  Plaintiff/Counterdefendant/) 2:06-CV-2141-DGC
  Counterclaimant, )
    vs. )
MIDWEST INDUSTRIAL SUPPLY, )
INC., an Ohio corporation )
authorized to do business in )
Arizona, )
  Defendant/Counterclaimant/ )
  Counterdefendant. )
- - -

    30(b)(6) Deposition of ROBERT W. VITALE, a Witness herein, called by the Plaintiff/Counterclaimant/Counterdefendant for Examination pursuant to the Federal Rules of Civil Procedure, taken before me, the undersigned, Christina A. Arbogast, a Registered Professional Reporter and Notary Public in and for the State of Ohio, pursuant to Notice and agreement of counsel at the law offices of

**Page 2**

Vorys, Sater, Seymour and Pease, LLP, First National Tower, 106 South Main Street, Suite 1100, Akron, Ohio, on Wednesday, the 20th day of February, 2008, commencing at 10:03 o'clock a.m.
- - -

**Page 3**

APPEARANCES:

On Behalf of the
Plaintiff/Counterdefendant/Counterclaimant:
  KUTAK ROCK LLP
BY:  John P. Passarelli, Attorney at Law
      E. Scott Dosek, Attorney at Law
      Suite 300
      8601 North Scottsdale Road
      Scottsdale, Arizona 85253-2742
      480/429-5000

On Behalf of the
Defendant/Counterclaimant/Counterdefendant:
  BROUSE McDOWELL
BY:  John M. Skeriotis, Attorney at Law
      388 South Main Street, Suite 500
      Akron, Ohio 44311-4407
      330/535-9999

---

**Page 4**

I N D E X

EXAMINATION                        5

Plaintiff's Exhibits 8 and 9      44

Page 33

1  A. Again, I don't recall, but I would say he's
2  been with us between 10 and 20 years.
3  Q. And he at all times headed up the
4  information technology --
5  A. Yes.
6  Q. -- systems? When did you first consult a
7  patent lawyer concerning the '270 and '266
8  methods and compositions?
9  A. Now, that I don't recall, but I'm sure that
10 that's in the record.
11 Q. Is that the first time you consulted a
12 patent lawyer for Midwest's methods or products?
13 A. I believe so, yes.
14 Q. And you don't remember the lawyer? Was it
15 Mr. Skeriotis?
16       MR. SKERIOTIS: Objection.
17       THE WITNESS: No. It was Joe
18 Sebolt of Sand & Sebolt.
19 BY MR. PASSARELLI:
20 Q. Is that a law firm?
21 A. It's a -- he's a patent attorney. A
22 trademark attorney.
23 Q. Where at?
24 A. Canton.
25 Q. Is he still around?

Page 34

1  A. Yes.
2  Q. So who prepared the initial application for
3  the method of chemical soil stabilization and
4  dust control that's the subject of the '270
5  patent?
6       MR. SKERIOTIS: Objection.
7       THE WITNESS: Within Midwest it
8  would have been Todd Hawkins, and within the law
9  firm it would have been -- or the firm, it would
10 be Sand & Sebolt.
11 BY MR. PASSARELLI:
12 Q. And at some point you transferred the legal
13 responsibility for the application to another
14 lawyer?
15 A. Correct.
16       MR. SKERIOTIS: Objection.
17 BY MR. PASSARELLI:
18 Q. When did you do that?
19 A. Again, I -- that I don't recall, but
20 sometime -- I just don't recall. I would have
21 to look at the file to see exactly when that
22 was.
23 Q. You would have records on that?
24 A. Yes.
25 Q. Besides Mr. Sebolt, do you recall any other

Page 35

1  names of lawyers that assisted you in
2  application/registration process of the '270 and
3  '266 patents?
4  A. No. Joe Sebolt himself, and then he had, I
5  believe, two other attorneys and I don't recall
6  their names.
7  Q. May I assume that Midwest has maintained
8  files as it relates to these patent
9  applications?
10 A. Yes.
11 Q. Do you know if those files were made
12 available to Mr. Peterson last week?
13 A. Oh, I'm sure they were, yes.
14 Q. Who were Midwest's primary competitors in
15 the dust control category at the time that this
16 patented method and composition were developed?
17       MR. SKERIOTIS: Objection.
18       THE WITNESS: You mean in broad,
19 general terms?
20 BY MR. PASSARELLI:
21 Q. Correct.
22 A. I mean there are literally hundreds. Ones
23 that we see most often are -- were/are, Syntech,
24 S-y-n-t-e-c-h, Nalco --
25 Q. I'm sorry?

Page 36

1  A. N-a-l-c-o. I have to -- I could -- I would
2  have to compile a list of, I mean, 50 that are
3  sort of on any given day competitors that we
4  compete with, but including Soilworks.
5  Q. Have you done an analysis of Soilworks'
6  products to determine whether they infringed the
7  '266 or '270 patents?
8       MR. SKERIOTIS: Objection.
9  Attorney work product as well as some
10 attorney-client privilege.
11      If -- you can answer the question,
12 unless any information was derived during the
13 course of this litigation by us or otherwise was
14 not subject to attorney-client privileged
15 communications.
16      If, in fact, there's any test that
17 Midwest did outside of an attorney representing
18 you or being with you or in anticipation of
19 litigation, you can answer that question.
20 Otherwise I instruct you not to answer. Do you
21 understand?
22      THE WITNESS: I don't know.
23      MR. SKERIOTIS: If Midwest did a
24 test outside of preparing for litigation or in
25 anticipation of litigation or outside of me --

**37**

1  THE WITNESS: Yeah. We did some
2  testing in our lab.
3  MR. SKERIOTIS: -- the lawyer --
4  then the answer is -- then you can't answer
5  that. But if you're testing it in the lab
6  without anybody around --
7  THE WITNESS: We did some testing
8  in our lab.
9  BY MR. PASSARELLI:
10 Q. When did you do that?
11 MR. SKERIOTIS: And I just want to
12 make sure he answers correctly. The question
13 was -- and you can repeat it and I don't want to
14 take over, but the question was: Did you do any
15 testing in preparation -- to determine
16 infringement.
17 THE WITNESS: Oh.
18 MR. SKERIOTIS: Just make sure you
19 understand the question.
20 THE WITNESS: Oh.
21 MR. SKERIOTIS: So if these lab
22 results you did for infringement, that's okay,
23 but make sure you understand the question.
24 THE WITNESS: We did not do that
25 for infringement. But that was -- again, we did

**38**

1  no -- I guess when Durasoil first came out we
2  didn't know what it was other than to read what
3  they said in their published materials.
4  BY MR. PASSARELLI:
5  Q. So when -- you described the product as
6  Durasoil?
7  A. Yes.
8  Q. When you encountered Durasoil in the
9  marketplace you did an evaluation of the
10 product?
11 MR. SKERIOTIS: Objection.
12 THE WITNESS: Yes.
13 BY MR. PASSARELLI:
14 Q. Can you describe for me what you did?
15 A. Probably testing of different types of
16 soils to see its action or reaction, testing
17 viscosity. Testing some physical properties
18 like viscosity, pH.
19 Q. Did you arrive at any conclusions as a
20 result of that testing?
21 A. No.
22 Q. What was the purpose of the testing?
23 A. Just to see what it was.
24 Q. Did you learn anything?
25 A. Not really, no.

**39**

1  Q. Did you use that evaluation in any respect
2  in your business?
3  A. In our business?
4  MR. SKERIOTIS: Objection.
5  THE WITNESS: We may have created
6  some type of comparison document between
7  Durasoil and our product.
8  BY MR. PASSARELLI:
9  Q. And our product would be what?
10 A. EnviroKleen.
11 Q. Do you remember if you did that?
12 MR. SKERIOTIS: Objection.
13 THE WITNESS: We did do that.
14 I'm not sure what we did with it. It might have
15 been internal.
16 BY MR. PASSARELLI:
17 Q. Do you know if you provided any of those
18 evaluations to any customers or prospective
19 customers?
20 A. I don't recall.
21 Q. Have you performed any evaluations to
22 determine whether Soilworks products infringe
23 the '270 or '266 patents?
24 MR. SKERIOTIS: Objection. Same
25 objection. When you say "evaluations," you're

**40**

1  looking at tests, John?
2  MR. PASSARELLI: Tests.
3  MR. SKERIOTIS: All right. It's
4  asked and answered and I maintain the objection.
5  And he's already identified the one test -- the
6  testing he did.
7  BY MR. PASSARELLI:
8  Q. So let me confirm for the record that
9  the -- you understand Midwest has asserted
10 claims of patent infringement in this case,
11 correct?
12 A. Yes.
13 Q. As far as your testimony is concerned,
14 Midwest has never performed any analysis about
15 that infringement?
16 MR. SKERIOTIS: Objection. Again,
17 that's attorney work product, preparation for
18 litigation, in anticipation thereof, and during
19 the course of litigation as to whether or not
20 what they did pursuant to this litigation. He's
21 already identified the only test that they did.
22 He's already answered that, so I'm not going to
23 let him answer that question. So I instruct you
24 not to answer.
25 MR. PASSARELLI: Why don't we take a