1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3                    _____

4    SOILWORKS, LLC,                    )
                                        )
5                        Plaintiff,     )     CV 06-02141-PHX-DGC
                                        )
6           vs.                         )     Phoenix, Arizona
                                        )     October 9, 2008
7    MIDWEST INDUSTRIAL SUPPLY, INC.,)
                                        )
8                        Defendant.     )
     _____)

9

10

11

12

13         BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

14              REPORTERS' TRANSCRIPT OF PROCEEDINGS

15                   FINAL PRETRIAL CONFERENCE

16

17

18

19

20
     Official Court Reporters:
21   Patricia Lyons, RPR, CRR
     Gary Moll
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporters
25   Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2

 3   For the Plaintiff/Counterdefendant:

 4           Kutak Rock LLP
             By: E. SCOTT DOSEK, ESQ.
 5           8601 N. Scottsdale Rd., Ste 300
             Scottsdale, AZ  85253
 6
             Kutak Rock LLP
 7           By:  JOHN P. PASSARELLI, ESQ.
             1650 Farnam St.
 8           Omaha, NE  68102

 9

10   For the Defendant/Counterclaimant:

11           Brouse McDowell
             By: CRAIG A. MARVINNEY, ESQ.
12           1001 Lakeside Ave., Ste 1600
             Cleveland, OH  44114
13
             Brouse McDowell LPA
14           By: JOHN M. SKERIOTIS, ESQ.
             388 S. Main St., Ste 500
15           Akron, OH  44311

16           Jones Skelton & Hochuli PLC
             By: DONALD L. MYLES, JR., ESQ.
17           2901 N. Central Ave., Ste 800
             Phoenix, AZ  85012

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Civil case 06-2141, Soilworks
LLC versus Midwest Industrial Supply, Inc.  This is the time
set for final pretrial conference.

Counsel, please announce your presence for the
record.

MR. DOSEK:  Good afternoon, Your Honor.  I'm Scott
Dosek with the law firm Kutak Rock on behalf of plaintiff.  And
with me is my partner John Passarelli, with the same firm from
our Omaha office.  Also present in court are Chad Falkenberg,
president of Soilworks, and his wife Dorian Falkenberg, vice
president.

THE COURT:  All right.  Good afternoon.

MR. MARVINNEY:  Good afternoon, Your Honor.  My name
is Craig Marvinney of the Akron based law firm of Brouse
McDowell.  I'm out of the Cleveland office.  Together with me
today is John Skeriotis of our Akron office, Brouse McDowell,
and next to him is Don Myles of Jones Hochuli Skeleton here in
Phoenix.  And of course we have our client, Bob Vitale, of
Midwest Industrial.  And the three of us represent Midwest
Industrial, defendant and counterclaimant.

THE COURT:  All right.  Good afternoon.

Our purpose is for a final pretrial conference today.
I think what I want to do first is talk through the motions in

limine that you all have filed.  I'm just going to give you

rulings on some.  Others I may have a question or two for you.

You didn't number them, so I'm going to go through them in the

order that they appear on the docket.  Well, sort of.  I'm

going to start with Soilworks and do those two first, and then

take Midwest motions in the order they appear on the docket.

The first motion is Docket Number 108, which is

Soilworks' motion to exclude evidence of its sales of

Durasoil.  This motion seeks to exclude the evidence of

Durasoil sales because Midwest allegedly cannot prove patent

infringement.  I'm going to deny this motion.  This is

effectively a second motion for summary judgment on Midwest's

patent infringement claim.  I denied an earlier motion on that

issue.  I don't believe that this is a proper subject for a

motion in limine.

I also think that the case that was cited, the

Robotic Vision Systems case wouldn't support a ruling in favor

of Southwest.  That's a Rule 11 case.  It's not really a case

about how you prove infringement.  But in any event, I do

think this is a motion for summary judgment that I've already

denied and not appropriate for a motion in limine.

The second Soilworks motion seeks to exclude evidence

of its sales of Soiltac and Gorilla-Snot, which is just as it

sounds, Tricia.  Southwest seeks to exclude evidence of its

profits because Midwest, it claims, cannot prove willfulness,

1   which Soilworks believes requires an intent to deceive.

2        I'm going to deny this motion as well.  I don't

3   believe that willfulness is limited to deception under the

4   Lindy, L-I-N-D-Y, Pen, P-E-N, case from the Ninth Circuit.

5   Willfulness includes deliberate infringement, bad faith, and

6   an attempt to gain value of Midwest's established trademarks.

7        I also held in my motion for summary judgment ruling

8   that initial interest confusion does not require deception.

9   So I don't believe I can grant this motion in limine on the

10  grounds Midwest could not prove deception.  I don't think they

11  need to if they can establish willfulness by one of these

12  other means.

13       But, as I'll make clear in a minute, I do not agree

14  with Midwest's contention that I have entered summary judgment

15  in favor of them on willful infringement.  I haven't addressed

16  the question of willfulness.  I granted summary judgment on

17  infringement, but willfulness was not briefed or considered by

18  me at that point.  And so I don't want my denial of this

19  motion to suggest that I think that willfulness has been

20  resolved in the case.

21       This has raised an issue that I want you all to be

22  thinking about as we go forward.  The question really raised

23  by this motion is what damages ultimately will be available

24  under 15 United States Code section 1117(a).  And as I read

25  your motion and then looked at the statute, I began to wonder

if this was really appropriate for a jury trial.  Because, as you know, 1117(a) talks about equitable remedies and it says the Court shall enter the remedies.  And it says that I can adjust, for example, profits if I decide that's an appropriate measure to satisfy equity.  And of course an accounting has sometimes been viewed as an equitable remedy.

So I asked my law clerk to do some research, to take an hour and do it.  He came back to me five hours later with a stack of cases and we talked through it.  It's clearly an unresolved issue in the law.  There's a split in the cases as to whether the remedies in 1117(a) give rise to a jury trial right or do not.

Based on the cases he found, it looks to me like the best interpretation in the Ninth Circuit, although cases have gone both ways in this circuit, is there is a jury trial right.  But what I want you all to be aware of is that it seems to me that even if we have a jury trial and they come up with an award of damages, this section clearly gives me the authority to adjust them if I don't think they're the right number.  Which makes me wonder why do we have the jury trial.

I think we need to have one if you want to stand on it.  But it looks to me as though I've got substantial discretion after the jury makes its decision to adjust their award, if they make one, to a level that I think is appropriate in the case.

And the reason I think that's relevant in this case is because there are other issues that are going to have to be tried to the bench. The Arizona common law unfair trade practices claims will be tried to the bench. The injunctive relief issue that's raised on some of these claims will be tried to the bench. So we've got an unusual case here where there's a lot of issues that aren't going to be decided by the jury but will probably be at issue in the same trial as the few that will be decided by the jury, and that could be a tricky case to manage.

So I guess the question I will put to you all to think about as we go forward is do we want to have a jury trial or should we just do a bench trial. That's your decision not mine. But it's really a hybrid even if we go forward with the jury.

Let me talk through the rest of the motions and we'll come back to these trial issues.

Midwest's first motion in limine is Docket Number 101 and it's a motion in limine to limit Soilworks' evidence of Midwest's alleged false advertising to the four documents that were produced during discovery.

The argument is that in response to requests for production of documents, there were only four produced, and those were the two letters that were written in July of '07, the press release and chart, I think, that was on the website

1    are the four documents.

2          The response from Soilworks wasn't very helpful.

3    Soilworks said "while there's a lot of others listed in the

4    final pretrial order without objections," but they are

5    objected to in the motion in limine.

6          Here's the question I have for Soilworks' counsel.

7    Are there documents listed in the final pretrial order that

8    you believe show instances of false advertising by Midwest

9    that are not among those four documents I just named?

10         MR. DOSEK:  Thank you, Your Honor.  Apparently I

11   didn't make myself clear in my response to the motion.

12          What I was trying to point out is that we have

13   identified those documents which will be trial exhibits.  We

14   have interposed our objections to those that we believe are

15   objectionable.  But the short answer to your question is no, I

16   don't think there are.  And my point was that I didn't believe

17   that the motion in limine was necessary because we have what

18   we have in terms of the doc- -- the documents that are

19   proposed by the parties to be introduced into evidence and

20   objections have been made.

21         But, again, I think that those four documents are,

22   from a documentary standpoint, are the ones that are at the

23   heart of our false advertising claim.

24         THE COURT:  So are you saying, Mr. Dosek, that you are

25   not going to seek to introduce at trial any other documents

1     that you believe to be a false advertisement by Midwest?

2         MR. DOSEK:  That's correct.

3         THE COURT:  All right.  I think that representation

4     resolves the motion with respect to documents.  The motion was

5     a little broader than that.  The motion also sought to preclude

6     any testimony that's beyond that.  The problem I have with that

7     issue, and Mr. Marvinney I don't know if you're the one

8     addressing this, but Rule 26(e) supplementation obligation

9     applies to written discovery, it doesn't apply to testimony.

10     So I wasn't quite understanding what was the basis for you

11     suggesting that there couldn't be testimony beyond the four

12     documents.

13         MR. MARVINNEY:  I'm sorry.  If I might -- I'm a little

14     bit confused for a moment, Your Honor.  You say that we took

15     the position it couldn't be testimony beyond the four documents

16     as in there could be a Rule 26(e) supplement of the testimony?

17         THE COURT:  Well, I didn't know.  The way you had

18     written it, you said -- you asked me to enter an order limiting

19     the evidence upon which plaintiff may rely to these four

20     documents.  Maybe you're just talking about documentary

21     evidence, but I assumed you wanted me also to say they can't

22     testify about anything other than what's in the four documents.

23     Is that an incorrect understanding of your motion?

24         MR. MARVINNEY:  No, that's an accurate understanding

25     of the motion.  Our position was based upon the evidence

1  presented to us and the responses to the documentary production

2  responses, the four documents, and the testimony about those

3  four documents as was obtained in deposition of the Falkenbergs

4  and other parties up in Alaska.  Not parties, but witnesses in

5  Alaska that were deposed, as well as here and Ohio, that the

6  case should be limited to the four documents and the testimony

7  surrounding those four documents, and that was our position as

8  expressed in the motion in limine.

9         THE COURT:  Are you aware of any other document

10  they're seeking to introduce besides the four?

11        MR. MARVINNEY:  No.  That's why we wanted to make sure

12  nobody was surprised here at the trial, Your Honor.

13        THE COURT:  All right.

14        Mr. Dosek, do you have any problem with the notion

15  that the testimony will surround those four documents and not

16  other alleged false advertisements?

17        MR. DOSEK:  Well, I do.  I think that would be an

18  improper limitation on the scope of the evidence surrounding

19  our obligation to show bad faith.  There's not going to be any

20  other documentary evidence beyond those four.  But the jury

21  needs to take into context, be able to put into context those

22  four documents and the circumstances around which they were

23  disseminated and other -- and other facts which may have -- and

24  other events which may have coincided in time or been close in

25  time to the dissemination of those four documents.

1        THE COURT:  Well, let me ask it this way, Mr. Dosek.

2   Are you going to try to use witnesses during the trial to

3   describe any other instance of false advertising besides the

4   four instances reflected in those documents?

5        MR. DOSEK:  I have no intention of doing that, no.

6        THE COURT:  All right.  I think that answers the

7   question, doesn't it?

8        MR. MARVINNEY:  Your Honor, from our standpoint it

9   does because the object was to restrict the testimony to the

10  events circulating around those four documents.

11        THE COURT:  And clearly, yeah, there's events

12  surrounding it that I think will be fair.  Okay, I think that

13  answers it.

14        MR. MARVINNEY:  Your Honor, if I may, is that -- I

15  don't mean to preempt anything or jump ahead, but were you

16  going to move on to the next motion?

17        THE COURT:  I will in just a minute after I make my

18  notes.  Did you have something you wanted to say on this one?

19        MR. MARVINNEY:  I wanted to clarify what your ruling

20  would be on the first motion, that's all.

21        THE COURT:  Well, I never know whether to deny the

22  motion because it's moot or grant it because it's conceded when

23  I get to this situation.

24        I think what I'll do is grant the motion.  The

25  evidence will be limited to the four documents.  But that's

1  all I'm going to say.  I'm not going to go beyond saying that

2  because it doesn't look like it's necessary.

3          MR. MARVINNEY:  Thank you, Your Honor.

4          THE COURT:  All right, the next motion is Midwest's

5  motion in limine to exclude evidence offered by Soilworks

6  related to elements of the false advertising claim.  This is

7  Docket 102.

8          In this motion Midwest seeks to exclude or preclude

9  Soilworks from presenting evidence on the deception of

10  consumers, the materiality of the deception, that Soilworks

11  was injured by the false advertising, and any damages.  The

12  basis for this motion is that Southwest didn't produce -- I'm

13  sorry.  Soilworks didn't produce evidence in response to some

14  fairly broad document production requests.

15          The question I think I have first of all is for you

16  Mr. Dosek, which is have you identified documents in the final

17  pretrial order that you intend to use in evidence in support

18  of your false advertising claim that were not produced to

19  Midwest during the course of discovery?

20          MR. DOSEK:  Absolutely not, Your Honor.

21          THE COURT:  Mr. Marvinney, do you have any basis for

22  disagreeing with that?

23          MR. MARVINNEY:  No.  We have no evidence of anything

24  that they have produced at all regarding that false advertising

25  claim.

1       THE COURT:  All right.  Let me make a note.

2       This motion also argues, Mr. Dosek, when witnesses

3   were deposed they failed to provide any evidence of injury or

4   damages.  And on that basis they seek -- "they" being Midwest

5   seeks to preclude Soilworks from presenting such oral evidence

6   at trial.  What is your response to that?

7       MR. DOSEK:  My response to that, Your Honor, is that I

8   would agree that during deposition testimony the witnesses that

9   were asked, and they were the appropriate witnesses, were not

10  able to articulate any quantifiable damage and that has not

11  changed as we're here today.  Other than what they have

12  testified to and what documents which will be introduced into

13  evidence will show, and that is that as a result of this false

14  advertising claim they were required to execute an agreement,

15  an agreement to indemnify their distributor up in Alaska who

16  had received these documents.

17      I can't tell the Court that there has been any

18  request as of today in any monetary amount, in any

19  quantifiable amount, for any such indemnification, but we did

20  need to do that in order to continue to be able to do business

21  with that distributor.

22      In terms of quantifiable monetary damages, as of the

23  time of the depositions there weren't any that we could

24  identify and there aren't any that we can identify as of

25  today.

THE COURT:  So you are not going to be making a damages claim in your false advertising claim at trial?

MR. DOSEK:  We're not going to be making a claim for damages that we can quantify.

THE COURT:  Are you going to be making a claim for damages that you can't quantify?

MR. DOSEK:  I can't -- I can't totally preclude that at this point because of the obligation that we have incurred to indemnify our distributor as a result of what has happened. And I don't know when this case is going to go to trial.  I don't know if we're going to be asked to provide that indemnification between now and trial.  So I would hate to -- I would hate to box myself into that corner and make a representation to the Court at this time that there never will be any such damages.

But the other kinds of damages I think that were sought were the kinds of damages such as loss of sales from other customers and that kind of thing.  May have been, but we cannot -- we can't prove that.  We can't articulate it and quantify it.  But it is conceivable that between now and trial there could be quantifiable damages as a result of our obligation to indemnify our distributor which flows as a result of, the direct result of, the false advertising claims that Midwest made.

THE COURT:  The evidence of those damages is not

1  obviously in the final pretrial order because it hasn't

2  happened yet, right?

3        MR. DOSEK:  Correct, Your Honor.

4        THE COURT:  Well, as you probably know, Rule 16 of the

5  federal rules states that an order entered after a final

6  pretrial conference like this can be amended only to prevent

7  manifest injustice.  So you just need to be aware that if for

8  some reason between now and trial you think those damages do

9  occur, you're going to have to make a manifest injustice

10  showing to get that evidence into the final pretrial order.

11  But as it now stands, it sounds as though there's no damages

12  claim you will be making, assuming there is no call on the

13  indemnification.

14        MR. DOSEK:  That's correct.

15        THE COURT:  If that's true, what do you intend to do

16  with your false advertising claim at trial?

17        MR. DOSEK:  Well, I think the other elements of the

18  false advertising claim that's asserted entitle us to, as we

19  have prayed for in our pleadings, at least injunctive relief

20  and an order requiring -- prohibiting Midwest from engaging in

21  this kind of conduct in the future.

22        THE COURT:  Any thought on that, Mr. Marvinney?

23        MR. MARVINNEY:  Yes, Your Honor, thank you.  First and

24  foremost, obviously without loss there's no damage and no

25  recovery.  So it pretty much follows if they don't have proof

1    of damage they can't -- they haven't produced any evidence of

2    damages and, as a result of that, we get to the point where

3    it's all been conceded.

4         The indemnification call, there has been no call for

5    indemnification, there's been no demand by my client, our

6    client, on behalf of Midwest, to Polar Supply or anyone else

7    in Alaska that they need to pay us damages at this point.  The

8    damages being sought are being sought from Midwest.  So as a

9    result, we can't foresee nor can we predict any reasonable way

10   in which there would be any call, if you will, on the

11   indemnification.

12        So that leaves us with Mr. Dosek's reference to

13   potential injunctive relief.  And if you were to actually

14   delve into -- if one were to, not necessarily you -- all the

15   evidence that has been produced thus far in the case, the

16   evidence that's been proposed in the final pretrial order as

17   manifested by the documents that have been shown, and/or those

18   documents which have been produced or made available for

19   production, Your Honor, we've seen nothing that goes to those

20   points with respect to whether there was deception or tendency

21   to deceive the consumer audience, nor was there anything with

22   respect to the deception being material nor as any resulting

23   injury whether something that some equitable injunctive relief

24   could cure or something that actual damages would be payable

25   on.

So we stand by our original position that is as expressed in the motion in limine, Your Honor.  Thank you.

THE COURT:  All right.  Well, with respect to that kind of evidence, the reason I had asked specifically about damages is because, as you know, Rule 26(e) does require supplementation of the Rule 26(a)(1) obligation to propose a calculation of damages.

And so if that hasn't been done, then Rule 37 would preclude it.  But Mr. Dosek has indicated there isn't any damages evidence at this time.

With respect to whether or not the other elements of the false advertising claim can be met, I'm not going to grant the motion in limine on the basis of these very broad document requests that said "Identify every document related to your claims."  I think you need to be more precise than that if you're going to invoke Rule 37(c) and preclude somebody from presenting evidence.

So I'm going to grant this motion to the extent it seeks to preclude evidence of damages, with the caveat that manifest injustice may permit it to come in if an indemnification call occurs.  But otherwise, I'm going to deny it.

The next motion is Docket Number 103, it's Midwest's motion in limine to bar evidence concerning Soilworks' costs. Midwest seeks to preclude Soilworks from introducing evidence

of the cost of producing its products.  The interrogatories

indicate that Midwest requested the information and Soilworks

objected.

Mr. Marvinney, did Midwest ever follow up on that

objection?

MR. MARVINNEY:  Your Honor, there was no motion to

compel filed in the case.  The parties had reached that

position, that point in time where the resulting answers were

given following the Court's discovery cutoff date, and in your

prior rulings we were aware of your adherence to that date and

we did not file a motion to compel at that time.

THE COURT:  If that response, that objection, has

never been challenged, how can I preclude evidence on their

failure to respond to it?

MR. MARVINNEY:  Your Honor, if I may.  We asked, and

Mr. Skeriotis was the person who posed the question that

resulted in an answer that we have, being the gentleman over

for Soilworks, that they have produced all of the documents

that they have in any way, shape, or form.  And so relying upon

that and seeing no further information regarding these

particular issues, that being their underlying costs, it was

posed to Mr. Falkenberg in deposition, his answer was that's

it, you have what we have.  So we're left with absolutely no

evidence.  A dearth would be a polite word for it, Your Honor.

There is no evidence produced in this case in any way, shape,

1  or form as to testimonial or document which suggests anything

2  other than a single line item as to what their costs underlying

3  their cost of production is, cost of goods sold were in this

4  case.

5      So, as a result, when the date actually passed as to

6  the discovery cutoff in this case, our understanding was, and

7  we did not file a motion to compel, our understanding was, was

8  that discovery not had, not produced, not responded to,

9  subject to Rule 26(e) supplement, if there's been no other

10  discovery, no other production, your order stands.  And your

11  order was discovery's done and there's no further motions to

12  compel.  If you haven't gotten it together by this point, it's

13  done, and you're precluded from bringing anything in at that

14  point.

15      So it was our understanding the filing of a Rule

16  26 -- I'm sorry, Rule 37 motion to compel at that time would

17  be basically a moot effort because your order spoke for

18  itself.  And in light of that, we didn't take further action.

19      THE COURT:  My problem with that, Mr. Marvinney, is if

20  you ask a question and another party responds by saying, "I

21  object, it's an improper question," even if discovery then

22  closes, what you're asking me to do is preclude them from

23  producing information because they didn't produce it in

24  response to your question.  If your question was objectionable,

25  they didn't to have produce it in response.

1        MR. MARVINNEY:  Your Honor, if I may?

2        THE COURT:  Yeah.

3        MR. MARVINNEY:  In addition to that particular mode of

4   discovery, interrogatory, there were requests for production of

5   documents, and the request for production of documents yielded

6   documents which, by their own admission, was everything they

7   have.  And those documents showed nothing with respect to the

8   underlying cost of goods sold in their repertoire of products.

9        The next item that came up, Your Honor, was in

10  deposition.  Another mode of discovery.  The question is posed

11  to Mr. Falkenberg, "What are your costs of goods sold?"

12  There's no information available.  He didn't know.  He had no

13  information at the deposition.

14       So by using those three means of discovery, even if

15  the interrogatory, in your opinion, Your Honor, is overbroad

16  or not reasonably calculated to lead to that particular

17  precise answer, the request for production of document

18  responses which, again, as I say, the Soilworks folks said

19  "this is everything we have," in addition to the deposition

20  testimony by Mr. Falkenberg, which was there is no further

21  underlying information, leads us to have no other way to

22  defend this aspect of the case, and now for them to walk in

23  and say they have cost-of-goods-sold data because they've

24  already told us, their CEO, "we don't have that information."

25       THE COURT:  The request for production that you served

was also objected to.  Did you ever resolve that objection?

MR. MARVINNEY:  Other than finding out from Soilworks that we have everything they have.  And when we look through everything they have, we don't have cost-of-goods-sold data at all.

THE COURT:  Mr. Dosek, are you intending to use documents in any way to prove the cost of goods sold during trial?

MR. DOSEK:  Actually, Your Honor, we have provided Midwest with specific information with respect to sales of the Durasoil product and sales of the Soiltac and Gorilla-Snot product, gross sales and cost of those sales.  Admittedly it is summary information, and it doesn't include all of the expenses.  But those documents have been produced to Midwest. And one of the problems and the reason that the original requests were objected to was because the request encompassed all of the products that Soilworks deals with and not all of the products Soilworks deals with are at issue in this case. So that never was resolved.

But notwithstanding that, we have provided them with sales information and cost-of-goods-sold information with respect to those products:  Durasoil, Soiltac, and Gorilla-Snot.

THE COURT:  So it sounds as though you're saying, Mr. Dosek, that you do not intend to use at trial any document

1    to support your cost of goods sold that has not been produced

2    to Midwest during the course of discovery.

3         MR. DOSEK:  That is correct, Your Honor.

4         THE COURT:  Do you disagree with that in any way,

5    Mr. Marvinney?

6         MR. MARVINNEY:  Not at all.  The only evidence we have

7    was, as Mr. Dosek mentioned, there was a line item summary

8    produced with absolutely no backup whatsoever, within the last

9    60 days.  That's it.  So there's no documents that support any

10   of the cost of goods sold.

11        THE COURT:  So are you disagreeing with what he just

12   said or agreeing?

13        MR. MARVINNEY:  No, we're agreeing.  There's no basis.

14   There's no documents in any way whatsoever that show this.

15        THE COURT:  Sounds like we don't have a disagreement,

16   then.  You have documents you intend to introduce, you don't

17   think it shows very much, but we're not disputing over

18   documents.  Am I right?

19        MR. MARVINNEY:  The documents that they, quote, intend

20   to produce, close quote, would be the documents which are the

21   line item summary, and those documents would be inappropriate

22   because they have never produced any backup for us to test in

23   the course of discovery in the case.

24        THE COURT:  Well, but that's a different issue.  You

25   didn't move in limine on that.  You only moved in limine to

1   preclude them from using documents they didn't produce.  And it

2   sounds like they're not intending to.  Am I misunderstanding

3   something?

4       MR. MARVINNEY:  That would be the gist of it, Your

5   Honor, that's correct.

6       THE COURT:  I'm going to grant this motion to the

7   extent there are any documents that were not produced during

8   discovery that may be used during trial, but it sounds as

9   though there won't be any.

10      The next motion is Number 104, Midwest's motion in

11   limine to bar testimony and evidence regarding the validity or

12   construction of Midwest's patents.

13      Midwest seeks to bar Soilworks from producing any

14   evidence on the construction of the Midwest patent claims

15   asserting that Soilworks did not provide such evidence in

16   discovery, never requested Markman hearing, has not produced

17   an expert on claim construction.

18      Soilworks responds by saying that it did produce a

19   claim chart in July of 2007, that its witnesses were

20   questioned at some length about the chart in depositions.

21      Let me first ask you, Mr. Marvinney, do you disagree

22   with the assertion that they produced a claim chart in July

23   2007 that was then the subject of deposition questioning?

24      MR. MARVINNEY:  We do not dispute they produced such a

25   claims chart, Your Honor.  Mr. Skeriotis will be addressing the

1    merits of this particular motion.

2          THE COURT:  Okay.  Mr. Skeriotis, do you have any

3    objection to their using that chart if they produced it?

4          MR. SKERIOTIS:  I do not, Your Honor.

5          THE COURT:  What you're saying is they cannot use any

6    other evidence.

7          MR. SKERIOTIS:  Correct, Your Honor.

8          THE COURT:  Okay.  Mr. Dosek are you --

9    Mr. Passarelli?  Are you intending to use any evidence on claim

10   construction besides the chart?

11         MR. PASSARELLI:  Your Honor, at this point in time I

12   don't believe either party has a right to use any extrinsic

13   evidence with regard to claim construction.

14         The exhibits include the patents, so we have the

15   intrinsic evidence of the claims and the patent specification.

16   The file history is not in evidence, but obviously that may

17   come into play depending what develops at trial.  But -- if

18   that answers your question.

19         Your Honor, I guess what I'd like to call to the

20   Court's attention at this point is there's never been a claims

21   analysis provided in this case.  We've been asking for it

22   since July of '06, before the litigation was initiated.  And

23   quite frankly, we don't know what the patent holder's position

24   is on an infringement claims analysis.

25         The 30(b)(6) deposition testimony of the most

1  knowledgeable individual at Midwest indicates there is no

2  infringement.  And so the concern I have with regard to

3  limiting evidence is we don't even know what they're claiming

4  the infringement is at this date.  There's no claims chart,

5  there's no piece of paper to present to the jury that provides

6  here's the claims and here's how the accused product reads on

7  those claims.

8         THE COURT:  Mr. Skeriotis.

9         MR. SKERIOTIS:  Your Honor, first of all, this goes --

10        THE COURT:  We need to have you speak more closely

11  into a mike.

12        MR. SKERIOTIS:  I believe this goes beyond the motion

13  in limine now to talk about how we're going to present our case

14  and try it to the jury or the Court.  However --

15        THE COURT:  But it's very appropriate for a final

16  pretrial conference.

17        MR. SKERIOTIS:  Yes.  Thank you.  Apologize, Your

18  Honor.

19        We are going to rely upon the deposition testimony of

20  Mr. Falkenberg and the documents that have been produced

21  during discovery to show that the accused product, which is

22  the Durasoil product, contains the ingredients that meet the

23  elements of the claims, specifically claim 1 of the '260 and I

24  believe the '277 patent.  '266 and '270 patent, Your Honor.

25        And we did provide a claim chart, Your Honor, that

1    specified what the claims mean, and there's been no request

2    for Markman hearing by either party.  And pursuant to your

3    previous orders regarding the -- your standing order with

4    respect to the case management plan, it was incumbent upon

5    either party to request a Markman hearing if they so desired.

6         THE COURT:  Well, that's one of the issues that I've

7    got today.  How do we try this patent case without having had

8    any claims construction?

9         MR. SKERIOTIS:  Your Honor, as I'm sure the Court is

10   well aware, you can -- not every claim is subject to a claim

11   construction.  Not every claim element in a patent is subject

12   to that.  It's only those disputed claim terms.

13        THE COURT:  Do we know what those are?

14        MR. SKERIOTIS:  Apparently we either agree or we don't

15   know because neither party has pursued a Markman hearing

16   indicating they have a discrepancy with each other's claim

17   construction.

18        THE COURT:  Well, that's my question.  How do we try a

19   patent case when the people in this room don't know if we agree

20   on the meaning of the claims?

21        MR. SKERIOTIS:  The way we're going to go about it

22   with respect to our evidence, Your Honor, is, for example, if

23   in fact the claim says it protects a chair and the accused

24   product has a seatback and legs, one would point to the accused

25   product and say here are the legs, here's the seatback.  And

1  therefore those two elements would be found on the accused

2  product.

3          THE COURT:  And if the other side says we don't agree

4  it protects a chair, then what do we do in front of this jury

5  in the middle of trial?

6          MR. SKERIOTIS:  Well, again, that's part of our motion

7  in limine to say this isn't the proper time to have a claim

8  construction effort because that should have been done prior to

9  the Court, so the jury would say --

10          THE COURT:  But it wasn't done by either side.

11          MR. SKERIOTIS:  Correct.  So what you do, in my

12  opinion, Your Honor, you take the ordinary meaning of the claim

13  terms as they're given or there's no claim construction at all,

14  and that would be our burden to show that their product meets

15  our claims as written in the patent.

16          THE COURT:  It is my obligation to say it applies to a

17  chair or doesn't apply to a chair.  Correct?  To construe the

18  claim.

19          MR. SKERIOTIS:  To construe the claim, yes.  Issue of

20  infringement is a fact question.

21          THE COURT:  So we're in front of a jury, we're now a

22  day into trial and it's clear you think it covers a chair and

23  they don't.  What do we do?  I've never construed the claim.

24  The jury can't decide that issue.

25          MR. SKERIOTIS:  Typically what you would do, Your

1  Honor, it's my understanding is you take the claim element just

2  as an ordinary case where the claim itself has not been -- the

3  claim element has not been defined and you say if you find that

4  the claimed element is found on the accused product, or

5  contained within the ingredients of the accused product, check

6  here.  If you believe the plaintiff, in this case the

7  defendant, has shown by a preponderance of the evidence that

8  this element is not found in the Durasoil product, check here.

9  And that's how you would go down that.

10  THE COURT:  But if you're claiming that the claim is

11  for a chair and they're claiming it's for a desk, don't I have

12  to tell the jury it is a desk or chair before they can start

13  checking boxes?

14  MR. SKERIOTIS:  Well, again, Your Honor, I believe

15  that to some degree you would have to do that if the claim

16  element itself is in dispute by the two sides.  However, again,

17  not every claim construction, not every claim element gets

18  defined and in the situation --

19  THE COURT:  I understand that.  My problem, and I

20  don't mean to interrupt you, but I'm really perplexed by this.

21  I've never seen a trial where you're doing claim construction

22  on the fly in front of the jury.  Or where you start the trial

23  not even knowing what claims need to be construed.  Have you

24  tried a case like that?

25  I've done Markman hearings to resolve that and it's

1    all typically done before summary judgments are filed.

2    Everybody knows what the disputed claims mean once that ruling

3    is in hand, and you go forward and try the case on the basis

4    of that construction.

5         I'm really struggling with how we do this when we

6    start trial on day one not even knowing what needs to be

7    construed.

8         I'm inviting your comments.  And I'll hear from

9    Mr. Passarelli on that as well.

10        MR. SKERIOTIS:  I guess I apologize, Your Honor, if I

11   haven't made myself clear.  But, again, you would try it the

12   same way we would try a situation where the claim itself, or

13   claim element, has not been construed by the Court because the

14   parties at the pre-Mark- -- or at the Markman hearing agree the

15   claim does not need to be construed by the Court.  So then you

16   go through the trial and at trial the claim apparently has

17   taken on a different meaning between plaintiff and defendant.

18   At that point, the Court doesn't go back and then say, okay,

19   I'm going to go back now and construe this claim now.  It

20   submits that claim element to the jury and says, if you find

21   that the plaintiff, again in this case the defendant, but if

22   you find the plaintiff has shown, has met its burden with

23   respect to showing that that claim element is found in the

24   accused product, then you check here.  And that's the way it

25   goes down throughout the jury instructions.

1          So, for example, in this case, let's take, for
2     example, as a hypothetical, we have a difference opinion what
3     a synthetic isoalkane is.
4          THE COURT:  You want to say that more slowly for the
5     court reporter.
6          MR. SKERIOTIS:  I'm sorry.
7          Let's say, for example, we have a difference of
8     opinion as to what a synthetic isoalkane is.
9     I-S-O-A-L-K-A-N-E.  Which is a claim element in claim 1 of
10    both the patents at issue.  What the jury would have in front
11    of them is an instruction:  "If you feel as though the
12    defendant has shown beyond a preponderance of the evidence
13    that a synthetic isoalkane is found in the Durasoil product,
14    check here."
15         The next claim element:  "If you find that the
16    Durasoil product has a binder, check here."
17         If in fact -- and the third one would be, "If you
18    have found 1 and 2 to be found in the Durasoil product, you
19    necessarily have found infringement because you have satisfied
20    all elements of claim 1, which is an independent claim of the
21    '267 and '270 patents."
22         And if in fact the jury says, "Well, I don't know
23    what a synthetic isoalkane is," then I submit, Your Honor, we
24    didn't prove that element to the jury.
25         THE COURT:  Let's say you and Soilworks disagree on

1  what a binder is -- you're arguing it's one thing;

2  Mr. Passarelli is arguing it's a different thing -- and I ask

3  the jury on the verdict form, have they proven that the

4  Soilworks product has this binder, and the jury says "we don't

5  know what is meant by 'binder,'" then you're saying I ought to

6  instruct them if that's unclear to you, then Midwest loses.

7          MR. SKERIOTIS:  That would be correct, Your Honor.

8  That's my understanding of the way the law would work in a

9  situation like that.

10          THE COURT:  So the burden of claim construction

11  ambiguity falls on you.

12          MR. SKERIOTIS:  I would say at this point, Your Honor,

13  from the standpoint of proving our case as to whether or not

14  infringement is found by the jury on that claim element, that

15  would be a correct answer, yes.  Whether or not the burden is

16  on me, I don't know of any case law that would support that as

17  far as claim construction.

18          THE COURT:  Let me state it differently.  The risk of

19  ambiguity is yours.  If you have to prove infringement and you

20  haven't clarified the meaning of the claims going into trial,

21  you take the risk of ambiguity that will prevent the jury from

22  ruling in your favor.

23          MR. SKERIOTIS:  I believe that's accurate, Your Honor.

24  As set forth because, again, I think the patent holder has

25  burden of proving infringement, and in order to prove

1    infringement he would have to show the claim necessarily was

2    understandable by the jury such that they found it on the

3    accused product.

4              THE COURT:  Okay.  Thanks.

5              Mr. Passarelli.

6              MR. PASSARELLI:  Thank you, Your Honor.

7              This issue permeates the entire trial, including our

8    case.  Because our 43(a) case is based on our belief that

9    they're using this patent and they're abusing the patent in

10   terms of its scope.  And the difficulty is today we don't know

11   what their infringement claims are.  They haven't provided

12   them in answers to interrogatories, they haven't produced a

13   single document that would provide that.  They have objected

14   to any questions by the 30(b)(6) most knowledgeable individual

15   at Midwest as to any analyses.  And in fact the 30(b)(6)

16   witness, the most knowledgeable witness for Midwest, indicated

17   in his sworn deposition testimony that he's not aware of any

18   infringement.

19             They're actually at that point in time, Your Honor,

20   playing, I thought, somewhat of a clever game.  What they were

21   basically saying is we found documents in the public record

22   that suggest characteristics to the Durasoil product, and we

23   don't believe or we've never done an analysis, we haven't

24   produced an analysis which demonstrates that Durasoil falls

25   within the claims element.  But either your falsely

representing the product characteristics, which is a 43(a)

claim, or you're violating our patent.

Well, as we stand here today, given the Court's

ruling on the -- on the summary judgments, they no longer have

that issue either/or. They now have to prove infringement and

they haven't done so. And they cannot do so because the

minute they try to introduce any testimony relevant to that

point we're going to object, and I don't believe they can

introduce it.

So I honestly believe the patent infringement claims

goes away at this point. But we're obviously waiting until

the presentation of evidence to do that.

And it's very difficult for this Court to address

construction issues if the Court doesn't know which claims --

we don't even know what claim of the two patents they contend

are infringed.

THE COURT: Well, so it sounds, Mr. Passarelli, as

you're saying, we go to trial and you make a motion at the

close of the plaintiff's case. Is that what you're saying?

MR. PASSARELLI: Right now I believe a directed

verdict will be -- will conclude the patent infringement part

of this trial.

Obviously, 20/20 hindsight, now that we know what the

Court's order was, we'd love another shot at summary judgment.

That's gone. But -- but as to the construction issues, we

1    don't know, since we don't know what claims -- I mean the

2    Court is being asked to construe a patent without any

3    circumstances surrounding it, which I agree with you, I've

4    never seen a patent case where we didn't even have a claims

5    analysis.

6         And the Robotics case, which we directed the opposing

7    counsel's attention to before the litigation started,

8    suggested you have to do an analysis before you start accusing

9    people of patent violations.  And we still don't have it.

10        THE COURT:  All right.  Hold on just a minute.

11        Mr. Skeriota?

12        MR. SKERIOTIS:  Skeriotis.

13        THE COURT:  Skeriotis.  I'm sorry.  I'll learn it.

14        You've only listed one witness for trial, I assume

15   it's the gentleman who's here.  Well, you've listed possible

16   others, but only one certain witness.  Is it your intention to

17   have him present the evidence from which the jury could find

18   patent infringement?

19        MR. SKERIOTIS:  Yes, Your Honor, as well as Mr. Chad

20   Falkenberg as well.  And the documents produced by the

21   plaintiff.

22        THE COURT:  Now, if he said in his deposition that he

23   didn't know of any infringement, how is he going to testify

24   differently at trial?

25        MR. SKERIOTIS:  He didn't say that, Your Honor.  What

1    Mr. Vitale said was, based upon a document that was presented

2    to him as an exhibit during his deposition, it would seem to

3    indicate, based upon that document, that there would be no

4    infringement.  He did not say that pursuant to all of the

5    information that he's received with respect to the Durasoil

6    product that there is no patent infringement.  He never

7    testified to that.

8            And in fact, Your Honor, we've received other

9    documents after the close of discovery which shed further

10   light on the Durasoil patent infringement produced by

11   Soilworks.

12           THE COURT:  You're saying you received the documents

13   from Soilworks?

14           MR. SKERIOTIS:  That's correct, Your Honor.

15           THE COURT:  Do you agree with the assertion of

16   Mr. Passarelli that you have never explained to Soilworks how

17   their product infringes the '266 and '270 patents?

18           MR. SKERIOTIS:  We do not, Your Honor.

19           At the time -- again, we've never been asked a

20   question with respect to all the documents that have been

21   produced in this case, is there any infringement based upon

22   the documents produced and the testimony of Mr. Falkenberg,

23   which, by the way, occurred after Mr. Vitale's deposition,

24   whether or not there was any infringement.

25           For example, Your Honor, the claim chart produced by

1    Soilworks indicates that they meet several elements of claim 1

2    of the '266 and '270 patents.  Then we received a document

3    afterwards, Your Honor, that shows that they indeed meet other

4    elements of the claim.  Their own documents, Your Honor, prove

5    patent infringement, that they have supplied to us.

6            THE COURT:  That wasn't my question.  My question was,

7    that I didn't ask very clearly, have you ever explained to them

8    how you think there's infringement?  Do they know today how you

9    think there's infringement?

10           MR. SKERIOTIS:  I guess I beg the Court to explain

11   that question.  Have we outlined the case for them as to why we

12   believe --

13           THE COURT:  No.  You just explained why you think

14   their products infringe your patent.

15           MR. SKERIOTIS:  Yes, we have.  We told them based upon

16   publicly available information that we were able to ascertain

17   at the time the deposition was taken that they infringe our

18   patents.

19           THE COURT:  Well, have you said more than that?  Have

20   you said, "and this is why," and explain to them the

21   infringement?

22           MR. SKERIOTIS:  This is a chemical case, Your Honor.

23   What we did was we said your product contains a synthetic

24   isoalkane, and we believe your product contains a binder

25   consisting of either carboxylic acid, an ester, and two other

1  things I can't recall.  Or two other things.  So we have told

2  them that, yes.

3  THE COURT:  In what form did you tell them that?

4  MR. SKERIOTIS:  We told them in written form that

5  predated this trial -- I'm sorry, predated the complaint that

6  gave rise to declaratory judgment action and we asked for more

7  information about that, which they never supplied.  We've also

8  supplied -- given testimony based upon, again, publicly

9  available information and said these are the claim elements we

10  believe are met.

11  THE COURT:  What testimony are you referring to?

12  MR. SKERIOTIS:  Mr. Vitale's testimony, Your Honor,

13  where he said these claim elements are met, but then they would

14  specifically provide him a document and say, based upon this

15  document, would you believe there's any patent infringement.

16  And his answer was based upon the document we have thus

17  received, it appears you don't have the binder.

18  But then later documents, such as claim chart, as

19  well as testimony from Mr. Falkenberg, would indicate that

20  they do.

21  THE COURT:  All right.  Any other comments,

22  Mr. Passarelli?

23  MR. PASSARELLI:  Yes, Your Honor, I believe that is a

24  misstatement.  We asked Interrogatory Number 7:  For each claim

25  of defendant's patents that defendant asserts are infringed by

1   plaintiff's products, A, identify and explain in detail the

2   basis for each claim of infringement, semicolon, and, B,

3   provide a claim chart showing the correspondence, parentheses,

4   or, alternatively, the lack thereof, parentheses, between each

5   and every element of each such claim and the ingredient,

6   composition, component, feature, portion, or chemical material

7   of each such product identified in your answer to subpart A of

8   this interrogatory that you contend infringes in the asserted

9   claim.

10          Defendant objected subject to and without further

11  waiving any of the objections defendant answers as follows:

12  A, the basis for defendant's belief that plaintiff Durasoil

13  product may infringe defendant's patents is plaintiff's

14  publicly available information regarding its Durasoil product

15  and the pre-lawsuit communication between respective counsel

16  regarding the issue of infringement and, B, a claim chart will

17  be provided.  A claim chart has never been provided.  There is

18  no claim chart in the identification of witnesses.  There's no

19  piece of paper that would allow this jury to understand in any

20  respect which of the claims they contend are accused or

21  infringed and how our products fall within those claims.

22          THE COURT:  Did you ever follow up on that

23  interrogatory answer?

24          MR. PASSARELLI:  No, Your Honor, because after the

25  30(b)(6) deposition, his deposition testimony confirmed they

1  have no evidence to support --

2          THE COURT:  So you didn't.  You never --

3          MR. PASSARELLI:  Did not.

4          THE COURT:  -- never in effect forced them to disclose

5  it?

6          MR. PASSARELLI:  I did not.  But I can't imagine they

7  can now -- they can't point to -- the jury to a document that

8  analyzes that.  They admit they have never done an analysis.

9          In their deposition there was some analysis done by

10 the lawyers, but we weren't allowed to examine the witness

11 under -- they took the position it was privileged attorney

12 work product.

13         MR. SKERIOTIS:  Your Honor, want to clear up one thing

14 real fast.  Exhibit Numbers 2 and 3 in our exhibit list are the

15 claim construction charts that we provided.  I'm not sure what

16 Mr. Passarelli is stating when he says we never provided a

17 claim chart.

18         THE COURT:  Were those provided in response to that

19 interrogatory?

20         MR. SKERIOTIS:  I believe so.  If not, if there was --

21 if it -- I believe it was.  And if not, was there an order?  I

22 don't recall if there's an order in this case requiring us to

23 exchange claim charts.  If not, it was provided pursuant to

24 their request.

25         MR. PASSARELLI:  That was a claim construction chart

1   not a claims infringement chart, which we asked for in the

2   initial letter, and then subsequently in the interrogatory.

3         THE COURT:  All right, let me come back to where we

4   started.  Mr. Passarelli, is Soilworks going to seek to use any

5   documentary evidence on this infringement issue besides the

6   patent that you mentioned a moment ago and the July 2007 chart?

7         MR. PASSARELLI:  With the possible exception that the

8   parties have exchanged the file wrapper, but neither party has

9   marked it as an exhibit and that would potentially be an

10   intrinsic evidence that the Court could use to construe a

11   patent claim if that issue comes up.

12         THE COURT:  Well, in light of what's just been said,

13   it sounds like there's nothing they're trying to use that your

14   motion in limine is directed at.  Do you agree with that,

15   Mr. Skeriotis?

16         MR. SKERIOTIS:  That's what it sounds like, Your

17   Honor, yes, I would agree with that.

18         THE COURT:  Okay.  Well, with respect to this motion,

19   I'm going to grant it because there is nothing that Soilworks

20   intends to use or, in my view, could use beyond the patents

21   themselves and the July 2007 chart.  The motion also seeks to

22   preclude Soilworks from challenging the validity of the Midwest

23   patents.  Soilworks didn't respond.  I upheld the validity in

24   my summary judgment motion, so I think that's why you didn't

25   respond.

1          MR. PASSARELLI:  Correct.

2          THE COURT:  The next motion by Midwest is the motion

3    in limine regarding any legal advice that Soilworks may have

4    received.  I'm going to deny this one as moot.  There's no

5    issue on that.  Soilworks has made clear in its response it's

6    not asserting an advice-of-counsel defense.

7          The next motion in limine concerns testimony and

8    evidence regarding composition of Durasoil and other products.

9    This is Docket 106.

10          Midwest seeks to exclude any evidence on the chemical

11   composition of Durasoil asserting that it asked for it in

12   interrogatories and that it was not provided, with the

13   exception of three ingredients.

14          In response, Soilworks says that it did provide that

15   list of three ingredients.  It also provided the MSDS for the

16   product, and a sample of the product.

17          My question to you, Mr. Passarelli, is in terms of

18   documentary evidence, do you intend to use anything beyond the

19   list of ingredients, the three ingredients that was provided,

20   and the material safety data sheet to prove the composition of

21   Durasoil?

22          Mr. Dosek?

23          MR. DOSEK:  No, we don't.

24          THE COURT:  Okay.

25          All right, I will grant the motion and the evidence

1  will be limited to those documents.

2        The next motion is Docket 107 concerning liability

3  insurance.  I'm going to grant this motion.

4        Midwest wants to bar evidence of liability insurance.

5  Southwest agrees.  So I'll grant the motion.  There will be no

6  evidence on insurance.

7        The final motion is Docket Number 110.  It concerns

8  evidence regarding innocent trademark infringement and Midwest

9  seeks to preclude Soilworks from addressing that issue.

10        As I previously indicated, I did not decide in my

11  motion for summary judgment that the infringement was willful,

12  and therefore I'm going to deny this motion.

13        Let me ask you a question about the final pretrial

14  order.  Page 13, right at the bottom, paragraph i.

15  Paragraph i says an issue in the case is whether from 2006

16  through today Midwest has made statements that would basically

17  be false advertising.  Now, I'd understood you a moment ago,

18  Mr. Dosek, to say you're only intending to litigate the four

19  documents, the two letters to the Alaskan company, the press

20  release, and the chart.  So I'm assuming there's nothing in

21  this paragraph that's going to be litigated.  Am I missing

22  something?

23        MR. DOSEK:  There isn't anything in this paragraph,

24  Your Honor, that's designed in any way to expand upon the

25  limitation.  We don't have evidence of the false advertising on

1   the part of Midwest beyond those documents and the

2   circumstances surrounding those documents that we've previously

3   discussed.

4           THE COURT:  Okay.

5           All right.  I'm going to adopt your final pretrial

6   order.  It will govern the evidence, objections, and issues to

7   be addressed at trial.  Obviously my rulings on the motions in

8   limine will also be relevant to what happens at trial.  And

9   any changes to it will require satisfaction of the manifest

10  injustice standard.

11          MR. MARVINNEY:  Your Honor?

12          THE COURT:  Yeah.

13          MR. MARVINNEY:  On behalf of Midwest may I address the

14  Court on just a couple points, if I may?

15          THE COURT:  Related to?

16          MR. MARVINNEY:  The final pretrial order as it's

17  been --

18          THE COURT:  You may.

19          MR. MARVINNEY:  On that page 13, that one subpart i at

20  the very bottom of the page about which you were just speaking

21  with Mr. Dosek, there was an unintentional and accidental

22  omission on the defendant's contention there, and it would be

23  obviously similar to what Mr. Skeriotis was saying before.  And

24  I didn't mean to have that omission in any way influence the

25  Court --

1          THE COURT:  That's why I asked about it.  But it seems

2     to me it's not really relevant because we all know now that the

3     false advertising claim by Soilworks is limited to those four

4     instances.

5          MR. MARVINNEY:  Thank you very much.  That clarifies

6     that.  I just didn't want that to be subsumed into the record

7     without any adjustment of that.

8          And if I may, Your Honor, with respect to exhibits,

9     Mr. Myles raised a point to me today in our discussions prior

10    to coming over here, he's obviously much more familiar with

11    practice before this Court than I, and I apologize for that.

12    Not his expertise but my lack of, if you will.  And with

13    respect to trying to put together exhibits, a question came up

14    about exhibits that might be used in the course of summary or

15    course of just demonstrative or exemplar purposes, and

16    Mr. Myles made a point to me that we should bring such

17    exhibits to your attention, obviously, if they aren't already

18    included in the books.

19         There were just a few photographs that we had found

20    that would be used as demonstrative of Mr. Vitale's efforts to

21    perfect and brand the Soil Cement brand and these were just

22    going to be used in the process of, "Mr. Vitale, can you tell

23    us," "Yes, I've got a number of photographs showing my trucks

24    and showing my advertisements dealing with the Soil Cement

25    brand over the years."

That was my omission and my error, Your Honor, in not including these in the document because I didn't look at these as being something we'd necessarily be using to admit to necessarily prove a specific point of evidence but just to provide background. I have them with me. I can give them to the other side today. They have already seen these in discovery, there's no surprise here at all. I can provide a copy to the bench as well, if you should so choose. These would be Exhibits 131 and 132 to our pretrial order, if in fact it's all right at this time to add them.

THE COURT: Are these matters you would seek to have admitted into evidence?

MR. MARVINNEY: Potentially, yes. But it's -- again, it's supplemental to what Mr. Vitale's testimony would be as opposed to anything that's new here at all before the Court.

THE COURT: Mr. Dosek.

Just one minute, Gary, and we'll get you in here.

MR. DOSEK: Among all the documents --

MR. MARVINNEY: If I -- if I may. It would be 132 and 133. I apologize for misspeaking.

MR. DOSEK: As I was saying, among all the materials and documents that have been exchanged by the parties in this case, I very well may have seen what he's referring to. But I don't know that I have. And I don't know that any reference has been made to them previously. And what he's talking about

1    and purporting to do does not deal with charts or demonstrative

2    aids.  He's purporting to ask these be added to our exhibit

3    list as exhibits to be offered into evidence at trial.  That's

4    not demonstrative.  Those are -- those are evidentiary trial

5    exhibits that he's asking be added to the list.

6            THE COURT:  So you're objecting?

7            MR. DOSEK:  I am objecting.

8            THE COURT:  All right.  We're going to change court

9    reporters, so nobody talk for a minute.

10           (Break taken to change court reporters.)

11           THE COURT:  All right.  Mr. Dosek, do you see

12   prejudice if those documents are allowed to come in?

13           MR. DOSEK:  That's really a difficult question to

14   answer.  I do not recall having seen these photographs before,

15   and to answer as to whether or not there would be prejudice if

16   they come in on the spot, as I stand here, I don't know.

17           THE COURT:  All right.  This is what we're going to

18   do.  I'm not going to permit them in the final pretrial order

19   today.  We're going to set in a minute a final conference

20   that's going to occur a couple of days before trial.

21           Provide copies, if you would, Mr. Marvinney, to

22   Mr. Dosek that he can take with him.

23           MR. MARVINNEY:  He has them.

24           THE COURT:  So you don't want them back?

25           MR. MARVINNEY:  No, those are his copies.

1          THE COURT:  So please be prepared at that final

2   conference to state if you feel you're prejudiced by them.  Or

3   alternatively, if you think there's some additional documents

4   you need to put in to counter them, identify those and I'll

5   decide at that final conference if you're prejudiced, or if we

6   can balance it and let you each bring in more, and I'll make

7   the call after you've had a chance to think about that.

8          Okay.  Let's talk about the length of trial.  I'm a

9   bit puzzled by this, so Mr. Dosek or Mr. Passarelli, perhaps

10  you can help me.

11         You have asked for 16 hours for your case: 12 hours

12  for your case and four hours for rebuttal.  Maybe they are

13  dividing the four hours equally, so it's 14 hours.  You've

14  really got one claim you're proving, which is this false

15  advertising claim based on four documents that sounds to me you

16  could do in a couple of hours.

17         Why are we at 14 or 16 hours in your estimate of trial

18  time?

19         MR. DOSEK:  The only reason that we are, Your Honor,

20  is that I guess my concern is that when considering the

21  allocation of time, we're talking about our cross-examination

22  of other witnesses as opposed to our own direct testimony and

23  direct evidence in support of our claims.

24         I would agree with you that -- that presentation of

25  our case with respect to our claims should not take the amount

1 of time that's identified in the pretrial.  The bulk of the

2 time I think is going to be spent by us in defending against

3 the claims, the patent infringement and trademark infringement

4 claims raised by the defendant.

5     THE COURT:  Okay.

6     MR. DOSEK:  So I guess, you know, the answer is that

7 that was intended to encompass all of those activities.

8     THE COURT:  Well, coming -- okay, thanks.

9     Coming to Midwest, I can't imagine that there's going

10 to be much, if any, trial time devoted to your false

11 advertising claim, Mr. Marvinney, where you're really just

12 seeking injunctive relief because Durasoil claims -- because

13 Soilworks claims it manufactures Durasoil.  That doesn't look

14 like a big time consumer to me, am I about right?

15     MR. MARVINNEY:  No, I think you're on about that,

16 that's correct.

17     THE COURT:  Similarly, your trademark infringement

18 claim is only an issue of damages, so that's not a particularly

19 complicated matter.  I mean, you're going to put on the

20 evidence for damages that you think you need to, and I'm going

21 instruct the jury I've already found trademark infringement and

22 I'll probably end up modifying it, or at least I'll have the

23 discretion to modify it afterwards, so I don't see that being a

24 big time consumer.

25     MR. MARVINNEY:  If I may, Your Honor, I see where

1  you're going with this, and I don't disagree.

2          Again, as with Mr. Dosek, we were trying to predict,

3  in some ways, as you're very familiar with, the unpredictable,

4  and trying to discern what would be the amount of time that we

5  felt fairly would, on the outside chance, keep within what we

6  need to prove and what we'd have to deal with in

7  cross-examination, and allowing for time for Mr. Dosek's

8  cross-examination on these issues, an --

9          THE COURT:  Well, your unjust enrichment claim will be

10  no different than the damages claims on your trademark

11  infringement, right?

12          MR. MARVINNEY:  Much of the -- much of the --

13          THE COURT:  It's the profits you're going to claim.

14          MR. MARVINNEY:  And much of the evidence would be

15  subsumed within the multiple claims, Your Honor.

16          THE COURT:  So that leaves infringement, and we've

17  learned a lot today about the sparsity of evidence on

18  infringement on both sides.  I mean, there's nothing hidden.

19  You guys know what's out there.  You didn't think there was

20  much coming in here, and now you've confirmed that's all there

21  is.  So it doesn't seem to me that's a multi-day issue, either.

22          Am I missing anything in what you're going to have to

23  cover?

24          MR. MARVINNEY:  I would think not, Your Honor.

25          The question that I have, and that again goes with my

1  lack of familiarity, perhaps, with your practice here, and that

2  is your trial days would assume how many hours per day?

3  THE COURT:  We are going to get six hours of trial

4  time in a day, and we're going to start at 9:00 and go till

5  4:30 or 5:00 in the evening, depending on how long we need to

6  go.  We'll take a one-hour break for lunch.

7  And I am going to give you nine hours per side to put

8  on this case.  That means we'll have a total of 18 trial hours.

9  That's three days.  It will take us a half day at the front end

10  to pick the jury, and we'll want to leave a half day at the

11  back end for deliberations, so that's a total of four trial

12  days that I'm going to allot for this trial.

13  I'm going to keep track of your time.  Everything you

14  do in front of the jury after it's sworn and instructed will be

15  counted.  So opening statements, closing arguments, direct

16  examination, cross-examination, will all be counted.  I'll let

17  you know how you're doing on time as we go along, so you can

18  adjust it.  But I think all of this evidence can be easily

19  brought in within that amount of time.

20  Usually I schedule trials within two months of the

21  final pretrial conference, but I am starting a criminal trial

22  next week that's going to take us through Thanksgiving.  I have

23  every week in December scheduled with trials.  I have two

24  trials -- three, actually, three weeks scheduled for trial in

25  January.  And so the only days I have available in January, but

1  days on which I would like to set this trial, would be the 20th

2  through the 23rd.  That would be a Tuesday through a Friday.

3       Does that cause problems with any of your calendars?

4       MR. DOSEK:  Does not for me, Your Honor.

5       MR. PASSARELLI:  No, Your Honor.

6       MR. MARVINNEY:  The only issue is, Your Honor,

7  we're -- I have those days open on my calendar, and I believe

8  Mr. Skeriotis does.  We have a very large trial that's set in

9  New Hampshire, in federal court in Manchester in February that

10  most of this pretrial order material is due on the 30th, and I

11  believe that we can work within the Court's constraints and be

12  able to try this case during the time that you've suggested.

13       THE COURT:  Okay.  We'll set it, then, for January

14  20th through the 23rd.  I'm going to set a final conference for

15  4:30 p.m. on the Thursday before the 15th, and out-of-state

16  counsel can participate by phone.

17       MR. PASSARELLI:  Thank you, Your Honor.

18       THE COURT:  And it's short.  The only things we need

19  to do at the final pretrial conference is I'm going to hand

20  you, if you haven't already received them, my proposed

21  preliminary instructions and voir dire.

22       Have you got those already?

23       MR. DOSEK:  We have, Your Honor.

24       THE COURT:  All right.  I'm going to have you give me

25  your reaction to those at that conference.  We'll talk about

1   this exhibit issue.  We'll just see if there's any other

2   last-minute issues that have come up, just so we make sure

3   we're ready to go.  And, as I say, you can all participate by

4   phone if you choose to do so.

5          Let's plan to have you here at 8:30 a.m. on January

6   20th.  We'll actually bring the jury panel up at 9 o'clock to

7   pick the jury.  We'll get the jury picked by noon and start

8   opening statements after lunch, and then we'll be done with our

9   18 hours of trial time by midday on Friday so that they've got

10  Friday afternoon to deliberate.

11         We're going to seat eight jurors.  As you know, under

12  Rule 48, there will be no alternates.  They'll all deliberate

13  if they're all there at the end of the trial.  A unanimous

14  verdict is required.

15         My practice will be to voir dire the entire panel.

16  We'll bring up all of them and seat them in number in the jury

17  box and in the rows behind you, and I'm going to ask the

18  voir dire questions of everybody.  I'm going to then allow you

19  to ask follow-up questions, and by follow-up questions I mean

20  you can follow up on answers the jurors have given; you

21  shouldn't launch into new subjects that you ask the whole

22  panel.  If you think a subject needs to be covered that's not

23  in my voir dire, then bring that up when we get together for

24  that final conference.

25         After you've finished your follow-up questions I'm

going to send them to lunch. I will then tell you who I'm

excusing for hardship, I'll hear challenges for cause, you'll

exercise your peremptory strikes, and when they come back from

lunch we'll just call forward the eight who have been chosen to

serve.

Under our local rules, the peremptory strikes will be

simultaneous and secret. Each side will have three, so you'll

just indicate the three you're striking. We're not going to

take time to go back and forth, so we'll get through that

pretty quickly.

The rest of my jury practices are pretty standard. I

instruct the jury after closing arguments. I do not allow

jurors to ask questions of witnesses. I do allow them to take

notes, and I do instruct them not to discuss the case until

they've heard all the evidence.

Any questions on jury selection?

MR. DOSEK: Yes, Your Honor. I think you may have

said this but I missed it: How many potential jurors will be

called?

THE COURT: I'm not sure. If we want to seat eight

and there's six peremptories, that means we need 14.

We'll probably call 30, something like that, for a

four-day trial. The jury office keeps those numbers, and they

do a real good job of cutting it pretty close. I suspect it

will be about 30.

1          MR. DOSEK:  And then, I'm sorry, Your Honor, but then

2     the eight who will actually -- these jurors will all be

3     identified by number, I presume, and the first eight

4     numerically who haven't been excused or challenged will be

5     seated?

6          THE COURT:  Correct.

7          MR. DOSEK:  Okay.

8          THE COURT:  Actually, what we'll do is the first 14

9     who haven't been excused or challenged will be subject to your

10    peremptory strikes, and then, if you strike six, then we're

11    left with eight.  If you overlap some, then we take the eight

12    with the lowest numbers.

13         MR. DOSEK:  Okay.

14         THE COURT:  All right.  There are a number of

15    stipulations at the beginning of your proposed final pretrial

16    order.  My practice generally is to read the stipulations --

17         That's somebody's Blackberry or cellphone that's on.

18    Even if your phone's on mute, it interferes when a message

19    comes in, so if you could make sure you turn it off, that would

20    be great.

21         My practice generally is to read the stipulations to

22    the jury after I've given them the preliminary instructions and

23    before opening statements.

24         Is that acceptable to everybody?

25         MR. DOSEK:  It is with us, Your Honor.

1          MR. MARVINNEY:  As with us, Your Honor.  Thank you.

2          THE COURT:  Okay.

3          The statement of the case that you all submitted left

4     out Midwest's false advertising claim.  I didn't know if you

5     wanted to include it or not.

6          Why don't you look at it and see if you want to -- we

7     don't need to go through it now, but if you want to add a

8     sentence, then let's take that up when we get here in that

9     conference on the 15th of January.

10         How is it you intend to present depositions?  Or, more

11    to the point, have you videotaped any of the depositions?

12         MR. DOSEK:  We have one.  The deposition of Todd

13    Hawkins has been videotaped, and portions of that deposition

14    have been designated.

15         THE COURT:  Are there objections in the designations?

16         MR. DOSEK:  I don't think that there are.

17         THE COURT:  All right.  Let me just say this --

18         MR. DOSEK:  There aren't.

19         THE COURT:  There aren't.  Okay.  So you'll go ahead

20    and prepare those tapes without me needing to rule on anything.

21         MR. DOSEK:  Well, I think that there are not

22    objections because that issue has not been considered.

23         MR. MARVINNEY:  Your Honor, if I may assist here, if I

24    may.

25         In addition to Mr. Hawkins that the plaintiffs will be

1   using, that would be Soilworks, we will be using portions of,

2   as has been designated in the pretrial order proposed, portions

3   of Mr. Hickman and Mr. Gordon, who are from Alaska.  And their

4   depositions were also duly recorded and they're on a DVD.

5           And I think Mr. Dosek and I can work very carefully to

6   make sure that we produce a DVD, if this is where you're going,

7   Your Honor, if I can predict, we can produce a DVD that has

8   everything other than the objections, if there are any --

9           THE COURT:  Well, now, here's what I want to point

10  out.  If there's an objection that was made during the

11  deposition that I need to rule on, so you know what to put on

12  the DVD you're going to show the jury, you need to get that to

13  me.

14          So compare notes.  If there's some objections you want

15  to rule on, then have somebody highlight the portions of the

16  transcript and the objection you need ruled on and get it to me

17  in the next few weeks.  I'll get you a ruling, and that way

18  you'll know what to put on the DVD.

19          For those that weren't videotaped, we'll just have

20  somebody at the lectern read the questions and somebody in the

21  witness chair read the answers, and if there's an objection

22  somebody wants me to rule on, I'll rule on it as it's being

23  read so we won't have to deal with those before trial.

24          Lisa will give you a little handout on sort of

25  courtroom procedures we use during trial, but will just

1  familiarize you with our local practices.

2       Is the rule going to be invoked in this case, the rule

3  of exclusion?

4       MR. DOSEK:  It is, Your Honor.

5       THE COURT:  All right.  I'll leave it to you to inform

6  your own witnesses of the rule of exclusion.  Obviously, if

7  it's your client who's a witness, the client can sit through

8  the trial.

9       MR. DOSEK:  Thank you, Your Honor.

10      THE COURT:  Somebody still has a DVD or a cellphone on

11 mute.  You might just check.

12      Maybe it's you, Gary.

13      Okay.  Mr. Dosek or Mr. Passarelli, are there other

14 matters that you want to raise?

15      MR. PASSARELLI:  Your Honor, should we address that

16 claims analysis in a bench brief or something for your Court's

17 convenience?  Obviously, that's going to be an issue.

18      THE COURT:  What would be in the bench brief?

19      MR. PASSARELLI:  There seems to be a big dispute as to

20 what was disclosed, and their ability to -- to put in evidence

21 of an infringement of the patent claims.

22      THE COURT:  So what would be in the brief?

23      MR. PASSARELLI:  Specific excerpts of deposition

24 testimony.  I mean, I think we basically disagree on what the

25 deposition testimony says, and that --

1          THE COURT:  I guess I'm not understanding,

2     Mr. Passarelli, what I would do with that.

3          MR. PASSARELLI:  Right now, we're looking at -- I

4     mean, at some point they're going to either -- probably attempt

5     to put in evidence of a claims analysis that has not been

6     produced, a claims analysis chart.

7          I can't imagine the jury is going to even understand

8     the patent infringement part of this case, and it sounded like

9     they're going to patch some deposition testimony with their own

10    exhibit testimony, and I'm just wondering if -- I believe it's

11    inevitable that that issue will be raised in the middle of

12    trial.  Because we're going to guard the record very jealously.

13    They have not established an infringement analysis, and they're

14    not going to be able to slop one in through any testimony or --

15         THE COURT:  So I'm still not understanding what's in

16    the briefs.  I can understand what objections you might make

17    during the course of trial.

18         Are you saying that you'll preview for me the

19    objections, or you want each side to lay out their claims

20    position, or --

21         MR. PASSARELLI:  It would be -- it would be basically

22    the evidence that would preclude them from introducing -- to

23    substantiate the surprise objection, probably is the best way

24    to describe it.

25         It would be if we filed it today, it would be what you

1    would call not a motion in limine, but a motion for summary

2    judgment.

3            THE COURT:  Right.  That's what I'm thinking.  You

4    know --

5            MR. MARVINNEY:  That ship left the station, Your

6    Honor.

7            THE COURT:  I'm sorry?

8            MR. MARVINNEY:  I apologize, I -- I just said it seems

9    that ship left the station.

10           THE COURT:  I understand.  I just love reading you

11   guys' briefs.  I think we've gotten to the eve of trial without

12   those issues being resolved, and we're going to have to do the

13   best we can during trial.  The fact that I'm in wall-to-wall

14   trials from now until we start this is really why I don't think

15   I should take time to do something in advance of trial that

16   really would be in the form of a motion for summary judgment.

17           Obviously, you all ought to be prepared at trial to

18   make objections, and to demonstrate why it is you think I

19   should rule in a particular way, but I don't think we ought to

20   try to do that in advance of the trial.

21           Counsel, do you have anything else that we ought to

22   raise today?

23           MR. MARVINNEY:  Your Honor, it's just a moment of

24   fly-specking, if you will.  On the final pretrial order, on

25   page 4 -- I'm sorry, 24, section Roman numeral small case viii,

1  that would be 8, in reference to Stephen Gordner, his

2  anticipated testimony would be, of course, Mr. Gordner is an

3  employee of Spenard Builders Supply, not Mr. Hickman.  And that

4  was an error in the brief, and we apologize for that.

5          THE COURT:  All right.  Okay.  Let me address one

6  final subject.

7          You know, somebody has something on in the courtroom.

8  Has everybody got your phone completely off?

9          MR. MYLES:  No phone.

10         MR. MARVINNEY:  Mine's off.

11         THE COURT:  Okay.  I'm just going to talk out loud for

12 a minute, but I'm not -- I am not previewing how I'm going to

13 rule because I need to hear the evidence, but I think the

14 clients ought to hear this.

15         I am, frankly, quite puzzled as to why this case is

16 going to trial.  And maybe it's the patent infringement issue,

17 maybe that's what it is.  But it doesn't look to me like it's a

18 trial that's going to result in a significant amount of money

19 recovered on either side.  I could be completely wrong about

20 that.

21         But, you know, the false advertising claim that

22 Soilworks has based on two letters -- well, you've already

23 indicated you really don't have a damages claim there.  You

24 want some future injunction that they won't threaten patent

25 infringement again.

1        The trademark infringement based on the use of the

2   Soil-Sement words in the Internet search engines, you may have

3   evidence that I'm not privy to, but it seems to me proving what

4   damage occurred to Midwest by that action is going to be very

5   difficult.

6        If you weren't able to track sales that went to

7   Soilworks because they had those metatags, or those key words,

8   it's going to be tough to show.  And the case law is quite

9   clear that even if you can recover lost profits, it's only as a

10  substitute for a precise measure of damages, so that any lost

11  profits you recover, in my view, unless you show me otherwise

12  in the case law, will be to compensate you for sales you lost

13  because of their use of those Internet words.  And if you can't

14  show that there were real sales lost, then it doesn't seem to

15  me the profits should be handed over.

16       And, of course, that's a decision I'll have to make

17  after I hear the evidence.  But at this stage, I'm having a

18  hard time seeing where there's going to be a significant number

19  of sales that were lost as a result of that.  Of course,

20  there's no damages to be awarded because they claim to

21  manufacture Durasoil.

22       The unjust enrichment claim is going to be the same

23  issue.  It's going to be:  What enrichment was unjust?  Can you

24  show that they have recovered profits that you would have

25  recovered had they not used those metatags or key words?  And

1   if you can't show that, then it seems to me proving unjust

2   enrichment is going to be tough.

3        So on both sides, I don't see large damages claims.

4   And maybe the answer is that this is a patent fight and you're

5   competitors, and you want to prove that your patent is

6   infringed by their product and they want to prove it's not.

7        But if that's why we're here, this is a very uncertain

8   patent trial.  We're going into this trial not even knowing

9   what claims are at issue; not knowing exactly what evidence is

10   going to be admissible; not knowing if the jury's going to be

11   able to sort it all out.

12        So it seems to me there's uncertainty both ways.  And

13   for that reason, I've been scratching my head since I started

14   going through this book at home last night as to why this case

15   is going to trial.

16        What I am going to do between now and the end of

17   January is I'm going to require you all to sit down and try to

18   settle -- settle the case, with the clients in the room.  And

19   I'm going to have you do it with a magistrate judge in this

20   building who will sit down and try to help you settle the case.

21        Because you now know more than you will ever know till

22   we get to trial about what this case looks like.  I think

23   you've probably learned a lot from each side today about just

24   what the evidence isn't.

25        And so I'm going to require in the order that I issue

1    after today that between now and December 15th you all come to

2    Phoenix if you're out of state, sit down with a magistrate

3    judge for a settlement conference, and see if he can help you

4    resolve this case, and save the tens of thousands of dollars

5    that will be spent on attorneys' fees if this case goes to

6    trial, recognizing that although the law allows the recovery of

7    attorneys' fees, that's only in exceptional cases in this kind

8    of litigation.  And exceptional cases are just that:  they're

9    exceptional.  They don't come along very often.  So the chance

10   of attorneys' fees being recovered is somewhat low, given that

11   high exceptional case requirement.

12          We will draw at random the name of the magistrate

13   judge who will sit down with you.  I will tell you that all

14   four of the magistrate judges here in Phoenix I have found to

15   be very good at helping people settle cases.  They work real

16   hard at it.  They are all very experienced lawyers and judges.

17   They will bring to the conference an informed view about this

18   case that I think you ought to listen to, and maybe they can

19   help you reach a resolution that will avoid the need for trial.

20   And so that will have to happen by December 15th of this year.

21          Are there any other thoughts or comments or issues

22   that need to be raised by anybody?

23          MR. MYLES:  Judge, Don Myles on behalf of Midwest.

24          In lieu of your order, if the parties can agree to a

25   settlement conference judge, or mediator, could that be in lieu

1    of a magistrate judge, if the parties agree?

2            THE COURT:  Yeah, if you can get it done by December

3    15th.  Obviously, you know the problem there.  The good

4    mediators are hard to schedule.

5            If you can do that, that's fine.  The reason I want it

6    to happen by December 15th is my own interest:  If this case

7    settles, I need that week in January for another trial.

8            So it's a firm trial date.  I'm not going move it for

9    you all unless it gets bumped by a criminal case, but that has

10   never happened yet.  I get the criminal cases tried on time.

11           But I'd like to know sooner rather than later if this

12   trial goes away so that we can use that week profitably.

13           MR. MYLES:  Thank you, Your Honor.

14           THE COURT:  Okay.  Thanks very much.  We will see you

15   in January if this case doesn't settle.

16           (Proceedings concluded at 5:40 p.m.)

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3          I, GARY MOLL, do hereby certify that I am duly

4 appointed and qualified to act as Official Court Reporter for

5 the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7 a full, true, and accurate transcript of all of that portion of

8 the proceedings contained herein, had in the above-entitled

9 cause on the date specified therein, and that said transcript

10 was prepared under my direction and control.

11          DATED at Phoenix, Arizona, this 22nd day of October,

12 2008.

13                              s/Gary Moll

14

15          I, PATRICIA LYONS, do hereby certify that I am duly

16 appointed and qualified to act as Official Court Reporter for

17 the United States District Court for the District of Arizona.

18          I FURTHER CERTIFY that the foregoing pages constitute

19 a full, true, and accurate transcript of all of that portion of

20 the proceedings contained herein, had in the above-entitled

21 cause on the date specified therein, and that said transcript

22 was prepared under my direction and control.

23          DATED at Phoenix, Arizona, this 22nd day of October,

24 2008.

25                              s/Patricia Lyons