H
United States Court of Appeals, First Circuit.
VENTURE TAPE CORPORATION, Plaintiff, Appellee,
v.
McGILLS GLASS WAREHOUSE; Don Gallagher,
Defendants, Appellants.
No. 07-1186.

Heard Jan. 7, 2008.
Decided Aug. 28, 2008.

**Background:** Manufacturer of specialty adhesive tapes and foils used in the stained-glass industry sued internet-based competitor and its owner, claiming trademark infringement, misappropriation of goodwill, and unfair competition. The United States District Court for the District of Massachusetts, Morris E. Lasker, J., granted summary judgment for manufacturer. Competitor appealed.

**Holdings:** The Court of Appeals, Lipez, Circuit Judge, held that:
(1) competitor infringed manufacturer's marks by embedding the marks in its website;
(2) competitor of trademark holder waived its right to a jury trial on issue of amount of its profits to be awarded;
(3) competitor's infringement was willful;
(4) award of profits of $230,339.17 was warranted; and
(5) award of $188,583.06 in attorney fees was warranted.

Affirmed.

West Headnotes

**[1] Trademarks 382T ☞1116**

382T Trademarks
 382TIII Similarity Between Marks; Likelihood of Confusion
  382Tk1116 k. Internet Cases. Most Cited

Cases
Internet-based competitor of manufacturer of specialty adhesive tapes and foils used in the stained-glass industry and its owner infringed manufacturer's trademarks by embedding the marks in its website; metatags and invisible background text on competitor's website incorporated manufacturer's exact marks, parties were direct competitors in the stained glass industry and both used websites to promote and market their products, and owner intentionally used manufacturer's marks on competitor's website for the express purpose of attracting customers to the website, and he chose particular mark because of its strong reputation in the stained glass industry. Lanham Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[2] Federal Courts 170B ☞776**

170B Federal Courts
 170BVIII Courts of Appeals
  170BVIII(K) Scope, Standards, and Extent
   170BVIII(K)1 In General
    170Bk776 k. Trial De Novo. Most Cited Cases
Court of Appeals reviews the district court's grant of summary judgment de novo.

**[3] Trademarks 382T ☞1421**

382T Trademarks
 382TVIII Violations of Rights
  382TVIII(A) In General
   382Tk1418 Practices or Conduct Prohibited in General; Elements
    382Tk1421 k. Infringement. Most Cited Cases
To establish trademark infringement under the Lanham Act, plaintiff was required to prove that: (1) it owned and used marks; (2) defendant used the same or similar marks without plaintiff's permission; and (3) defendant's use of plaintiff's marks likely confused consumers, thereby causing plaintiff harm. Lanham Act, § 43(a), 15 U.S.C.A. § 1125(a).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**[4] Trademarks 382T ☞1081**

382T Trademarks
    382TIII Similarity Between Marks; Likelihood of Confusion
        382Tk1081 k. Factors Considered in General. Most Cited Cases
In determining the likelihood of confusion among consumers, as element of trademark infringement under the Lanham Act, the court must assess eight criteria: (1) the similarity of plaintiff's and defendant's marks; (2) the similarity of their goods; (3) the relationship between their channels of trade; (4) the relationship between their advertising; (5) the classes of their prospective purchasers; (6) any evidence of actual confusion of consumers; (7) defendant's subjective intent in using plaintiff's marks; and (8) the overall strength of plaintiff's marks. Lanham Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[5] Trademarks 382T ☞1081**

382T Trademarks
    382TIII Similarity Between Marks; Likelihood of Confusion
        382Tk1081 k. Factors Considered in General. Most Cited Cases
No single criterion considered by the court in determining the likelihood of confusion among consumers, as element of trademark infringement under the Lanham Act, is necessarily dispositive in this circumstantial inquiry. Lanham Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[6] Trademarks 382T ☞1629(2)**

382T Trademarks
    382TIX Actions and Proceedings
        382TIX(C) Evidence
            382Tk1620 Weight and Sufficiency
                382Tk1629 Similarity; Likelihood of Confusion
                    382Tk1629(2) k. Actual Confusion. Most Cited Cases
The absence of direct evidence of actual consumer confusion is not dispositive of determination of likelihood of confusion among consumers, as element of trademark infringement under the Lanham Act. Lanham Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[7] Trademarks 382T ☞1086**

382T Trademarks
    382TIII Similarity Between Marks; Likelihood of Confusion
        382Tk1083 Nature of Confusion
            382Tk1086 k. Actual Confusion. Most Cited Cases

**Trademarks 382T ☞1629(2)**

382T Trademarks
    382TIX Actions and Proceedings
        382TIX(C) Evidence
            382Tk1620 Weight and Sufficiency
                382Tk1629 Similarity; Likelihood of Confusion
                    382Tk1629(2) k. Actual Confusion. Most Cited Cases
Trademark holder's burden on infringement claim is to show likelihood of confusion, not actual confusion, even though evidence of actual confusion is often deemed the best evidence of possible future confusion. Lanham Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[8] Federal Courts 170B ☞776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most Cited Cases

**Federal Courts 170B ☞860**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)5 Questions of Fact, Verdicts and Findings

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

170Bk855 Particular Actions and Proceedings, Verdicts and Findings
170Bk860 k. Copyrights, Patents and Trade Regulation. Most Cited Cases
Court of Appeals reviews de novo the legal standard by which the award of profits under the Lanham Act was calculated and reviews for clear error the factual findings supporting the award. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

[9] Jury 230 ☞28(6)

230 Jury
    230II Right to Trial by Jury
        230k27 Waiver of Right
            230k28 In Civil Cases
                230k28(6) k. Submission to Court.
Most Cited Cases
Competitor of trademark holder waived its right to a jury trial on issue of amount of its profits to be awarded holder for trademark infringement, notwithstanding its prior jury demand, where competitor's counsel appeared at the remedies hearing and made a variety of arguments challenging holder's request, and counsel never objected that the remedies issue should have been tried by a jury rather than determined by the judge. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

[10] Jury 230 ☞28(1)

230 Jury
    230II Right to Trial by Jury
        230k27 Waiver of Right
            230k28 In Civil Cases
                230k28(1) k. In General. Most Cited Cases
The right to a jury trial can be waived.

[11] Jury 230 ☞28(6)

230 Jury
    230II Right to Trial by Jury
        230k27 Waiver of Right
            230k28 In Civil Cases
                230k28(6) k. Submission to Court.

Most Cited Cases
Party's participation in a bench trial without objection constitutes a waiver of a jury trial right.

[12] Federal Courts 170B ☞616

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
            170BVIII(D)1 Issues and Questions in Lower Court
                170Bk616 k. Grounds of Defense.
Most Cited Cases
Trademark infringer waived argument, on appeal of amount of profits awarded trademark holder, that there was no evidence other than guesses and approximations regarding the length of time the infringing marks had been used, where infringer failed to raise argument before the district court. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

[13] Trademarks 382T ☞1664

382T Trademarks
    382TIX Actions and Proceedings
        382TIX(D) Damages and Profits
            382Tk1661 Profits; Accounting
                382Tk1664 k. Intent; Fraud. Most Cited Cases
Even if showing of willfulness was required for award of profits under the Lanham Act, infringer's intentional use of the holder's marks to lure customers to its website was willful, where infringer programmed its website so that holder's marks were displayed in the same color as the webpage background, concealing them from view. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

[14] Trademarks 382T ☞1662

382T Trademarks
    382TIX Actions and Proceedings
        382TIX(D) Damages and Profits
            382Tk1661 Profits; Accounting
                382Tk1662 k. In General. Most Cited

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Cases
When a mark owner cannot prove actual damages attributable to the infringer's misconduct, such as specific instances of lost sales, its recovery of an equitable share of the infringer's profits serves as a rough measure of the likely harm that the mark owner incurred because of the infringement, while also preventing the infringer's unjust enrichment and deterring further infringement. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

|15| Trademarks 382T ☞1665(1)

382T Trademarks
  382TIX Actions and Proceedings
    382TIX(D) Damages and Profits
      382Tk1661 Profits; Accounting
        382Tk1665 Measure and Amount
          382Tk1665(1) k. In General. Most Cited Cases
Award of profits of $230,339.17 to trademark holder was warranted for its Internet-based competitor's infringement for three-and-a-half-year period of its marks by embedding the marks in its website; award represented an equitable share of competitor's $1.9 million in gross sales during the period of infringement. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

|16| Trademarks 382T ☞1754(2)

382T Trademarks
  382TIX Actions and Proceedings
    382TIX(G) Costs
      382Tk1752 Attorney Fees
        382Tk1754 Grounds
          382Tk1754(2) k. Exceptional Cases; Intent or Bad Faith. Most Cited Cases

Trademarks 382T ☞1755

382T Trademarks
  382TIX Actions and Proceedings
    382TIX(G) Costs
      382Tk1752 Attorney Fees
        382Tk1755 k. Amount, Rate, and

Items. Most Cited Cases
District court did not abuse its discretion in awarding $188,583.06 in attorney fees to trademark holder, since infringer's intentional use of the holder's marks to lure customers to its website by embedding the marks on the website in the same color as the webpage background, concealing them from view, was willful. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

|17| Federal Courts 170B ☞830

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
        170Bk830 k. Costs, Attorney's Fees and Other Allowances. Most Cited Cases
Court of Appeals reviews award of attorney fees under the Lanham Act for abuse of discretion. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

|18| Trademarks 382T ☞1754(2)

382T Trademarks
  382TIX Actions and Proceedings
    382TIX(G) Costs
      382Tk1752 Attorney Fees
        382Tk1754 Grounds
          382Tk1754(2) k. Exceptional Cases; Intent or Bad Faith. Most Cited Cases
The district court has discretion to consider a trademark infringement case exceptional, as would warrant award of attorney fees, if, after reviewing the totality of the circumstances, it finds that the infringer's actions were malicious, fraudulent, deliberate, or willful. Lanham Act, § 35(a), 15 U.S.C.A. § 1117(a).

Trademarks 382T ☞1800

382T Trademarks
  382TXI Trademarks and Trade Names Adjudicated
    382Tk1800 k. Alphabetical Listing. Most Cited Cases

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Venture Foil.

**Trademarks 382T ☞1800**

382T Trademarks
    382TXI Trademarks and Trade Names Adjudicated
        382Tk1800 k. Alphabetical Listing. Most Cited Cases
Venture Tape.

*58 Christopher J. Cunio, with whom Jaimie A. McKean and Cooley Manion Jones LLP were on brief, for appellee.
Chloris DeBrauwere, for appellants.

Before LYNCH, Chief Judge, TORRUELLA and LIPEZ, Circuit Judges.

LIPEZ, Circuit Judge.
McGills Glass Warehouse ("McGills"), an internet-based retailer of stained-glass supplies, and its owner Donald Gallagher, appeal from a district court judgment finding them liable for infringement of the registered trademarks "Venture Tape" and "Venture Foil," and awarding the marks' owner, Venture Tape Corporation ("Venture"), an equitable share of McGills' profits, as well as costs and attorney's fees. We affirm.

**I.**

In 1990, Venture, a manufacturer of specialty adhesive tapes and foils used in the stained-glass industry, procured two federal trademark registrations (Nos. 1,579,001 and 1,583,644) for products called "Venture Tape" and "Venture Foil," respectively. Over the next fifteen years, Venture expended hundreds of thousands of dollars to promote the two marks in both print and *59 internet advertising. Consequently, its products gained considerable popularity, prestige, and good will in the worldwide stained glass market.

Through its internet website, McGills also sells ad-

hesive tapes and foils which directly compete with "Venture Tape" and "Venture Foil." Beginning in 2000, and without obtaining Venture's permission or paying it any compensation, McGills' owner Donald Gallagher intentionally "embedded" the Venture marks in the McGills website, both by including the marks in the website's metatags-a component of a webpage's programming that contains descriptive information about the webpage which is typically not observed when the webpage is displayed in a web browser-and in white lettering on a white background screen, similarly invisible to persons viewing the webpage. Gallagher, fully aware that the McGills website did not sell these two Venture products, admittedly took these actions because he had heard that Venture's marks would attract people using internet search engines to the McGills website.

Because the marks were hidden from view, Venture did not discover McGills' unauthorized use of its marks until 2003. It then promptly filed suit against McGills and Gallagher in federal district court, alleging federal trademark infringement, Lanham Act § 32, 15 U.S.C. § 1114(1) (Count 1),[FN1] unfair competition, id. § 43(a), 15 U.S.C. § 1125(a) (Count 2), false designation of origin, id.(Count 3),[FN2] and trademark dilution, Mass. Gen. Laws. Ann. ch. 110B, § 12 (Count 4).[FN3] After conducting lengthy discovery, the parties filed cross-motions for summary judgment on all four counts of the complaint. The district court conducted a motion hearing, granted summary judgment for Venture on all counts, and requested that Venture submit a motion itemizing any damages, costs, and attorney's fees attributable to McGills' trademark infringement, all of which are potentially recoverable under the Lanham Act. See Lanham Act § 35, 15 U.S.C. § 1117(a).

> FN1. Lanham Act § 32 provides, in pertinent part:
>
> Any person who shall, without the consent of the registrant-use in commerce any reproduction, counterfeit, copy, or

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive-shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1).

FN2. Lanham Act § 43(a) provides, in pertinent part:

Any person who ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which- is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person-... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

FN3. The state statute, since repealed, provided in pertinent part:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or

services.

Mass. Gen. Laws Ann. ch. 110B, § 12 (repealed 2006).

*60 Although Venture adduced evidence that McGills generated almost $1.9 million in gross sales during the period of its infringement from 2000-2003, Venture eventually requested only $230,339.17, the amount that it estimated to be McGills' net profits. Citing McGills' willful infringement and alleging McGills engaged in obstructionist discovery tactics, Venture sought $188,583.06 in attorney's fees and $7,564.75 in costs. After a hearing on Venture's motion, the district court granted Venture's requested recovery. McGills and Gallagher now appeal from the district court's grant of summary judgment to Venture on Lanham Act liability, and from the district court's award of profits and attorney's fees.

II.

A. Lanham Act Liability

[1][2] McGills first contends that the district court improvidently granted summary judgment for Venture on appellees' liability under the Lanham Act.[FN4] Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1st Cir.1989). We review the district court's grant of summary judgment de novo. *Colt Def. LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 705 (1st Cir.2007).

FN4. The Lanham Act and the state trademark dilution statute impose comparable standards of liability, *see* Mass. Gen. Laws Ann. ch. 110B, § 12 ("likelihood of injury to business reputation"). On appeal, McGills does not address the grant of sum-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

mary judgment to Venture on Count 4, the state trademark dilution claim. Hence we do not address it either.

[3] "The purpose of a trademark is to identify and distinguish the goods of one party from those of another. To the purchasing public, a trademark 'signi [fies] that all goods bearing the trademark' originated from the same source and that 'all goods bearing the trademark are of an equal level of quality.' " *Id.* (quoting 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 3:2 (4th ed.2007)) (internal citation omitted). To establish trademark infringement under the Lanham Act, Venture was required to prove that: (1) it owns and uses the "Venture Tape" and "Venture Foil" marks; (2) McGills used the same or similar marks without Venture's permission; and (3) McGills' use of the Venture marks likely confused internet consumers, thereby causing Venture harm (e.g., lost sales). *See Star Fin. Servs., Inc. v. AASTAR Mortgage Corp.,* 89 F.3d 5, 9 (1st Cir.1996); 15 U.S.C. § 1125(a). The parties agree that no genuine factual dispute exists concerning the first two elements of proof.[FN5]

FN5. Venture's registration of the two marks, when coupled with its continuous use of them from 1990 to 1995, is incontestible evidence of Venture's exclusive right to use the marks. *See Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 820 (1st Cir.1987). Further, McGills concedes that, without Venture's permission, Gallagher embedded the marks *verbatim* on the McGills website.

[4][5] Our focus then becomes the "likelihood of confusion" among internet consumers. This inquiry requires us to assess eight criteria: (1) the similarity of Venture's and McGills' marks; (2) the similarity of their goods; (3) the relationship between their channels of trade (*e.g.,* internet-based commerce); (4) the relationship between their advertising; (5) the classes of their prospective purchasers; (6) any evidence of actual confusion of internet *61 con-

sumers; (7) McGills' subjective intent in using Venture's marks; and (8) the overall strength of Venture's marks. *Boston Duck Tours, LP v. Super Duck Tours, LLC,* 531 F.3d 1, 10 n. 6 (1st Cir.2008) (citing *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 487 (1st Cir.1981)) [hereinafter " *Pignons* factors" or " *Pignons* analysis"].[FN6] No single criterion is necessarily dispositive in this circumstantial inquiry. *Borinquen Biscuit Corp. v. M.V. Trading Corp.,* 443 F.3d 112, 120 (1st Cir.2006).

FN6. Venture's unfair competition claim (Count 2) and false designation claim (Count 3) are subject to the same legal standard-namely, "likelihood of confusion"-as its Count 1 infringement claim. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 780, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

By the conduct of its case below, McGills effectively admitted seven of the eight elements of the *Pignons* analysis. The record contains numerous admissions that metatags and invisible background text on McGills' website incorporated Venture's exact marks. In his deposition, Gallagher admitted that the parties are direct competitors in the stained glass industry and that both companies use websites to promote and market their products. Gallagher even admitted that he intentionally used Venture Tape's marks on McGills' website for the express purpose of attracting customers to McGills' website and that he chose "Venture Tape" because of its strong reputation in the stained glass industry. These admissions illustrate the similarity (indeed, identity) of the marks used, the similarity of the goods, the close relationship between the channels of trade and advertising, and the similarity in the classes of prospective purchasers. They also support the conclusions that McGills acted with a subjective intent to trade on Venture's reputation and that Venture's mark is strong. Accordingly, only the sixth factor-evidence of actual consumer confusion-is potentially in dispute.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

On appeal, McGills argues that Gallagher had no way of knowing whether or not his use of the Venture marks on the McGills website had been successful, i.e., whether the marks actually lured any internet consumer to the website.[FN7] Thus, the company contends that summary judgment in Venture's favor was improper because there was no evidence of actual confusion. However, McGills' various protestations below and on appeal that there is no direct evidence of actual consumer confusion, even if accepted as true, are ultimately beside the point.

> FN7. The bulk of the other arguments raised by McGills on appeal were not raised below, and are therefore waived for purposes of appeal. Accordingly, we need not address them here. They include assertions that: (1) the district court's *Pignons* analysis depended on Venture's deliberately misleading record citations, by which Venture falsely implied that Gallagher had admitted "every" aspect of Lanham Act liability; (2) Venture misled the district court with respect to the *Pignons* "channel of trade" factor by misrepresenting that McGills and Venture both used their websites to "sell" their respective products; (3) Venture's Exhibit E, which purported to show that McGills' use of the marks had led consumers looking for Venture products to McGills' website, was misleading because the exhibit discloses that McGills paid Yahoo! for a priority position on search lists; and (4) Venture is barred from recovery under the equitable defenses of laches or unclean hands.

[6][7] Although Venture might have attempted to adduce evidence of actual consumer confusion (e.g., internet user market surveys) in support of a favorable *Pignons* determination, the absence of such proof is not dispositive of the *Pignons* analysis. "[A] trademark holder's burden is to show likelihood of confusion, not actual confusion. While

evidence of actual confusion is 'often deemed the best evidence of possible future confusion, *62 proof of actual confusion is not essential to finding likelihood of confusion.' " *Borinquen Biscuit*, 443 F.3d at 120 (citations omitted); *see also Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1050 (9th Cir.1999) ("[D]ifficulties in gathering evidence of actual confusion make its absence generally unnoteworthy."); *cf. Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 640 (1st Cir.1992) ("[T]he district court erred in suggesting that proof of actual harm to Nestle's goodwill was a prerequisite to finding a Lanham Trade-Mark Act violation [because] [t]he Lanham Act contains no such proof-of-injury requirement.").

McGills' admissions regarding the other seven *Pignons* factors, particularly Gallagher's admission that his *purpose* in using the Venture marks was to lure customers to his site, permit us to conclude that no genuine dispute exists regarding the likelihood of confusion. As a result, Venture was entitled to summary judgment on the liability issue.

## B. Award of Profits under the Lanham Act

[8] Because Venture established its entitlement to summary judgment on Lanham Act liability, it was potentially entitled-subject to applicable principles of equity-to recover, *inter alia*, McGills' profits during the period that McGills infringed the Venture marks. Lanham Act § 35(a), 15 U.S.C. § 1117(a).[FN8] McGills argues on appeal that the district court erred in awarding Venture $230,339.17, McGills' net profits for the three-and-a-half-year period of infringement, pursuant to section 1117(a). We review de novo the legal standard by which the award was calculated and review for clear error the factual findings supporting the award. *Tamko Roofing Prods., Inc. v. Ideal Roofing Co.*, 282 F.3d 23, 35 (1st Cir.2002).

> FN8. Lanham Act § 35(a) provides:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a).

[9][10][11] McGills first contends that, because it filed a timely demand for a jury trial in its answer and never stipulated to the withdrawal of that demand, the district court violated its Seventh Amendment rights when it determined the amount of McGills' profits, rather than submitting the question for jury resolution. However, the right to a jury trial can be waived. *CoxCom, Inc. v. Chaffee,* 536 F.3d 101, 110-11 (1st Cir.2008). "[A] party's participation in a bench trial without objection constitutes a waiver of a jury trial right." *63 *Id.; see also United States v.1966 Beechcraft Aircraft Model King Air,* 777 F.2d 947, 951 (4th Cir.1985) (jury right waived where parties "fully and vigorously participated in the bench trial, making no mention of their early jury demand"). Here, McGills' counsel appeared at the remedies hearing and made a variety of arguments challenging Venture's request. Counsel never objected that the remedies issue should be tried by a jury rather than determined by the judge. This acquiescence represents a waiver of McGills' prior jury demand. *See CoxCom,* 536 F.3d at 111 (holding that appellants' "active participation both leading up to and during the bench trial," coupled with a failure to "specifically object to the lack of a jury," constituted waiver).

[12][13] McGills raises two substantive objections to the award of profits.[FN9] First, the company challenges the district court's finding that the infringement here was "willful," asserting that such a finding is a prerequisite to an award of profits under the Lanham Act. We have previously declined to reach the question of whether "willfulness" is required as a foundation for such an award, *see Tamko Roofing Prods.,* 282 F.3d at 36, and we need not decide the issue here. Even assuming that "willfulness" is required, McGills has not demonstrated that the district court's finding of "willfulness" was clearly erroneous. McGills asserts that Gallagher's admittedly intentional use of the Venture marks to lure customers to his site was not "willful" because Gallagher was unaware that such use of the marks was illegal. However, the district court specifically noted that McGills had programed its website so that Venture's marks were displayed in the same color as the webpage background, concealing them from view. We can find no clear error in the district court's conclusion that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

such intentional concealment provides strong circumstantial evidence of "willfulness."

> FN9. On appeal, McGills also argues that the district court erred in awarding profits based on an infringement period of three-and-a-half years. McGills claims that there was no evidence other than "guesses and approximations" regarding the length of time the infringing marks had been embedded in McGills' website. McGills has waived this argument by failing to raise it below.

[14] Second, McGills attacks the award by claiming that it overstates the actual harm to Venture. McGills first complains that Venture did not even attempt to show actual harm, and suggests that this failure means that there was no actual harm. Our case law does not support that inference. When a mark owner cannot prove actual damages attributable to the infringer's misconduct (e.g., specific instances of lost sales), its recovery of an equitable share of the infringer's profits serves, *inter alia*, as a "rough measure" of the likely harm that the mark owner incurred because of the infringement, while also preventing the infringer's unjust enrichment and deterring further infringement. *Tamko Roofing Prods.*, 282 F.3d at 36. The district court explicitly concluded that the profits award here was "sufficiently substantial to serve these purposes without being unduly large or burdensome." We find no fault with this conclusion.

[15] McGills' alternative theory is that the award of profits is overstated because the "only possible enrichment" to McGills from the use of the Venture marks would have arisen from its sales of foils and tapes. McGills argues, without marshaling any competent evidence, that its sales of those products amounted to less than one percent of its total sales. McGills complains that Venture should have known this and provided more detailed breakdowns*64 to the court. McGills asserts that Venture "copied over 5000 records," but "carefully chose to show none of it to the Court."

This argument entirely misplaces the burden of proof for a profit award under the Lanham Act. We have held that "once the plaintiff has shown direct competition and infringement, the statute places the burden on the infringer to show the limits of the direct competition." *Tamko Roofing Prods.*, 282 F.3d at 37. This allocation of burdens arises from the language of the Lanham Act itself: "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). Here, Venture met its burden by introducing tax returns showing Venture's gross sales over the relevant time period. McGills then had the burden of producing evidentiary documentation that some of those sales were unrelated to and unaided by McGills' illicit use of Venture's marks. The company produced no such evidence. As a result, there was no clear error in the district court's determination that $230,339.17 represented an equitable share of McGills' $1.9 million in gross sales during the three-and-a-half year infringement period.

## C. Attorney's Fee Award

[16][17][18] Finally, McGills challenges the district court's award of $188,583.06 in attorney's fees. The Lanham Act permits the court to award reasonable attorney's fees to the prevailing party in "exceptional cases." 15 U.S.C. § 1117(a). We review such awards for abuse of discretion. *Tamko Roofing Prods.*, 282 F.3d at 30. The district court has discretion to consider an infringement case "exceptional" if, after reviewing the totality of the circumstances, it finds that the infringer's actions were "malicious, fraudulent, deliberate, or willful." *Id.* at 31 (internal quotation marks omitted). As we noted above, the district court did not err in concluding that McGills' infringement was "willful." Accordingly, it did not abuse its discretion in determining that this is an "exceptional case" where an award of attorney's fees is appropriate.

*Affirmed.*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

C.A.1 (Mass.),2008.
Venture Tape Corp. v. McGills Glass Warehouse
540 F.3d 56, 88 U.S.P.Q.2d 1051

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H

United States Court of Appeals, Seventh Circuit.
WMS GAMING INC., Plaintiff-Appellant,
v.
WPC PRODUCTIONS LTD. and PartyGaming
PLC, Defendants-Appellees.
No. 07-3585.

Argued Feb. 25, 2008.
Decided Sept. 8, 2008.
As Amended Sept. 16, 2008.

**Background:** Trademark owner filed action
against foreign competitor alleging infringement.
The United States District Court for the Northern
District of Illinois, Blanche M. Manning, J., granted
default judgment for both monetary and injunctive
relief for owner. Owner appealed.

**Holdings:** The Court of Appeals, Wood, Circuit
Judge, held that:
(1) federal courts had jurisdiction over lawsuit;
(2) unresolved collateral issues of owner's motion
for fees and costs and separate motion to have com-
petitor held in contempt did not affect existence of
appellate jurisdiction;
(3) competitor waived opportunity to contest dis-
trict court's personal jurisdiction over it;
(4) owner was entitled to equitable accounting of
profits; and
(5) owner did not have to bear risk of uncertainty
about proper characterization of revenues.

Reversed and remanded.

West Headnotes

**[1] Trademarks 382T €═1559**

382T Trademarks
 382TIX Actions and Proceedings
  382TIX(A) In General
   382Tk1557 Jurisdiction
    382Tk1559 k. Foreign Commerce.

Most Cited Cases
Federal courts had jurisdiction over lawsuit under
Lanham Act against foreign entity alleging in-
fringement of trademarks. Lanham Act, § 39, 15
U.S.C.A. § 1121; 28 U.S.C.A. § 1338.

**[2] Federal Courts 170B €═600**

170B Federal Courts
 170BVIII Courts of Appeals
  170BVIII(C) Decisions Reviewable
   170BVIII(C)2 Finality of Determination
    170Bk598 Determination of Contro-
versy as Affecting Finality
     170Bk600 k. Particular Actions.
Most Cited Cases
Unresolved collateral issues of trademark owner's
motion for fees and costs and separate motion to
have competitor held in contempt did not affect ex-
istence of appellate jurisdiction for purposes of ad-
dressing issues before Court of Appeals of damages
for competitor's infringement under Lanham Act,
where competitor had been properly served but
failed to appear or answer owner's complaint, com-
petitor had been found to be in default, and default
judgment had been entered and owner's motion for
reconsideration later had been denied. Lanham Act,
§§ 35(a), 39, 15 U.S.C.A. §§ 1117(a), 1121; 28
U.S.C.A. § 1338; Fed.Rules Civ.Proc.Rule 59(e),
28 U.S.C.A.

**[3] Federal Courts 170B €═622**

170B Federal Courts
 170BVIII Courts of Appeals
  170BVIII(D) Presentation and Reservation in
Lower Court of Grounds of Review
   170BVIII(D)2 Objections and Exceptions
    170Bk622 k. Organization and Juris-
diction of Lower Court; Venue. Most Cited Cases
    (Formerly 170Bk616)
Competitor that had opportunity to contest district
court's personal jurisdiction over it in trademark in-
fringement action under Lanham Act, but did not

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

do so, waived opportunity to do so. Lanham Act, §
35(a), 15 U.S.C.A. § 1117(a); Fed.Rules
Civ.Proc.Rule 12(h)(1), 28 U.S.C.A.

**[4] Trademarks 382T ☞1662**

382T Trademarks
   382TIX Actions and Proceedings
      382TIX(D) Damages and Profits
         382Tk1661 Profits; Accounting
            382Tk1662 k. In General. Most Cited
Cases
Trademark owner was entitled under Lanham Act
to equitable accounting of profits after competitor's
default in lawsuit alleging trademark infringement,
where, among other things, owner repeatedly had
stated in its complaint that it sought equitable rem-
edies of injunctive relief and accounting of profits
and it asserted multiple times that "there is no ad-
equate remedy at law" for competitor's actions and
owner's motion for entry of default judgment con-
tinued that theme. Lanham Act, § 35(a), 15
U.S.C.A. § 1117(a); Fed.Rules Civ.Proc.Rule 54(c),
28 U.S.C.A.

**[5] Federal Civil Procedure 170A ☞2422**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(B) By Default
         170AXVII(B)1 In General
            170Ak2422 k. Relief Awarded. Most
Cited Cases
The usual rule that a party should be given the re-
lief to which it is entitled whether or not it has re-
quested that relief does not apply to a default judg-
ment. Fed.Rules Civ.Proc.Rule 54(c), 28 U.S.C.A.

**[6] Trademarks 382T ☞1666**

382T Trademarks
   382TIX Actions and Proceedings
      382TIX(D) Damages and Profits
         382Tk1661 Profits; Accounting
            382Tk1666 k. Evidence. Most Cited
Cases

Trademark owner did not have to bear risk of un-
certainty about proper characterization of revenues
established by using competitor's own public finan-
cial statements and reports, after competitor defaul-
ted in trademark infringement action under Lanham
Act which sought equitable accounting of profits,
since competitor had burden to show which por-
tions of its gross income were not attributable to its
infringing uses. Lanham Act, § 35(a), 15 U.S.C.A.
§ 1117(a); Fed.Rules Civ.Proc.Rule 54(c). 28
U.S.C.A.

**[7] Trademarks 382T ☞1665(1)**

382T Trademarks
   382TIX Actions and Proceedings
      382TIX(D) Damages and Profits
         382Tk1661 Profits; Accounting
           382Tk1665 Measure and Amount
              382Tk1665(1) k. In General. Most
Cited Cases
When a trademark plaintiff offers evidence of in-
fringing sales and the infringer fails to carry its
statutory burden to offer evidence of deductions,
the plaintiff's entitlement to profits under the Lan-
ham Act is equal to the infringer's gross sales. Lan-
ham Act, § 35(a), 15 U.S.C.A. § 1117(a).

**Trademarks 382T ☞1800**

382T Trademarks
   382TXI Trademarks and Trade Names Adjudic-
ated
      382Tk1800 k. Alphabetical Listing. Most
Cited Cases
JACKPOT PARTY.

**Trademarks 382T ☞1800**

382T Trademarks
   382TXI Trademarks and Trade Names Adjudic-
ated
      382Tk1800 k. Alphabetical Listing. Most
Cited Cases
PARTYJACKPOT.

**Trademarks 382T ☞1800**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

382T Trademarks
   382TXI Trademarks and Trade Names Adjudic-
ated
      382Tk1800 k. Alphabetical Listing. Most
Cited Cases
SUPER JACKPOT PARTY.

*602 Theodore H. Davis, Jr. (argued), Kilpatrick
Stockton, Atlanta, GA, Douglas N. Masters, Loeb
& Loeb, Chicago, IL, for Plaintiff-Appellant.

*603 Before ROVNER, WOOD, and WILLIAMS,
Circuit Judges.


WOOD, Circuit Judge.
This appeal involves a trademark-infringement dis-
pute between gaming companies. It began when
WMS Gaming, Inc. ("WMS"), sued WPC Produc-
tions Ltd. and its parent corporation, PartyGaming
PLC (collectively, "PartyGaming" or "the defend-
ants"), for PartyGaming's unapologetic infringe-
ment of WMS's registered trademarks JACKPOT
PARTY and SUPER JACKPOT PARTY. Party-
Gaming is based in Gibraltar, but the electronic
gaming services that it provides span the globe.
After several failed attempts to persuade PartyGam-
ing voluntarily to cease its infringing uses of
WMS's marks, WMS filed this suit in federal dis-
trict court seeking injunctive relief, damages, and
an equitable accounting of the profits PartyGaming
reaped from its use of WMS's marks in the United
States.

Despite receiving proper notice, the defendants
have opted to ignore WMS's lawsuit entirely. The
result was a default judgment for both monetary
and injunctive relief entered in WMS's favor. Be-
lieving that it was entitled to additional relief,
however, WMS appealed, arguing that the district
court applied the wrong standard to its claim for an
accounting of profits. We reverse.


I

WMS has manufactured, sold, and leased gaming

devices, including slot machines, for many years.
Since as early as 1998, WMS has used the JACK-
POT PARTY trademark (U.S.Reg. No. 2,283,967)
in interstate commerce in connection with its
goods, and since as early as October 5, 2004, it has
used the SUPER JACKPOT PARTY trademark
(U.S.Reg. No. 2,952,924) in the same way. Under
U.S. law, these registrations constitute conclusive
evidence of WMS's exclusive rights to the underly-
ing marks for the uses specified in the registrations,
see 15 U.S.C. § 1115(b), and they also provide na-
tionwide constructive notice of WMS's rights to the
underlying marks, dating back to the filing dates of
the applications from which the registrations ma-
tured: December 9, 1997, for JACKPOT PARTY,
and February 22, 2002, for SUPER JACKPOT
PARTY, id. § 1057(c).

PartyGaming's business is online gaming, including
slot machines, poker, bingo, sports betting, and oth-
er casino games. During the years 2004, 2005, and
2006, PartyGaming used approximate and even ex-
act reproductions of WMS's marks for that busi-
ness, throughout the world and in the United States.
Its use of WMS's marks is well-documented and
has occurred frequently and persistently throughout
the years in question.

In addition to having constructive notice of WMS's
ownership of the trademarks by virtue of their re-
gistration with the U.S. Patent and Trademark Of-
fice ("PTO"), PartyGaming also had actual notice
that WMS owned the JACKPOT PARTY mark by
the beginning of 2005. At that time, it attempted to
register the mark "PARTYJACKPOT" with the
PTO, but the PTO promptly rejected the request be-
cause it found that the mark was "confusingly sim-
ilar" to WMS's prior registered mark JACKPOT
PARTY. This was not enough to prompt PartyGam-
ing to abandon its use of the mark. To the contrary,
the record shows that it instead expanded its use
after the PTO's action, and with its use, the profits
it derived from the mark. According to PartyGam-
ing's 2005 Annual Report, available from its web-
site, the company earned $977.7 million in total

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

revenue that year, of which 84%, or $820 million, came from U.S. customers. (See http:// *604 www. partygaming. com, 2005 Annual Report at 80, 87 (follow "Investors" hyperlink to "Financial Performance" and then "Financial Reports" hyperlinks), report reproduced in App. vol. 1, at 141 ff.) PartyGaming also continued for several months to pursue its application in the United States to register PARTYJACKPOT, ultimately forcing WMS to oppose that application in litigation before the Trademark Trial and Appeal Board.

While that litigation was pending, the U.S. Congress passed the Unlawful Internet Gambling Enforcement Act, Pub.L. No. 109-347, 120 Stat.1952 (2006) ("UIGEA"), which effectively prohibited gambling businesses from receiving proceeds or monies in connection with online gambling. Up until that point (late 2006), the largest source of Party-Gaming's revenues, by far, was the United States. In the wake of the UIGEA's enactment, however, PartyGaming decided to cease its operations in the U.S. market. It also abandoned its application and litigation in this country regarding the PARTY-JACKPOT mark.

Once again, however, PartyGaming did not abandon its use of WMS's trademarks. It continued, for a time, to rake in hundreds of millions of dollars in revenues from U.S. customers. When amicable efforts to resolve the dispute failed, WMS filed this suit, which, as we noted, PartyGaming chose to boycott despite proper service of process. Eventually, the district court, having found that it had subject-matter jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. § 1338 (and, we might add, apparently 28 U.S.C. § 1332(a)(2)), and that the requirements of Illinois's long-arm statute, 735 ILCS 5/2-209 were satisfied, granted WMS's motion for entry of default judgment. Its order, entered July 19, 2007, awarded damages to WMS in the amount of $2,673,422.10. It also granted injunctive relief, the terms of which it provided in an order entered on September 21, 2007.

Though the district court granted relief to WMS,

the monetary award that WMS had sought was exponentially larger than the one it got: WMS had requested $287,391,140.70. It arrived at this figure by determining the total amount of revenue that Party-Gaming had earned as a result of its business in the United States in 2004, 2005, and 2006. WMS obtained that data from PartyGaming's website, which featured links to its public financial statements and annual revenue reports. The reports (which we have in the substantial Appendices that WMS has filed) reveal, in PartyGaming's own words and colorful charts, the hundreds of millions of dollars that it earned during the years in question. The reports even separate the revenues into "U.S." and "non-U.S." revenues. When it became clear that PartyGaming would not respond to WMS's lawsuit, WMS turned its focus to the accounting-of-profits remedy it wanted, and it used the defendants' annual reports to estimate how much money the defendants had earned in the United States while infringing WMS's trademark rights.

The district court concluded that WMS's estimate of its 2004 damages was "reasonable." That amount was $891,140.70, and it was significantly lower than the estimates for 2005 and 2006, because the revenues for the later years reflected PartyGaming's expanded use of the marks. In the district court's view, however, WMS's estimates for 2005 and 2006 could not "be ascertained with reasonable certainty" and were "clearly excessive." It therefore based its awards for those years not in the amounts that WMS had requested, but instead on the same amount that it had deemed "reasonable" for 2004: *605 $891,140.70. The result was the total award reflected in the court's order, $2,673,422.10.

WMS responded with a motion under FED.R.CIV.P. 59(e) to alter or amend the judgment. In its motion, it tried to persuade the district court that it had committed legal error by applying the standard for actual damages in its order for default judgment, rather than the proper (and more flexible) standard for an equitable accounting of profits. Both types of relief are available under the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Lanham Act to redress trademark infringement, see 15 U.S.C. § 1117(a), and they are distinct remedies with different legal standards and burdens of proof. The district court denied the Rule 59(e) motion; it remained committed to its prior interpretation of WMS's request as one for "damages" and concluded again that WMS was asking for "damages that are clearly excessive" and "cannot be ascertained with reasonable certainty."

## II

[1] Before proceeding to the substance of WMS's claims, we believe that it is prudent to assure ourselves that the federal courts have jurisdiction over this lawsuit. The statutes on which the district court based its conclusion that subject-matter jurisdiction exists were 15 U.S.C. § 1121 and 28 U.S.C. § 1338. See 15 U.S.C. § 1121(a) (granting original jurisdiction to the district courts, and appellate jurisdiction to the circuit courts of appeals, "of all actions arising under this chapter [Chapter 22: Trademarks], without regard to the amount in controversy or to diversity or lack of diversity of the citizenship of the parties"); 28 U.S.C. § 1338(a) (granting exclusive jurisdiction to the district courts "of any civil action arising under any Act of Congress relating to patents, ... copyrights and trademarks"); and 28 U.S.C. § 1338(b) (granting the district courts "original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent, plant variety protection or trademark laws"). WMS's claims fall squarely within the scope of these statutes.

[2] Our appellate jurisdiction is secure because the defendants were properly served but failed to appear or answer WMS's complaint. They therefore were found to be in default, and the district court's entry of default judgment and later denial of WMS's Rule 59(e) motion constitutes an appealable judgment. Though a few loose ends remain in the district court (namely, WMS's motion for fees and costs and a separate motion to have the defendants

held in contempt), those collateral issues do not affect the existence of appellate jurisdiction for purposes of the issues before us. See *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989) (costs); *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 199-201, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988) (attorneys' fees).

[3] We also note that while the defendants had the opportunity to contest the district court's personal jurisdiction over them, they have now waived their opportunity to do so. See FED.R.CIV.P. 12(h)(1). While we thus cannot rule on the point, it does appear to us that their business contacts with the United States probably would have sufficed to secure personal jurisdiction under FED.R.CIV.P. 4(k)(2). *Cf. Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 715-16, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) (Powell, J., concurring in the judgment) (court should assure itself of *prima facie* support for personal jurisdiction).

## *606 III

[4] WMS's appeal rests on its position that the district court misconstrued its request for relief as limited to one for actual damages, rather than seeing it for what it was: a request for the separate remedies of damages at law (if possible) *and* an equitable accounting of profits. Indeed, WMS maintains that its central claim was for an accounting, not for damages, and so the district court committed reversible error when it failed to recognize that distinct standards apply to each type of claim, which in turn led it to conflate the standards for damages with those that govern an equitable accounting of profits.

[5] We begin by noting that because this was a default judgment, the usual rule that a party should be given the relief to which it is entitled whether or not it has requested that relief does not apply. See FED.R.CIV.P. 54(c). Instead, Rule 54(c) stipulates that "[a] default judgment must not differ in kind

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

from, or exceed in amount, what is demanded in the pleadings." WMS's pleadings thus are more important, for purposes of relief, than they would have been had PartyGaming appeared and contested the case.

That said, we find it clear from WMS's filings in the district court that, contrary to the assumption in the district court's orders of July 19, 2007, and September 24, 2007, WMS has throughout this litigation requested an equitable accounting of profits, rather than-or at least in addition to-actual damages. In its six-count complaint, WMS repeatedly stated that it sought the equitable remedies of injunctive relief and an accounting of profits, and it asserted multiple times that "there is no adequate remedy at law" for the defendants' actions. The complaint also asks for attorneys' fees, costs, statutory damages, treble damages, punitive damages, and, at a few points, actual damages. All of the paragraphs requesting actual damages *also* request an accounting of profits. From the start, then, WMS recognized the distinction between these two types of relief and properly requested that the court consider both. The complaint also shows that the request for an accounting appears far more often than the request for actual damages. WMS thus did not bury or obscure its requests for an accounting, nor did it attempt a sudden change of course midway through the proceedings.

WMS's motion for entry of default judgment continues this theme. This motion, filed after WMS realized that PartyGaming would not respond or participate in this litigation in any way, asks only for "injunctive relief and ... an accounting of profits." Similarly, WMS's memorandum in support of entry of default judgment requested only statutory damages (available for willful infringement), injunctive relief, and "an accounting of defendants' profits while operating under the infringing marks"; it makes no mention at any point of a request for actual damages.

[6] Section 35 of the Lanham Act, on which WMS was relying, has this to say, in relevant part, about a

plaintiff's remedies:

When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office ... shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.... In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, *607 according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty....

15 U.S.C. § 1117(a).

We agree with WMS that the district court, despite mentioning in passing the proper standard for an accounting of profits, made a fundamental error of law by failing to distinguish between WMS's right to the defendants' profits and its right to its damages. In its order of July 19, 2007, the district court referred to WMS's "requests for damages." It then noted that "the plaintiff must provide evidence to the court so that it may ...'ascertain the amount of damages with reasonable certainty.' " The court quoted from *In re Catt*, 368 F.3d 789, 793 (7th Cir.2004), which had quoted *Credit Lyonnais Securities (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir.1999). Both of those cases dealt with claims for actual damages, not for an accounting of profits.

The court then set forth the three "types of dam-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ages" that "are available for the infringement of trademarks," quoting in part the language from section 35 of the Lanham Act that we have furnished above. But after doing so, the district court did not follow through with two separate computations, one for the accounting and one for damages. The result was that the court incorporated into its accounting-of-profits analysis the additional considerations of whether the "damages" could be "ascertained with reasonable certainty," and whether WMS had proven that its calculation properly separated out the revenues gained from lawful business as opposed to infringing uses of WMS's marks. In rejecting WMS's estimate of profits for 2005, for example, the court stated:

> Although the defendants' Annual Report reported revenue attributable to casino games, it did not identify which portion of that revenue was attributable to games that infringed WMS' mark. According to WMS' own submissions, the defendants offered a wide variety of casino games, including "poker, bingo, backgammon, sports betting," and slot machines, which presumably included slot machines that did not infringe WMS' marks. Therefore, the revenue amount upon which WMS based its damages calculation overstated the revenue generated by the defendants' infringing uses of WMS' marks. WMS has not identified any information from which the court can calculate what percentage of the defendants' casino revenues are attributable to the defendants' infringing uses of WMS' marks.

The court applied the same reasoning when rejecting WMS's 2006 estimate. This analysis was based on the wrong standard. The Supreme Court held nearly a century ago in *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 36 S.Ct. 269, 60 L.Ed. 629 (1916), that "the owner of the trademark is entitled to so much of the profit as resulted from the use of the trademark," and while it is often difficult to "ascertain[ ] what proportion of the profit is due to the trademark, and what to the intrinsic value of the commodity"-such that the proper pro-

portional often "cannot be ascertained with any reasonable certainty"-the Court decided that

> it is more consonant with reason and justice that the owner of the trademark should have the whole profit than that *608 he should be deprived of any part of it by the fraudulent act of the defendant. It is the same principle which is applicable to a confusion of goods. If one wrongfully mixes his own goods with those of another, so that they cannot be distinguished and separated, he shall lose the whole, for the reason that the fault is his; and it is but just that he should suffer the loss rather than an innocent party, who in no degree contributed to the wrong.

240 U.S. at 262, 36 S.Ct. 269.

Thus, when the district court in this case assumed that it had to segregate PartyGaming's legitimate revenues from those that PartyGaming derived through its infringement, and that WMS had to bear the risk of uncertainty about the proper characterization of the revenues, it erred. Moreover, as WMS points out, it was more generous to PartyGaming than it had to be when it used low-end estimates and U.S.-only revenues to calculate its estimates. In doing so, the court relieved PartyGaming of its burden to show which portions of its gross income were not attributable to its infringing uses. The Supreme Court has made it clear, both in *Hamilton-Brown Shoe Co.* and in later cases, that

> [t]he burden is the infringer's to prove that his infringement had no cash value in sales made by him. If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark. There may well be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer.

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206-07, 62 S.Ct. 1022,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

86 L.Ed. 1381 (1942). The Court in Mishawaka went on to note that, unless the infringer could provide evidence that it did not earn some or all of its profits by infringing the owner's marks, "it promotes honesty and comports with experience to assume that the wrongdoer who makes profits from the sales of goods bearing a mark belonging to another was enabled to do so because he was drawing upon the good will generated by that mark." *Id.* at 207, 62 S.Ct. 1022; see also *Nintendo of Am., Inc. v. Dragon Pac. Int'l,* 40 F.3d 1007, 1012 (9th Cir.1994) ("[W]here infringing and noninfringing elements of a work cannot be readily separated, all of a defendant's profits should be awarded to a plaintiff."); *Wesco Mfg. v. Tropical Attractions of Palm Beach, Inc.,* 833 F.2d 1484, 1488 (11th Cir.1987) ("Although the exact amount of infringing sales cannot be determined from the [evidence], exactness is not required. [The defendant] is in the best position to ascertain exact sales and profits, and it bears the burden of doing so in an accounting."); *id.* at 1487-88 ("A plaintiff need not demonstrate actual damage to obtain an accounting of an infringer's profits under section 35 of the Lanham Act. It is enough that the plaintiff proves the infringer's sales. The burden then shifts to the defendant, which must prove its expenses and other deductions from gross sales."(citations omitted)).

The burden was therefore on PartyGaming to show that certain portions of its revenues-which for purposes of the award after its default judgment WMS established by using PartyGaming's own public financial statements and reports-were not obtained through its infringement of WMS's marks. There was no evidence in the record that would have helped PartyGaming to meet that burden. As the Second Circuit noted in *Louis Vuitton S.A. v. Spencer Handbags Corp.,* 765 F.2d 966 (2d Cir.1985),

*609 [p]laintiffs here proved defendants' sales, using defendants' own words. The burden then shifted, requiring defendants to prove costs or deductions. Defendants failed to sustain their bur-

den. In the absence of any evidence introduced by defendants, the court's reliance on defendants' videotaped statements as to their profits was not unreasonable.

*Id.* at 973.

[7] Similarly, in this case PartyGaming has not come forward with any evidence suggesting that deductions are warranted from the revenues that its own annual reports reflect. Courts consistently find that when a trademark plaintiff offers evidence of infringing sales and the infringer fails to carry its statutory burden to offer evidence of deductions, the plaintiff's entitlement to profits under the Lanham Act is equal to the infringer's gross sales. See, e.g., *Tex. Tech. v. Spiegelberg,* 461 F.Supp.2d 510, 526 (N.D.Tex.2006); *N.Y. Racing Ass'n, Inc. v. Stroup News Agency Corp.,* 920 F.Supp. 295, 301 (N.D.N.Y.1996).

WMS has provided evidence of the profits that PartyGaming earned from its U.S. sales. In the absence of evidence from PartyGaming showing that deductions are warranted, WMS is entitled to the revenues supported by its evidence. A remand is necessary so that the district court can assess WMS's claim for an accounting in accordance with the proper legal standard for that claim. We add that while the figure WMS seeks, $287,391,140.70, is considerably larger than the "damages" award granted by the district court, $2,673,422.10, the record shows that in a single year (2005), the defendants reported revenues of $977.7 million-nearly $1 billion. WMS urges that "this is not a case in which [the plaintiff] is seeking wildly excessive relief." Be that as it may, it is Congress that has specified the types of relief to which WMS is entitled, and it is our job to uphold those rules. The record shows persistent, pervasive, knowing, and willing infringement for several years by PartyGaming, as it repeatedly refused to cease and desist even after receiving several forms of actual notice of its unlawful activity, from both the PTO and from WMS. We therefore REVERSE the judgment of the district court and REMAND for further proceedings con-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

sistent with this opinion.

C.A.7 (Ill.),2008.
WMS Gaming Inc. v. WPC Productions Ltd.
542 F.3d 601, 88 U.S.P.Q.2d 1109

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.