Strojnik v. Costar Realty Information, Inc. et al

Doc. 153 Att. 4

# Exhibit 5

Dockets.Justia.com

**COURT REPORTERS**
**OF AKRON CANTON AND CLEVELAND**

# Transcript of the Testimony of **Robert W. Vitale**

**Taken On:** February 20, 2008
**Case Number:** 2:06-CV-2141-DGC

**Case:** Soilworks, LLC, vs. Midwest Industrial Supply, Inc.,

Court Reporters of Akron Canton and Cleveland
Phone: 800-804-7787
Fax: 330-666-9833
Email: reporters@compuserve.com
Internet: www.courtreportersinc.com

A. Again, I don't recall, but I would say he's been with us between 10 and 20 years.
Q. And he at all times headed up the information technology --
A. Yes.
Q. -- systems? When did you first consult a patent lawyer concerning the '270 and '266 methods and compositions?
A. Now, that I don't recall, but I'm sure that that's in the record.
Q. Is that the first time you consulted a patent lawyer for Midwest's methods or products?
A. I believe so, yes.
Q. And you don't remember the lawyer? Was it Mr. Skeriotis?
**MR. SKERIOTIS:** Objection.
**THE WITNESS:** No. It was Joe Sebolt of Sand & Sebolt.
**BY MR. PASSARELLI:**
Q. Is that a law firm?
A. It's a -- he's a patent attorney. A trademark attorney.
Q. Where at?
A. Canton.
Q. Is he still around?

A. Yes.
Q. So who prepared the initial application for the method of chemical soil stabilization and dust control that's the subject of the '270 patent?
**MR. SKERIOTIS:** Objection.
**THE WITNESS:** Within Midwest it would have been Todd Hawkins, and within the law firm it would have been -- or the firm, it would be Sand & Sebolt.
**BY MR. PASSARELLI:**
Q. And at some point you transferred the legal responsibility for the application to another lawyer?
A. Correct.
**MR. SKERIOTIS:** Objection.
**BY MR. PASSARELLI:**
Q. When did you do that?
A. Again, I -- that I don't recall, but sometime -- I just don't recall. I would have to look at the file to see exactly when that was.
Q. You would have records on that?
A. Yes.
Q. Besides Mr. Sebolt, do you recall any other

names of lawyers that assisted you in application/registration process of the '270 and '266 patents?
A. No. Joe Sebolt himself, and then he had, I believe, two other attorneys and I don't recall their names.
Q. May I assume that Midwest has maintained files as it relates to these patent applications?
A. Yes.
Q. Do you know if those files were made available to Mr. Peterson last week?
A. Oh, I'm sure they were, yes.
Q. Who were Midwest's primary competitors in the dust control category at the time that this patented method and composition were developed?
**MR. SKERIOTIS:** Objection.
**THE WITNESS:** You mean in broad, general terms?
**BY MR. PASSARELLI:**
Q. Correct.
A. I mean there are literally hundreds. Ones that we see most often are -- were/are, Syntech, S-y-n-t-e-c-h, Nalco --
Q. I'm sorry?

A. N-a-l-c-o. I have to -- I could -- I would have to compile a list of, I mean, 50 that are sort of on any given day competitors that we compete with, but including Soilworks.
Q. Have you done an analysis of Soilworks' products to determine whether they infringed the '266 or '270 patents?
**MR. SKERIOTIS:** Objection. Attorney work product as well as some attorney-client privilege.
If -- you can answer the question, unless any information was derived during the course of this litigation by us or otherwise was not subject to attorney-client privileged communications.
If, in fact, there's any test that Midwest did outside of an attorney representing you or being with you or in anticipation of litigation, you can answer that question. Otherwise I instruct you not to answer. Do you understand?
**THE WITNESS:** I don't know.
**MR. SKERIOTIS:** If Midwest did a test outside of preparing for litigation or in anticipation of litigation or outside of me --

**THE WITNESS:** Yeah. We did some testing in our lab.

**MR. SKERIOTIS:** -- the lawyer -- then the answer is -- then you can't answer that. But if you're testing it in the lab without anybody around --

**THE WITNESS:** We did some testing in our lab.

**BY MR. PASSARELLI:**

**Q.** When did you do that?

**MR. SKERIOTIS:** And I just want to make sure he answers correctly. The question was -- and you can repeat it and I don't want to take over, but the question was: Did you do any testing in preparation -- to determine infringement.

**THE WITNESS:** Oh.

**MR. SKERIOTIS:** Just make sure you understand the question.

**THE WITNESS:** Oh.

**MR. SKERIOTIS:** So if these lab results you did for infringement, that's okay, but make sure you understand the question.

**THE WITNESS:** We did not do that for infringement. But that was -- again, we did

no -- I guess when Durasoil first came out we didn't know what it was other than to read what they said in their published materials.

**BY MR. PASSARELLI:**

**Q.** So when -- you described the product as Durasoil?

**A.** Yes.

**Q.** When you encountered Durasoil in the marketplace you did an evaluation of the product?

**MR. SKERIOTIS:** Objection.

**THE WITNESS:** Yes.

**BY MR. PASSARELLI:**

**Q.** Can you describe for me what you did?

**A.** Probably testing of different types of soils to see its action or reaction, testing viscosity. Testing some physical properties like viscosity, pH.

**Q.** Did you arrive at any conclusions as a result of that testing?

**A.** No.

**Q.** What was the purpose of the testing?

**A.** Just to see what it was.

**Q.** Did you learn anything?

**A.** Not really, no.

**Q.** Did you use that evaluation in any respect in your business?

**A.** In our business?

**MR. SKERIOTIS:** Objection.

**THE WITNESS:** We may have created some type of comparison document between Durasoil and our product.

**BY MR. PASSARELLI:**

**Q.** And our product would be what?

**A.** EnviroKleen.

**Q.** Do you remember if you did that?

**MR. SKERIOTIS:** Objection.

**THE WITNESS:** We did do that. I'm not sure what we did with it. It might have been internal.

**BY MR. PASSARELLI:**

**Q.** Do you know if you provided any of those evaluations to any customers or prospective customers?

**A.** I don't recall.

**Q.** Have you performed any evaluations to determine whether Soilworks products infringe the '270 or '266 patents?

**MR. SKERIOTIS:** Objection. Same objection. When you say "evaluations," you're

looking at tests, John?

**MR. PASSARELLI:** Tests.

**MR. SKERIOTIS:** All right. It's asked and answered and I maintain the objection. And he's already identified the one test -- the testing he did.

**BY MR. PASSARELLI:**

**Q.** So let me confirm for the record that the -- you understand Midwest has asserted claims of patent infringement in this case, correct?

**A.** Yes.

**Q.** As far as your testimony is concerned, Midwest has never performed any analysis about that infringement?

**MR. SKERIOTIS:** Objection. Again, that's attorney work product, preparation for litigation, in anticipation thereof, and during the course of litigation as to whether or not what they did pursuant to this litigation. He's already identified the only test that they did. He's already answered that, so I'm not going to let him answer that question. So I instruct you not to answer.

**MR. PASSARELLI:** Why don't we take a